# Exhibit 38

PBJKDOEC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DAHLIA DOE, et al,

                    Plaintiffs,

         v.                            25 Civ. 8686 (KPF)

KRISTI NOEM, Secretary, United
States Department of Homeland
Security, in her official
capacity, et al,

                    Defendants.                 Oral Argument
------------------------------x
                                       New York, N.Y.
                                       November 18, 2025
                                       12:00 p.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                       District Judge

                          APPEARANCES

INTERNATIONAL REFUGEE ASSISTANT PROJECT
        Attorneys for Plaintiffs
BY:   GUADALUPE V. AGUIRRE
      MEGAN M. HAUPTMAN
      GHITA SCHWARZ
      -AND-
VAN DER HOUT, LLP
BY:   MARC VAN DER HOUT

JAY CLAYTON
      United States Attorney for the
      Southern District of New York
BY:   MARK OSMOND
      REBECCA S. TINIO
      Assistant United States Attorneys
```

PBJKDOEC

1          (Case called; the Court and all parties appearing by

2     videoconference)

3          MS. AGUIRRE:  Good afternoon, your Honor.  Guadalupe

4     Aguirre, International Refugee Assistance Project, for the

5     plaintiffs.

6          THE COURT:  Good afternoon.  And thank you.

7          And I see several of your colleagues on the screen, as

8     well.  I see Ms. Hauptman, and I see Ms. Schwarz.  And I

9     understand Mr. Van Der Hout is also appearing.  Thank you very

10    much.  Again, thank you for appearing on short notice.

11         Representing the defendants this afternoon?

12         MR. OSMOND:  Mark Osmond, from the U.S. Attorney's

13    Office.

14         THE COURT:  Mr. Osmond, thank you very much.

15         And I see Ms. Tinio, as well.  Thank you.

16         So, counsel, as was suggested by the ECF alert that

17    went out yesterday, after I saw you on Monday, I spent the rest

18    of the time trying to put together a decision as quickly as I

19    could, recognizing the time sensitivities we have here.  So I

20    want to begin by thanking you, once again, for your preparation

21    and for your flexibility and for participating on this terribly

22    foreshortened schedule.

23         I also want to give a special thanks to my oralists

24    from Monday, because three hours of oral argument is intense.

25    I know it.  I was on the giving end of it, but it was still

PBJKDOEC

1    intense.

2            So, I have this oral decision.  It is lengthy — that's

3    all I can say — and I've done my best with it.  I will

4    appreciate your attention as I give it.  I might not be looking

5    up to you, so take no offense at my inability to maintain eye

6    contact.  I just think it's more important that I read what I

7    have written.

8            I am expecting one or both sides to order the

9    transcript on an expedited basis, and I'm just going to -- ah,

10   thank you, the government has volunteered.  Many thanks.

11           I'm going to ask, and I see that you've all muted

12   yourselves, so I will begin now.

13           The parties are familiar with the facts and procedural

14   history of this matter, and, at a high-level, plaintiffs are

15   seven Syrian nationals with family ties to the United States,

16   who argue that they will face harms of many types if they are

17   forced to return to Syria.  They further argue that the conduct

18   of defendants — the Secretary of the Department of Homeland

19   Security, that department, United States Citizenship and

20   Immigration Services, and the United States — in terminating

21   temporary protected status, or TPS, for Syria, effective

22   November 21st, 2025, is contrary to law, arbitrary and

23   capricious, and unconstitutional, and, for these reasons, they

24   move for its postponement while their challenges to the

25   termination can be litigated.

PBJKDOEC

1              For the reasons I'm about to describe, I agree with

2      certain of plaintiffs' arguments, and I am granting the motion

3      to postpone.  I do want to pause and note here that my decision

4      is based on the record before me at this time, at this stage in

5      the litigation.  It might be different on a more complete

6      record.  The fact remains that plaintiffs have presented a

7      wealth of evidence supporting their claims of impropriety as to

8      this and other TPS termination decisions this year, and

9      defendants have limited their evidence to the Secretary's

10     Federal Register notice regarding the termination and

11     assertions that I either lack jurisdiction to consider these

12     claims or assertions that I'm not permitted to consider large

13     swathes of the plaintiffs' evidence.

14             I want to also underscore that I have reviewed — and I

15     know the parties have, as well — the limited number of federal

16     court decisions concerning TPS designations that have been

17     issued over the past eight or so years.  I think I only

18     referred to a few of them specifically in my decision, but I

19     have read and considered each of them carefully.

20             I also do want to recognize that I am issuing this

21     decision in the shadow of two Supreme Court stays of similar

22     relief granted in what I've called, perhaps incorrectly, the

23     NTPSA cases.  I'm not sure how people pronounce that particular

24     acronym.  The defendants asked me to read into those stays the

25     conclusion that the Court "necessarily determined that the

PBJKDOEC

1   government was likely to succeed on the merits and that the

2   balance of harms favored giving effect to the termination

3   during litigation."

4          Defendants' counsel may ultimately be right, but I

5   don't feel comfortable doing that on this record, although I do

6   note that it would seem that if that's correct, then at least I

7   have jurisdiction to consider these issues.

8          In the first stay, the Supreme Court did not address

9   the merits, but simply noted that the particular order was

10  stayed pending the disposition of the appeal in the United

11  States Court of Appeals for the Ninth Circuit and disposition

12  of a petition for writ of certiorari, if such a writ is timely

13  sought.

