UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AUNG DOE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 25 C 15483 |
| v. | ) | |
| | ) | Judge Kennelly |
| KRISTI NOEM, in her official capacity as | ) | |
| Secretary of Homeland Security, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

ANDREW S. BOUTROS
United States Attorney for
the Northern District of Illinois

JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
Tel:  (312) 886-7625
e-Mail: joshua.press@usdoj.gov

**Table of Contents**                                                                 **Page**

Introduction ...................................................................................................................1

Background ....................................................................................................................1

Legal Standard .............................................................................................................4

Argument ......................................................................................................................5

     I.       Plaintiffs Have No Likelihood of Success ...........................................29

     II.     There Is No Showing of Imminent, Irreparable Harm Here. ................33

     III.   The Balance of Equities and the Public Interest Favor Respondents. ..................37

     IV.   Any Grant of Preliminary Relief Must Be Narrowly Tailored. ...........................37

Conclusion ...................................................................................................................40

## Table of Authorities

| Cases | Page(s) |
|---|---|

*Aguayo v. Christopher*,
865 F. Supp. 479 (N.D. Ill. 1994) .......................................................... 29

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) .............................................................................. 7

*Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184,
2025 U.S. App. LEXIS 15297 (D.C. Cir. June 20, 2025) ...................... 38

*Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) ...................................................... 21

*Arjo, Inc. v. Handicare USA, Inc.*, No. 18 C 2554,
2018 WL 5298527 (N.D. Ill. Oct. 25, 2018) ......................................... 37

*Baan Rao Thai Rest. v. Pompeo*,
985 F.3d 1020 (D.C. Cir. 2021) ........................................................... 33

*Biden v. Texas*,
597 U.S. 785 (2022) .................................................................. 11, 17, 20

*Bouarfa v. Mayorkas*,
604 U.S. 6 (2024) ........................................................................... 11, 14

*Brasil v. Sec'y of DHS*,
28 F.4th 1189 (11th Cir. 2022) ............................................................. 14

*Britkovyy v. Mayorkas*,
60 F.4th 1024 (7th Cir. 2023) ................................................................. 8

*Brown v. Gilmore*,
533 U.S. 1301 (2001) ........................................................................... 18

*Bultasa Buddhist Temple of Chicago v. Nielsen*,
878 F.3d 570 (7th Cir. 2017) ............................................................... 11

*Burmester v. Berryhill*,
920 F.3d 507 (7th Cir. 2019) ............................................................... 27

*Cal. Tow Truck Ass'n v. City & County of San Francisco*,
807 F.3d 1008 (9th Cir. 2015) ............................................................... 7

*Christian Legal Soc'y v. Walker*,
  453 F.3d 853 (7th Cir. 2006) ................................................................. 5

*Christianson v. Colt Indus. Operating Corp.*,
  870 F.2d 1292 (7th Cir. 1989) ............................................................... 7

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ................................................................................ 5

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*,
  466 F.3d 134 (D.C. Cir. 2006) ............................................................ 26

*Cook County v. Wolf*,
  962 F.3d 208 (7th Cir. 2020) ................................................................. 4

*Corley v. United States*,
  556 U.S. 303 (2009) ............................................................................. 18

*Cronin v. USDA*,
  919 F.2d 439 (7th Cir. 1990) ............................................................... 17

*D&G Holdings v. Burwell*,
  156 F. Supp. 3d 798 (W.D. La. 2016) ................................................. 16

*Dan's City Used Cars, Inc. v. Pelkey*,
  569 U.S. 251 (2013) ............................................................................... 7

*DCH Regional Medical Ctr. v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019) .............................................................. 9

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ....................................................................... 20, 28

*DeVillier v. Texas*,
  601 U.S. 285 (2024) ............................................................................. 19

*Dhakal v. Sessions*,
  895 F.3d 532 (7th Cir. 2018) ............................................................... 36

*Dijamco v. McAleenan*, No. 18 C 3338,
  2019 WL 13280486 (N.D. Ill. Aug. 12, 2019) .................................... 10

*Dubey v. DHS*,
  154 F.4th 534 (7th Cir. 2025) ............................................................ 8, 9

*Egbert v. Boule,*
    596 U.S. 482 (2022) ............................................................................................ 6

*El-Khader v. Monica,*
    366 F.3d 562 (7th Cir. 2004) ................................................................ 11, 12, 13

*Episcopal Hosp. v. Shalala,*
    994 F.2d 879 (D.C. Cir. 1993) ........................................................................... 28

*Evangelical Lutheran Church in Am. v. INS,*
    288 F. Supp. 2d 32 (D.D.C. 2003) ................................................................... 14

*Fathers of St. Charles v. USCIS,* No. 24 C 13197,
    2025 WL 2201013 (N.D. Ill. Aug. 1, 2025) ................................................. 8, 11

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) .................................................................................... 26, 33

*FDA v. Wages and White Lion Invs., LLC,*
    604 U.S. 542 (2025) ........................................................................................... 22

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ........................................................................................... 29

*FirstHealth Moore Reg. Hosp. v. Becerra,*
    560 F. Supp. 3d 295 (D.D.C. 2021) .................................................................. 32

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ........................................................................................... 27

*Flores v. Garland,*
    72 F.4th 85 (5th Cir. 2023) ......................................................................... 12, 13

*Francisco-Diego v. Garland,* No. 21-3870,
    2022 U.S. App. LEXIS 15036 (6th Cir. 2022) ................................................. 36

*Garcia v. USCIS,*
    760 F. Supp. 3d 671 (N.D. Ill. 2024) ................................................................. 8

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022) .............................................................................. 15, 17, 18

*Grand Trunk Corp. v. TSA,*
    153 F.4th 517 (7th Cir. 2025) ........................................................................... 28

*Hanson v. Smith,*
    120 F.4th 223 (D.C. Cir. 2024) ........................................................................ 35

*Hecht v. Bowles*,
    321 U.S. 321 (1944) ........................................................................................... 39

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ...................................................................................... 27, 38

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    219 F. Supp. 2d 57 (D.D.C. 2002) ................................................................ 38

*Huffington v. T.C. Group*, LLC,
    637 F.3d 18 (1st Cir. 2011) ............................................................................ 7

*Ill. Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020) ......................................................................... 5

*Immigrant Defs. L. Ctr. v. Noem*,
    145 F.4th 972 (9th Cir. 2025) ...................................................................... 40

*Ind. Mun. Power Agency v. FERC*,
    56 F.3d 247 (D.C. Cir. 1995) ....................................................................... 27

*Institutional S'holder Servs., Inc. v. SEC*,
    142 F.4th 757 (D.C. Cir. 2025) .................................................................... 19

*Int'l Union, Allied Indus. Workers of Am., AFL-CIO v. Local Union No. 589*,
    693 F.2d 666 (7th Cir. 1982) ....................................................................... 33

*Inventus Power, Inc. v. Shenzhen Ace Battery Co., Ltd.*, No. 20 C 3375,
    2020 WL 3960451 (N.D. Ill. July 13, 2020) ................................................ 4

*J.E.F.M. v. Lynch*,
    837 F.3d 1026 (9th Cir. 2016) ..................................................................... 35

*Kandamar v. Gonzales*,
    464 F.3d 65 (1st Cir. 2006) .......................................................................... 30

*Kinney-Coastal Oil Co. v. Kieffer*,
    277 U.S. 488 (1928) ..................................................................................... 39

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ..................................................................................... 29

*Kucana v. Holder*,
    558 U.S. 233 (2009) ............................................................................... 11, 14

*Lobatos v. Noem*, No. 25 C 1223,
    2025 WL 1651220 (N.D. Ill. June 11, 2025) ............................................... 11

*Lopez v. Davis,*
    531 U.S. 230 (2001) ..................................................................................... 12

*Marinescu v. Att'y Gen.,*
    284 F. App'x 889 (3d Cir. 2008) ................................................................. 36

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ....................................................................................... 29

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ....................................................................................... 5

*Mid-Continent Wood Prod., Inc. v. Harris,*
    936 F.2d 297 (7th Cir. 1991) ......................................................................... 1

*Monumental Task Comm., Inc. v. Foxx,*
    157 F. Supp. 3d 573 (E.D. La. 2016) ........................................................... 17

*Morina v. Mayorkas*, No. 22 Civ. 2994,
    2023 WL 22617 (S.D.N.Y. Jan. 3, 2023) ..................................................... 10

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................. 20, 21

*Mousavi v. USCIS,*
    828 F. App'x 130 (3d Cir. 2020) ................................................................. 14

*Munaf v. Geren,*
    553 U.S. 674 (2008) ....................................................................................... 5

*N.S. v. Dixon,*
    141 F.4th 279 (D.C. Cir. 2025) ................................................................... 15

*Narenji v. Civiletti,*
    617 F.2d 745 (D.C. Cir. 1979) ..................................................................... 30

*Nat'l Ass'n of Broads. v. FCC,*
    39 F.4th 817 (2022) ..................................................................................... 26

*Nielsen v. Preap,*
    586 U.S. 392 (2019) ..................................................................................... 15

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) .......................................................................... 33

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................... *passim*

*Nobles v. Noem,* No. 24 C 9473,
    2025 WL 860364 (N.D. Ill. Mar. 19, 2025) ....................................... 8, 11

*Noem v. Nat'l TPS All.,*
    145 S. Ct. 2728 (2025) ............................................................ 1, 9, 10

*Noem v. Nat'l TPS All.,*
    2025 WL 2812732 (Oct. 3, 2025) .............................................. 1, 9, 10

*On-Site Screening, Inc. v. United States,*
    687 F.3d 896 (7th Cir. 2012) ............................................................ 7

*Patel v. Garland,*
    596 U.S. 328 (2022) ............................................................... 6, 8, 10

*Poursina v. USCIS,*
    936 F.3d 868 (9th Cir. 2019) ....................................................... 13, 14

*Rajah v. Mukasey,*
    544 F.3d 427 (2d Cir. 2008) ........................................................... 30

*Ramos v. Wolf,*
    59 F.4th 1010 (9th Cir. 2023) ........................................................... 7

*Ramos v. Wolf,*
    975 F.3d 872 (9th Cir. 2020) ............................................... 7, 8, 9, 32

*Regents of Univ. of Cal.,*
    591 U.S. 1 (2020) .......................................................... 31, 32, 33, 34

*Reno v. Am.-Arab Anti-Discrim. Comm.* ("AADC"),
    525 U.S. 471 (1999) .................................................................. 27, 38

*Rogers v. Lodge,*
    458 U.S. 613 (1982) ...................................................................... 30

*Russello v. United States,*
    464 U.S. 16 (1983) ........................................................................ 19

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................................... 20

*Sampson v. Murray*,
   415 U.S. 61 (1974) .............................................................................. 39

