**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **AUNG DOE, NINA DOE, THURA DOE, KHIN THET DOE, CHU LET DOE, and MAUNG DOE, on their own behalf and on behalf of others similarly situated,** )<br>)<br>)<br>)<br>)<br>)<br>) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No. 25 C 15483** |
| ) | |
| **KRISTI NOEM, SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, and UNITED STATES OF AMERICA,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| ) | |
| **Defendants.** ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

      Six Burmese nationals who currently hold Temporary Protected Status (TPS) under the Immigration and Nationality Act (INA) have sued the government alleging that Kristi Noem—the Secretary of the United States Department of Homeland Security— and other defendants violated the Administrative Procedure Act (APA) and the Fifth Amendment when terminating the TPS status of Burma, also known as Myanmar. That decision becomes effective January 26, 2026. The plaintiffs allege that the Secretary's decision to terminate Burma's TPS designation is part of a broader policy and practice of unlawfully terminating TPS designations for over ten countries. The plaintiffs have

filed a motion for the Court to postpone the effective date of Burma's TPS termination under APA section 705. 5 U.S.C. § 705. For the reasons stated below, the Court grants the plaintiffs' motion.

## Background

### A.      Temporary Protected Status

In 1990, Congress amended the INA to create the TPS program. Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5030 (codified at 8 U.S.C. § 1254a). The TPS program provides temporary work authorization and protection against removal for noncitizens present in the United States who cannot return to their home countries because of conditions enumerated in the statute. *Id.* The TPS statute states that the Secretary may provide a TPS designation for a foreign nation, or part of a foreign nation, for an initial period of between six and eighteen months if she finds that at least one of three conditions has been met:

> (1) there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

> (2) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected, the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and the foreign state officially has requested designation under this subparagraph; or

> (3) there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1); *see* 6 U.S.C. § 557 (conferring upon the Secretary of Homeland Security certain authorities granted by statute to the Attorney General, including those

2

relating to TPS).

For an individual from a designated foreign nation to be eligible for TPS protection, that person must, among other requirements, have maintained continuous physical presence in the United States since the effective date of the TPS designation, be "admissible" as an immigrant, and not have a prior conviction for certain criminal offenses. 8 U.S.C. § 1254a(c).

The TPS statute also requires the Secretary to periodically review a TPS designation to determine whether it should be extended or terminated. *Id.* § 1254a(b)(3)(A). This review must occur at least sixty days before the end of the initial or extended period of designation. *Id.* The TPS statute provides that the Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met." *Id.*

Historically, United States Citizenship and Immigration Services (USCIS) manages and coordinates the TPS review process for the Secretary. Pls.' Ex. 1 at 26. According to USCIS officials, at the start of a review for an existing designation, USCIS's Office of Policy & Strategy generally contacts USCIS's Refugee, Asylum and International Operations Directorate (RAIO) to request input on country conditions. *Id.* at 27. USCIS also historically has coordinated with the Department of State's Bureau of Population, Refugees, and Migration regarding the target time frame for receiving the Department of State's input. *Id.* In general, once USCIS receives input from RAIO and State, USCIS finalizes its country conditions report and recommendation memo for the

Secretary. *Id.*

After review, the Secretary must provide, on a timely basis, for the publication of the notice of her determination. *Id.* The notice must include "the basis for the determination, and in the case of an affirmative determination, the period of extension of designation . . . ." *Id.* If the Secretary determines that a foreign state (or part of such a foreign state) no longer continues to meet the conditions for designation, she "shall terminate the designation by publishing notice in the Federal Register of the determination . . . (including the basis for the determination)." *Id.* § 1254a(b)(3)(B).

The Secretary may postpone the effective date of a termination "in order to provide for an orderly transition." *Id.* § 1254a(d)(3). In the twelve TPS terminations announced before 2025, DHS provided at least a six-month orderly transition period. Pls.' Ex. 2. In the history of the TPS statute, prior to 2025, only four TPS designations (in the 1990's and early 2000's) were terminated without an orderly transition period. *Id.*

**B.    Burma's TPS designation**

On May 25, 2021, former Secretary Alejandro Mayorkas designated Burma for TPS based on extraordinary and temporary conditions in the country. Designation of Burma (Myanmar) for Temporary Protected Status, 86 Fed. Reg. 28 (May 25, 2021). As an overview of why Burma was designated for TPS, the original notice stated:

> On February 1, 2021, the Burmese military perpetrated a coup, deposing the democratically elected government and declaring a temporary one-year state of emergency, after which it has said it will hold elections. The military is responding with increasing oppression and violence to demonstrations and protests, resulting in large-scale human rights abuses, including arbitrary detentions and deadly force against unarmed individuals. The coup has triggered a humanitarian crisis, including the disruption of communications and limited access to medical care. The Burmese military has a clear and well-documented history of committing atrocities against the people of Burma, and again, the military is committing brutal violence

4

against the Burmese people, including young children.

*Id.*

Following the initial designation, former Secretary Mayorkas extended Burma's existing designation in 2022. Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status, 87 Fed. Reg. 58,515, 58,518 (Sep. 27, 2022). As a summary of why Burma's TPS designation was extended, the second notice stated:

> [M]ore than a year after the Burmese military perpetrated a coup, human rights violations and abuses including sexual violence, disappearances, excessive use of force, and killings are occurring in most parts of the country. As a result, more than 974,000 people are currently internally displaced throughout the country, while more than 45,500 remain in neighboring countries after fleeing since the coup. Burma was economically vulnerable when the coup took place, but has since suffered further economic decline, with mass job losses, business closures and the weakening of the country's currency, which has affected households across the country. As a result, major vulnerabilities related to shelter, food security, human trafficking risks, and the country's economy have arisen as Burmese families have lost on average more than half of their income since the February 2021.

*Id.*

Former Secretary Mayorkas again extended Burma's designation from May 25, 2024 through November 25, 2025. Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status, 89 Fed. Reg. 20,682, 20,684 (Mar. 25, 2024). As a summary of the reasons supporting the second extension of Burma's TPS designation, the notice stated:

> The February 1, 2021, military coup that overthrew Burma's democratically elected civilian government gave rise to further widespread violence that continues to put persons in Burma at significant risk. Attacks killing civilians are frequent, and particularly affect members of certain ethnic groups. Human trafficking perpetrated by both the military regime and criminal actors is prevalent. Burma also faces challenges in the provision of food, access to health care, and economic stability.

*Id.*

Most recently, on November 24, 2025, Secretary Noem announced her decision to terminate Burma's TPS designation in sixty days, on January 26, 2026. Pls.' Ex. 20; Termination of Burma (Myanmar) Temporary Protected Status, 90 Fed. Reg. 53,378, 53,382 (Nov. 25, 2025). As a summary of the reasons for terminating Burma's TPS, the notice stated:

> While some extraordinary and temporary conditions may exist, the Secretary has determined that, for the foregoing reasons of national security, public safety, foreign policy, and immigration integrity, permitting Burmese nationals to remain temporarily in the United States is contrary to the U.S. national interest.

90 Fed. Reg. at 53,382 (2025).

In a press release, Secretary Noem stated that the decision to terminate TPS for Burma "restores TPS to its original status as temporary." Pls.' Ex. 20.

## C.    Other TPS terminations

On January 29, 2025, Secretary Noem announced she was "revoking Joe Biden's extension of Venezuelan Temporary Protected Status. . . ." Pls.' Ex. 8. On February 24, 2025, Secretary Noem announced a partial termination of TPS for Haiti. Pls.' Ex. 9. DHS's press release regarding this termination stated that "the TPS system has been exploited and abused" "for decades." *Id.* The release also stated that it was "returning TPS to its original status: temporary." *Id.* In May 2025, DHS announced termination of TPS for Afghanistan. Pls.' Ex. 10. In June, DHS announced termination of TPS for Cameroon and Nepal. In July, DHS announced termination of TPS for Haiti, Honduras, and Nicaragua. In September, DHS announced termination of TPS for Venezuela and Syria. In November, DHS announced termination of TPS for South

Sudan and Burma.  In December, DHS announced termination of TPS for Ethiopia.  In January 2026, DHS announced termination of TPS for Somalia.

## D.    Public statements

In an interview on March 5, 2024, now-Secretary Noem (who was then the governor of South Dakota) described immigration as an "invasion happening on purpose . . . to remake the foundation of this country."  Pls.' Ex. 44.  At her confirmation hearing on January 15, 2025, Secretary Noem stated that "[TPS] has been abused and manipulated by the Biden Administration and that will no longer be allowed . . . ."  Pls.' Ex. 3 at 104:18-20.  And, on January 29, 2025, Secretary Noem stated that the TPS program was "abused, exploited, and politicized" and promised "[n]o more immigration schemes that makes Americans less safe."  Pls.' Ex. 8.

On May 19, 2025, DHS stated that TPS was "exploited" to "let half a million poorly vetted migrants into this country," including "MS-13 gang members," "known terrorists," and "murderers."  Pls.' Ex. 49.  On October 14, 2025, DHS posted a message on social media that simply stated, "Remigrate."  Pls.' Ex. 45.  The plaintiffs cite an article describing how this term "invokes white nationalism and ethnic cleansing via 'mass deportation of non-white immigrants.'"  Pls.' Mem. at 31 (quoting Pls.' Ex. 46).  The defendants do not present any contrary interpretation of the word.

Secretary Noem also publicly stated, in relation to TPS, that "when the [P]resident gives a directive, the Department of Homeland Security will follow it . . . ."  Pls.' Ex. 43 at 4.  On January 20, 2025, his first day in office, President Trump issued Executive Order 14159 titled "Protecting the American People Against Invasion."  E.O. 14159, 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025).  In Executive Order 14159, President

Trump directed the Secretary of Homeland Security to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States . . . ."  *Id.*  This included "ensuring that designations of Temporary Protected Status" "are appropriately limited in scope . . . ."  *Id.*  Through this order, President Trump expressly connected prior TPS determinations to an immigration "invasion" and stated that "[m]any [noncitizens] have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels."  *Id.*  On November 27, 2025, just three days after the Secretary's announcement of Burma's TPS termination, President Trump stated that immigrants from "Third World Countries" are "non-compatible with Western Civilization . . . ."  Pls.' Ex. 51.  DHS adopted this message on its social media the next day with the message, "The fight for western civilization is just getting started."  Pls.' Ex. 52.