14         That particular case, Noem *v. National TPS Alliance*,

15  is at 145 S. Ct. 2728 (2025).  From my perspective, any

16  decisions or any conclusions or inferences I might draw from

17  that case would really be in the vein of speculation.

18         In the second stay, the Court noted that the stay was

19  granted, and they said although the posture of the case has

20  changed, the parties' legal arguments and relative harms

21  generally have not.  The same result that we reached in May is

22  appropriate here.  And that case is *Noem v. National TPS*

23  *Alliance*, 2025 WL 2812732.  In dissent, Justice Jackson

24  provided a hint at the majority's reasoning when she commented

25  that "the Court plainly misjudges the irreparable harm and

PBJKDOEC

1    balance-of-the-equities factors by privileging the bald

2    assertion of unconstrained executive power over countless

3    families' pleas for the stability our government has promised

4    them."  Once again, however, I'm not privy to the specifics of

5    the Court's stay decision, and I therefore must wait, along

6    with the rest of you, to see how the Court resolves this

7    specific jurisdictional and merits issues, some of which are

8    being repeated in my case.

9            The relief sought is a stay pursuant to Section 705 of

10   the APA, which does allow this Court to issue necessary and

11   appropriate process to postpone the effective date of an agency

12   action.  A sister court in this district has observed that the

13   standard under Section 705 is the same or similar to the

14   standard for a preliminary injunction.  I'm quoting here from

15   *Rural & Migrant Ministry v. United States Environmental*

16   *Protection Agency*, 565 F. Supp. 3d 578 -- one moment, please.

17           I'm noting I lost Mr. Osmond.  Oh, he's back, okay.

18   Thank you.  Excuse me.

19           And you'll excuse me if I occasionally pause because

20   you're all jumping around on the screen ahead of me, so it's

21   fine.  Let me, please, go back to the decision.

22           I was quoting from Judge Liman's case, *Rural & Migrant*

23   *Ministry v. United States Environmental Protection Agency*,

24   565 F. Supp. 3d 578, 595 (S.D.N.Y. 2020).  Judge Castel, as

25   well, in *African Communities Together v. Lyons*,

PBJKDOEC

2025 WL 2633396, at *10.  But under that standard, the moving
party must show that, number (1), it is likely to prevail on
the merits; number (2), without a stay, it will suffer
irreparable injury; number (3), there is no substantial harm to
other interested persons; and number (4), the public interest
will not be harmed.  Now, other cases dealing with similar
standards include *Winter v. Natural Resources Defense Council*
*Incorporated*, 555 U.S. 7, 20 (2008), and in that instance, the
slight modification is the discussion of a success on the
merits, irreparable harm, the balance of equities tipping in
the movant's favor, and an injunction being in the public
interest.  And then *Nken v.Holder*, 556 U.S. 418, which noted
that in an action challenging agency action, the third and
fourth prongs merge.

          Now, as we discussed at the oral argument, there are
certain instances in which a preliminary injunction can also be
obtained upon a showing of irreparable harm and either
likelihood of success on the merits or sufficiently serious
questions going to the merits to make them a fair ground for
litigation and a balance of hardships tipping decidedly toward
the party requesting the preliminary relief.  I've just been
quoting from *Citigroup Global Markets, Incorporated v. VCG*
*Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35
(2d Cir. 2010).  But the Second Circuit has also found that
when plaintiffs seek a preliminary injunction or a temporary

PBJKDOEC

restraining order that will affect government action taken in
the public interest pursuant to a statutory or regulatory
scheme, they must establish a clear or substantial likelihood
of success on the merits.  I'm quoting here from *Sussman v.
Crawford*, 488 F.3d 136, 140 (2d Cir. 2007).

         Plaintiffs here argue that the relevant standard is
the substantial question standard, but that they can succeed
under either standard.  And the theory is that because the
government conduct of which they complain is not, they argue,
taken in the public interest, the substantial question standard
applies.  As I suggested at oral argument, I find that
particular argument to be too clever by half.  The government
proffers that termination of TPS status for Syrian nationals is
taken in the public interest, and it is clearly pursuant to a
statutory scheme.  I might find default with defendants'
decision, but I'm not ready to say that they were acting in a
manner contrary to the public interest.  I find them to be
acting within an existing regulatory framework, even if I may
otherwise find that they failed to abide by certain
requirements of that framework.

         Of course — and let me just put this out here — if a
reviewing court disagrees with my analysis, that provides an
even stronger basis for my decision, because each of
plaintiffs' arguments discussed in this opinion raises a
substantial question going to the merits, and the balance of

PBJKDOEC

1   hardships tips decidedly in plaintiffs' favor.

2          Again, as I suggested at oral argument, I find that

3   the irreparable harm factor is squarely in defendants' favor.

4   And I focused the bulk of my inquiries, and I focused the bulk

5   of this decision, on whether plaintiffs have a likelihood of

6   success as to any of their claims.

7          Before I get there, I do have to address the issue of

8   my jurisdiction to consider plaintiffs' claims, as defendants

9   are quick to note Title 8, United States Code, Section 12 --

10  excuse me, irreparable harm factor is in plaintiffs' favor.  I

11  may have misspoken a moment ago.

12         Let me go back to my issue of jurisdiction.

13  Section 1254a(b)(5)(A) specifies that there is no judicial

14  review of any termination -- determination of the Attorney

15  General with respect to the designation, or termination or

16  extension of a designation, of a foreign state under this

17  subsection.