*Sanchez v. Mayorkas*,
   593 U.S. 409 (2021) .............................................................................. 2

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) ............................................................................ 20

*Shaffer v. Globe Protection, Inc.*,
   721 F.2d 1121 (7th Cir. 1983) ............................................................ 37

*Sheldon v. Sill*,
   49 U.S. (8 How.) 441 (1850) ................................................................. 6

*Soltane v. U.S. Dept. of Justice*,
   381 F.3d 143 (3rd Cir. 2004) .............................................................. 14

*Soni v. Jaddou*,
   103 F.4th 1271 (7th Cir. 2024) ............................................................. 8

*Starbucks Corp. v. McKinney*,
   602 U.S. 339 (2024) ............................................................................ 39

*Staub v. Proctor Hosp.*,
   562 U.S. 411 (2011) ............................................................................ 32

*Tiktok Inc. v. Trump*,
   490 F. Supp. 3d 73 (D.D.C. 2020) ...................................................... 38

*Time Warner Cable v. Doyle*,
   66 F.3d 867 (7th Cir. 1995) ................................................................ 16

*Tranchita v. Callahan*,
   511 F. Supp. 3d 850 (N.D. Ill. 2021) ................................................. 37

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ..................................................................... 39, 40

*Trump v. Hawaii*,
   585 U.S. 667 (2018) .................................................................. *passim*

*Trump v. Int'l Refugee Assistance Project*,
  582 U.S. 571 (2017) ........................................................................ 37

*Trump v. United States*,
  603 U.S. 593 (2024) ........................................................................ 32

*Ty, Inc. v. Jones Grp., Inc.*,
  237 F.3d 891 (7th Cir. 2001) ............................................................ 37

*U.S. ex rel. Espinoza v. Fairman*,
  813 F.2d 117 (7th Cir. 1987) .............................................................. 7

*Ukeiley v. EPA*,
  896 F.3d 1158 (10th Cir. 2018) ......................................................... 22

*United States v. Aponte-Guzmán*,
  696 F.3d 157 (1st Cir. 2012) ............................................................ 13

*United States v. Martinez-Fuerte*,
  428 U.S. 543 (1976) ........................................................................ 38

*United States v. Nixon*,
  418 U.S. 683 (1974) ........................................................................ 33

*Verde-Rodriguez v. Att'y Gen.*,
  734 F.3d 198 (3d Cir. 2013) ............................................................. 35

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977) ....................................................... 29, 30, 31, 32

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ........................................................................ 37

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................ 5, 37

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .......................................................... 35

*Wyoming v. Dep't of Interior*, No. 18-8027,
  2018 WL 2727031 (10th Cir. June 4, 2018) ..................................... 18

*Yang v. Lynch*,
  611 F. App'x 357 (7th Cir. 2015) ...................................................... 36

*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 U.S. 579 (1952) ............................................................................ 23

*Your Home Visiting Nurse Servs. v. Shalala*,
 525 U.S. 449 (1999) ............................................................................ 16

*Zadvydas v. Davis*,
 533 U.S. 678 (2001) ............................................................................ 38

*Zeng v. Mayorkas*, No. 21-cv-446,
 2021 U.S. Dist. LEXIS 111323 (D.D.C. Apr. 16, 2021) ...................... 36

*Zhu v. Gonzales*,
 411 F.3d 292 (D.C. Cir. 2005) ........................................................ 12, 13

**Statutes**

5 U.S.C. § 705 ........................................................................... 4, 15, 17, 39

6 U.S.C. § 557 ........................................................................................... 2

8 U.S.C. § 1101(a)(47) ............................................................................ 34

8 U.S.C. § 1103(a) .................................................................................... 2

8 U.S.C. § 1252(a)(2)(B) ......................................................................... 10

8 U.S.C. § 1252(f)(1) .......................................................... 15, 16, 17, 18

8 U.S.C. § 1252(f)(2) ............................................................................... 18

8 U.S.C. § 1252a(2)(B)(ii) ...................................................................... 14

8 U.S.C. § 1254a(a)(1)(A) ........................................................................ 2

8 U.S.C. § 1254a(a)(5) ............................................................................ 34

8 U.S.C. § 1254a(b)(1) ................................................................ 2, 11, 23, 28

8 U.S.C. § 1254a(b)(1)(C) .............................................................. 2, 11, 22

8 U.S.C. § 1254a(b)(2) .............................................................................. 2

8 U.S.C. § 1254a(b)(3)(B) ........................................................... 2, 11, 23, 34

8 U.S.C. § 1254a(b)(3)(C) ......................................................................... 2

8 U.S.C. § 1254a(b)(5)(A) ................................................................... 3, 5, 6, 8

8 U.S.C. § 1252(a)(5) ............................................................................. 34, 35

8 U.S.C. § 1252(b)(9) ................................................................................... 34

8 U.S.C. § 1254a(b)(3) .......................................................................... 14, 23

Pub. L. No. 101-649 ........................................................................................ 2

Pub. L. No. 104-208 ...................................................................................... 16

Pub. L. No. 107-296 ........................................................................................ 2

**Regulations**

8 C.F.R. § 244.17(a) ...................................................................................... 24

**Other Authorities**

*Federal Practice & Procedure* § 2948.1 (3d ed. 2013) ................................. 37

**Introduction**

The six plaintiffs in this proposed class action are natives and citizens of Burma (also known as Myanmar) with Temporary Protected Status ("TPS"). They challenge the Secretary of Homeland Security's determination to terminate TPS designation for Burma (more specifically, the effective date). But, as explained below, their complaint, Dkt. 1 ("Compl."), should be dismissed for lack of jurisdiction, *cf. Noem v. Nat'l TPS All.*, 2025 WL 2812732, at *1 (Oct. 3, 2025) (staying district court's order postponing the termination of TPS for Venezuelan nationals (for a second time)); *Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025) (staying the same for the first time—that is, before lower courts ignored it), and their motion for a preliminary injunction, Dkt. 15 (styled as a "Motion to Postpone Effective Date of Agency Action"), should accordingly be denied.[1]

**Background**

## I.    Statutory and Regulatory Background

### A.  The TPS Statute

The Immigration Act of 1990 established a program to create a means for providing temporary and discretionary protection in the United States for foreign nationals from designated countries experiencing ongoing armed conflict, environmental disaster, or "extraordinary and temporary conditions" that temporarily rendered the country unable to adequately handle the return

---

[1] Incidentally, the plaintiffs have not yet effectuated service on the defendants pursuant to Federal Rule of Civil Procedure 4(i). The undersigned cannot agree to waive service, and defendants' opposition to the plaintiffs' motion should not be construed as such a waiver. This is shown by how actual notice to defendants that a lawsuit has been filed is not sufficient under the Federal Rules; plaintiffs must instead comply with Rule 4. *See Mid-Continent Wood Prod., Inc. v. Harris*, 936 F.2d 297, 301–02 (7th Cir. 1991) (stating that actual notice is not sufficient to satisfy the requirements of Rule 4).

of its nationals.[2]  Pub. L. No. 101-649, 104 Stat. 4978 (1990).  As relevant here, the statute

authorizes the Department of Homeland Security ("DHS"),[3] "after consultation with appropriate

agencies of the Government," to designate countries for TPS if there are:

> extraordinary and temporary conditions in the foreign state that
> prevent aliens who are nationals of the state from returning to the
> state in safety, unless the [Secretary] finds that permitting the aliens
> to remain temporarily in the United States is contrary to the national
> interest of the United States.

8 U.S.C. § 1254a(b)(1)(C).

Foreign nationals who are granted TPS based on a country designation are eligible for work

authorization and may not be removed while that status is in effect.  8 U.S.C. § 1254a(a)(1)(A)–

(B); *see also Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021) (explaining what TPS can provide

for such foreign nationals).  Initial determinations to designate a country for TPS are discretionary,

8 U.S.C. § 1254a(b)(1), and DHS must conduct periodic reviews to determine whether the

conditions underlying a country's TPS designation continue to be met, 8 U.S.C. § 1254a(b)(2),

(b)(3)(A).  If the DHS Secretary "does not determine" that the foreign state "no longer meets the

conditions for designation," then the TPS designation is extended.  8 U.S.C. § 1254a(b)(3)(C).  On

the other hand, if the Secretary determines that the foreign state "no longer continues to meet the

conditions for designation," she "*shall* terminate the designation[.]"  8 U.S.C. § 1254a(b)(3)(B)

(emphasis added).  And Congress did not want such reviews to be judicially reviewed: "There is

no judicial review of any determination of the [Secretary] with respect to the designation, or

---

[2]  This memorandum uses the term "foreign national" as equivalent to the statutory term of "alien" within the Immigration and Nationality Act ("INA").

[3]  Although the INA still includes many references to the Attorney General, Congress transferred the Attorney General's TPS authority to the DHS Secretary.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1517, 116 Stat. 2135, 2311 (2002) (codified at 6 U.S.C. § 557); 8 U.S.C. § 1103(a).

termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A).

**B. Burma's 2021 TPS Designation, and the Secretary's Recent Termination Thereof**

In March 2021, former Secretary of Homeland Security Alejandro Mayorkas designated Burma for TPS for 18 months, based on a February 2021 military coup. *See* DHS, *Designation of Burma (Myanmar) for Temporary Protected Status*, 86 Fed. Reg. 28,132 (May 25, 2021). This designation allowed Burmese nationals who had been continuously residing in the United States since March 11, 2021, to apply for TPS. *See id.* Following that initial designation, former Secretary Mayorkas extended the designation and newly designated Burma for TPS in 2022. *See* DHS, *Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status*, 87 Fed. Reg. 58,515 (Sept. 27, 2022). And the former Secretary again extended Burma's designation from May 26, 2024, to November 25, 2025. *See* DHS, *Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status*, 89 Fed. Reg. 20,682 (Mar. 25, 2024).