E.     **Procedural history**

On December 19, 2025, six Burmese nationals (and TPS holders) filed the present lawsuit on behalf of themselves and others similarly situated.  The plaintiffs assert three claims, two claims alleging violations of the Administrative Procedure Act and one claim alleging violation of equal protection under the Fifth Amendment.  The plaintiffs have moved to postpone the effective date of the termination of Burma's TPS, currently set to take effect January 26, 2026.

**Discussion**

A.     **Jurisdiction**

The government contends at the outset that the Court lacks jurisdiction over the

plaintiffs' claims. It relies on three statutory jurisdictional bars in the INA: 8 U.S.C. § 1254a(b)(5)(A), 8 U.S.C. § 1252(a)(2)(B)(ii), and 8 U.S.C. § 1252(f)(1).

**1.    8 U.S.C. § 1254a(b)(5)(A)**

The government first argues that section 1254a(b)(5)(A) of the TPS statute strips the Court of jurisdiction over the plaintiffs' claims. That provision states that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A).

This statutory provision resembles those in two Supreme Court cases: *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), and *Patel v. Garland*, 596 U.S. 328 (2022). These cases frame the parties' arguments and the Court's analysis, so the Court begins by discussing them in some depth.

In *McNary*, the Supreme Court interpreted a different jurisdictional bar in the INA, section 210(e)(1) of the Immigration Reform and Control Act of 1986 (Reform Act). *McNary*, 498 U.S. at 481–84; *see* 8 U.S.C. § 1160(e)(1). There, the plaintiffs alleged that the procedures for evaluating applications for special agricultural worker (SAW) status violated due process. *McNary*, 498 U.S. at 488. The government argued that the claim was barred by section 210(e)(1), which states, "There shall be no administrative or judicial review of a determination respecting an application for adjustment in status under this section except in accordance with this subsection." 8 U.S.C. § 1160(e)(1). The only judicial review provided in that subsection was set out in 8 U.S.C. § 1160(e)(3), which channeled all judicial review "of such a denial" of an application to "judicial review of an order of exclusion or deportation . . . ." *Id.* §

1160(e)(3).  The statute further limited the scope of that review by providing that "[s]uch judicial review shall be based solely upon the administrative record" and that "the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole."  *Id.*

The Court held that section 210(e)(1) did not bar jurisdiction over the plaintiffs' claim.  *McNary*, 498 U.S. at 494.  The "critical words" in the provision were "of *a determination* respecting *an application*."  *Id.* at 491–92.  The Court reasoned that "the reference to 'a determination' describes a single act rather than a group of decisions or a practice of procedure employed in making decisions."  *Id.* at 492.  That reading was supported by section 210(e)(3)'s reference to "judicial review of *such a denial*," again referring to a single act.  *Id.* (quoting 8 U.S.C. § 1160(e)(3)).  Based on Congress's choice of language, the Court agreed with the lower courts that section 210(e)(1) precluded "direct review of individual denials of SAW status" but not "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications."  *Id.* at 492, 494.  The plaintiffs' claim that the Immigration and Naturalization Service's (INS) procedures violated due process fell into the latter category and therefore was not barred.  *Id.* at 494.

The Court pointed to three additional factors that supported limiting section 210(e)(1) to direct review of individual denials.  First, the limited judicial review permitted in section 210(e)(3) was to be "based solely upon the administrative record."  *Id.* at 493.  That "incorporate[d] an assumption that the limited review provisions of § 210(e) apply only to claims that . . . have resulted in the creation of an adequate administrative

10

record." *Id.* The administrative process, however, would not "address the kind of procedural and constitutional claims [the plaintiffs brought]." *Id.*

Second, section 210(e)(3) prescribed an "abuse-of-discretion" standard for the judicial review permitted by the Reform Act. The Court noted that standard would be "appropriate for judicial review of an administrative adjudication of the facts of an individual application for SAW status" but not for "constitutional or statutory claims, which are reviewed *de novo* by the courts." *Id.* The standard of review contemplated by the Act thus further suggested that the Act's jurisdictional provisions did not apply to the plaintiffs' challenge.

Third, the Court noted that if Congress intended to preclude challenges to procedures and practices, "it could easily have used broader statutory language." *Id.* at 494. Indeed, Congress had already done so in other provisions of the INA by referring to "all causes . . . arising under any of the provisions" or "all questions of law and fact." *Id.*

Finally, the Court distinguished *McNary* from its earlier decision in *Heckler v. Ringer*, 466 U.S. 602 (1984). In *Ringer*, the plaintiffs challenged the Secretary's policy of refusing Medicare reimbursement for a surgical procedure. *Id.* at 604–05. The Court held that the plaintiffs who had already received the procedure were required to exhaust administrative remedies, as would be required for a claim for benefits. *Id.* at 619. Though the plaintiffs' claims were styled as a collateral challenge to the reimbursement policy, the Court viewed them as "inextricably intertwined" with their claims for benefits. *Id.* at 614. It observed that the relief sought—invalidation of the policy and a "'substantive' declaration . . . that the expenses . . . are reimbursable"—would leave

11

"only . . . ministerial details . . . before [the plaintiffs] would receive reimbursement." *Id.*
at 614–15.  The Court also found it significant that the administrative process would
provide an adequate remedy because the plaintiffs could challenge "all aspects of the
Secretary's denial of their claims for payment" and any error could be remedied by the
later payment of benefits.  *Id.* at 618.

 *McNary* was different from *Ringer* because the plaintiffs in *McNary* did not "seek
review on the merits of a denial of a particular application" or seek a "substantive
declaration that they are entitled to SAW status."  *McNary*, 498 U.S. at 494–95.  Rather,
if they prevailed, they would "only be entitled to have their case files reopened and their
applications reconsidered in light of the newly prescribed INS procedures."  *Id.*

 The Court further noted that, unlike in *Ringer*, applying the jurisdictional bar to
the plaintiffs in *McNary* would "as a practical matter" deprive them of "meaningful
judicial review of their application denials or of their objections to INS procedures."  *Id.*
at 496.  The Court observed that if the jurisdictional bar applied to the plaintiffs'
challenge, their only chance for judicial review of their SAW status would be in removal
proceedings.  *Id.* at 496.  That, the Court explained, was "tantamount to a complete
denial of judicial review for most undocumented aliens."  *Id.* at 496–97.  Additionally,
one of the plaintiffs' central claims was that the administrative process was inadequate.
But if the jurisdictional bar applied to the plaintiffs' challenge, their only opportunity for
judicial review would be based solely on the allegedly deficient administrative record.
*Id.* at 497.  The administrative record would also develop in the context of an individual
application, likely omitting facts necessary for the plaintiffs' challenge to an overarching
pattern and practice.  *Id.* at 497.  The Court reasoned that judicial review on that limited

record would be "the practical equivalent of a total denial of judicial review of generic constitutional and statutory claims." *Id.*

Drawing upon the statutory text, the collateral nature of the claims, and the presumption of judicial review, the Court concluded that section 210(e) did not bar the plaintiffs' challenge to INS's procedures. The Court adhered to that reading two years later in *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993), where it held that a "virtually identical" jurisdictional bar did not apply to statutory and constitutional claims "challenging the legality of a regulation without referring to or relying on the denial of any individual application." *Id.* at 56.

In *Patel*, the Supreme Court interpreted another jurisdictional bar in the INA, 8 U.S.C. § 1252(a)(2)(B)(i), which "strips courts of jurisdiction to review 'any judgment regarding the granting of relief' under section 1255." *Patel*, 596 U.S. at 336–37. The Court held that this provision precluded the plaintiff's claim that an immigration judge's factual finding under section 1255 was clearly erroneous. *Id.* at 347. Starting with the text of the statute, the Court reasoned that Congress's choice of the words "any" and "regarding" broadened the provision to encompass "not just 'the granting of relief' but also any judgment *relating* to the granting of relief." *Id.* at 338–39. In doing so, the Court rejected the argument that "judgment" referred only to the "ultimate decision" of "whether to grant relief." *Id.* at 343–44. The Court also noted that other related statutory provisions preserved review of constitutional claims and questions of law, leading to the negative inference that Congress intended to preclude review of questions of fact. *Id.* at 339.

Finally, the Court rejected the plaintiff's reliance on the presumption that

executive determinations generally are subject to judicial review. The Court explained that its decision was driven by "the plain meaning" of the statute, "not any interpretative presumption," leaving "no reason to resort to the presumption of reviewability." *Id.* at 347.

With those cases in mind, this Court returns to the jurisdictional bar in the TPS statute. The TPS jurisdictional bar applies to "any determination . . . with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). Like the jurisdictional bar in *McNary*, the type of decision insulated from judicial review is a "determination." The plaintiffs rely on this word choice to argue that the TPS bar likewise applies only to "*a single act* rather than a group of decisions or a practice or procedure employed in making decisions." Pls.' Mem. at 17. They further argue that the single act, or determination, covered by the jurisdictional bar is "'whether conditions' in a given country meet or 'continue to' meet the 'conditions for such designation.'" *Id.*

The plaintiffs' reading is too narrow. *McNary* did not interpret the word "determination" in isolation. Rather, it interpreted the phrase "*a* determination" to refer to a single act. Moreover, *McNary* did not limit the jurisdictional bar to only the final decision whether to adjust SAW status. It held only that the jurisdictional bar did not apply to a particular type of claim—a collateral challenge to a general pattern and practice. Unlike *McNary*, and more like *Patel*, the TPS jurisdictional bar applies to "*any* determination *with respect to*" the enumerated TPS decisions. Under the reasoning in *Patel*, the words "any" and "with respect to" broaden the TPS jurisdictional bar to cover more than just the final decision of whether designation is warranted.

14

That does not mean, however, that all claims related to TPS decisions are jurisdictionally barred. *McNary* established that a jurisdictional bar on discrete decisions does not necessarily preclude jurisdiction over collateral challenges to a general pattern and practice. *Patel*, which involved a direct challenge to a factual finding, did not change that principle.

The question before the Court is whether Congress, in the TPS statute, intended to preclude collateral claims of the kind endorsed in *McNary*. The Court concludes that Congress did not. *McNary* held that "a determination" did not include collateral challenges to a pattern and practice, and it contrasted that limited language with more sweeping language in the INA that applied to "all causes . . . arising under any of the provisions" and similarly broad language in the veteran benefits statute barring review of "all questions of law and fact." *McNary*, 498 U.S. at 494. In the TPS statute, passed one year after *McNary*, Congress elected not to use similarly broad language or make any other prominent change to indicate its intent to preclude collateral, pattern-and-practice challenges. Instead it largely adhered to the language in *McNary*, with only the relatively modest adjustment from "a determination" to "any determination."