18         In case you had any doubts, I take very seriously the

19  limits on my jurisdiction, but I also take seriously recent

20  decisions from the Second Circuit and courts within the circuit

21  making clear the restrictive manner in which

22  jurisdiction-stripping provisions are construed.  There's a

23  recent decision from the Second Circuit, *Ozturk v. Hyde*,

24  136 F.4th 382, a Second Circuit decision from 2025, which makes

25  clear or focuses on the presumption favoring interpretations of

PBJKDOEC

1    statutes to allow judicial review absent clear statement.  And

2    I will just commend the parties to page 394 of that case, which

3    has a series of citations to cases making clear the very high

4    standards for finding that a court has no jurisdiction.

5           One of those cases is *McNary v. Haitian Refugee*

6    *Center, Inc.*, 498 U.S. 479, from 1991, and courts and our

7    friends at the Eastern District have concluded, reasoning from

8    this *McNary* in the specific context of this TPS statute, that

9    it is clear from context that the judicial review provision in

10   the TPS statute refers to an individual designation,

11   termination, or extension of a designation with respect to a

12   particular country, not to defendants' determination practices

13   or adoption of general policies or practices employed in making

14   such determinations.  The quote I just gave you was from --

15   I'll call it *Saget* for now.  It may also be *Saget v. Trump*,

16   345 F. Supp 3d 287, at 295, an Eastern District decision from

17   2018.  It is then cited in *Haitian Evangelical Clergy*

18   *Association v. Trump*, 789 F. Supp. 3d 255, 269, and that

19   decision was issued in 2025.

20          I'll also note, as plaintiffs note, that every court

21   to have considered analogous challenges to changes in TPS

22   designations has found that it has jurisdiction to consider the

23   challenges.  And those cases are set forth at pages 11 and 12

24   of plaintiffs' brief.  This Court joins that chorus, and finds

25   that while it does not have jurisdiction to review the

PBJKDOEC

1   Secretary's substantive (and discretionary) analysis of

2   specific TPS determinations, it does retain jurisdiction to

3   consider collateral agency patterns and practices that impact

4   those determinations.

5           So let me now proceed to discuss the evidence that I

6   can, and that I have, considered in resolving this motion.

7           For their part, plaintiffs suggest that I can consider

8   statements made during the election campaigns and in the course

9   of both Trump administrations, as well as Executive

10  Order 14159, which, as we discussed at oral argument, appears

11  to be predicated on a legally erroneous understanding of the

12  TPS statute.  They also suggest that I may consider significant

13  procedural irregularities in the Secretary's decision to

14  terminate; repeated disconnects between the proffered factual

15  bases for termination of TPS status and the actual country

16  conditions reported by other federal agencies; reliance on

17  *post hoc* justifications for termination; and the failure to

18  engage with the stated bases for continuing TPS designations,

19  including in Syria.

20          Let me note that while I've been asked to consider

21  statements from the first Trump Administration, I think that

22  statements are, generally speaking, too attenuated to be useful

23  to my analysis, and, thus, I have not considered them.

24  However, what I have considered are the records developed by

25  courts considering the first administration's TPS

PBJKDOEC

1   determinations, and that includes the *Saget* decision and *Ramos*
2   *v. Nielsen*, 336 F. Supp. 3d 1075, a Northern District of
3   California decision from 2018, and to the extent relevant, I
4   have considered the legal analyses of courts reviewing pre-2025
5   TPS determinations.

6          The defendants have also argued that I should not set
7   much store by statements made on the campaign trail, or in
8   confirmation hearings, or by individuals other than the
9   Secretary.  I have given only limited significance to campaign
10  statements.  In particular, I have considered them only to the
11  extent that they were confirmed by and through writings and
12  other actions like executive order 14159.  I do believe it is
13  appropriate for me to consider statements made by the President
14  and Vice President, in addition to those of the Secretary,
15  because my interpretation of the administration's policy with
16  respect to certain classes of immigrants — for example, the
17  degree to which that policy proceeds from discriminatory
18  animus — may be informed by individuals other than the
19  Secretary.

20         Finally, in this category, defendants suggest or argue
21  that I may not consider materials relating to the termination
22  of TPS status for any country but Syria.  And here, too, I
23  disagree.  It is plain from the record of the terminations that
24  have occurred to date — all of which, I believe, have involved
25  non-European, majority non-White populations — that the

PBJKDOEC

1  executive is engaging in a coordinated effort to end TPS status

2  if and as each renewal comes up, and, with respect to Venezuela

3  and Haiti, perhaps even before that time.  The rationales are

4  coordinated.  The procedural errors are virtually identical,

5  and each termination is of a piece with a stated policy to

6  reduce immigrant population.

7          So what, then, are the claims that I am to consider?

8          As defined by the plaintiffs, they are three:

9          An APA claim that TPS termination was contrary to law

10  based on its purported compliance with Section 1254a.  This

11  claim includes allegations that the termination was

12  predetermined and that the Secretary improperly relied on the

13  national interest.

14          There is a second APA claim — which has a degree of

15  overlap with the first — that the termination is arbitrary and

16  capricious because, among other things, it improperly relied on

17  the national interest, it was politically influenced, it was

18  pretextual, and it broke with longstanding government practice.

19          And then there's a claim under the Fifth Amendment's

20  due process clause, making equal protection arguments.