On November 25, 2025, Secretary Kristi Noem announced the termination of TPS for Burma, with the termination effective January 26, 2026. *See* DHS, *Termination of the Designation of Burma (Myanmar) for Temporary Protected Status*, 90 Fed. Reg. 53,378 (Nov. 25, 2025). Secretary Noem concluded that the situation in Burma had improved enough for Burmese nationals to return home safely, citing progress in governance and stability—including the end of a state of emergency, plans for free and fair elections, successful ceasefire agreements, and improved local governance. *Id.* The Secretary also emphasized that the termination restored TPS to its *temporary* nature and was made after consultation with appropriate U.S. government agencies. *Id.*

## II. Factual and Procedural Background

Almost four weeks later, this putative class action was filed by six Burmese TPS holders

on behalf of a nationwide class of what they estimate to be 4,000 individuals seeking to block the Secretary's TPS termination. *See* Compl. at ¶ 1. They disagree with the Secretary's determinations, arguing that Burma remains engulfed in violent conflict, and contend that the termination is part of a broader effort to systematically end TPS designations. *Id.* at ¶¶ 4–6. They therefore bring three claims: (1) an Administrative Procedure Act ("APA") claim arguing that DHS's termination of TPS for Burmese nationals deviated from past practice, was predetermined, "pretextual[,] and animated by animus based on the perceived race and ethnicity of Burmese national TPS holders," *id.* at ¶¶ 191–97; (2) another APA claim arguing that the same determination, made "with only 60 days' notice," was arbitrary and capricious because it differed from past agency practices, *id.* at ¶¶ 198–201; and (3) a constitutional claim arguing that the Secretary's determination violated the Fifth Amendment's equal protection component because it "impermissibly and intentionally discriminates against Plaintiffs because of their race, ethnicity, or national origin," *id.* at ¶¶ 202–06. And to get out ahead of the termination's effective date of January 26, 2026, the plaintiffs have moved for a stay under the APA's 5 U.S.C. § 705—hoping to postpone its effective date and stave off the TPS termination as long as possible. *See* Dkt. 15; *see also* Dkt. 27 (their memorandum, hereinafter, "Pls.' Br.").

## Legal Standard

Under Federal Rule of Civil Procedure 65, a district court may issue a temporary restraining order or a preliminary injunction. Here, plaintiffs seek the latter. Dkt. 15.[4] "The standard for issuing a TRO is the same one that governs issuance of a preliminary injunction," *Inventus Power, Inc. v. Shenzhen Ace Battery Co., Ltd.*, No. 20 C 3375, 2020 WL 3960451, at *4 (N.D. Ill. July 13,

---

[4] To the extent the plaintiffs and the court wish to split hairs, the legal standard for a stay postponing agency action under § 705 is the same as the standard for a preliminary injunction. *See Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

2020), which is "never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 690 (2008), and "is

an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear

showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)

(cleaned up). More specifically, a movant for preliminary relief "must establish that he is likely

to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As the Seventh Circuit has explained, an "applicant must make a strong showing that he is

likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir.

2020). "[A] possibility of success is not enough. Neither is a 'better than negligible' chance." *Id.*

Movants must also demonstrate clearly, and through specific factual allegations, that immediate

and irreparable injury will result to them absent the order. *City of Los Angeles v. Lyons*, 461 U.S.

95, 101–02 (1983) (citations omitted). Only if the movants meet their burden of showing both a

likelihood of success on the merits and an imminent risk of irreparable harm will courts then

engage in further analysis. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

## Argument

I.     **Plaintiffs Have No Likelihood of Success.**

   A.  **This Court Lacks Jurisdiction Over Plaintiffs' Claims.**

      1.  **8 U.S.C. § 1254a(b)(5)(A)**

As a threshold matter, Congress spoke emphatically when it declared that "[t]here is

no judicial review of *any* determination of the [Secretary] with respect to the designation, or

termination or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A)

(emphasis added). By foreclosing "judicial review," § 1254a(b)(5)(A) bars all of plaintiffs'

challenges to Secretary Noem's termination determinations. *See* H.R. Rep. No. 101-245, at 14

(1989) ("Moreover, none of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review."). This specific language reflects Congress's clear intent in limiting Article III jurisdiction regarding the Secretary's TPS determinations. *See* U.S. Const. art. III, § 1, cl. 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."); *see also Egbert v. Boule*, 596 U.S. 482, 491 (2022) (recognizing that "Congress," not the courts, has the authority and ability to weigh the pros and cons of remedial schemes, including "economic and governmental concerns," "administrative costs," and the "impact on governmental operations systemwide"); *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850) ("Courts created by statute can have no jurisdiction but such as the statute confers.").

Plaintiffs unquestionably challenge the Secretary's decision to terminate Burma's TPS designation and seek to have this court both superintend that determination and stop it from going into effect. *See* Compl. ¶¶ 207–14 (Prayer for Relief). But a decision to terminate TPS is a "determination" "with respect to" the "termination or extension of a designation" of Burma for TPS. 8 U.S.C. § 1254a(b)(5)(A); *see also Merriam-Webster's Dictionary* (2025) (defining "Determination" as "the act of deciding definitely and firmly"); *The American Heritage Dictionary* (2022), (defining "Determination" as "[t]he act of making or arriving at a decision[;] The decision reached[;] [t]he settling of a question by an authoritative decision or pronouncement"). Indeed, the Supreme Court held that materially similar jurisdiction stripping language in the INA precludes a whole category of judicial review. *See Patel v. Garland*, 596 U.S. 328, 337–40 (2022) (statute barring review of "*any judgment* regarding the granting of relief" covers "any authoritative decision" on the matter (emphasis added)).

Here, as in *Patel*, the word "any" indicates the jurisdictional bar's broad sweep. *See, e.g.*,

6

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'" (citation omitted)). The phrase "with respect to" is likewise broad in scope, as that phrase "is generally understood to be synonymous with the phrase 'relating to'" or "'related to.'" *Cal. Tow Truck Ass'n v. City & County of San Francisco*, 807 F.3d 1008, 1021 (9th Cir. 2015); *accord Huffington v. T.C. Group*, LLC, 637 F.3d 18, 22 (1st Cir. 2011). And the Supreme Court has underscored that the ordinary meaning of "related to" is "a broad one," meaning "having a connection with or reference to . . . whether directly or indirectly." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). Consistent with its plain language, the Ninth Circuit has previously agreed that the TPS statute "generally precludes direct review of the secretary's country-specific TPS determinations." *Ramos v. Wolf*, 975 F.3d 872, 891 (9th Cir. 2020).[5] The same result should happen here, as § 1254a plainly precludes judicial review of the Secretary's "determination[s] with respect to the termination" of the TPS designation for Burma. 90 Fed. Reg. at 54,733. A determination to terminate a TPS designation is at the core of the broad sweep of the statute's jurisdictional bar.

Plaintiffs try to overcome this clear jurisdictional bar by arguing that "determination" can only mean the final TPS-related determination made by the Secretary. *See* Pls.' Br. at 17–18. But that argument ignores the broadening words "any" and "with respect to" and is thus an improper attempt to get around Congress's jurisdictional bar. *Cf. On-Site Screening, Inc. v. United States*,

---

[5] The Ninth Circuit panel's opinion was vacated on rehearing, *see Ramos v. Wolf*, 59 F.4th 1010, 1011 (9th Cir. 2023), and the case subsequently became moot before any new opinion could be issued. A vacated decision, however, still carries persuasive value. *See, e.g.*, *Christianson v. Colt Indus. Operating Corp.*, 870 F.2d 1292, 1298 (7th Cir. 1989) ("[A]lthough vacated, the decision stands as the most comprehensive source of guidance available on the . . . questions at issue in this case."); *see also U.S. ex rel. Espinoza v. Fairman*, 813 F.2d 117, 125 n.7 (7th Cir. 1987) (decision vacated by Supreme Court remains persuasive precedent so long as the Court did not reject the lower court decision's underlying reasoning).

687 F.3d 896, 898 (7th Cir. 2012) (noting how a "provision is broad given its use of the expansive term 'any'"). Indeed, Seventh Circuit precedent, as well as other decisions within this judicial district (and even this court) have likewise interpreted other jurisdiction-stripping provisions' usage of "any" to include antecedent determinations of both law and fact. *See, e.g.*, *Dubey v. DHS*, 154 F.4th 534, 536 (7th Cir. 2025) (affirming this court's decision that there was no jurisdiction to review expedited removals based on an INA provision barring review of "any individual determination"); *Soni v. Jaddou*, 103 F.4th 1271, 1273 (7th Cir. 2024) (no jurisdiction to review "a decision or action" regarding requests for waiver); *Britkovyy v. Mayorkas*, 60 F.4th 1024, 1030 (7th Cir. 2023) (applying *Patel* to bar judicial review of adjustment-of-status decisionmaking); *Fathers of St. Charles v. USCIS*, No. 24 C 13197, 2025 WL 2201013, at *7 (N.D. Ill. Aug. 1, 2025); *Nobles v. Noem*, No. 24 C 9473, 2025 WL 860364, at *2, 5 (N.D. Ill. Mar. 19, 2025); *Garcia v. USCIS*, 760 F. Supp. 3d 671, 673 (N.D. Ill. 2024) (concluding that similar language "strips the Court of the ability to review not just those ultimate decisions but any action leading to such decisions"). The plaintiffs have no discussion of such reasoning or decisions, and instead simply cite to cases that have ignored § 1254a(b)(5)(A). Pls.' Br. at 18.

Regardless of those decisions, the plaintiffs here are necessarily seeking review of "any determination" "with respect to" the "termination or extension of a designation" of a country for TPS. 8 U.S.C. § 1254a(b)(5)(A); *see Patel*, 596 U.S. at 338–39 (similar jurisdictional bar did not "restrict itself to certain kinds of decisions," but instead covered both subsidiary determinations and the ultimate, "last-in-time judgment" on the matter). Because the Secretary's determinations to terminate TPS for Burma are determinations "with respect to" the TPS extension or termination, this court lacks authority to review them. *See Ramos*, 975 F.3d at 889 (this bar "preclude[s] direct review of the Secretary's country-specific TPS determinations"). Review of the considerations

and results of those considerations is equally barred. *Cf. Dubey*, 154 F.4th at 537 ("Every order of removal . . . has a justification. If an alien could avoid [the jurisdictional bar] by attacking that justification, the statute might as well be erased from the United States Code. On plaintiffs' understanding, the statute would apply only to inexplicable [decisions]. Yet plaintiffs do not offer, and we cannot imagine, any reason why Congress would foreclose judicial review of high-handed decisions by petty bureaucrats . . . while allowing judicial review as long as the orders have reasoned support. That would be perverse."). The plaintiffs here wish to have this court re-weigh the evidence and make its own TPS determination for Burma, but "section 1254a(b)(5)(A) makes clear that the Secretary's discretion to consider and weigh various conditions in a foreign country in reaching her TPS determinations is not only broad, but unreviewable." *Ramos*, 975 F.3d at 891.