To be sure, Congress presumably worded the statute differently for a reason. But it likely meant to foreclose the reading proposed by the plaintiffs in this case. In *McNary*, the Court was clear that "a determination" meant a single act. By specifying that the TPS jurisdictional bar applies to "any determination" rather than "a determination," Congress ensured that not only the final decisions to designate, extend, or terminate TPS, but also any antecedent determinations leading to those decisions, were insulated from judicial review. That is what the Supreme Court believed that

15

Congress did with similar language in *Patel*.[1]  *See Patel*, 596 U.S. at 338 ("Here, 'any' means that the provision applies to judgments 'of whatever kind' under § 1255, not just discretionary judgments or the last-in-time judgment." (internal quotations omitted)).

Moreover, interpreting the TPS statute to bar collateral challenges to underlying practices or policies would effectively preclude judicial review of all TPS-related decisions.  Like in *McNary*, if the TPS statute barred collateral challenges, the only possible opportunity for judicial review of the plaintiffs' claims would be later on, in the context of removal proceedings.  But just as in *McNary*, that opportunity is illusory.  As an initial matter, plaintiffs would have to voluntarily surrender themselves for deportation to affirmatively bring their claims.  As the Court in *McNary* recognized, that is "tantamount to a complete denial of judicial review."  *McNary*, 498 U.S. at 496–97.  And even at the end of removal proceedings, a plaintiff would not receive adequate review of

---

[1] In *Patel*, the majority also reasoned that reading the jurisdictional bar to preclude only the final decision to grant or deny relief would read the word "regarding" out of the statute.  *Patel*, 596 U.S. at 343–44.  That might suggest that the similar phrase "with respect to" in the TPS statute alone would suffice to cover related determinations, in which case the word change from "a" to "any" might fulfill a different purpose.  The Court rejects that interpretation, however, for two reasons.  One, the majority opinion in *Patel* itself is best understood to read the words "any" and "regarding" as working together to indicate a broader sweep.  *See id.* at 338 ("The provision does not restrict itself to certain kinds of decisions.  Rather, it prohibits review of *any* judgment *regarding* the granting of relief under § 1255 and the other enumerated provisions.").  With only one or the other, the statute might be ambiguous and fail to overcome the presumption in favor of judicial review.  *See id.* at 356 (Gorsuch, J., dissenting) ("The majority insists that the word 'regarding' has 'a broadening effect.' . . .  But in truth, the word can have either a broadening or narrowing effect depending on context.").  Two, the TPS statute was enacted after *McNary* but before *Patel*.  As discussed, *McNary* construed the phrase "a determination respecting an application" to refer to a single act.  The word "respecting" played virtually no role in the Supreme Court's analysis.  At the time, Congress reasonably might have been concerned that the similar phrase "with respect to" in the TPS statute would not suffice to cover other related determinations leading to the final decision on TPS status.

a pattern-and-practice claim relating to the termination of a TPS designation. The administrative record generated by the removal process likely would focus narrowly on the particular individual's eligibility for removal. As a result, it likely would lack the basis needed for a meaningful review of general, collateral challenges to the Secretary's pattern and practice of terminating TPS designations. Requiring plaintiffs to raise such challenges only in removal proceedings would be "the practical equivalent of a total denial of judicial review" of those claims. *See id.* at 497.

This all reinforces the inference that Congress, by choosing to make a relatively minor change, did not intend to preclude collateral challenges. Congress is presumed to legislate with knowledge of the courts' basic rules of statutory construction, including the "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action." *Id.* at 496. If Congress had intended to overcome that presumption, it would have done so in a clearer way than changing "a" to "any."

Consistent with other courts that have interpreted the provision, this Court concludes that 8 U.S.C. § 1254a(b)(5)(A) does not strip jurisdiction over "general collateral challenges to . . . practices and policies." *See, e.g.*, *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 588–93 (D. Md. 2025) (citing cases). The Court does not have jurisdiction, however, over claims challenging a discrete TPS determination, even if the claim purports to do so on procedural grounds. *See id.* at 591.

The Supreme Court has consistently described *McNary* narrowly, as permitting pattern-and-practice claims. *See, e.g.*, *Cath. Soc. Servs.*, 509 U.S. at 56 (citing *McNary* to uphold "jurisdiction over an action challenging the legality of a regulation without referring to or relying on the denial of any individual application"); *Thunder Basin Coal*

*Co. v. Reich*, 510 U.S. 200, 213 (1994) (describing *McNary* as permitting "broad 'pattern and practice' challenges"). And it has cautioned against circumventing jurisdictional bars by merely recharacterizing claims as procedural. *See Ringer*, 466 U.S. at 614.

A court therefore must look behind the label of the plaintiffs' claims to assess whether they actually challenge a pattern and practice. Otherwise, the jurisdictional bar would be illusory; it is arguable that virtually any claim could be reframed as a challenge to an underlying pattern and practice. *See Morales v. Yeutter*, 952 F.2d 954, 957 (7th Cir. 1991) ("We are mindful of . . . the danger of undermining the remedial scheme of the immigration laws by imputing patterns and policies behind determinations and then allowing those patterns and policies to be challenged in injunction suits under 28 U.S.C. § 1331.").

Applying these principles to this case, the Court concludes that it has jurisdiction over the plaintiffs' claims only to the extent that they challenge a general pattern and practice. The plaintiffs challenge several aspects of the Secretary's decision to terminate Burma's TPS. In substance, they argue that: (1) the Secretary did not consult with appropriate agencies; (2) the Secretary did not conduct a review of country conditions; (3) the Secretary impermissibly considered the national interest; (4) the Secretary was improperly influenced by political considerations and provided a pretextual rationale for her decision; (5) the Secretary broke from previous agency practice by declining to provide any period of orderly transition after termination; and (6) the Secretary was improperly motivated by racial and national origin animus.

Importantly, the plaintiffs assert that these claimed deficiencies are not unique to the Secretary's decision on Burma's status. Instead, they contend and allege that each

18

reflects an unlawful pattern and practice in how the Secretary has handled a recent string of TPS decisions. The plaintiffs' challenges to those underlying patterns and practices do not seek review on the merits of any individual TPS decision—*e.g.*, whether the Secretary properly weighed the evidence in deciding to terminate Burma's TPS status. Nor would the plaintiffs, if they ultimately prevailed on those challenges, receive an order that would require the Secretary to extend Burma's TPS designation. *See Ringer*, 466 U.S. at 614. Rather, the plaintiffs would be entitled to have the Secretary reconsider Burma's TPS and reach a new decision based on the proper statutory procedures.[2] *See McNary*, 498 U.S. at 495.

---

[2] The recent order by the Supreme Court in *National Institutes of Health v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025), does not change the analysis. There, the Court split 4-1-4 on whether to stay two district court orders: one vacating the government's decision to terminate certain grants and another vacating internal guidance used by the government in making that decision. *Id.* at 2661 (Barrett, J., concurring). Justice Barrett provided the critical vote, staying the order vacating the grant terminations themselves but leaving intact the order vacating the internal guidance. *Id.* In Justice Barrett's opinion, she stated that the district court likely had jurisdiction to hear the challenge to the underlying guidance but not for the challenges to the grant terminations, which instead likely belonged in the Court of Federal Claims (CFC) under the Tucker Act. *Id.* Justice Barrett explained that the two claims were distinct: "vacating the guidance does not necessarily void decisions made under it." *Id.* *NIH* might be read to suggest that this Court can vacate the underlying agency practice but not, specifically, the Secretary's decision regarding Burma. The Court does not think *NIH* reaches so far. As an initial matter, *NIH* was decided in an emergency posture and resulted in a 4-1-4 split. Though the reasoning in that case nonetheless carries precedential weight, *see id.* at 2664 (Gorsuch, J., concurring), nothing in any opinion in *NIH* purports to change the analysis in *McNary*—a binding decision on the merits in a context far more analogous to this case—that a successful pattern-and-practice claim would warrant ordering reconsideration of individual decisions affected by the unlawful practice. To the contrary, in *NIH*, Justice Barrett cited the district court opinion in *D.A.M. v. Barr*, 486 F. Supp. 3d 404 (D.D.C. 2020), for the principle that vacatur of an underlying policy does not *necessarily* void decisions made under it. The word "necessarily" is key; the district court in *D.A.M.* went on to assert "the uncontroversial proposition that, when a court with jurisdiction finds that the plaintiffs before it were harmed by an agency decision issued under an illegal rule, the court should vacate that wrongful decision as a remedy." *Id.* at 416. Additionally, there are

Those challenges thus are not barred by 1254a(b)(5)(A).[3]

**2.      8 U.S.C. § 1252(a)(2)(B)(ii)**

The government next contends that 8 U.S.C. § 1252(a)(2)(B)(ii) strips the Court

of jurisdiction over the plaintiffs' claims.  8 U.S.C. § 1252(a)(2)(B) provides in relevant

part that:

> [N]o court shall have jurisdiction to review—
>
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority of which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . .

*Id*.  According to the government, the plaintiffs challenge decisions or actions that are

discretionary under subsection (ii) and therefore insulated from judicial review.

The Court does not agree.  Section 1252(a)(2)(B)(ii) applies only to decisions

"made discretionary *by legislation*."  *Bouarfa v. Mayorkas*, 604 U.S. 6, 17 (2024)

---

good reasons to think that *NIH* does not extend to this case.  Most notably, the issue in *NIH* was limited to *where* each challenge would be heard:  the district court or the Court of Federal Claims.  At the end of the day, the plaintiffs would have a forum that could provide adequate relief for each claim.  Here, in contrast, the plaintiffs have no adequate alternative forum to hold the Secretary to her statutory obligations before terminating Burma's TPS determination.

[3] The government cites two recent orders by the Supreme Court staying a preliminary injunction in another TPS case.  *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025); *Noem v. Nat'l TPS All.*, 146 S. Ct. 23 (2025).  Those orders, however, do not provide any way to ascertain the Court's underlying reasoning.  The government points out that the only argument raised in response to one of the claims was that they were barred by section 1254a(b)(5)(A), but the stay nonetheless could have been granted for a different reason.  Notably, the district court in that case appeared to construe section 1254a(b)(5)(A) more narrowly than this Court by excepting all procedural challenges, not just those challenging a pattern and practice.  *See Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1108, 1133–36 (N.D. Cal. 2025).