21          So let me, please, consider each claim in turn.  And I

22  do so by beginning with the language of the TPS statute,

23  Section 1254a.  And in 1254a(b), the statute explains the bases

24  for an initial designation of a foreign state or portion

25  thereof.  These bases include:  Number (1) an ongoing armed

PBJKDOEC

conflict, number (2) a natural or environmental disaster, or number (3) extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

After the initial designation, the Secretary must undertake a periodic review.  And the specific language is: After consultation with the appropriate agencies of the government, the Secretary — I believe it says the Attorney General — shall review the conditions in the foreign state, or part of such foreign state, for which a designation is in effect under this subsection, and shall determine whether the conditions for such designation under this subsection continue to be met.

There is, as well, a provision for termination of designation, which provides that if the Attorney General determines under subparagraph (A) — which, to note, is the periodic review of country conditions — that a foreign state, or part of such foreign state, no longer continues to meet the conditions for designation under paragraph (1), the Attorney General shall terminate the designation by publishing notice in the Federal Register of the determination under this subparagraph, including the basis for the determination.

PBJKDOEC

1          In the absence of termination, it is my understanding

2     that TPS status is extended.  This Court agrees with Judge

3     Kuntz, from the Eastern District, that Congress' directive that

4     the Secretary shall review the conditions in the foreign state,

5     evinces congressional intent that the Secretary undertake a

6     periodic review grounded in fact — that is, based on objective

7     conditions in the foreign country and regardless of any

8     government official's political motives — and in good faith.

9     I'm quoting here from 375 F. Supp. 3d at 346.

10         Now, unfortunately, on the record before me, that does

11    not appear to have happened.  Once again, for avoidance of

12    doubt, this Court is not opining on the substance of the

13    Secretary's termination decision or on her authority to make

14    such a decision.  But, again, on the record before it, this

15    Court finds instances of noncompliance with the procedural

16    requirements of the TPS statute that are sufficient to give

17    plaintiffs a likelihood of success on their first APA claim.

18         To begin, the context in which the Secretary's

19    decision was reached belies any notion of considered and

20    good-faith review of country conditions.  The President

21    campaigned on revoking TPS if elected because, in his opinion,

22    it's not legal, which is plainly incorrect.  In other

23    statements, he referred to immigrants poisoning the blood of

24    this country.  The Vice President displayed a similar

25    misperception of the TPS program in referring to program

PBJKDOEC

1    participants as illegal immigrants, despite their status in

2    this country.

3            The Secretary did make statements at her confirmation

4    hearing.  I don't find them to be anything more than statements

5    of opinion that are not readily disproven.  I do want to be

6    clear that these statements are relevant to this Court's

7    decision on this motion insofar as they foretell or dovetail

8    with later, postelection statements and conduct of the

9    administration and confirmatory action — in particular here,

10   the mass termination of TPS status.

11           Now, the campaign promises were quickly followed by

12   executive order 14159, titled "Protecting The American People

13   Against Invasion," issued on the same day as the President's

14   inauguration.  And, among other things, the President directed

15   the Secretary of State, the Attorney General, and the Secretary

16   of DHS to ensure that designations of temporary protected

17   status are appropriately limited in scope and made for only so

18   long as may be necessary to fulfill the textual requirements of

19   that statute.  Here, too, the significance of this statement is

20   the later confirmatory action.

21           In particular, in early 2025, and continuing through

22   the present, the Secretary has been taking a hatchet to the TPS

23   system.  Separate and apart from Venezuela and Haiti, where the

24   Secretary sought to revoke or curtail previously granted

25   extensions, the Secretary has announced termination of TPS

PBJKDOEC

1    status for virtually every country that has come up for

2    consideration, including Afghanistan, Cameroon, Nepal,

3    Honduras, Nicaragua, and South Sudan.  In the Federal Register

4    notice for South Sudan, the Secretary makes clear that the only

5    reason she did not terminate it earlier, and extended it from

6    May through November of 2025, occurred because she had a

7    noncurrent record, but she did move for termination at the end

8    of that extension period.

9         As to Haiti, DHS's website makes note its disagreement

10   with the E.D.N.Y. decision postponing the effective date of

11   termination.

12        When TPS was terminated for Syria on September 19,

13   2025, DHS trumpeted it as evidence of restoring sanity to

14   America's immigration system.  Somewhat curiously, DHS also

15   remarked that Syria had been a hotbed of terrorism and

16   extremism even as the President sought to restore diplomatic

17   relations with an interim president, Ahmed Al Sharaa, who was

18   the reputed head of a group designated by the U.S. Government

19   as a terrorist organization.

20        Here's the point:  On this record, it confounds logic

21   that as to a group of disparate countries, with disparate bases

22   of designation, in different parts of the world, that in a few

23   months all of them could resolve troubles that were so severe

24   as to warrant TPS designation in the first instance, and have

25   them immediately resolved, such that termination is appropriate

PBJKDOEC

1    for all of them, and that is because that is not the case.  As

2    demonstrated in plaintiffs' submissions, as to at least four

3    countries — Nicaragua, Cameroon, Nepal, and Venezuela — the

4    record makes clear that the requisite interagency consultation

5    did not occur.

6          There is an extensive record of *post hoc*

7    justifications, and because of that, this Court cannot find

8    that the Secretary engaged in a good-faith and objective review

9    of country conditions in Syria, nor that she engaged in the

10   requisite interagency consultation.  There is no way to square

11   the Secretary's determination that the armed conflict had

12   subsided and that conditions in Syria that prevented Syrian

13   nationals from returning in safety no longer existed, with, for

14   example, the evidence that she cites, which makes plain that

15   the armed conflict remains widespread, the State Department

16   advisories, which, as plaintiffs' counsel noted, are not

17   citizenship-specific, and the evidence of intervening events,

18   including, but not limited to, Israeli incursions.  I derive no

19   confidence from the Secretary's reliance in her termination

20   notice on a U.N. report that postdated the deadline for her to

21   make a final decision.