If the court sees even the slightest opening for review, at a minimum, § 1254a(b)(5)(A) bars claims that an agency's decision was arbitrary and capricious. To hold otherwise "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology." *DCH Regional Medical Ctr. v. Azar*, 925 F.3d 503, 506 (D.C. Cir. 2019). Moreover, the Supreme Court's granting of a stay, twice, in the termination of TPS as it pertains to Venezuela strongly suggests that the government's arguments are correct. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (mem.) (2025); *Noem v. Nat'l TPS All.*, 2025 WL 2812732 (Oct. 3, 2025). A stay of a lower court order would not have been granted without a finding of likelihood of success on the merits. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). And the Supreme Court noted that its decisions rested on the "parties' legal arguments." *Nat'l TPS All.*, 2025 WL 2812732, at *1 (the same legal arguments made here). The government's only argument on the arbitrary-and-capricious claims there was that § 1254a(b)(5)(A) barred the plaintiffs' claims against the Venezuelan TPS termination. The Supreme Court, therefore, has

signaled its concurrence with the government's reading of § 1254a(b)(5)(A), and this court should

follow suit.  *See  Nat'l TPS All.*, 145 S. Ct. at 2728; *Nat'l TPS All.*, 2025 WL 2812732 at *1.

### 2.  8 U.S.C. § 1252(a)(2)(B)(ii)

Plaintiffs' claims run aground against another dispositive jurisdictional bar: 8 U.S.C.

§ 1252(a)(2)(B)(ii).  In relevant part, § 1252(a)(2)(B) states:

> Notwithstanding any other provision of law (statutory or
> nonstatutory), including section 2241 of Title 28, or any other
> habeas corpus provision, and sections 1361 and 1651 of such title,
> and except as provided in subparagraph (D), and regardless of
> whether the judgment, decision, or action is made in removal
> proceedings, *no court shall have jurisdiction to review—*
>
> > (i) *any judgment regarding the granting of relief under*
> > section 1182(h), 1182(i), 1229b, 1229c, *or 1255* [the
> > provision governing adjustment of status] . . . .
> >
> > (ii) *any other decision or action* of the Attorney General or
> > the Secretary of Homeland Security *the authority for which
> > is specified* under this subchapter *to be in the discretion of
> > the Attorney General or the Secretary of Homeland Security*
> > . . . .

(Emphases added.)

As shown and briefly discussed above, § 1252(a)(2)(B)(i) "prohibits review of *any*

judgment *regarding* the granting of relief under . . . § 1255."  *Patel*, 596 U.S. at 338 (emphases

in original).  And § 1252(a)(2)(B)(ii) has likewise been expansively interpreted (as its language

of "any other decision or action" is even broader).  *See, e.g., Morina v. Mayorkas*, No. 22 Civ.

2994, 2023 WL 22617, at *10 (S.D.N.Y. Jan. 3, 2023) ("The words 'decision or action' are at

least as broad, if not broader, than the word 'judgment' in subclause (i).").  The jurisdictional

bars thus extend to factual findings, *id.* at 339, and apply "regardless of whether the judgment

[or] decision . . . is made in removal proceedings," 8 U.S.C. § 1252(a)(2)(B).  And even extend

to "pure questions of law."  *Dijamco v. McAleenan*, No. 18 C 3338, 2019 WL 13280486, at *5–

6 (N.D. Ill. Aug. 12, 2019), *aff'd sub. nom.*, *Dijamco v. Wolf*, 962 F.3d 999, 1003 (7th Cir. 2020); *see also Bultasa Buddhist Temple of Chicago v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017); *El-Khader v. Monica*, 366 F.3d 562, 567 (7th Cir. 2004). And that bar includes even constitutional claims. *See, e.g.*, *Fathers of St. Charles*, 2025 WL 2201013, at *6; *Nobles*, 2025 WL 860364, at *5–6. Boiled down, this means that "to trigger § 1252(a)(2)(B)(ii)'s jurisdictional bar, there must be: (1) a decision or action by the Attorney General or the Secretary of Homeland Security and (2) statutorily specified discretion to make that decision or take that action under Subchapter II of Chapter 12 of Title 8 (8 U.S.C. §§ 1151–1381)." *Lobatos v. Noem*, No. 25 C 1223, 2025 WL 1651220, at *3 (N.D. Ill. June 11, 2025).

The first prerequisite is met in this matter because it concerns decisions and actions under § 1254a, which is clearly within "this subchapter" between 8 U.S.C. §§ 1151 and 1382. *See Kucana v. Holder*, 558 U.S. 233, 239 n.3 (2009). Therefore, the application of § 1252(a)(2)(B)(ii) turns on whether the termination of TPS is a discretionary decision left to the Secretary. The answer is "yes" because 8 U.S.C. § 1254a(b)(1)(C) has all the hallmarks of conferring on the Secretary tremendous discretion in determining whether a country should maintain its TPS designation. To start, the statutory text notes how the Secretary "*may* designate any foreign state" for TPS protections. 8 U.S.C. § 1254a(b)(1). That is sufficient language to connote discretion. *See, e.g.*, *Bouarfa v. Mayorkas*, 604 U.S. 6, 13–14 (2024) ("As 'this Court has repeatedly observed,' 'the word may *clearly* connotes discretion.'" (emphasis in original) (quoting *Biden v. Texas*, 597 U.S. 785, 802 (2022) (cleaned up)). While the decision to terminate a foreign state's TPS designation operates through a different provision, the use of the word "shall" only confirms termination is required *if* the Secretary determines *in her discretion* that the original designation is no longer warranted. *See* 8 U.S.C. § 1254a(b)(3)(B).

11

Nor is Congress required to use any particular "magic words" to specify that an agency decision is discretionary for the purposes of § 1252(a)(2)(B)(ii). *Flores v. Garland*, 72 F.4th 85, 90 (5th Cir. 2023). In other words, a decision may be "specified . . . to be in the discretion" of an agency "even if the grant of authority to make that decision does not use the word 'discretion.'" *Zhu v. Gonzales*, 411 F.3d 292, 293–94 (D.C. Cir. 2005) (interpreting § 1252(a)(2)(B)(ii) and concluding that Congress's use of the words "may" and "deem" in § 1153(b)(2)(B)(i) were sufficient to render agency decisions discretionary); *El-Khader*, 366 F.3d at 563 ("[T]he discretionary nature of the decision is apparent from the plain language of the statute. Initially, we cannot help but repeat the actual words employed by the statute, which involve the permissive 'may' and a temporal reference to 'at any time.' This language plainly signifies a discretionary decision."). Because no magic words are required to trigger § 1252(a)(2)(B)(ii)'s jurisdictional bar, at least three language choices in § 1254a(b)(1)(C) dictate that the termination of TPS designation is discretionary: (1) "may designate"; (2) "extraordinary circumstances"; and (3) "national interest."

The Supreme Court has recognized that, ordinarily, legislation using "shall" indicates a mandatory duty while legislation using "may" grants discretion, particularly when Congress uses both "shall" and "may" in the same section. *See Lopez v. Davis,* 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' . . . contrasts with the legislators' use of a mandatory 'shall' in the very same section."). Congress specifically used the words "shall" and "may" throughout § 1254a to denote mandatory and discretionary authority. *Compare* § 1254a(a)(b)(1) ("The Attorney General . . . *may designate* any foreign state") (emphasis added), *with* § 1254a(b)(3) (stating that the Attorney General "shall review the conditions in the foreign state"). Here, Congress's use of the "precatory term 'may,' rather than the directory term 'shall'" indicates

that Congress deemed discretionary the decision to terminate a foreign state's TPS designation after she revisited a prior exercise of discretion. *See United States v. Aponte-Guzmán*, 696 F.3d 157, 160 (1st Cir. 2012).

What constitutes the "national interest" of the United States requires the Secretary to "call upon [her] expertise and judgment unfettered by any statutory standard whatsoever." *Zhu*, 411 F.3d at 295. The Secretary here decided to root her termination decision in the national interest of the United States. *See* 90 Fed. Reg. at 53,380 ("DHS has determined that the termination of the Burma designation is required because it is contrary to the national interest to permit Burmese nationals (or nationals having no nationality who last habitually resided in Burma) to remain temporarily in the United States."). The Secretary reviewed governing executive orders, statistics on immigration violations, the current state of the country's immigration system, and international relations and efforts, amongst other things. *See id*. at 53,380–381. These are value judgments that are not amenable to judicial standards and second guessing—signaling that a discretionary judgment is at play. *Cf., e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 684–86 (2018) ("By its terms, § 1182(f) exudes deference to the President in every clause. It entrusts to the President the decisions whether and when to suspend entry ('[w]henever [he] finds that the entry' of aliens 'would be detrimental' to the national interest) . . . . It is therefore unsurprising that we have previously observed that § 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA."); *El-Khader*, 366 F.3d at 563 (discussing how "the determination of whether there exists 'good and sufficient cause' . . . necessarily is highly subjective, and there exist no strict standards for making this determination"); *Zhu*, 411 F.3d at 295; *Flores*, 72 F.4th at 88 (holding § 1252(a)(2)(B)(ii) bars review of agency's denial of a national-interest waiver); *see also Poursina v. USCIS*, 936 F.3d 868 (9th Cir. 2019)

(observing "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts"); *Brasil v. Sec'y of DHS*, 28 F.4th 1189 (11th Cir. 2022) (per curiam) (same); *Mousavi v. USCIS*, 828 F. App'x 130 (3d Cir. 2020) (same).

Finally, "extraordinary conditions" also connotes discretion. What one Secretary clearly contemplates as "extraordinary" may not be consistent to the next. That too supports § 1252(a)(2)(B)(ii) barring review. *See also Evangelical Lutheran Church in Am. v. INS*, 288 F. Supp. 2d 32, 44 (D.D.C. 2003) (acknowledging that a court "may not be able to quarrel with an INS determination that there were no extraordinary circumstances . . . commensurate with the delay" when utilizing a regulation).