(quoting *Kucana v. Holder*, 558 U.S. 233, 246–47 (2010)).  The Court therefore looks to the text of the TPS statute to determine whether TPS decisions are discretionary for purposes of section 1252(a)(2)(B)(ii).

The TPS statute deals with several types of decisions.  As relevant here, it provides for initial TPS designation, periodic review of that designation, and termination or extension after such review.  The plaintiffs challenge only the Secretary's periodic review and termination of TPS designations.

For initial TPS designations, the statute provides that the Secretary, "after consultation with appropriate agencies of the Government, *may* designate any foreign state . . . only if" the Secretary finds that the conditions for TPS status are met.  8 U.S.C. § 1254a(b)(1) (emphasis added).  In contrast, for periodic review, the statute states that the Secretary "*shall* review the conditions in the foreign state . . . and *shall* determine whether the conditions for such designation . . . continue to be met."  *Id.* § 1254a(b)(3)(A) (emphasis added).  It further provides that if the Secretary "determines . . . that a foreign state . . . no longer continues to meet the conditions for designation" she "*shall* terminate the designation."  *Id.* § 1254a(b)(3)(B).  Otherwise, "the period of designation of the foreign state is extended."  *Id.* § 1254a(b)(3)(C).

By the text of the statute, conducting periodic review and deciding whether to terminate or extend a TPS designation—which is what the plaintiffs challenge here—are not discretionary.  It is well established that "the word 'may' *clearly* connotes discretion."  *See Bouarfa*, 604 U.S. at 13 (cleaned up).  That word, however, appears only in the part of the statute describing initial TPS designation.  In contrast, the provisions addressing periodic review and termination use the word "shall," which carries a mandatory

connotation, especially when Congress has used "may" elsewhere in the statute. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171–72 (2016); *see also Bouarfa*, 604 U.S. at 9–10 (emphasizing the word "shall" in a mandatory provision). And though the extension provision does not use the word "shall," it likewise is not discretionary. By stating that the designation "*is extended*" absent action by the Secretary, it sets extension as the automatic default.

The government resists this conclusion by arguing that Congress need not use any particular language to grant discretion. The government points out that the words "may designate," "extraordinary circumstances," and "national interest" all connote discretion. Those terms, however, appear only in the portion of the statute involving the initial TPS designation. To the extent that those words indicate that Congress intended for initial designation to be discretionary, they highlight that Congress deliberately chose to substitute mandatory language in the other parts of the statute that are relevant to the plaintiffs' claims. *See Kucana*, 558 U.S. at 248–49 ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Nken v. Holder*, 556 U.S. 418, 430 (2009)). That clear contrast in statutory language, and not the absence of magic words, is what indicates that Congress did not intend for periodic review, termination, or extension under the TPS statute to be discretionary.

The government also contends that "the use of the word 'shall' only confirms termination is required *if* the Secretary determines *in her discretion* that the original designation is no longer warranted." Defs.' Resp. at 12. To be sure, the Secretary's

22

mandatory duty to terminate a country's TPS status is triggered by a predicate determination that the conditions in that country no longer qualify for TPS designation. And in making that predicate determination, the Secretary likely exercises some form of judgment.

But almost every action authorized by statute depends on some predicate determination that, as a practical matter, requires the exercise of judgment. That is not the sort of discretionary determination usually shielded from judicial review in the law. *See, e.g.*, *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) ("[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action . . . to follow."). Nor is it enough to make TPS termination decisions discretionary under section 1252(a)(2)(B)(ii) when Congress used paradigmatically mandatory language to describe those decisions in the text of the TPS statute. *Cf. Bouarfa*, 604 U.S. at 9–10 (stating that a requirement that the agency "shall" approve a petition *if* it "determines that the facts stated in the petition are true" is mandatory).

In sum, section 1252(a)(2)(B)(ii) does not strip the Court of jurisdiction over the plaintiffs' challenges to the Secretary's periodic review and termination of a TPS designation.

### 3.    8 U.S.C. § 1252(f)(1)

The government's last jurisdictional argument relies on 8 U.S.C. § 1252(f)(1). That provision states in its entirety:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal

> Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

*Id.*

Section 1252(f)(1) does not apply to the plaintiffs' claims. By its terms, section 1252(f)(1) applies only to "operation of the provisions of part IV of this subchapter." *Id.* Section 1252(f)(1) falls in Subchapter II, of Chapter 12 of Title 8 of the United States Code. The TPS statute is in part V of that subchapter, outside of section 1252(f)(1)'s reach. *See CASA*, 792 F. Supp. 3d at 594.

The government contends that "part IV of this subchapter" should be understood by reference to the United States Statutes at Large, not the U.S. Code. The government asserts that, on that reading, section 1252(f)(1) would cover Chapter 4 of Title II of the INA, which would include the TPS statute.

The Court rejects that alternative reading for the reasons stated by the district court in *CASA*. *See id.* at 595–96. First and foremost, the Supreme Court has consistently read section 1252(f)(1) to refer to the U.S. Code. *Id.* at 595; *see, e.g.*, *Biden v. Texas*, 597 U.S. 785, 797 (2022); *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549 (2022); *id.* at 558 (Sotomayor, J., concurring). Second, the exception in section 1252(f)(1) permitting courts to enjoin "application of such provisions to an individual alien against whom proceedings under such part have been initiated" indicates that the covered provisions relate to removal. That fits best with part IV of subchapter II in the U.S. Code, which deals with "Inspection, Apprehension, Examination, Exclusion, and Removal." *See CASA*, 792 F. Supp. 3d at 595.

The Court therefore concludes that 8 U.S.C. § 1252(f)(1) is inapplicable to

decisions under the TPS statute and does not bar the plaintiffs' claims.

**B.     Standard for motion to postpone**

The standard for postponement of an agency action under section 705 of the APA is the same as the standard for a preliminary injunction.  *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).  The movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  When, as here, the government is a party to the suit, "assessing the harm to the opposing party and weighing the public interest . . . merge."  *Nken*, 556 U.S. at 435.  The party seeking a stay "carries the burden of persuasion" on each of these points.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

**1.     Likelihood of success on the merits**

**a.     APA claims**

The APA permits courts to review "final agency action."  5 U.S.C. § 704.  An agency action is "final" when it is (1) "the consummation of the agency's decision-making process," and (2) an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations omitted).  It is undisputed that the Secretary's termination of Burma's TPS designation was a final agency action.

The plaintiffs bring two categories of APA claims, each in the form of a challenge to the most recent instance of a pattern or practice.  First, they claim that the Secretary's

termination was contrary to law and arbitrary and capricious because the decision to terminate Burma's TPS designation was predetermined. The plaintiffs argue that the Secretary decided to terminate TPS entirely; terminated TPS designations of ten nations when she had the opportunity and without a review of conditions in those countries, as required by statute; and similarly terminated Burma's TPS designation based on her policy goals rather than a review of the conditions in Burma. Second, the plaintiffs point to the Secretary's decision not to grant Burmese TPS holders an orderly transition period over the sixty days of notice required by statute. The plaintiffs argue that this decision was an arbitrary and capricious change in position by DHS, which historically provided orderly transition periods of between six and eighteen months, but as of Secretary Noem's tenure, has declined to do so in each TPS termination.

### i.     Predetermination - contrary to law

The APA instructs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity[.]"  5 U.S.C. § 706(2).  Contrary to law "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003).  In this case, the plaintiffs contend that the agency's action was contrary to both the governing TPS statute and the Constitution.  The constitutional claim is addressed in a separate section below.

The plaintiffs argue that the termination of TPS for Burma was predetermined based on the Secretary's objective of eliminating TPS entirely.  The Secretary has engaged in a pattern of predetermined terminations that violates the TPS statute, they

26

say, because the statute requires review of the conditions in each country, which the Secretary has not performed. The TPS statute states that at least sixty days before the end of a designation or extended designation, the Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The plaintiffs contend that the Secretary violated this provision of the TPS statute because she did not consult with appropriate agencies, review the conditions in Burma (or any of the other nations whose TPS status has been terminated), and then determine whether the statute's conditions were met for an extension of the designation. Instead, the plaintiffs say, "the decision to terminate TPS for Burma was a predetermined *fait accompli*" along with the other recent terminations, and the Secretary made little, if any, effort to consult with other agencies or meaningfully review the conditions in Burma. *See* Pls.' Mem. at 19. The defendants respond that a presidential administration is entitled to have policy goals, and Congress permitted the Secretary to make a discretionary determination without requiring a specific level of consultation or review.

As the Court has concluded, 8 U.S.C. § 1254a(b)(5)(A) does not prohibit the Court from exercising jurisdiction over this claim. The plaintiffs allege that, throughout the spate of TPS terminations since January 20, 2025, the "Defendants have repeatedly failed to engage in the statutorily required process for reviewing TPS designation[s]." Pl.'s Mem. at 19. The plaintiffs state that the termination decisions with respect to TPS designations for Venezuela, Nicaragua, Cameroon, Honduras, and Syria similarly either

27

lacked evidence of the consultation with other agencies required by statute or of evaluation of the conditions in the country. *See id.* at 20. The plaintiffs therefore allege a broader pattern of preordained TPS terminations that violate the statutory requirements of consultation with other agencies and consideration of country conditions.

### a) Consultation

Turning to the merits, the first portion of the plaintiffs' claim concerns the Secretary's failure to engage in "consultation with appropriate agencies" as required by 8 U.S.C. § 1254a(b)(3)(A). A consultation requires "a meaningful exchange of information." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1086 (9th Cir. 2011) (contrasting statutory language requiring an agency to engage "in consultation with affected States" with the less onerous requirement to provide "an opportunity for comment from affected States[,]" *id.* at 1080). The ordinary meaning of the term "consult" is to "seek information or advice from (someone with expertise in a particular area)" or to "have discussions or confer with (someone), typically *before* undertaking a course of action." *Id.* at 1087 (quoting *The New Oxford Dictionary* 369 (2001) (emphasis added)). As the Supreme Court has explained in discussing ineffective assistance of criminal defense counsel, "[b]y 'consult,' the Court means advising the defendant about the advantages and disadvantages of taking an appeal and making a reasonable effort to discover the defendant's wishes." *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000). Consultation is a process that requires reciprocal communication of some substance; it is not satisfied by a rubber stamp or a sign-off on a decision that has already been made. The defendants presented nothing to suggest

that Congress had a different meaning of "consultation" in mind when it employed that term in the TPS statute. To the contrary, the proposition that the TPS statute was intended to formalize previous, ad hoc designations of temporary immigration relief by the executive suggests that Congress employed the ordinary meaning of "consultation." *See* 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989).