22         A separate issue concerns the Secretary's reliance,

23   both as to Syria and as to other countries for which she has

24   issued termination notices, on the issue of whether termination

25   is contrary to the national interest of the United States.  I

PBJKDOEC

1    agree with plaintiffs, to a degree, that under the TPS statute

2    reliance on the national interest divorced from an analysis of

3    country conditions — in this case, these would include

4    promotion of the administration's America First policy,

5    criminal cases taking place in this country, and foreign policy

6    objectives — is not appropriately considered in the periodic

7    review or termination inquiries.

8            So to review, Section 1254a(b)(1)(C) allows for TPS

9    designation upon a finding that extraordinary and temporary

10   conditions in the foreign state exist that prevent aliens who

11   are nationals from the state from returning to the state in

12   safety, unless the Attorney General finds that permitting the

13   aliens to remain temporarily in the United States is contrary

14   to the national interest of the United States.

15           However, 1254a(b)(3)(A) limits the periodic review

16   process with the requisite interagency consultation to the

17   conditions in the foreign state or part of such foreign state

18   for which a designation is in effect under this subsection.  In

19   addition, in subsection (b)(3)(B), the statute specifies a

20   process for termination of designation if the Secretary

21   determines under subparagraph (A), which, as I noted, is the

22   review of country conditions in the foreign state, that the

23   foreign state no longer continues to meet the conditions for

24   designation under paragraph (1).  These provisions read

25   together make clear that periodic review, including review for

termination, is limited to consideration of country conditions, and not to proclamations of the national interest divorced from those country conditions.

Further support for this Court's interpretation is found in the declaration of plaintiffs' expert witness, Aaron Reichlin-Melnick, who noted, among other things, that:  (1) the sole rationale cited to justify termination of TPS has been an end to the temporary country conditions which authorized the initial designation; and (2) until 2025, no Attorney General or Secretary has explained their conclusion that it is not contrary to the national interest to permit TPS beneficiaries to remain temporarily in the United States or has ever justified a termination on national interest grounds.

By contrast, the Secretary has invoked the "contrary to the national interest" standard in the 2025 termination notices for Venezuela, Haiti, Afghanistan, Cameroon, Nepal, Honduras, Nicaragua, and South Sudan, in addition to Syria. This Court can reasonably infer — indeed, can only infer — from the Secretary's across-the-board invocation of the "contrary to the national interest" standard that the specific conditions of each of the nine countries are completely irrelevant to the national interest determination.  The Secretary's consideration of the national interest divorced from country conditions in the termination inquiry of a particular TPS designee is not only not the silver bullet that she believes it to be, but, in

PBJKDOEC

1   fact, is contrary to the statute.  With particular respect to

2   Syria, the Secretary's heavy-handed reliance on the national

3   interest divorced from country conditions — including as

4   discussed earlier, her heavy reliance on the promotion of an

5   America First policy, certain criminal cases in the U.S., and

6   certain foreign policy objectives — renders her termination

7   decision unlawful under the APA.

8         Let me underscore that I'm not saying the Secretary

9   weighed the evidence incorrectly or that she came up with the

10  wrong decision.  What I'm saying is that I have nothing but the

11  Federal Register notice from which I can conclude that the

12  Secretary undertook either an interagency consultation or an

13  objective review of country-condition materials.  That notice

14  is internally inconsistent, and flawed in the manners I've just

15  described.  Worse yet, the termination analysis in the notice

16  contravenes Section 1254a by considering national interest

17  divorced from country conditions.  And it is for these reasons

18  that I find, on this record, that plaintiffs have a substantial

19  likelihood of success on their APA claim predicated on

20  noncompliance with the TPS statute.

21        But, as noted, plaintiffs claim that the termination

22  of TPS for Syria is also arbitrary and capricious because,

23  among other reasons, it was pretextual, it was politically

24  influenced, or it contravened the change-in-policy doctrine.

25        Now, as was suggested at oral argument, there is a

PBJKDOEC

1  degree of factual overlap between the evidentiary support for

2  plaintiffs' first and second APA claims; where the first claim

3  focuses on what the Secretary did, the second adds the inquiry

4  of why she did it.

5       I believe the parties are familiar with the arbitrary

6  and capricious standard.  It was discussed at some length in

7  Judge Furman's decision in *New York v. Wolf*, 2020 WL 6047817 at

8  page 5.  One quote I'll just extract from that analysis is

9  that, normally, an agency rule or decision would qualify as

10 arbitrary and capricious if the agency has relied on factors

11 which Congress has not intended it to consider, entirely failed

12 to consider an important aspect of the problem, offered an

13 explanation for its decision that runs counter to the evidence

14 before the agency, or is so implausible that it could not be

15 ascribed to a difference in view or the product of agency

16 expertise.

17      So, as an initial matter, given the procedural

18 deficiencies that I've outlined in my preceding section, I find

19 that the Syrian termination notice was arbitrary and capricious

20 insofar as there was a failure to comply with the relevant

21 statute.