Defendants acknowledge that the Supreme Court recognized that § 1252(a)(2)(B)(ii) applies to those challenges "specified" to be in the Secretary's discretion. *See Kucana*, 558 U.S. at 243 n.10. Although "specified" is not synonymous with "implied" or anticipated, *see id.*, the court's statutory inquiry is whether the Secretary's authority to make a decision is discretionary based on text. *See Poursina*, 936 F.3d at 871; *Soltane v. U.S. Dept. of Justice*, 381 F.3d 143, 146 (3rd Cir. 2004) (Alito, J.) ("The key to § [1252(a)(2)(B)(ii)] lies in its requirement that the discretion giving rise to the jurisdictional bar must be 'specified' by statute."). And here, the TPS statute unquestionably provides the Secretary with discretionary authority to designate the foreign state for TPS in the first place, which must be terminated only after the Secretary has revisited the prior exercise of discretion. *See* 8 U.S.C. §§ 1254a(b)(3) (requiring termination *if* the Secretary finds that subparagraph (1) is no longer met). Consequently, the statutory language in § 1254a(d)(3) "exudes deference" to the Secretary. *Bouarfa*, 604 U.S. at 14 (holding that 8 U.S.C. § 1252a(2)(B)(ii) applied where, as here, "Congress has in no way prescribed how that discretion

14

must be exercised," and "[t]here are no conditions that the Secretary must satisfy before" she can exercise her authority). Thus, in addition to the judicial bar in § 1254a(b)(5)(A), this court also lacks jurisdiction over this matter under § 1252(a)(2)(B)(ii) and should dismiss this case entirely under Federal Rule of Civil Procedure 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

### 3. 8 U.S.C. § 1252(f)(1)

Plaintiffs' request for relief under § 705 is also barred by 8 U.S.C. § 1252(f)(1). Staying the effect of an agency decision is indeed injunctive or at the very least restrains the government's ability from carrying out a covered action. That is precisely what § 1252(f)(1) was meant to avoid. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Section 1252(f)(1) strips lower federal courts of the "jurisdiction or authority" to "enjoin or restrain the operation of" certain INA provisions "other than with respect to the application of such provisions to an individual alien against whom proceedings . . . have been initiated." 8 U.S.C. § 1252(f)(1); *see Nielsen v. Preap*, 586 U.S. 392, 402 (2019). This means that lower federal courts may not force "federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specific statutory provisions," except in "individual cases." *Aleman Gonzalez*, 596 U.S. at 550; *see also N.S. v. Dixon*, 141 F.4th 279, 288-90 (D.C. Cir. 2025).

5 U.S.C. § 705 provides that where a rule has not yet become effective, and "an agency finds that justice so requires," it may postpone the effective date of action taken by it, pending judicial review," and that:

> [o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

However, "Section 705 of the Administrative Procedure Act ('APA') is not an independent grant of subject matter jurisdiction," and the "Supreme Court has stated that the APA does not provide a mechanism to override the jurisdictional requirements of" more specific statutes that govern review of a particular agency's actions. *D&G Holdings v. Burwell*, 156 F. Supp. 3d 798, 811 (W.D. La. 2016) (citing *Your Home Visiting Nurse Servs. v. Shalala*, 525 U.S. 449, 457–58 (1999)).

Section 1252(f)(1) is such a provision because it is one of the specified sections covered. More specifically, Congress placed TPS within Chapter 4 of Title II of the INA—the chapter that § 1252(f)(1) shields. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, div. C, Pub. L. No. 104-208, §§ 306, 308, 110 Stat. 3009-546 (1996); *see also* Exhibit 1 (listing TPS within subchapter 4).[6] This is important because § 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1) (emphasis added). The Supreme Court held that § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain

---

[6] "We follow the general rule that in the event of a conflict between the Statutes at Large and the United States Code, the language in the Statutes at Large controls." *Time Warner Cable v. Doyle*, 66 F.3d 867, 878 n.11 (7th Cir. 1995) (quotation marks omitted).

from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Texas*, 597 U.S. at 797 (quoting *Aleman Gonzalez*, 596 U.S. at 544). Section 1252(f)(1) thus precludes the court from issuing orders restraining, even temporarily, implementation of § 1254a.

As a basic matter, granting plaintiffs the relief that they seek would require an order that runs to "an entire class of aliens," *Aleman Gonzalez*, 596 U.S. at 550–51—which here would be every foreign national covered by the purported class definition for Burmese nationals with TPS— rather than any "individual alien," 8 U.S.C. §1252(f)(1).

A court order postponing agency action under § 705 impermissibly "enjoin[s] or restrain[s]" the government just as a temporary restraining order or preliminary injunction does. An order under § 705 purports to maintain the status quo pending resolution of the merits. 5 U.S.C. § 705 (referencing "preserv[ation of] status or rights"). Indeed, courts routinely note that the standard for a § 705 stay "is the same as the standard for issuance of a preliminary injunction." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 586 (E.D. La. 2016), *aff'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017); *see also Cronin v. USDA*, 919 F.2d 439, 446 (7th Cir. 1990). In fact, the plaintiffs even note that the standard is the same. Pls.' Br. at 17. Thus, an order under § 705 postponing the effective date of the Secretary's termination determination would "check, hold back, or prevent" the government's operation of the TPS statute, *Aleman Gonzalez*, 596 U.S. at 549 (defining "restrain" in § 1252(f)(1)), and it would "order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" the Secretary's determination, *Texas*, 597 U.S. at 797; *see* Black's Law Dictionary (12th ed. 2024) (defining "Injunction" as "[a] court order commanding or preventing an action").

17

The plaintiffs here are not asking this court for an order on an agency adjudication pending judicial review of that adjudication. On the contrary, they are broadly requesting that this court "prevent" the government from implementing its chosen "course of action" with respect to TPS under § 1254a. *See Aleman Gonzalez*, 596 U.S. at 549 (orders requiring government to "refrain from actions that (again in the Government's view) are allowed" by a covered provision are barred by § 1252(f)). Such an order, even if labeled a stay, is injunctive in effect and prohibited by § 1252(f)(1). *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers) ("[A]pplicants are seeking not merely a stay of a lower court judgment, but an injunction against the enforcement of a presumptively valid state statute"); *Wyoming v. Dep't of Interior*, No. 18-8027, 2018 WL 2727031, at *1 (10th Cir. June 4, 2018) ("The district court's 'stay' effectively enjoins enforcement of the Rule."). Indeed, in *Nken*, the Supreme Court explained that "[a] stay simply suspends judicial alteration of the status quo, while injunctive relief grants judicial intervention" in the first instance. 556 U.S. at 429.

Regardless, even if the court otherwise concluded that a stay here does not "enjoin" operation of the Secretary's termination under *Nken*, § 1252(f)(1) is broader than § 1252(f)(2), given that it strips courts of jurisdiction to "enjoin *or restrain* the operation" of the covered provisions, rather than just prohibiting enjoining individual removal orders. 8 U.S.C. § 1252(f)(1) (emphasis added). While Congress used the words "enjoin or restrain" in § 1252(f)(1), Congress used only "enjoin" in the very next provision. Section 1252(f)(2) bars courts from "enjoin[ing] the removal of any alien pursuant to a final order under this section" absent certain conditions. 8 U.S.C. § 1252(f)(2). Reading §1252(f)(1) as limited to injunctions would render the term "restrain" superfluous—contrary to the "cardinal principle of statutory construction" that courts must "give effect, if possible, to every clause and word of a statute." *Corley v. United States*, 556

U.S. 303, 314 (2009) (quotation marks omitted).  Doing so also would violate the principle that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up).  Congress's deliberate inclusion of the broader phrase "enjoin or restrain" in § 1252(f)(1), when considered alongside its use of only "enjoin" in § 1252(f)(2), confirms that § 1252(f)(1) cannot plausibly be read to apply only to injunctions. *Cf. Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 767 (D.C. Cir. 2025) (using contextual clues to determine that regulating "different conduct using broader language" indicates that "Congress meant something different in its choice of the term").

In sum, the court cannot grant an equitable remedy that "enjoins or restrains the operation" of the termination determination for Burma's TPS designation.  Congress specifically foreclosed that.

### B. Alternatively, Plaintiffs' APA Claims Are Unlikely to Succeed.

Jurisdiction aside, the plaintiffs' claims fail on the merits, as well.

### 1. Incoming Presidential Administrations May Enter Office with Policy Goals.

To recap, the plaintiffs here are bringing two APA claims and a Fifth Amendment claim (assuming that it provides its own cause of action)[7] arguing that the Secretary's termination of TPS for Burmese nationals was improper because it was pre-determined, arbitrary and capricious, and invidious discrimination.  Compl. ¶¶ 191–206.

---

[7] *See DeVillier v. Texas*, 601 U.S. 285, 286 (2024) ("Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts.").

Starting with the first claim, the plaintiffs contend that the Secretary's determination here is arbitrary and capricious because they argue it was reached during presidential campaigning. *See* Pls.' Br. at 7, 19. Not only is that a mischaracterization of the record, but it is not a viable claim under the APA in any event. As an initial matter, "[i]t is hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Commerce v. New York*, 588 U.S. 752, 783 (2019); *see also Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part) (discussing how "change[s] in administration [are] brought about by the people casting their votes"). And contrary to plaintiffs' contentions, *Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019), does not provide a workaround of the Supreme Court's decision in *New York*. This is because *Saget* predates *New York*. *Compare Saget*, 375 F. Supp. 3d 280 (published April 11, 2019), *with New York*, 588 U.S. 782 (published June 27, 2019). Indeed, only a few years later, the Supreme Court again confirmed that courts should not find any violations of law simply because a new administration enters office with a different policy agenda from its predecessors. *See Texas*, 597 U.S. at 812 ("But the agency's *ex ante* preference for terminating [the Migration Protection Protocols]—like any other feature of an administration's policy agenda—should not be held against the October 29 Memoranda."). If that were not enough, the entire body of Appointments Clause precedent is designed to *ensure* just what plaintiffs argue is *forbidden*: that agencies "remain[] subject to the ongoing supervision and control of the elected President" who is "directly accountable to the people through regular elections." *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020). An agency decision thus cannot be rejected, as plaintiffs say, anytime it serves an administration's "political agenda." Pls.' Br. at 1.

20

Plaintiffs' argument also fails on a more fundamental level. The Secretary here set forth extensive reasoning and analysis supporting her termination determination. *See* 90 Fed. Reg. at 53,378–381. The notice reflects weighing various considerations, and the Secretary specifically determined that permitting Burmese TPS holders to remain in the United States would be contrary to the national interest, taking into account current administration domestic policies and foreign-policy interests. 90 Fed. Reg. at 53,380–381. That is the opposite of an unsupported determination. Additionally, plaintiffs point to the Secretary relying on Executive Orders and Presidential Proclamations preventing entry of Burmese nationals when reaching her termination determination. Pls' Br. at 7, 24–27. But "[a]gencies are bound to follow binding executive orders unless rescinded or overridden through lawful procedures." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 310 (D.D.C. 2025). And, here again, the Secretary reasonably considered the current administration's domestic and foreign policies and priorities in making the requisite national interest determination (such as accounting for national security concerns, visa overstays, and instances of fraud). Thus, the record reflects that the Secretary "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (majority op.).

### 2. Exercise of Statutory Authority Cannot Establish an Improper Deviation from Past Practice Theory.

Plaintiffs also contend that the Secretary's determination to terminate TPS based on "national interest" considerations is a deviation from prior practice, which makes their arbitrary-and-capricious claim likely to succeed. *See* Pls' Br. at 24–25. But this argument implies illogically that national-interest determinations must remain static and that a Secretary cannot exercise her congressionally delegated authority in any manner contrary to her predecessor. That argument

fails because Congress both specifically contemplated and authorized the DHS Secretary to make a "national interest" finding when considering whether to terminate TPS. *See* 8 U.S.C. §§ 1254a(b)(1)(C), (3)(B). The government has never made a "hard-and-fast commitment" not to consider the national interest when making termination decisions—let alone taken an "earlier [agency] position" that could have conferred a legitimate reliance interest on a TPS recipient that the government would not consider the national interest in future periodic reviews. *FDA v. Wages and White Lion Invs., LLC*, 604 U.S. 542, 573–85 (2025).