The certified administrative record filed by the defendants lacks any indication of consultation with other agencies regarding the termination of the TPS designation for Burma. As best as the Court can tell, the only communication between DHS and another agency in the record is a set of three emails from July 2025. First, an employee of the Office of the Secretary of Homeland Security wrote the following to an employee of the Department of State's Bureau of Population, Refugees, and Migration: "The following TPS designations are coming up for review: Syria: Aug. 1 decision deadline[;] South Sudan: September 3 decision deadline[;] Burma: September 26 decision deadline[;] Ethiopia: October 13 decision deadline[.]" Administrative Record (AR) at 292. The email did not contain a question or a request for input from the State Department. The State Department official responded, "I confirm that State has no foreign policy concerns with ending these TPS designations on or before those dates. As you are aware, sanctions on Syria have recently been lifted, and we have partnered with South Sudan on immigration-related issues." *Id.* at 291. The DHS official then replied and added to the email the USCIS Chief of Staff "so the State consultation makes it into the memo." *Id.*

There are numerous reasons why this exchange does not qualify as a consultation. There was no "meaningful exchange of information." *Cal. Wilderness*

*Coal.*, 631 F.3d at 1086. The email addressed the TPS terminations of four different countries, but the State Department's response did not individually consider the circumstances in those nations. There was no back-and-forth discussion about the issue at all. Rather, the State Department official's response suggests that it was a foregone conclusion that the Secretary would terminate the listed TPS designations, a logical assumption based on the Secretary's recent practice of terminating each TPS designation up for review.

Additionally, the conclusory statement by the State Department official addressed only "foreign policy concerns with ending these TPS designations[,]" a distinct issue from the statute's reference to whether "the conditions for [TPS] designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The TPS statute does not specify the topic about which the Secretary must consult other agencies, but the consultation clause is part of a subsection concerning the Secretary's review of conditions in the designated nation, and the State Department email provides no opinion on that issue. The fact that DHS framed the State Department official's two sentence email as a "State consultation" to be included in a memorandum suggests that no further or additional consultation occurred, and the defendants have not pointed to any other evidence of consultation in the record, nor have they claimed that other consultations occurred via meetings, phone calls, or otherwise.

Historically, before terminating a TPS designation, DHS engaged in genuine consultations with the Department of State and DHS's subcomponents. According to the Government Accountability Office, the Secretary would collect country conditions reports from USCIS RAIO and the Department of State's Bureau of Population,

Refugees, and Migration. *See* Pls.' Ex. 1 at 20. The Secretary of DHS would receive a memorandum with a recommendation from the USCIS Director and a letter with a recommendation from the Secretary of State. The administrative record in this case includes a country condition report from the RAIO dated June 2025 and a heavily redacted memorandum of less than two pages from the USCIS Director to Secretary Noem. AR at 106–07. The memorandum is dated September 2025 and lists two USCIS reports as attachments, but no attachments were included from other agencies. It appears that the Secretary never received a country condition report from the State Department or a recommendation from the Secretary of State.

Although that specific historical consultation practice may not have been required by law, it reflects what a meaningful exchange of information might look like. Relatedly, unlike previous TPS notices related to Burma, the Secretary's notice of termination does not cite any reports or publications by the State Department, or from any other agency, which supports a conclusion that no consultation occurred.[4] *Compare* 90 Fed. Reg. at 53,378 (2025) (citing no sources from other agencies in the termination notice), *with* 89 Fed. Reg. at 20,684 nn.11, 17, 20,685 nn.21, 26 (2024) (citing in extension of TPS for Burma several Department of State reports on genocide, trafficking, and human rights concerns in Burma).

The government does not respond to the plaintiffs' consultation argument in its brief, but at oral argument, it contended that the TPS statute does not define the scope

---

[4] The notice cites data from U.S. Customs and Border Patrol and Immigration and Customs Enforcement (which are components of DHS) relating to visa overstay rates, advance parole requests by Burmese nationals, and ICE removals to Burma. *See* 90 Fed. Reg. at 53,380 (2025). But nowhere has DHS argued that consultations with its own subcomponents could fulfill the requirements of 8 U.S.C. § 1254a(b)(3)(A).

or degree of a consultation. The Court agrees that the TPS statute does not require consultations with specific agencies or in a particular fashion. But it does require consultation to occur. The only evidence even hinting at consultation in the 2,000-page administrative record is a few brief emails that do not involve any substantive exchange of information. That is not enough.

The lack of consultation is part of a larger pattern. Courts have similarly held that the Secretary failed to consult agencies when terminating TPS designations for Venezuela, Nicaragua, and Cameroon. *See* Pls.' Mem. at 20 (collecting cases). The larger pattern is supported by the brief emails with the State Department described above, which reference not only Burma but the assumed TPS terminations for three other nations (Syria, South Sudan, and Ethiopia). AR at 292. The State Department's two-sentence response mentioned two of those countries by name in one sentence, *id*. at 291, a far cry from a meaningful exchange of information (though the Court acknowledges that it lacks a complete record of communications regarding those three nations). The plaintiffs are likely to succeed on their contrary to law claim that the Secretary failed to perform the consultation required by the TPS statute in terminating the TPS designation of Burma, which is the latest instance of the Secretary's practice of disregarding the statutory consultation requirement.

### b) Review of conditions in the foreign state

Second, the plaintiffs contend that the Secretary failed to "review the conditions in the foreign state . . . for which a designation is in effect under this subsection" and "determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The statute states that the Secretary "shall"

conduct this review, *id.*, making it mandatory. *See City of Chicago v. United States Dep't of Homeland Sec.*, No. 25 C 5463, 2025 WL 3043528, at *17 (N.D. Ill. Oct. 31, 2025) (Kennelly, J.) (discussing the mandatory meaning of "shall").

At the outset, the Court agrees with the government that the Court may not make its own determination regarding whether extraordinary and temporary conditions persist in Burma. The Court refrains from making an assessment of the conditions in Burma or from balancing the evidence presented on the record to assess the merits of the Secretary's determination.

The plaintiffs contend that the Secretary acted pursuant to a pattern of failing to conduct an actual review of the designated country's conditions as required by the statute and instead simply papering over a predetermined outcome based on opposition or outright hostility to TPS designations. The President, Vice President, and Secretary Noem all publicly discussed their objective of eliminating TPS. Compl. ¶ 85 (quoting President Trump's claim that TPS is "not legal" and is a "little trick"); Pls.' Ex. 4 at 1 (quoting Vice President Vance's statement at a campaign event, "We're going to stop doing mass grants of Temporary Protected Status[.]"); Pls.' Ex. 43 at 5 (quoting the Secretary, who stated regarding TPS that "we are getting direction on how this works from the direction of the [P]resident of the United States. And he is pausing this program to re-evaluate.").

On the day he took office, President Trump issued Executive Order 14159, "Protecting the American People Against Invasion," which summarized the President's criticism of policies of the prior administration that, in his view, "invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States[,]"

causing "threats to national security and public safety," "vile and heinous acts against innocent Americans[,]" and "hostile activities, including espionage, economic espionage, and preparations for terror-related activities." E.O. 14159 § 1. The Order directed the Attorney General and Secretaries of State and Homeland Security to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States" and, with respect to TPS, ensure that "such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute[.]" *Id.* § 16. On its own, the specific text regarding TPS is unremarkable, but it must be read along with the other statements in E.O. 14159 and by administration officials that articulate a restrictive immigration agenda.

Against the backdrop of this expressed hostility towards TPS, Secretary Noem has, since her confirmation, terminated TPS for each and every country that has been eligible for redesignation: Venezuela, Haiti, Afghanistan, Cameroon, Nepal, Honduras, Nicaragua, South Sudan, Ethiopia, Syria, and Somalia.[5] All of the termination notices except those for Burma, Syria, and Somalia, three of the most recent terminations, cited E.O. 14159.[6]

---

[5] There was only one aberration, regarding South Sudan. *See* Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, 50,485 (Nov. 6, 2025) (terminating TPS for South Sudan but explaining that TPS designation for South Sudan was automatically extended from May 2025 to November 2025 because the Secretary lacked a current record at that time).

[6] *See* Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 n.2 (Feb. 5, 2025); Termination of the Designation of Afghanistan for Temporary Protected Status, *id*. at 20,309, 20,310–11 (May 13, 2025); Termination of the Designation of Cameroon for Temporary Protected Status, *id*. at 23,697, 23,698 (June 4, 2025); Termination of the Designation of Nepal for

The government noted at oral argument that this administration has a legitimate policy preference for keeping TPS a temporary status. That may be true, but the length of time that a country has been designated under TPS was not a distinguishing factor: TPS was terminated across the board, even though nationals of some of these nations have benefitted from TPS status for several decades and others for just a few years.

Many of these terminations have resulted in litigation, and other district courts have found that the Secretary failed to comply with the consultation and review requirements, which supports the plaintiffs' claim of a broader, predetermined mission of terminating TPS in full. *See, e.g.*, *Nat'l TPS All.*, 798 F. Supp. 3d at 1151 ("[T]he Court finds that the Secretary violated the TPS statute because she effectively made the decision to terminate [TPS for Venezuela] *before* consultation with any government agency" and belatedly consulted with the State Department after drafting the termination decision); *CASA*, 792 F. Supp. 3d at 607 (finding that the State Department was not consulted regarding termination of TPS for Cameroon, as the Secretary received no updated recommendation or memorandum, or Afghanistan, as the Secretary of State provided a recommendation letter with no supporting facts or memorandum); Transcript

Temporary Protected Status, *id*. at 24,151, 24,152 n.10; (June 6, 2025); Termination of the Designation of Haiti for Temporary Protected Status, *id.* at 28,760, 28,762 n.17 (July 1, 2025); Termination of the Designation of Nicaragua for Temporary Protected Status, *id*. at 30,086, 30,088 n.4 (July 8, 2025); Termination of the Designation of Honduras for Temporary Protected Status, *id*. at 30,089, 30,091 n.10 (July 8, 2025); Termination of the 2021 Designation of Venezuela for Temporary Protected Status, *id*. at 43,225, 43,228 (Sept. 8, 2025); Termination of the Designation of South Sudan for Temporary Protected Status, *id*. at 50,484, 50,486 (Nov. 6, 2025); Termination of the Designation of Ethiopia for Temporary Protected Status, *id*. at 58,028, 58,031 (Dec. 15, 2025). *But see* Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. 45,398 (Sep. 22, 2025); 90 Fed. Reg. 53,378 (2025) (Burma termination notice); Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1,547 (Jan. 14, 2026).