22      I turn now to the issue of pretext.  That was

23 discussed in the Supreme Court decision of *Dep't of Commerce v.*

24 *New York,* 588 U.S. 572, 780.  And in that section, the Supreme

25 Court agreed with Judge Furman, of this district, that the

PBJKDOEC

1    Secretary of Commerce's decision to reintroduce a citizenship

2    question into the census should be set aside for resting on a

3    pretextual basis.  But for me, what is important is that the

4    Supreme Court presented what I believe to be a number of

5    guardrails for the lower court's review of a decision on

6    pretext.  These guardrails include the facts that the agency

7    must disclose the basis of its action, a court is ordinarily

8    limited to evaluating the agency's contemporaneous explanation

9    in light of the existing administrative record; a court may not

10   reject an agency's stated reason for acting simply because the

11   agency might also have had other unstated reasons; a court may

12   not set aside an agency's policy-making decision solely because

13   it might have been influenced by political considerations or

14   prompted by administration policies, and a recognition of a

15   narrow exception against the general rule of inquiring into the

16   mental processes of administrative decision-makers, which could

17   be found on a strong showing of bad faith or improper behavior.

18        Ultimately, the Supreme Court found with Judge Furman

19   because it found that it was rare to review a record as

20   extensive as the one before it when evaluating informal agency

21   action — and it should be.  This is their quote:  But having

22   done so for the sufficient reasons we have explained, we cannot

23   ignore the disconnect between the decision made and the

24   explanation given.

25        Let me summarize it this way:  This Court does not

PBJKDOEC

have a record analogous to that present in the *Dep't of Commerce* case, which it believes it needs to find that plaintiffs have shown a substantial likelihood of success on their pretext claim.  Judge Furman, as I recall, had a multiday trial and extra-record disclosure that was discussed in the Supreme Court opinion.  And that record may some day be developed in this case, but I don't have it today.

Relatedly, this Court recognizes that the Eastern District judge in the *Saget* decision found an acting Secretary's decision to be pretextual, but that, too, was on a far more developed record than I have.

I turn, then, to plaintiffs' next arbitrary and capricious argument, which claims undue political influence. Those standards are set forth in the *Saget* decision at 375 F. Supp. 3d, pages, I believe, 359 and 360.  And I'll just very briefly summarize it.  There must be some showing that the political pressure was intended to, and did, cause the agency's action to be influenced by factors not relevant under the controlling statute.  And there are many cases cited for that proposition.

In resolving the political influence issue, the *Saget* court relied heavily on the case of that *Tummino v. Torti*, 603 F. Supp. 2d, 519, an Eastern District decision from 2009.  And in the *Tummino* case, there was evidence of an FDA commissioner who had been improperly influenced by the White House, with the

PBJKDOEC

promise of facilitation of the confirmation of another FDA
commissioner.  In the *Saget* case, the evidence of political
influence included explicit coordination between the acting
Secretary and the White House concerning the placement of the
decision in the Administration's America First strategy,
meetings with the White House to coordinate TPS decisions, and
pressure from the Attorney General to make a decision and not
leave it for a successor Secretary.

Though I concede it is a close call, I find that
plaintiffs have demonstrated a likelihood of success on the
political influence issue.  As noted, the President made
sweeping and erroneous statements concerning his belief in the
legality of the TPS program and its inutility to what can only
be fairly described as an anti-immigrant agenda.  Once in
office, the President issued a sweeping and, again, erroneous
executive order, which paid lip service to the TPS statute
while *sub silentio* calling for its demise.  In a similar vein,
once the Secretary was confirmed, she endeavored to terminate
TPS status whenever presented with an opportunity to do so,
resulting in termination decisions that are ground not in law
and not in fact, but that are in political considerations
simply not relevant under the TPS statute.

There is a final claim of arbitrary and capricious
conduct, and that is the change in DHS position concerning the
national interest and the length of time given for transition

PBJKDOEC

1   periods.  The case that was cited to me by the parties was *Food*
2   *& Drug Admin. v. Wages & White Lion Invs. LLC*, 604 U.S. 542
3   from 2025.  It was discussed slightly more recently in a case
4   from a sister court in this district, Judge Vargas, in *New York*
5   *v. Trump*, 778 F. Supp. 3d, 578 at 595-596.

6          The important thing for me to call to the parties'
7   attention is this:  As Judge Vargas noted, the change of
8   position doctrine only applies if an agency changed existing
9   policy.  Judge Vargas subsequently notes that, as the Supreme
10  Court explained in *Wages & White Lion Invs.*, for an agency
11  position to constitute a policy within the meaning of the
12  change-in-position doctrine, it must typically have been set
13  forth in some formal manner, such as a regulation, a guidance
14  memorandum or an agency enforcement action.

15         I do agree that plaintiffs have demonstrated practices
16  in these two areas — the areas of national interest and
17  transition periods, that have lasted as long as the TPS statute
18  has been in existence.  I don't have evidence sufficient to
19  transform these practices into policies in the manner
20  described, but the Supreme Court in *Wages & White Lion Invs*.
21  and by Judge Vargas in the New York v. Trump indication and I,
22  therefore, cannot find that plaintiffs have established a
23  likelihood of success on this claim.

24         Now, changing topics, plaintiffs have separately
25  alleged that the termination of TPS for Syria is violative of

PBJKDOEC

1    the Fifth Amendment's due process clause.  Plaintiffs allege an

2    equal protection violation in that termination of TPS for Syria

3    was motivated by defendants' animus toward noncitizens who are

4    not White or of European origin.