Nor do plaintiffs accurately describe past agency practice. This is shown by how the Secretary has considered the national-interest element of § 1254a(b)(1)(C) in making extension or termination determinations about TPS for decades. *See, e.g.*, DHS, *Extension and Redesignation of Haiti for Temporary Protected Status*, 88 Fed. Reg. 5,022, 5,025 (Jan. 26, 2023) ("The Secretary has determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting Haiti's TPS designation remain *and that such extension is not contrary to the national interest of the United States*." (emphasis added)); DOJ, *Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension*, 63 Fed. Reg. 15,437, 15438 (Mar. 31, 1998) (terminating Liberia's Temporary Protected Status designation after "consultations with the appropriate agencies of the U.S. Government concerning (a) the conditions in Liberia; *and (b) whether permitting nationals of Liberia . . . to remain temporarily in the United States is contrary to the national interest of the United States*" (emphasis added)). The Secretary's termination determination here therefore does not amount to a change in interpretation to the statutory language, and acting in accordance with a statute passed by Congress cannot be deemed unlawful. *See, e.g.*, *Ukeiley v. EPA*, 896 F.3d 1158, 1165 (10th Cir. 2018) ("[S]ince the EPA's Rule complies with the statute's plain meaning, we

22

cannot find its application here arbitrary and capricious."); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585–88 (1952) (recognizing that the Executive must act with authority conferred by Congress).

### 3. The Secretary Followed Statutory Procedure.

Plaintiffs also contend that the Secretary's determination here was arbitrary and capricious because it was politically influenced and provided too short of a transition period. But the Secretary's termination determination follows a natural reading of the statute. The TPS statute ties a country's initial TPS designation to specific events or conditions (such as an "ongoing armed conflict," "an earthquake, flood, drought, epidemic, … other environmental disaster," or other "extraordinary and temporary conditions"). 8 U.S.C. § 1254a(b)(1). The statute emphasizes that the conditions that give rise to the TPS designation must be "temporary" and "extraordinary." *See id*. § 1254a(b)(1)(B)(i) (permitting the Secretary to designate a country for TPS if it finds, among other things, that an environmental disaster causes a "substantial, but temporary, disruption of living conditions"); *id*. § 1254a(b)(1)(C) (the Secretary may designate a country for TPS if she finds that "there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety"). Thus, when the statute mandates that the Secretary periodically evaluate whether "the conditions for [a country's TPS] designation . . . continue to be met," *id*. § 1254a(b)(3)(A), it follows that the Secretary is supposed to evaluate whether the "extraordinary and temporary" conditions caused by the event that gave rise to the TPS designation *continue* to exist. Indeed, this is why Congress specifically contemplated Secretaries revisiting original decisions when deciding whether to extend or terminate. *See* 8 U.S.C. § 1254a(b)(3)(B) (referring back to subparagraph (A), which requires the Secretary to "determine whether the conditions of *such* designation" continue to be met, 8 U.S.C.

23

§ 1254a(b)(3)(A)). Nothing in the statute suggests that a DHS Secretary's periodic evaluation of a TPS designation must incorporate events entirely unrelated to the original designation.

That the statute contemplates that the Secretary will focus the determination to terminate or extend an existing TPS designation on the originating event is underscored by DHS's longstanding interpretation of the TPS statute as providing that the Secretary, when reviewing a country's TPS status, may redesignate (that is, newly designate) a country for TPS, as opposed to extending the country's existing TPS designation. *See* DOJ, *Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program*, 62 Fed. Reg. 16,608, 16,609 (Apr. 7, 1997); *see also* 8 C.F.R. § 244.17(a) ("Such registration applies to nationals of those foreign states designated or redesignated for more than one year by DHS."). DHS's recognition of the distinction between redesignations and extensions of previous designations demonstrates that the agency understands the statute to differentiate between whether new country conditions justify a TPS designation independently (thus warranting a redesignation) and whether conditions resulting from the events that gave rise to the initial designation continue to exist (thus warranting an extension of the initial designation).

Previous Secretaries generally considered new or intervening conditions to the extent that they would be linked to or impeded recovery from the event underlying the initial designation or re-redesignation. *See, e.g.*, DHS, *Extension of the Designation of El Salvador*, 81 Fed. Reg. 44,645 (July 8, 2016) ("Recovery from the [2001] earthquakes has been slow and encumbered by subsequent natural disasters and environmental challenges, including hurricanes and tropical storms, heavy rains and flooding, volcanic and seismic activity, an ongoing coffee rust epidemic, and a prolonged regional drought that is impacting food security."); DHS, *Extension of the Designation of Haiti*, 80 Fed. Reg. 51,582 (Aug. 25, 2015) ("Haiti's ability to recover [from the

2010 earthquake] has been further constrained by political instability."); DHS, *Extension of the Designation of Sudan*, 79 Fed. Reg. 52,027 (Sept. 2, 2014) ("[T]he Secretary has determined that an 18-month extension is warranted because the armed conflict [in Sudan] is ongoing and the extraordinary and temporary conditions that prompted the May 2013 extension and redesignation continue to exist."); DHS, *Extension of the Designation of Nicaragua*, 75 Fed. Reg. 24,737 (May 5, 2010) (extending Nicaragua's TPS designation "because there continues to be a substantial, but temporary, disruption of living conditions in Nicaragua resulting from Hurricane Mitch").

Even termination determinations made by prior Secretaries likewise indicate that they have often focused their analyses on whether the event and conditions that led to the original designation persisted—precisely the standard used here. *See* DHS, *Termination of Guinea's Designation*, 81 Fed. Reg. 66,064 (Sept. 26, 2016) (noting that "[w]hile the impacts of the [Ebola] epidemic pose a lasting challenge to Guinea's economy and the capacity of its health system to provide treatment for preventable or treatable conditions," "the extraordinary and temporary conditions that prompted Guinea's TPS designation have substantially resolved and no longer prevent nationals of Guinea from returning to Guinea in safety"); DHS, *Termination of the Designation of Burundi*, 72 Fed. Reg. 61,172 (Oct. 29, 2007) ("[C]onditions that warranted the initial designation of TPS [for Burundi] in 1997 and the re-designation in 1999 no longer continue to be met."); DOJ, *Termination of Designation of Rwanda*, 62 Fed. Reg. 33,442 (June 19, 1997) ("The ability of so many to return in relative safety demonstrates the end of the extraordinary circumstances that existed in 1994," when Rwanda was designated for TPS.); DOJ, *Termination of Designation of Kuwait Under TPS Program*, 57 Fed. Reg. 2931 (Jan. 24, 1992) ("[T]he extraordinary and temporary conditions found to exist in Kuwait on March 27, 1991 are not presently in existence."); *see also, e.g.*, DHS, *Extension of the Designation of Nicaragua*, 68 Fed. Reg. 23,748 (May 5, 2003)

25

("Each decision to extend the TPS designation was made on the determination that the conditions that warranted the TPS designation initially continued to exist."); DHS, *Extension and Redesignation of Somalia*, 77 Fed. Reg. 25,723 (May 1, 2012) ("The Secretary has determined that an 18-month extension is warranted because the armed conflict is ongoing, and the extraordinary and temporary conditions that prompted [Somalia's] 2001 redesignation persist.").

Any argument for further, more strict considerations on discretionary relief would effectively turn the TPS statute's discretionary review process into a mandatory duty. As § 1254a(b)(1)(A)–(C) sets out, the Secretary "may designate" a foreign state with the TPS designation "only if" one (or more) of three conditions are met. If DHS must go beyond these conditions, every Secretary would then have to review and consider whether a foreign state meets other prongs under the TPS statute when Congress afforded discretion to the Secretary in the first place in conducting such a review. It is well-established that agencies "must abide 'not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 820 (2022) (quoting *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139-40 (D.C. Cir. 2006)).

In sum, the Secretary here appropriately followed statutory procedures, and plaintiffs' misconstruction of what the TPS statute requires does not undercut the Secretary's determination.

### 4. The Court May Not Reweigh the Evidence before the Secretary.

The plaintiffs similarly argue that the Secretary's determination runs contrary to the evidence and was not an "objective review of country conditions." *See* Pls' Br. at 20–22. This is nothing more than a request that this court substitute its own determinations for the Secretary's, and that is not permissible in an APA record-review case. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("The APA's arbitrary-and-capricious standard requires that

agency action be reasonable and reasonably explained . . . . A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."). First, many of plaintiffs' proffered facts and arguments are based on extra-record articles and declarations, amongst other things. *See* Dkt. 16. The court should disregard such facts and arguments to the extent they were not in the administrative record. *See, e.g.*, *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) ("The focal point for judicial review [of agency action] should be the administrative record already in existence, not some new record made initially in the reviewing court.").

But even if the court considers plaintiffs' arguments, they still fail. Plaintiffs make much of data regarding Burma, a foreign country, and argue that the Secretary's determination is implausible considering those conditions. *See* Pls' Br. at 26–29. This argument is nothing more than a clear invitation for this court to "reweigh the conflicting evidence or otherwise [] substitute [its] judgment for that of the agency." *Ind. Mun. Power Agency v. FERC*, 56 F.3d 247, 254 (D.C. Cir. 1995). And that is something courts are not supposed to do. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (courts do not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [our] judgment for that of the [agency]"). Even worse, plaintiffs are asking for this court to draw its own inferences on questions related to foreign policy and national security, where "'the lack of competence on the part of the courts is marked.'" *Hawaii*, 585 U.S. at 704 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010)); *see also Reno v. Am.-Arab Anti-Discrim. Comm.* ("*AADC*"), 525 U.S. 471, 491 (1999) (noting that courts are "ill equipped" to review evidence related to "foreign-policy objectives").

Plaintiffs suggest that Department of State travel advisories and other reports support their theory about terminating Burma's TPS designation. *See* Pls.' Br. at 13, 16, 21. But Congress

authorized the Secretary of Homeland Security to make the final determination without prescribing which facts she must consider or how to best weigh the relevant evidence. *See* 8 U.S.C. § 1254a(b)(1). That happened here, and it is improper for this court to second-guess that decisionmaking and "penalize[e] [her] for departing" from other agencies' inferences. *New York*, 588 U.S. at 777. The Secretary here assessed the facts, set those out in the termination notice, and made a choice "between reasonable policy alternatives." *Id*. at 775.