35

of Oral Argument at 18, *Dahlia Doe v. Noem*, No. 25 C 8686 (S.D.N.Y. Nov. 19, 2025) (Pls.' Ex. 38) (concluding that the Secretary did not review conditions in Syria or consult with other agencies prior to terminating its TPS designation). As another district court observed, "it confounds logic that as to a group of disparate countries, with disparate bases of designation, in different parts of the world, that in a few months all of them could resolve troubles that were so severe as to warrant TPS designation . . such that termination is appropriate for all of them[.]" Transcript of Oral Argument at 17–18, *Dahlia Doe v. Noem*. The pattern that the plaintiffs describe—the Secretary's termination of TPS at every opportunity against the backdrop of the President's efforts to eliminate TPS—suggests that the Secretary did not review the evidence regarding any of these countries, including Burma, as required by the TPS statute.

Without second-guessing the Secretary's judgment, the Court observes that the termination notice claims vastly improved conditions relative to the most recent extension of TPS in Burma. When TPS for Burma was extended and redesignated in March 2024, the then-Secretary's notice described widespread violence from the coup in Burma affecting 315 of 330 townships in Burma. *See* 89 Fed. Reg. at 20,684 (2024). The notice described violence against civilians including airstrikes, shelling, and razing of villages, human trafficking, and dire humanitarian need. *See id.* In June 2025, during the current Administration, USCIS's RAIO issued a country report on Burma that described violence in 321 of the 330 townships, an increase in bombing in civilian areas relative to the previous period, and a March 2025 earthquake severely affecting millions of people. AR at 115, 121, 134. Yet the Secretary's termination notice represents that there had been "improvements in Burma's governance and stability at the national and

36

local levels." 90 Fed. Reg. at 53,379 (2025). Again, the Court is not opining on the actual conditions in Burma, but it notes that the Secretary's statement seems to suggest that conditions in Burma have improved significantly since DHS's own June 2025 report. As described above, the Secretary made this apparent determination—if it can be characterized as such—without consulting or obtaining relevant country conditions information from the State Department or other appropriate agencies as the statute contemplates.[7]

The defendants are correct that an administration may have policy goals and pursue those goals through the tools at its disposal. But the executive must pursue its policy goals under the governing laws. TPS may only be terminated after consultation with appropriate agencies and review of the conditions in the designated country. The termination of TPS for Burma appears to have occurred without a review of conditions in that country, much like the administration's termination of other TPS designations. The plaintiffs have demonstrated a likelihood of success on their contrary to law claim by presenting evidence that the defendants did not comply with the statutory requirements of consultation and review.

## ii.    Predetermination - arbitrary and capricious

The APA requires courts to "hold unlawful and set aside agency action, findings,

---

[7] The record also includes a report by USCIS's Office of Policy and Strategy from July 2025. *See* AR at 140. That report explains that "Burma continues to face challenges regarding armed violence, humanitarian provisions and human rights concerns" but frames those concerns as largely localized to specific states and ethnic groups and notes improvements in conditions since 2024. *See id.* The plaintiffs compare the two reports and argue that they demonstrate that the Secretary engaged in "cherry-picking" rather than an objective determination. Pls.' Reply at 7. The Court refrains from this comparison, which would require weighing the evidence in the record.

and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2), (2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A reviewing court must consider whether the agency's action was based on the relevant statutory factors. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action may be arbitrary and capricious when the agency relied on factors not contemplated by Congress, "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423.

### a)  National interest

The plaintiffs argue that Secretary Noem's reliance on "national interest" to justify termination of Burma's TPS was arbitrary and capricious because this reliance was a "sharp departure from past practice." Pls.' Mem. at 27. The defendants respond that the plaintiffs' argument implies "that national-interest determinations must remain static and that a Secretary cannot exercise her congressionally delegated authority in any manner contrary to her predecessor." Defs.' Resp. at 33.

"[A]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change[.]" *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221

(2016)).[8]  A court must ask "whether an agency changed existing policy" and whether the agency "'display[ed] awareness that it *is* changing position' and offer[ed] 'good reasons for the new policy[.]'"  *Id.*  When an agency changes an existing policy, it need not " provide a more detailed justification than what would suffice for a new policy[.]"  *Id.* (quoting *FCC v. Fox Television Stations*, Inc., 556 U.S. 502, 515 (2009)).  But it must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Id.* (quoting *Encino*, 579 U.S. at 221–22).

The defendants point to the portion of the TPS statute governing initial determinations and two prior TPS notices in support of their argument that consideration of national interest when performing periodic TPS reviews is not contrary to past DHS policy.  Neither the statute nor the prior notices support the defendants' position.  The TPS provision relevant to periodic reviews requires a consideration of conditions in the foreign nation under review.  8 U.S.C. § 1254a(b)(3)(A).  And the two TPS notices the defendants cite broadly state that an extension or termination of the TPS status was not contrary to the national interest of the United States.  These notices do not rely on national interest as a rationale for termination of TPS and therefore do not show a past practice of doing so.

Secretary Noem's reliance on national interest to justify recent TPS terminations deviated from past agency policy.  The defendants point to no prior TPS terminations that relied on national interest in this way.  And DHS did not explain why it changed its previous policy to now rely on the national interest of the United States as the

---

[8] As discussed in detail below, the Court will apply the change-in-position doctrine to the plaintiffs' claims but recognizes that the law is unsettled in this area.

determinative factor when reviewing whether TPS should be extended or terminated. Thus DHS failed to show any awareness that it was changing position.

Furthermore, the plaintiffs argue that Secretary Noem's decision was arbitrary and capricious because she offered no explanation for how visa overstays or the President's ban on entry by Burmese nationals are rationally connected to the decision to terminate TPS. The plaintiffs note that TPS holders legally live and work in the United States. The defendants' only response to this argument is that "the Secretary reasonably considered the current administration's domestic and foreign policies and priorities in making the requisite national interest determination (such as accounting for national security concerns, visa overstays, and instances of fraud)." Defs.' Resp. at 33.

Although "[t]he scope of review . . . is narrow and a court is not to substitute its judgment for that of the agency," "the agency must . . . articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). As discussed, the TPS statute requires the Secretary to consider whether the grant of TPS to foreign nationals from a certain nation is contrary to the national interest of the United States in conjunction with the conditions in the foreign state. Visa overstay data concerns foreign nationals from a particular country who remain in the country without legal status. But TPS holders have legal status. Visa overstay data thus has no bearing on TPS holders *at all*. The Secretary did not, and could not, explain how visa overstay data that has no relevance to TPS holders is rationally connected to the decision to terminate Burma's TPS designation.

The same is true for the Secretary's reliance on the President's ban on the entry

of Burmese nationals into the United States.  The Secretary broadly asserts that "[a]n extension of Burma's designation for Temporary Protected Status would be in conflict with the President's directive of fully restricting the entry of Burmese nationals . . . ."  90 Fed. Reg. at 53,381 (2025).  To benefit from TPS status, one must have been present in the United States at the time of the TPS designation.  Any directive by the President to restrict entry by nationals of a particular country going forward has no logical connection to the extension of TPS for nationals of the same country who are already present in the United States.

For these reasons, the plaintiffs are likely to succeed on their claim that Secretary Noem's reliance on national interest to justify TPS terminations was arbitrary and capricious.

### b)    Pretext and political influence

The plaintiffs argue that the Secretary's termination was arbitrary and capricious because it was prompted by the President's "directive to terminate TPS to advance his own anti-immigrant agenda, without regard for the country conditions considerations required by statute."  Pls.' Mem. at 27.  Again, the Court has jurisdiction over this claim because it challenges the broader pattern of Secretary Noem's allegedly pretextual TPS terminations rather than the individual decision to terminate TPS for Burma.

The defendants assert that political influence has a role in agency decision making, citing the Supreme Court's subsequent decision in *Department of Commerce v. New York*, 588 U.S. 752 (2019).  In that case, the Supreme Court assessed the role of political influence and pretext in the Secretary of Commerce's decision to "reinstate a question about citizenship on the 2020 census questionnaire."  *Id.* at 758.  The

Secretary issued a memo announcing the reinstatement of the question and explaining "that he was acting at the request of the Department of Justice (DOJ), which sought improved data about citizen voting-age population for purposes of enforcing the Voting Rights Act (or VRA)[.]" *Id.* at 761. Considering a challenge to the action as arbitrary and capricious, the district court set aside the Secretary's decision because the cited rationale was pretextual. *Id.* at 785.

The Supreme Court affirmed. *Id.* It explained that "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons. . . . a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Id.* at 781. Still, the APA requires an agency to "'disclose the basis' of its action." *Id.* at 780 (quoting *Burlington Truck Lines*, 371 U.S. at 167–169 (internal quotation marks omitted). The unusually extensive record "showed that the Secretary was determined to reinstate a citizenship question from the time he entered office; instructed his staff to make it happen; waited while Commerce officials explored whether another agency would request census-based citizenship data; subsequently contacted the Attorney General himself to ask if DOJ would make the request; and adopted the Voting Rights Act rationale late in the process." *Id.* at 782–83. Although agencies may develop a legal basis to pursue preferred policies, the Court observed that the Secretary "initially attempted to elicit requests for citizenship data from the Department of Homeland Security and DOJ's Executive Office for Immigration Review, neither of which is responsible for enforcing the VRA" and later "contrived" the "VRA enforcement rationale" despite a "lack of interest on DOJ's part" in order to

Case: 1:25-cv-15483 Document #: 51 Filed: 01/23/26 Page 43 of 57 PageID #:3285

reinstate the citizenship question. *Id.* at 783–84.