5            Now, for reasons that I will just describe to you

6    briefly, I find that plaintiffs win the battle in terms of the

7    standard of review but lose the war in terms of the likelihood

8    of success on their claim.  I won't delve deeply because I know

9    the parties are aware of equal protection clause jurisprudence,

10   but, as noted by the Supreme Court, classifications based on

11   race, national origin or alienage are subject to strict

12   scrutiny and must narrowly tailored to serve a compelling state

13   interest.  I'm quoting from or citing to *City of Cleburne, Tex.*

14   *v. Cleburne Living Ctr.*, 473 U.S. 432, 440, issued in 1985.  A

15   plaintiff can show intentional discrimination where a

16   discriminatory purpose was a motivating factor in the

17   government's action.  I'm quoting here from *Vill. of Arlington*

18   *Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

19           The dispute between the parties concerns the

20   appropriate standard of review.  Plaintiffs are arguing for

21   strict scrutiny and analysis under *Arlington Heights*.

22   Defendants are arguing for rational basis scrutiny and more

23   deference to the executive under *Trump v. Hawaii*, the Supreme

24   Court decision from 2018 at 585 U.S. 667.

25           On this issue, the Court finds that plaintiffs have

PBJKDOEC

1    the stronger of the argument.  As was discussed in the *Saget*

2    decision, the Supreme Court's analysis in *Trump v. Hawaii* was

3    informed by at least two factors that aren't present here:

4    Number one, plaintiffs sought to invalidate a national security

5    directive regulating the entry of aliens abroad; and, number

6    two, the executive order was facially neutral toward religion

7    and required probing the sincerity of the stated justifications

8    for the policy by reference to extrinsic statements, many of

9    which were made before the President took the oath of office.

10          Here, plaintiffs have legal status in this country

11   under a congressionally created program that implicates the

12   national security and foreign policy concerns to a much lesser

13   degree than that present in *Trump v. Hawaii*, and, in this

14   regard, my decision accords with that of other courts to have

15   considered the issue, including *Nat'l TPS All. v. Noem*, 25 WL

16   2233985, the *Ramos v. Nielsen* case I mentioned earlier, and

17   *Centro Presente v. United States Dep't of Homeland Sec.*, 332

18   F. Supp. 3d, 393, a District of Massachusetts decision from

19   2018.

20          Where plaintiffs falter is in their definition of the

21   protected class as "non-White, non-European."  I find such a

22   definition to be too expansive, too amorphous, and I'm not able

23   to conduct the equal protection analysis.  In this regard, I

24   agree with Mr. Osmond that to accept the protected class would

25   sweep in too much.  I am aware that other courts have concluded

PBJKDOEC

1    differently, and, indeed, I believe one of the NTPSA judges has

2    adopted a class of immigrants, but I am not comfortable making

3    factual determinations on so broad a class.  And, as plaintiffs

4    would seem to recognize by their briefing, at least implicitly,

5    there is not sufficient evidence of Syrian-specific animus to

6    support a finding of likelihood of success on the merits.

7           Once again, and for any reviewing court that might see

8    this, if my perspective is unduly myopic, one can find plenty

9    of evidence of race- and national origin-based animus in this

10   record, but on this definition of the class, I do not feel

11   comfortable doing so.

12          Let me, please, continue with the other elements of

13   the stay motion.

14          We continue with irreparable harm.

15          Plaintiffs easily satisfy the irreparable harm prong

16   of the preliminary injunction standard.  Their submissions make

17   plain the list of harms that can, and very likely will, befall

18   them if the TPS termination date is not postponed.

19          Syrian TPS holders will lose their lawful status to

20   reside and to work in the U.S. as of November 21, 2025.  This

21   will result in immediate vulnerability to arrest, detention,

22   deportation, and family separation.  They will lose their

23   employment authorization.  They will lose their livelihoods.

24   And those with U.S. citizen children and family members will

25   face decisions no one should have to make regarding family

PBJKDOEC

1   separation.

2             Conversely, the record — particularly the information

3   from the State Department — reflects a variety of risks to

4   plaintiffs' lives and safety upon their return to Syria,

5   including ongoing armed conflict, food insecurity, lack of

6   healthcare, and widespread displacement.

7             I also find that plaintiffs have the stronger of the

8   argument regarding their inability to pursue other -- or their

9   diminished ability to pursue other avenues of immigration

10  relief, which was something suggested by defendants.  The short

11  time frame afforded by the termination is insufficient, as a

12  practical matter, to allow plaintiffs to make these contingency

13  plans.  Moreover, the anticipated gap in status occasioned by

14  the termination of TPS will foreclose certain opportunities.

15            On the issue of the remaining two prongs, the balance

16  of equities and the public interest, which are considered

17  together, I find that they favor plaintiffs.  There is no

18  public interest in allowing the government to proceed with

19  unlawful or arbitrary and capricious actions that violate the

20  INA or the APA.  The public has a substantial interest in

21  ensuring that government agencies comply with federal laws.

22  And I also accept plaintiffs' showing about the contributions

23  that they and other Syrian TPS holders make to our communities

24  and to our nation.

25            More fundamentally, I agree with plaintiffs that the

PBJKDOEC

TPS statute springs from an appropriate concern regarding
protecting vulnerable populations from deportation to countries
experiencing armed conflict, human rights abuses, and
humanitarian crises.  There is a public interest in upholding
those humanitarian principles.

Again, conversely, I don't see sufficient support in
this record for defendants' conclusions that allowing these
fewer than 7,000 people to remain in this country while this
litigation proceeds would adversely impact national security or
compromise the executive's ability to engage in foreign
relations.

The final issue concerns the scope of relief — whether
it is limited to the plaintiffs in this case or extends more
broadly to those Syrian nationals who have been granted TPS
status.  Defendants raise two principal challenges in this
regard.  This Court finds that neither succeeds at this stage.