Plaintiffs' theory suffers not only from legal flaws but practical ones, too. TPS designations have also been terminated in the past despite significant ongoing problems in the relevant countries. *See, e.g.*, DHS, *Termination of Designation of Angola Under TPS Program*, 68 Fed. Reg. 3,896 (Jan. 27, 2003) (terminating Angola's TPS designation despite the remaining "challenge of assisting an estimated 4 million displaced Angolan nationals," ongoing "concern that Angola lacks housing, medical services, water systems, and other basic services destroyed by a 27-year-long war"); DOJ, *Termination of the Province of Kosovo*, 65 Fed. Reg. 33,356 (May 23, 2000) (terminating Kosovo's designation because, "[a]lthough conditions remain difficult with bursts of ethnically-motivated violence, the situation in Kosovo cannot now be classified as ongoing internal conflict"). It is unclear how those terminations could have ever been possible if the plaintiffs' one-way-ratchet theory for TPS were correct (perhaps because it would effectively eliminate the word "temporary" from the statutory program).

At bottom, the plaintiffs are requesting that this court impermissibly "interfere with the policy decisions of an agency." *Episcopal Hosp. v. Shalala*, 994 F.2d 879, 884 (D.C. Cir. 1993). Not only is that wrong under the APA, but it is especially inappropriate where matters of foreign policy and national-security considerations are concerned, where judicial intervention is least warranted and deference to the Executive Branch is most critical. *See Grand Trunk Corp. v. TSA*,

153 F.4th 517, 525 (7th Cir. 2025) ("[W]e are . . . loathe to second-guess expert agency judgments on potential risks to national security when we traditionally defer to the informed judgment of agency officials whose obligation it is to assess such risks." (quotation marks omitted)).  There is no reason this case should be treated any differently just because plaintiffs disagree with the determination the Secretary made about Burma.

### C.  Plaintiffs' Constitutional Claim Is Also Not Likely to Succeed.

Plaintiffs similarly contend that they are likely to succeed on their constitutional discrimination claim, arguing that this court should apply the standard set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977).  *See* Pls.' Br. at 29–33.  But the Supreme Court has specifically foreclosed that standard in the context of immigration-related decisionmaking--recognizing that "[a]ny rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution."  *Hawaii*, 585 U.S. at 704 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976)).  This is because the appropriate standard to review plaintiffs' equal-protection theory is the "facially legitimate and bona fide" standard[8] or *at most* rational basis.[9] *See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 794–95 (1977) (assessing an equal-protection claim under the "facially legitimate and bona fide" standard because the Court could "see no reason to review the . . . policy choice at issue here under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case"); *Aguayo v. Christopher*, 865 F. Supp. 479, 488–49 (N.D. Ill. 1994) ("[W]here immigration or naturalization is concerned, the Supreme Court has employed a far more deferential standard of review.  The applicable standard in these cases

---

[8]  *See Hawaii*, 585 U.S. at 704 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972)).

[9]  *See Hawaii*, 585 U.S. at 704 (rational basis review may also be appropriate).

resembles the political question doctrine, insofar as it calls upon courts to defer to the broad policy choices of Congress, even where constitutional interests are implicated, so long as those policy choices are based on a facially legitimate and bona fide reason." (cleaned up)). The termination determination satisfies either one of those tests, and the plaintiffs cannot rely on statements by the President or impute upon the Secretary of Homeland Security the President's campaign statements. *See Hawaii*, 585 U.S. at 702–04 (noting how the Proclamation at issue there survived both the Mandel standard, as well as rational-basis review, partly because "relations with foreign powers" "involve classifications defined in the light of changing political and economic circumstances").

Plaintiffs disagree, contending that the Secretary's termination determination is motivated by racial animus. *See* Pls' Br. at 30–31. But the court should reject such a preposterous argument. The TPS statute itself requires a country- or nationality-based determination. "Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive . . . [and must be upheld] [s]o long as such distinctions are not wholly irrational . . . ." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) (citations omitted); *accord Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008); *Kandamar v. Gonzales*, 464 F.3d 65, 72–74 (1st Cir. 2006). And agency actions that affect a greater proportion of one race than another does not run afoul of equal protection guarantees. *See Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Accordingly, the *Arlington Heights* standard has no place in this analysis, and plaintiffs' arguments, which rely on that standard should fail. *See Hawaii*, 585 U.S. at 704-05 (recounting how *Mandel*'s narrow standard of review would acknowledge separation-of-power concerns and the judiciary's "lack of competence" in collecting evidence and drawing inferences on questions related to national security and foreign relations with specific countries).

Plaintiffs' claims fail even under the *Arlington Heights* standard. First, the invocation of race and ethnicity discrimination is merely a backdoor attempt to raise a nationality claim. *See* Compl. ¶ 195 (alleging discriminatory animus against "Burmese national TPS holders" because they are not perceived as white or European). But even accepting that claim, the court should not welcome such a low pleading standard because doing so would "virtually" invite equal protection challenges to "any generally applicable immigration policy." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 34 (2020) (rejecting disparate impact claim because accepting sufficiency standards *see also Hawaii*, 585 U.S. at 706.

Second, plaintiffs cannot show that the Secretary's TPS determinations were "motivated by discriminatory animus," Pls.' Br. 30, through statements taken out of context, often from other speakers and from years ago, and without direct links to the challenged action, *see Regents of the Univ. of Cal.*, 591 U.S. at 34–35 (explaining that disparate impact, unusual recission history, and pre- and post-election statements failed "to raise a plausible inference that the recission was motivated by animus"). Rather, Secretary Noem provided reasoned, facially sufficient explanations for her determinations. To that end, the *Federal Register* Notice outlined positive improvements in the country's conditions that informed the Secretary's decision to terminate TPS for Burma and how and why the United States' national interests outweigh Burma's TPS designation. 90 Fed. Reg. at 53,380–381. Plaintiffs ignore these stated justifications, and instead cherry-pick external statements, social media posts, and media appearances to infer an overarching discriminatory motive with respect to TPS terminations as a whole.

But Plaintiffs' allegations run into several problems. First, Plaintiffs take the Secretary's statements regarding TPS out of context and mischaracterize them. Second, they do not point to a single statement in which *the Secretary* directed or suggested animus towards Burmese nationals.

That failure is telling and should confirm that plaintiffs have failed to state a plausible claim, let alone shown a strong likelihood of success. *See Regents of the Univ. of Cal.*, 591 U.S. at 35 (finding "unilluminating" statements that were not attributable to the decisionmakers). Third, plaintiffs also rely on actions from December 2025, which post-date the termination decision. *See* Compl. ¶¶ 53–54; *see also* Pls.' Br. at 36 (discussing a December 2025 memorandum from U.S. Citizenship and Immigration Services ("USCIS")). Statements that postdate the agency decision have no place in the court's analysis. *See, e.g.*, *FirstHealth Moore Reg. Hosp. v. Becerra*, 560 F. Supp. 3d 295, 308–09 (D.D.C. 2021).

Instead of pointing to Burma-related statements made by the Secretary, plaintiffs then fall back on statements made by the President, during the campaign and after inauguration. *See, e.g.*, Compl. ¶¶ 84–90. In this regard, the plaintiffs seem to be advancing a "cat's paw theory," but they fail to show how such statements or conduct can be connected or extended to the Secretary's determination at issue here. The campaign statements were "remote in time and made in unrelated contexts" and therefore "do not qualify as 'contemporary statements' probative of the decision at issue." *Regents of the Univ. of Cal.*, 591 U.S. at 35 (opinion of Roberts, C.J.) (quoting *Arlington Heights*, 429 U.S. at 268); *Hawaii*, 585 U.S. at 708 ("The Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving "sensitive and weighty interests of national security and foreign affairs."). As for post-inauguration statements, a president maintains "broad powers to speak on matters of public concern" including "a vast array of activities that touch on nearly every aspect of American life." *Trump v. United States*, 603 U.S. 593, 626–29 (2024). Therefore, President Trump's statements do not demonstrate animus by Secretary Noem. *See, e.g.*, *Staub v. Proctor Hosp.*, 562 U.S. 411, 418 (2011); *Ramos*, 975 F.3d at 897 ("We doubt that the 'cat's paw' doctrine of employer liability in discrimination

cases can be transposed to th[e] particular context" of TPS terminations). A cat's-paw approach would invite judicial second guessing of an agency official's actions based on mere allegations that a different government official harbored a discriminatory motive. That would open the door to impermissible intrusion on privileged Executive Branch deliberations, *see United States v. Nixon*, 418 U.S. 683, 708 (1974), and potential litigation-driven discovery that would disrupt a president's execution of the laws, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982).

Put simply, the plaintiffs have provided nothing that is either independently or collectively sufficient to state a claim that the Secretary's TPS termination of Burma was motivated by racial animus. Plaintiffs' challenge amounts to disputing whether the Burma's termination is a "wise" choice given continued concerns in the foreign country, but that is not for this court to review. *See Prometheus Radio Project*, 592 U.S. at 423. All that matters is that the Secretary here easily had a rational basis to conclude that Burma's TPS designation should be terminated. *See* 90 Fed. Reg. at 53,380–381. That decisionmaking was in line with how past Secretaries, or the Attorney General prior to the creation of DHS, routinely has decided to terminate a country's TPS designation. *See supra*. Terminating Burma's TPS designation is thus a quintessential decision that goes to "the admission and exclusion of noncitizens" and therefore "implicates relations with foreign powers, or involve[s] *classifications* defined in the light of changing political and economic circumstances[.]" *Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021) (citation modified) (emphasis added). And permitting a discriminatory animus claim to move forward based on mere conflation between nationality, race, ethnicity, and national origin would invite a tidal wave of litigation that the Supreme Court has cautioned against. *See Regents of the Univ. of Cal.*, 591 U.S. at 34.

## II.    There Is No Showing of Imminent, Irreparable Harm Here.

This court should also deny plaintiffs' motion because they cannot carry their burden to

show that they are likely to suffer imminent, irreparable harm. *See Int'l Union, Allied Indus. Workers of Am., AFL-CIO v. Local Union No. 589*, 693 F.2d 666, 674 (7th Cir. 1982). This is because plaintiffs' entire argument on irreparable harm is primarily rooted in the fear of potential removal and deportation. Pls' Br. at 33–36; see id. at 35 (discussing "*if* Plaintiffs are deported to Burma" (emphasis added)). But that is not irreparable harm because removal and potential loss of employment authorization—are inherent in the statutory scheme *Congress* designed, which provides "temporary" status. *See* 8 U.S.C. §§ 1254a(b)(1)(B)(i), (ii), (C), and (g). The Secretary's termination decision here occurred as a result of congressionally prescribed periodic review and provided the requisite 60-day notice of termination. And the Secretary's decision to terminate TPS here is not equivalent to a final removal order. See 8 U.S.C. § 1101(a)(47). Instead, when a TPS designation terminates, beneficiaries return to the immigration status they held before Burma's 2021 designation. And putative class members who are TPS beneficiaries may have other immigrant or nonimmigrant status, 8 U.S.C. § 1254a(a)(5); those who have a credible fear of persecution in their home country may apply for asylum. Plaintiffs' concerns at this stage are therefore insufficient to outweigh the concrete harms to preventing the Secretary form undertaking and implementing precisely the type of periodic review of TPS determinations that Congress wanted to occur in 8 U.S.C. § 1254a(b)(3)(B).