Under *Department of Commerce*, an agency may pursue a President's political goals but remains bound by the APA's requirement that an agency disclose a "genuine justification[]" for an action. *Id.* at 785. "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Id.* at 785.[9]

In evaluating a claim of pretext, "a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Id.* at 780. Still, the limited record before the Court suggests that the Secretary's notice presented contrived reasons for the termination. As explained above, the Secretary did not consult with any other agencies regarding the conditions in Burma, which the statute

---

[9] The plaintiffs assert claims of improper political influence and pretext within the same section of their brief. Pls.' Mem. at 27–28. In the pretext section, the plaintiffs cite *Department of Commerce* as the governing standard. In the political influence section, the plaintiffs cite *Town of Orangetown v. Ruckelshaus*, 740 F.2d 185, 188 (2d Cir. 1984), which was applied by a district court invalidating a TPS termination based on political influence prior to *Department of Commerce*. *See Saget v. Trump*, 375 F. Supp. 3d 280, 359 (E.D.N.Y. 2019); *see also Ruckelshaus*, 740 F.2d at 188 ("To support a claim of improper political influence on a federal administrative agency, there must be some showing that the political pressure was intended to and did cause the agency's action to be influenced by factors not relevant under the controlling statute."). Courts facing political influence and pretext claims within the Second Circuit have evaluated these claims under different standards even after *Department of Commerce*. *See* Transcript of Oral Argument at 24, *Dahlia Doe v. Noem*. But other courts have treated *Department of Commerce* as governing improper political influence claims. *See Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, 32 F.4th 1130, 1142 (Fed. Cir. 2022). The Court analyzes the political influence and pretext claims together because *Ruckelshaus* is not binding law in this circuit, which lacks other relevant precedent, and *Department of Commerce* addresses both political influence and pretext in a context closely analogous to this case.

43

required her to evaluate in making her termination decision. In the only communication present in the record, the brief emails described above, DHS never stated that it planned to terminate TPS for Burma or the other three countries mentioned, but the State official responded and assumed that TPS would be terminated for these nations. AR at 291–92. It appears that the State official understood that TPS for Burma, like every nation whose TPS status was eligible for review since Secretary Noem took office, would be terminated at the first opportunity.

Without input from country experts at the State Department, the Secretary apparently determined that conditions in Burma had rapidly improved since TPS for Burma was extended in March 2024 and since her own agency's June 2025 report of widespread violence against civilians in nearly every region of Burma. *See* AR at 115. She issued a notice citing several sources supporting her conclusion but also relying on facts irrelevant to whether "extraordinary and temporary" circumstances persist in Burma, such as data about ICE removals to Burma and visa overstay rates by Burmese nationals. 90 Fed. Reg. at 53,381 (2025). But the statute governing removal, 8 U.S.C. § 1231(b), does not require ICE to ensure that a foreign nation is free of "extraordinary and temporary" circumstances before effectuating removal to that nation, and that aside, high or low visa overstay rates likewise do not demonstrate that a country is free from those conditions. The Court cannot discern a genuine basis for the Secretary's action in the record and finds it more likely that the decision to terminate TPS was not actually rooted in the reasons cited in the notice. It is more plausible that TPS was terminated to effectuate the Secretary's broader goal of curtailing immigration and eliminating TPS generally, not on her evaluation of changed conditions in Burma. For

44

these reasons, the Court concludes that the plaintiffs have sufficiently shown a likelihood of success on the merits of the arbitrary and capricious claim based on pretext.

This, of course, is only a preliminary determination (as typically is the case in the preliminary injunction context) given the state of the record at this point and the brief period afforded to the Court to review the record. The record in *Department of Commerce* included a trial and extra-record discovery, including depositions of the Secretary of Commerce and a DOJ official, which provided an unusual window into the Secretary's state of mind. *See Dep't of Comm.*, 588 U.S. at 765. In *Saget v. Trump*, the court held that the termination of TPS for Haiti during the first Trump administration was arbitrary and capricious because of improper political influence. *Saget*, 375 F. Supp. 3d at 360. After a trial, the record showed meetings between White House officials and the Secretary to "coordinate the conditions and process for terminating temporary protected status" and specific directives from the Attorney General and Chief of Staff to the Secretary to terminate TPS for Haiti. *Id.* (record citations omitted). Other cases included circumstantial evidence of pretext. In a case challenging the vacatur and termination of TPS for Venezuela, the court found that the agency began drafting the termination decision for Venezuela before the vacatur decision was finalized and within days of the new administration, with no time for consultation with agencies or an internal evaluation. *See Nat'l TPS All.*, 798 F. Supp. 3d at 1150–51.

Unlike *Saget* and *Department of Commerce*, the Court has not had the benefit of a trial to develop the record. And unlike *National TPS Alliance*, the record here technically shows some interagency communication regarding the termination several

45

months before it occurred, but the three emails between officials at the State Department and DHS discussed earlier actually reveal that no substantive consultation occurred.  Still, the plaintiffs have presented evidence that the Secretary, like the Secretary of Commerce in *Department of Commerce*, decided to terminate TPS *ex ante* and avoided the statutory requirements for a meaningful consultation and review of conditions in Burma.  The Secretary did not articulate a rational connection between the extensive administrative record, much of which reflects that conditions in Burma remain unchanged or have deteriorated, *see, e.g.*, AR at 110, and her decision to terminate TPS for Burma.  The Court cannot discern the Secretary's exact motive, nor is that its function.  *Dep't of Commerce*, 588 U.S. at 781.  But it would strain credulity to accept a contention that the Secretary terminated TPS for Burma because it no longer qualified under the TPS statute.  Rather, it is more likely that the Secretary made an overall decision to eliminate TPS and terminated the TPS designation for Burma (and other nations) based on factors irrelevant under the controlling statute, making the termination arbitrary and capricious.

If the Court additionally examined the extra-record evidence of the Secretary and the administration's animus towards TPS, *see, e.g.*, E.O. 14159, as well as the trend of TPS terminations similarly lacking in consultation with appropriate agencies, the claim of pretext would be much stronger.  It is difficult to imagine that every one of the twelve countries around the world whose TPS designation has come up for review has resolved the "extraordinary and temporary" conditions—including civil wars, damage from natural disasters, food shortages, lack of clean water, and public health failures— underlying each designation.  But the Court need not consult extra-record evidence to

46

support its conclusion that the plaintiffs are likely to succeed on their contention that the termination of Burma's designation was based on pretext.

### iii. Change in position

The plaintiffs next allege that DHS's decision not to afford an orderly transition period for TPS holders from Burma to arrange their affairs was arbitrary and capricious because it departed from decades of past practice. In assessing whether an agency's change in position is arbitrary and capricious, a court must ask "whether an agency changed existing policy" and whether the agency "'display[ed] awareness that it *is* changing position' and offer[ed] 'good reasons for the new policy[.]'" *Wages & White Lion*, 604 U.S. at 569–70 (quoting *Fox Television Stations, Inc.*, 556 U.S. at 515). Although the agency is not required to prove that the reasons for the new policy are stronger than the reasons underlying its previous policy, it must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (quoting *Encino*, 579 U.S. at 221–222) (internal quotation marks omitted).

Under the TPS statute, when the Secretary terminates a designation by publishing notice in the Federal Register, termination "shall not be effective earlier than sixty days after the date the notice is published or, if later, the expiration of the most recent previous extension." 8 U.S.C. § 1254a(b)(3)(B). The termination provision also references subsection (d)(3), which allows the Secretary to delay termination for "such period after the effective date of the determination as the Attorney General determines to be appropriate in order to provide for an orderly transition." *Id.* § 1254a(d)(3). In other words, the Secretary has discretion to provide for more than sixty days as an

orderly transition period.

For the past twenty years, DHS has provided an orderly transition period of at least six months in twelve TPS terminations. Pls.' Ex. 2. Between 2017 and January 20, 2025, the agency provided for termination periods of twelve or eighteen months in each of its six TPS terminations. *See id.* Prior to 2025, TPS designations had been terminated without an orderly transition period only four times, most recently in 2003. *See id.* Since taking office, the current administration has terminated TPS for twelve nations and has not provided for orderly transition periods. The plaintiffs challenge the lack of an orderly transition period following the termination of TPS for Burma, one instance of this recent pattern. The Court has jurisdiction to consider this claim because the orderly transition period issue appears to relate to an agency policy that is "collateral" to the individual termination decision or, if not collateral, part of a pattern or practice demonstrating the agency's change in position. *See McNary*, 498 U.S. at 498.

The defendants do not respond to this claim at all. But the plaintiffs must demonstrate a likelihood of success to prevail, which requires the Court to assess the scope of the change-in-position doctrine. The Supreme Court recently faced a case where "[t]he parties assume[d] that the change-in-position doctrine applie[d] when an agency abandons a position it first articulated in a nonbinding guidance document." *Wages & White Lion*, 604 U.S. at 569 n.5. The Court did not address the scope of the doctrine because it was not contested, but it expounded briefly:

> We have traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009). True, we have on at least one occasion applied the doctrine when an agency altered a position first stated in a policy statement. See *Department of Homeland Security v. Regents of Univ. of*

48

>*Cal.*, 591 U.S. 1, 30, 140 S. Ct. 1891, 207 L. Ed. 2d 353 (2020).  But as we explained in that case, the policy statement instituted "a standardized review process" that "effectively" resembled adjudication. *Id.*, at 18, 140 S. Ct. 1891.

*Id.*

Courts have divided in their reading of *Wages & White Lion.*  Some courts understand it to limit the change-in-position doctrine to policies "set forth in some formal manner, such as a regulation, a guidance memorandum[,] or an agency enforcement action."  Transcript of Oral Argument at 26, *Dahlia Doe v. Noem* (Pls.' Ex. 38) (holding that the practice of providing orderly transition periods under the TPS statute did not qualify as a policy triggering the change-in-position doctrine) (quoting *New York v. Trump*, 778 F. Supp. 3d 578, 596 (S.D.N.Y. 2025)).  Other courts continue to apply the change-in-position doctrine to longstanding agency practices, including the practice of providing for orderly transition periods.  *See Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1008, 1030–31 (N.D. Cal. 2025) (holding that plaintiffs identified a policy of six month orderly transition periods after the termination of TPS and that the Secretary failed to acknowledge its shift from prior practice or sufficiently explain the change); *see also Saget*, 375 F. Supp. 3d at 355 (explaining prior to *Wages & White Lion* that the change-in-position doctrine "is not limited to formal rules or official policies and applies equally to practices implied from agency conduct"); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1108–09 (N.D. Cal. 2018) (same).

The Court will apply the change-in-position doctrine to the plaintiffs' claims because the Supreme Court's footnote in *Wages & White Lion* did not definitively foreclose requiring agencies to provide reasons when they change unwritten but longstanding practices generating significant reliance interests.  In addition to *National*

*TPS Alliance v. Noem*, other courts continue to apply the change-in-position doctrine to longstanding agency policies as before *Wages & White Lion*. *See Shenzhen IVPS Tech. Co. v. FDA*, 148 F.4th 306, 315 (5th Cir. 2025) (applying the change-in-position doctrine to the FDA's decision to issue a single deficiency letter rather than undertake its previous "iterative review process involving multiple rounds of letters and responses").