In the case of *Trump v. CASA, Inc.*, 606 U.S. 831, a
2025 decision, the Supreme Court held that injunctions
asserting the power to prohibit enforcement of a law or policy
against anyone likely exceed the equitable authority that
Congress has granted to federal courts.  However, the Court was
careful to note in footnote 10 — and I quote — nothing we say
today resolves the distinct question whether the Administrative
Procedure Act authorizes federal courts to vacate agency
action.

PBJKDOEC

1          A sister court in this district recently observed —

2     and that sister court is Judge Kaplan — in *Mercado v. Noem*,

3     2025 WL 2658779 at *17, he recognized that in the Supreme

4     Court's decision in *AARP v. Trump,* the Supreme Court recently

5     held that courts may issue temporary relief to a putative

6     class, and citing the "Newberg and Rubenstein on Class Actions"

7     treatise, he noted that those treatise authors found that the

8     filing of a class suit, coupled with a showing that the

9     standard for interim relief has been met, should be sufficient

10     to enable such relief to the entire putative class and that

11     nothing more was necessary, although that treatise did note

12     that it might be safer practice to go through the entire Rule

13     23 analysis prior to granting preliminary relief.

14          It is true that plaintiffs here have filed this action

15     as a class action.  I don't think they should be penalized

16     because I declined their generous offer to submit a class

17     certification motion.  If a reviewing court believes that

18     footnote 10 in *CASA* is not sufficient for me to postpone the

19     termination date, which I don't consider to be injunctive

20     relief, for all Syrian TPS beneficiaries in this country, and

21     that, instead, I need to certify a class, the Court can remand

22     the matter back to me for an expedited decision on interim

23     class relief.

24          Defendants have also suggested that Section 1252(f)(1)

25     of Title 8 of the United States Code, which provides that no

PBJKDOEC

court, other than the Supreme Court, shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of Part V of this subchapter, other than with respect to the application of such provisions to the individual alien against whom proceedings under such part have been initiated.  There's an initial tussle between the parties as to whether the statute in question is in Part IV or Part V.  I do think defendants have the better of that argument.  However, I do join those courts that have rejected arguments predicated on this provision because I find that the relief sought is an order pursuant to 705.  It is not injunctive relief.  The *Haitian Evangelical Clergy Ass'n* that I mentioned earlier came that that conclusion, and I give that as one example.

I consider the postponement under Section 705 to be a stay of agency action, not injunctive relief on the merits.  I think it operates on the agency action itself.  I think it's what is considered and set aside in the *CASA* decision, and I believe it to be permissible.

So, for all of these reasons, and with my deep thanks to those of you who have listened for this long, as I've read this decision into the record, I am granting the plaintiffs' motion in part.  I am ordering a postponement of the termination date of TPS status for Syria pending further order of this or a reviewing court.

I know what's going to happen, friends.  I know the

PBJKDOEC

1    next stage is appeal.  I will, later today, issue a written

2    notice that's just a bottom-line order, indicating what I've

3    done today, so that gives one side, perhaps both sides, the

4    opportunity to file their notices of appeal.  And I will expect

5    that you will keep me apprised of what is happening in the

6    appeal.

7           Again, I thank you, and I'm going to let you go.  We

8    are adjourned.

9           MR. OSMOND:  Your Honor, could the government be heard

10   on one point before we sign off?

11          THE COURT:  Yes, sir.

12          MR. OSMOND:  We understand that the Court has ruled,

13   but the government would respectfully request that the Court

14   stay its decision for 14 days so that the government can seek

15   authorization from the Solicitor General to appeal to the

16   Second Circuit.

17          As you know, the Ninth Circuit and Supreme Court have

18   stayed district court decisions in similar TPS cases, and the

19   Fourth Circuit recently refused plaintiffs' motion for a stay

20   in a TPS case where the district judge had denied plaintiffs'

21   request to postpone the Secretary's TPS determination.

22          If the Court would find it useful, I can go through

23   the factors governing the stay, but those are integral to the

24   factors that you just discussed, so I don't know if that would

25   be helpful.

PBJKDOEC

1    THE COURT:  Sir, I understand exactly why you're

2 making this request.  You know, as well as I do, that if I do

3 that, then effectively the termination takes place on Friday,

4 and that's my concern.  I, who have no horse in this race, am

5 here to preserve the status quo and not to disrupt it.

6    I do want you to understand that I'm aware of both --

7 well, candidly, from my life before this job, as to the hurdles

8 you will have to deal with internally — by "hurdles," I mean

9 the steps you will have to take — so with appropriate regard

10 for your arguments, which I know, with an understanding of what

11 the Supreme Court has done and what the Fourth Circuit has

12 done, only because this thing otherwise terminates on Friday, I

13 am denying your request for a stay.  And if the Second Circuit

14 disagrees with me, I know they'll let me know.

15    So I'm genuinely sorry that I can't give that relief,

16 sir, because it's not my goal to make your life any more

17 difficult.  And I know, sir, you know that you and I both lost

18 a lot of time because of the timing of the complaint, but I

19 just can't do it, and I'm sorry.  But you have your record,

20 sir.  Thank you.

21    Anything else, Mr. Osmond?

22    MR. OSMOND:  Nothing else, Judge.  Thank you.

23    THE COURT:  All right.  Thank you, all.  We're

24 adjourned.  Take care, everyone.

25    (Adjourned)