Moreover, plaintiffs cannot rely on *potential* threats of removal, detention, or loss of employment authorization by themselves or collectively, to establish irreparable harm. As a threshold concern, considering removal and removal-related detention as harms would effectively invite the court to weigh in on questions of law and fact that arise from actions or proceedings to remove aliens, and Congress specifically divested federal district courts of authority to review such

questions. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9), (g).[10] Even if the court were to review plaintiffs' alleged removal concerns, "[t]he Supreme Court has held that 'simply showing some possibility of irreparable injury' is not sufficient to make the irreparable harm showing needed to obtain preliminary relief. *Hanson v. Smith*, 120 F.4th 223, 245 (D.C. Cir. 2024) (quoting *Nken*, 556 U.S. at 434), *cert. denied*, 145 S. Ct. 2778 (2025). And indeed, the same *Nken* Court confirmed that, while a serious burden, removal "is not categorically irreparable." 556 U.S. at 435. None of the plaintiffs allege that they have ever been subject to removal proceedings, let alone that they have orders of removal. Therefore, speculative fears about removal are nothing more than "remote conjecture" at this point, and that is simply not enough to meet their high burden. *Hanson*, 120 F.4th at 245. Similarly for detention, there is nothing in the record that even *suggests* that plaintiffs would be subject to detention immediately upon TPS being terminated. Such speculation is instead "pure conjecture" that makes preliminary injunctive relief improper. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 676 (D.C. Cir. 1985).

Even if the threat of removal were not merely theoretical, plaintiffs cannot establish that the threat of removal is irreparable. If relief from removal can be afforded later, then there is no irreparable harm for the purposes of awarding extraordinary relief. *See Nken*, 556 U.S. at 434. None of the Plaintiffs alleges that they could not obtain review of their fear of return to Burma through regular immigration proceedings if such proceedings were to be commenced. If so, plaintiffs can then present fear claims before an immigration judge, appeal an adverse ruling to the Board of Immigration Appeals, and from there file a petition for review with the appropriate court of appeals. 8 U.S.C. §§ 1252(a)(5), (b)(9); *see also J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th

---

[10] Detention claims are subsumed into the jurisdictional bars within 8 U.S.C. §§ 1252(b)(9) and (g), which both strip federal district courts of habeas jurisdiction over claims related to removal.

Cir. 2016) ("Taken together, § 1252(a)(5) and § 1252(b)(9) mean that any issue – whether legal or factual – arising from any removal-related activity can be reviewed only through the [petition-for-review] process."); *Verde-Rodriguez v. Att'y Gen.*, 734 F.3d 198, 201 (3d Cir. 2013). And even if proceedings are not commenced, nothing stops plaintiffs from affirmatively seeking relief from removal by filing applications with USCIS. *See generally Dhakal v. Sessions*, 895 F.3d 532 (7th Cir. 2018) (discussing the affirmative asylum application of a Nepalese TPS recipient). Putative class members who are in removal proceedings can raise and obtain Article III review of issues related to removal, including fears about ongoing medical treatment[11] and potential employment opportunities.[12] Similarly, if plaintiffs are detained (which is a permissible component of the removal process), they may seek review of their detention through habeas.

Plaintiffs also contend that the potential loss of employment authorization would constitute irreparable harm. *See* Pls' Br. at 34–35. But "[t]hese alleged injuries do not meet the threshold of injunctive relief." *Zeng v. Mayorkas*, No. 21-cv-446, 2021 U.S. Dist. LEXIS 111323, at *4 (D.D.C. Apr. 16, 2021). That is because economic harm is generally not sufficient to constitute irreparable injury. *See id.* Particularly where the "temporary" of the TPS program should underscore how recipients should not plan on TPS designations lasting forever. The court should therefore not hesitate in denying plaintiffs' request for interim relief particularly where they have failed to submit any evidence regarding monthly expenses, total savings, or other sources of income. *See id.* at *7.

---

[11] *See, e.g.*, *Yang v. Lynch*, 611 F. App'x 357, 359 (7th Cir. 2015) (recognizing that the Board of Immigration Appeals would review claims related to medical care in determining whether to reopen proceedings).

[12] *See, e.g.*, *Marinescu v. Att'y Gen.*, 284 F. App'x 889, 894 (3d Cir. 2008) (discussing employment prospects established in evidentiary record); *Francisco-Diego v. Garland*, No. 21-3870 2022 U.S. App. LEXIS 15036, at *8 (6th Cir. 2022) (same).

Nor do the plaintiffs' declarations move the needle here. This is because plaintiffs waited nearly *four weeks* before even moving for preliminary injunctive relief. *See* Dkt. 15. This self-imposed delay is fatal to because hornbook law teaches that a "long delay by plaintiff after learning of the threatened harm . . . may be taken as an indication that the harm [is] not . . . serious enough to justify a preliminary injunction." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2948.1 (3d ed. 2013). Seventh Circuit precedent and other cases from this district court are to the same effect. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."); *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (two-month delay in filing motion weighs heavily against issuance of injunction); *Tranchita v. Callahan*, 511 F. Supp. 3d 850, 882 (N.D. Ill. 2021) (discussing how "delay in seeking preliminary injunctive relief . . . undermines [the movant's] irreparable harm argument"); *Arjo, Inc. v. Handicare USA, Inc.*, No. 18 C 2554, 2018 WL 5298527, at *9 (N.D. Ill. Oct. 25, 2018) ("[A] significant delay in filing a motion for preliminary injunction undermines the moving party's argument that it will suffer irreparable harm without an injunction."). Accordingly, the plaintiffs have failed to carry their burden that they will suffer irreparable harm absent injunctive relief.

## III.    The Balance of Equities and the Public Interest Favor Defendants.

The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. A court "'should pay particular regard for the public consequences'" of injunctive relief. *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Here, the balance of the equities and public interest tips decisively in defendants' favor because "[t]he interest in preserving national security is an urgent objective of the highest order." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581

(2017) (per curiam). That is the challenge that this court is reviewing: the Secretary's discretionary judgment in concluding that the conditions for Burma's TPS designation are no longer met. The clear congressional purpose of § 1254a is to allow the Secretary to make a determination as to whether a foreign state's TPS designation is to be terminated and to do so in a timely manner.

Granting plaintiffs relief here would "inflict[] irreparable harm on the [Secretary of Homeland Security] by interfering with the national-security" and national interests "determinations entrusted to [her] by Congress." *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 U.S. App. LEXIS 15297, at *9 (D.C. Cir. June 20, 2025). In a case in which the court "must, of course, give deference to the Executive Branch's evaluation of the facts and the sensitive and weighty interests of national security and foreign affairs, including the timing of those . . . decisions," the public interest favors the government. *Tiktok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (citation modified) (citing *Humanitarian Law Project*, 561 U.S. at 33–34, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002)).

Additionally, the significance of the public interest in the enforcement of the United States' immigration laws is well-settled. *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Nken*, 556 U.S. at 435. The Secretary's termination determination is meant to advance the enforcement of those laws, such as ending the unlawful presence of foreign nationals who would remain in the United States in violation of law. *See Nken*, 556 U.S. at 436 (relying on *AADC*, 525 U.S., at 490). Preserving the political branches' authority to control such policy choices serves "the obvious necessity that the Nation speak with one voice" on such matters. *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001).

## IV.    Any Grant of Preliminary Relief Must be Narrowly Tailored.

If the court grants the relief sought, it should be strictly limited to those plaintiffs in this matter who have established standing, a likelihood of success, and irreparable harm.  It should not inure to a putative class where, as here, no class certification motion has even been filed.  This is shown by how the Supreme Court made clear that universal preliminary injunctive relief, untethered to the plaintiffs in a litigation, is unlawful.  Specifically, the Supreme Court ruled that a "universal injunction . . . falls outside the bounds of a federal court's equitable authority under the Judiciary Act."  *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025).  At most, a court "may administer complete relief between the parties" and should not go beyond that to enjoin action or implementation more broadly.  *Id.* at 851 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)).

Those limitations on courts' equitable authority apply just as squarely to § 705 relief as to preliminary injunctions.  Nothing in § 705 rebuts the presumption that traditional equitable rules apply to relief ordered under § 705, so § 705, like the Judiciary Act of 1789, does not authorize universal relief.  To the contrary, § 705's language embraces principles of equity, authorizing "all necessary and appropriate process" and making clear that "irreparable harm," a traditional equitable inquiry, is a key consideration.  5 U.S.C. § 705; *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (interpreting similar statutory text to incorporate traditional equitable principles); *Hecht v. Bowles*, 321 U.S. 321, 330 (1944) (courts should not "lightly imply" a "major departure" from the "long tradition" of equity).  The Supreme Court and commentators thus recognize that § 705 "was primarily intended to reflect" the "existing law," not to "fashion new rules," unmoored from principles of equity, governing remedies.  *Sampson v. Murray*, 415 U.S. 61, 80 n.15 (1974); *see also* Louis L. Jaffe, *Judicial Control of Administrative Action* 662 (1965)

(§ 705 merely "relates the power granted under the All Writs statute to the review of administrative orders"); Tom C. Clark, *Attorney General's Manual on the Administrative Procedure Act* 106 (1947) (§ 705 "is an equitable power, to be exercised 'upon such conditions as may be required.'"); H.R. Rep. No. 1980, 79th Cong., 2d Sess. 43 (1946) (explaining that the authority granted by what is now § 705 "is equitable" and "would normally, if not always, be limited to the parties complainant").  In sum, there is no basis to read § 705 to depart from the "party-specific principles" that "permeate our understanding of equity."  *CASA*, 606 U.S. at 844; *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995–96 (9th Cir. 2025) (court "limit[ed a] district court's § 705 stay order" to plaintiff's clients in light of *CASA*).

## Conclusion

For the foregoing reasons, the court should deny the plaintiffs' motion.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Joshua S. Press
  JOSHUA S. PRESS
  Assistant United States Attorney
  219 South Dearborn Street
  Chicago, Illinois 60604
  (312) 886-7625
  joshua.press@usdoj.gov