Turning to the merits, the plaintiffs have sufficiently shown a change in policy. For the past twenty years, DHS provided TPS holders with an orderly transition period of between six and eighteen months after a termination. *See* Pl.'s Mot., Ex. 2. Since Secretary Noem took office, however, no such orderly transition period has been provided, so TPS holders have been given only sixty days to leave the country or secure another status to remain. The Secretary did not "display awareness" of the change in position. *Wages & White Lion*, 604 U.S. at 570 (cleaned up). The Secretary's notice recognized that 8 U.S.C. § 1254a(d)(3) permits the Secretary to provide for periods of "orderly transition." 90 Fed. Reg. at 53,381 (2025). In a footnote, the notice explained that "DHS has allowed such extended periods for certain Temporary Protected Status terminations, [but] certain other Temporary Protected Status designations were terminated without allowing for an extended transition period[]." *Id.* at n.28 (internal citations omitted). Although that statement is technically accurate, the footnote suggests that DHS only sometimes provided orderly transition periods, when in fact, for twenty years, DHS had always done so, and for nearly ten years, those periods were twelve to eighteen months. *See* Pl.'s Mot., Ex. 2. DHS was not required to summarize the facts in the same manner as the Court, but its stated

rationale did not acknowledge that the agency was changing position from its previous practice of generally, or more recently, always granting periods of orderly transition.

The notice also failed to "offer good reasons for the new policy." *Wages & White Lion*, 604 U.S. at 570 (cleaned up). The notice explained that "[t]he Secretary has determined in her discretion that a 60-day transition period is sufficient and warranted here given the Secretary's finding that continuing to permit the Burmese nationals to remain temporarily in the United States is contrary to the U.S. national interest." 90 Fed. Reg. at 53,381 (2025). As explained above, national interest is not a basis under the statute to terminate a TPS designation. The notice further stated that the Secretary "considered putative reliance interests in the Burma Temporary Protected Status designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous Temporary Protected Status terminations." *Id.* The notice concludes that "Temporary Protected Status, as the name itself makes clear, is an inherently temporary status . . . [and] whether to allow for an orderly transition period is left to the Secretary's unfettered discretion." *Id.* The notice does not reflect any "good reason[,]" *see Wages & White Lion*, 604 U.S. at 570, for the new policy; it merely asserts the Secretary's authority to assess whether an orderly transition period is warranted and uses the phrase "putative reliance interests" without elaboration. The Court does not dispute the Secretary's authority, but a reasoned explanation requires more than incanting the magic phrase "reliance interests."

The plaintiffs have shown a likelihood of success on the arbitrary and capricious claim based on the change-in-position doctrine.

51

### b.      Fifth Amendment claim

The plaintiffs argue that the defendants' decision to terminate TPS for Burma and other nonwhite, non-European countries violates their equal protection rights because it was motivated by racial and national origin animus.  The defendants respond that Secretary Noem's determination was supported by "reasoned, facially sufficient explanations."  Defs.' Resp. at 43.  Based on the Court's conclusion that the plaintiffs are likely to succeed on their APA claims, it need not address the merits of their Fifth Amendment claim at this time.

### 2.      Irreparable harm

"To say that an injury is irreparable means that the methods of repair (remedies at law) are inadequate."  *Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1098 (7th Cir. 1988).  And a remedy at law is inadequate if "it is not practicable to calculate damages to remedy" the kind of harm that the plaintiff has suffered. *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003).

Without preliminary relief, the plaintiffs would be immediately subject to arrest and detention pending deportation.  The plaintiffs also assert that the termination of Burma's TPS will "trigger the loss of Plaintiffs' lawful status to reside in the United States, and with it, their permission to work, their livelihoods, and ability to pursue long-held professions."  Pls.' Mem. at 27.

The government contends that the plaintiffs' concerns of removal and detention are hypothetical.  The Court disagrees.  Given the government's recent change in position to require mandatory detention of any noncitizen in removal proceedings, the risk of detention—and thus loss of liberty—is particularly acute.  *See, e.g., Garcia*

*Pacheco v. Olson*, No. 25 C 13405, 2025 WL 3281850, at *2 (N.D. Ill. Nov. 25, 2025) (Kennelly, J.); *Garcia Rios v. Noem*, No. 25 C 13180, 2025 WL 3124173, *3 (N.D. Ill. Nov. 7, 2025).  The government also asserts that the plaintiffs are free to challenge their detention through habeas corpus.  Even if true, seeking such relief would require a race to the courthouse and an unknown amount of time spent in detention until the habeas corpus petition is resolved.

The government next contends that the plaintiffs could seek other relief from deportation through the immigration process.  The declarations show the flaw in this argument.  Multiple plaintiffs assert genuine fear of the harm they would face if forced to return to Burma, but there is no indication that applications for any relief through the immigration system will be processed.  Pls.' Exs. 55 ¶¶ 15–23, 56 ¶¶ 12, 15,  58 ¶ 8; *see also* USCIS, PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries, at 1 (Dec. 2, 2025) (placing a hold on asylum and immigration benefit requests for individuals from Burma).  Additionally, in the sixty-day notice period, the plaintiffs are unlikely to have secured relief in an immigration system that adjudicates cases in years, not days or weeks.

The government argues that the plaintiffs' declarations do not "move the needle here" because they waited nearly four weeks before moving for preliminary relief.  Defs.' Resp. at 49.  But the plaintiffs provide examples of significant hardships beyond the threat of removal and detention that far outweigh any short delay in moving for preliminary relief.  For example, the plaintiffs would no longer be eligible to work or renew their driver's licenses.  Pls.' Exs. 57 ¶ 11, 58 ¶ 13.  For some, the loss of their

work authorization means they will no longer be able to financially support their children and other family members.  Pls.' Exs. 55 ¶ 22, 56 ¶  18, 57 ¶ 11.  Families of mixed immigration status, including families where some members are U.S. citizens, would also face the difficult decision on separating or moving to a dangerous country where they face significant risk of harm.  Pls.' Ex. 55 ¶¶ 15–22.  These are significant, irreparable harms.  *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (recognizing a noncitizen's interest was a "weighty one" as she stood "to lose the right to stay and live and work in this land of freedom" and "she may lose the right to rejoin her immediate family, a right that ranks high among the interests of the individual") (internal quotations omitted)).

Given the Court's finding that plaintiffs have shown a likelihood of success on their APA claims and will suffer numerous irreparable harms based on the government's action, the plaintiffs have shown that remedies at law are inadequate.

### 3.    Balancing of the harms & public interest

The plaintiffs argue that the irreparable harm they will experience absent postponement of the agency action far outweighs any potential harm to the government. The government relies heavily on "national interest" and "national security" when arguing that the public interest weighs against postponement of the agency action.  But the government has presented no evidence supporting the proposition that Burmese TPS holders provide a "national interest" or "national security" risk.  Instead, the government relies on broad assertions of visa overstays, the ban of incoming foreign nationals from Burma, and unsupported allegations of fraud on the immigration system. As the Court has discussed, however, none of these assertions relate to Burmese

54

nationals who were already present in the United States and benefitting from TPS status.

The Court has concluded that the plaintiffs are likely to succeed on their APA claims, and "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). Furthermore, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. As discussed, without preliminary relief, the plaintiffs will immediately face detention and removal. Several of the plaintiffs also present facially legitimate fears of detention and other substantial harms if removed to Burma. Pls.' Exs. 55 ¶¶ 18–19, 57 ¶ 13, 59 ¶ 11–12, 60 ¶ 10–12.

For these reasons, the balance of harms and public interest weighs in favor of postponing the agency action.

**C.    Scope of relief**

The government's final argument is that any relief must be narrowly tailored to the plaintiffs in this case in light of the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). In that case, the Court held that so-called universal injunctions—injunctions that restrain enforcement against everyone, not just the plaintiffs in the case—exceeded federal courts' equitable authority under the Judiciary Act. *Id.* at 847. The government asserts that "[t]hose limitations on courts' equitable authority apply just as squarely to § 705 relief as to preliminary injunctions." Defs.' Resp. at 39.

That is far from clear. The decision in *CASA* was rooted in a historical analysis of the equitable authority that federal courts inherited under the Judiciary Act of 1789. *See*

*CASA*, 606 U.S. at 841–52.  That analysis does not necessarily define the federal courts' authority under the APA, an entirely different statute that Congress enacted a century and a half later.  For that reason, the Court in *CASA* expressly stated that "[n]othing [in its decision] resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."  *Id.* at 847 n.10.

Considering that "distinct question," this Court disagrees with the government's claim that limitations on universal injunctions apply just as squarely to relief under the APA.  The text of APA section 706—titled "Scope of review"—provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions" found to be arbitrary and capricious or contrary to law.  5 U.S.C. § 706.  The most natural reading of that language is that courts act on the "agency action, findings, and conclusions" themselves.  Courts have thus long understood section 706 to authorize "vacatur"—vacating the agency action itself, rather than enjoining enforcement of the action against specific plaintiffs.  *See Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 830–31 (2024) (Kavanaugh, J., concurring).

APA section 705, which the plaintiffs in this case invoke, relates to interim relief. That provision states that "a reviewing court[] may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  Like with section 706, this language is naturally read to authorize courts to postpone or stay the agency action itself, rather than enjoining its enforcement as to particular plaintiffs.  *Cf. CASA*, 606 U.S. at 873 (Kavanaugh, J., concurring) (noting that courts after *CASA* may still

56

"preliminarily set[] aside or declin[e] to set aside an agency rule under the APA").

These provisions of the APA thus differ from the Judiciary Act of 1789 because they evince Congress's intent to depart from the background equitable principle of limiting relief to the specific plaintiffs in a case. *See Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring). That has been the "longstanding consensus" since the APA's enactment. *See id.* at 842–43. And though that consensus has recently come under scrutiny, *see, e.g.*, *United States v. Texas*, 599 U.S. 670, 695–704 (Gorsuch, J., concurring), neither the Supreme Court nor the Seventh Circuit has departed from the longstanding view that the APA authorizes courts to act against agency action directly. The Court thus continues to adhere to that view and the text of the APA.

**Conclusion**

For the reasons stated above, the Court grants the plaintiffs' motion for postponement of agency action [dkt. no. 15] and will separately enter an order embodying the relief the Court is ordering. The Court sets the case for a telephonic status hearing on February 6, 2026 at 9:15 a.m., using call-in number 650-479-3207, access code 2305-915-8729.

Date: January 23, 2026

_____
MATTHEW F. KENNELLY
United States District Judge