UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AUNG DOE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) No. 25 C 15483 |
| v. | ) |
| | ) |
| | ) Judge Kennelly |
| KRISTI NOEM, in her official capacity as | ) |
| Secretary of Homeland Security, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**MOTION FOR STAY PENDING APPEAL**

Defendants request a stay pending appeal of the court's order postponing the termination of the Temporary Protected Status ("TPS") designation for Burma (also known as Myanmar). Dkt. 51, 52. The government is likely to succeed on appeal, and the non-merits factors tip in its favor, as the Supreme Court necessarily determined in *twice* granting the government's stay motions in similar TPS litigation. *Noem v. NTPSA*, 145 S. Ct. 2728 (2025); *Noem v. NTPSA*, 146 S. Ct. 23 (2025). The Supreme Court's stay orders involved substantially similar issues (the reviewability and lawfulness of a TPS termination), and this court must follow those informative decisions to resolve this substantially similar stay request. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025); *NTPSA*, 146 S. Ct. at 23 (granting stay because "the parties' legal arguments and relative harms generally" remained unchanged). Presumably recognizing as much, the Ninth Circuit has twice stayed another district court's postponement of three other TPS designation terminations. *NTPSA v. Noem*, No. 25-4901 (9th Cir. Aug. 20, 2025); *NTPSA v. Noem*, No. 26-199 (9th Cir. Feb. 9, 2026). This court should follow suit and grant defendants a stay pending appeal.

**Background**

The court is familiar with the relevant procedural and legal background, and the government incorporates the corresponding portions of its opposition to the plaintiffs' motion for preliminary relief. *See* Dkt. 34 at 1–4.

**Legal Standard**

A stay pending appeal turns on "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).

**Argument**

The government incorporates by reference its arguments in its opposition to the plaintiffs' motion for preliminary relief. Dkt. 34 at 5–33. The court should grant a stay pending appeal for the additional reasons below.

I.  **The Government Is Likely to Succeed on Appeal.**

   A.  **Congress Barred Review of Plaintiffs' Claims.**

The government is likely to prevail on appeal because 8 U.S.C. § 1254a(b)(5)(A) bars review of the plaintiffs' claims. Dkt. 34 at 5–10. The court rejected that argument because it concluded that § 1254a(b)(5)(A) permits judicial review of "collateral claims of the kind endorsed in *McNary*," Dkt. 51 at 15, and that all of the plaintiffs' claims were collateral because "the plaintiffs assert that the[] claimed deficiencies" in the Burma termination "are not unique to" that termination and instead form part of "an unlawful pattern and practice in how the Secretary has handled a recent string of TPS decisions," *id.* at 18–19. That is inconsistent with the text of § 1254a(b)(5)(A), which means defendants are likely to prevail in challenging both conclusions.

2

First, § 1254a(b)(5)(A) does not distinguish between kinds of challenges to TPS determinations. Instead, it provides that there is "no judicial review," of any kind, of any kind of TPS determination, including of any TPS termination. Second, the plaintiffs do not assert "collateral" challenges simply because they allege that other terminations, which they do not challenge, have been flawed. As the Court observed, the plaintiffs in *Reno* challenged "the legality of a regulation" that governed the adjudication of individual applications. Op. 13 (quoting *Reno v. Catholic Social Servs, Inc.*, 509 U.S. 43, 56 (1993)). And the plaintiffs in *McNary* challenged genuinely "unlawful policies and practices adopted by the INS" for adjudicating individual applications, such as denying applicants "the opportunity to present witnesses," failing to provide "competent interpreters," and failing to record proceedings. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 487-88 (1991). The Supreme Court concluded that review of those claims *could not* proceed on the administrative record in a challenge to an individual decision. *Id.* at 493. In this case, by contrast, the plaintiffs challenge precisely one decision: the termination of Burma's TPS designation. To that end, the court considered *only* the administrative record for the Burma termination, not records of other terminations. And, most tellingly, unlike in the cases this court analogized to, there is no separate, freestanding agency policy or procedure that plaintiffs could challenge or the court could set aside or enjoin.

If the court sees even the slightest opening for review, at a minimum, § 1254a(b)(5)(A) bars claims that an agency's decision was arbitrary and capricious. To hold otherwise "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 506 (D.C. Cir. 2019). Moreover, the Supreme Court's granting of a stay, twice, in the termination of TPS as it pertains to Venezuela strongly suggests that the government's arguments are correct. *See Noem*

3

*v. Nat'l TPS All.*, 145 S. Ct. 2728 (mem.) (2025); *Noem v. Nat'l TPS All.*, 2025 WL 2812732 (Oct. 3, 2025). A stay of a lower court order would not have been granted without a finding of likelihood of success on the merits. *See Nken*, 556 U.S. at 434. And the Supreme Court noted that its decisions rested on the "parties' legal arguments." *Nat'l TPS All.*, 2025 WL 2812732, at *1. The government's *only* argument on the arbitrary-and-capricious claims there was that § 1254a(b)(5)(A) barred the plaintiffs' claims against the Venezuelan TPS termination. The Supreme Court, therefore, has signaled its concurrence with the government's reading of § 1254a(b)(5)(A), and this court should do the same. *See Nat'l TPS All.*, 145 S. Ct. at 2728; *Nat'l TPS All.*, 2025 WL 2812732 at *1.

**B. Alternatively, the Government Will Likely Succeed on Plaintiffs' APA Claims.**

Setting jurisdiction aside, plaintiffs' claims are also unlikely to succeed on the merits. To recap, this court ruled that plaintiffs are likely to succeed on their two APA claims. The court first characterized plaintiffs as pressing a "predetermination — contrary to law" claim, which contended that the Secretary failed to consult with appropriate agencies and failed to review conditions in Burma, Dkt. 51 at 26–37; and a "predetermination — arbitrary and capricious" claim that the Secretary improperly considered the national interest, that her decision was improperly pretextual and politically influenced, and that the lack of a more-than-sixty-day transition period impermissibly changed agency policy, *id.* at 37–51. The government is likely to succeed on all of the plaintiffs' APA claims.

**1.** At the outset, the court framed plaintiffs' claims as establishing that the Burma TPS termination was unlawful because it was "predetermined," which meant that those claims were likely to succeed on appeal because there was no true challenge to the final agency action at issue here—the Burma TPS termination. Moreover, it "is hardly improper for an agency head to come

4

into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Comm. v. New York*, 588 U.S. 752, 783 (2019); *see also Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part) (observing that a "change in administration" is "a perfectly reasonable basis for an executive agency's reappraisal" of how it implements its statutory responsibilities and policies). In short, these cases teach that courts should not find a violation of law simply because a new administration enters office with a different policy agenda from its predecessors, regardless of whether a court may view "some parts of the [agency's] analysis [as] debatable." *Garrett v. Lyng*, 877 F.2d 472, 476 (6th Cir. 1989).

As the Supreme Court explained when the Fifth Circuit held that the prior administration cancelled certain protocols because it lacked a sufficiently "open mind," an "agency's *ex ante* preference for terminating [a prior administration's action]—like any other feature of an administration's policy agenda—should not be held against the" ultimate agency decision. *Biden v. Texas*, 597 U.S. 785, 812 (2022). Nor is there any requirement that an agency have an "open-minded attitude" in considering an action. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 685 (2020). Instead, as long as an agency complies with "the APA's objective criteria," courts may not "rebuke[]" agencies for "purported attitudinal deficiencies" such as having a preferred policy outcome. *Id.* at 674, 685. Consequently, even if the plaintiffs could show that the Burma termination was predetermined in the sense that the Secretary, consistent with the President's direction, was being more exacting in her interpretation and application of the TPS statute (including the national interest criterion) than her predecessors, that would not establish a violation of the APA or show a likelihood that plaintiffs will succeed on the merits.

5

2. Regardless, the government is likely to succeed on appeal against the plaintiffs' specific claims that the termination was contrary to law.

**Consultation.** In this case, the Secretary consulted with the United States Department of State ("State Department") as part of the decisional process. As the administrative record reflects, the State Department *did* weigh in on the decision, confirming that State had "no foreign policy concerns" with terminating Burma's TPS designation. Dkt. 39–43 ("AR") at 291. The court nonetheless concluded that this consultation was inadequate because there was no "back-and-forth discussion" or "'meaningful exchange of information.'" Dkt. 51 at 29–30 (citation omitted). But nothing in the TPS statute imposes such "back-and-forth discussion," and the Supreme Court has been clear that courts are "not free to impose additional judge-made procedural requirements on agencies" beyond what statutes demand. *Ming Dai v. Garland*, 593 U.S. 357, 358 (2021). This is elementary in administrative law. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978). Here, nothing in the TPS statute requires the Secretary to consult with specific agencies, let alone in a face-to-face meeting, to send two e-mails instead of one, to convey or receive a specific amount of information, or—as the court agreed, Dkt. 51 at 30, 32—to discuss set topics.

**Country conditions review.** As the *Federal Register* notice reflects, the Secretary plainly conducted a review of country conditions in Burma. *See* 90 Fed. Reg. at 53,378–381. More specifically, the Secretary concluded that the situation in Burma had improved enough for Burmese nationals to return home safely, citing progress in governance and stability—including the end of a state of emergency, plans for free and fair elections, successful ceasefire agreements, and improved local governance. *Id.* at 53,378. The court's conclusion that the termination "appears to have occurred without a review of conditions in" Burma, Dkt. 51 at 37, is squarely contradicted by the record, and the government is thus very likely to prevail on appeal.

6

3. The government is also likely to succeed on appeal against the plaintiffs' specific arguments that the termination was arbitrary and capricious.

**Change-in-position doctrine.** The court found that plaintiffs would likely succeed on two arguments based on the change-in-position doctrine. As its name suggests and as the court agreed, the change-in-position doctrine applies only when an agency changes its "existing policies." Dkt. 51 at 38 (quoting *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025)). The government is likely to succeed in challenging both of the court's change-in-position doctrine rulings on appeal, because each was erroneous.

Start with the national interest determination. The Secretary considered the national interest as part of her periodic review of Burma's TPS designation, as required by statute. 90 Fed. Reg. at 53,380–81. The court concluded that the Secretary's consideration of "national interest to justify recent TPS terminations deviated from past agency policy" because the government pointed "to no prior TPS terminations that relied on national interest in this way," Dkt. 51 at 39, so the termination failed under the change-in-position doctrine because the Secretary did not justify this change in position, *id.* at 39–40.

The government is likely to succeed in challenging that conclusion on appeal. The court identified no previous agency policy against considering the national interest as part of the periodic review of "extraordinary and temporary conditions" TPS designations. Nor did the plaintiffs—for the simple reason that no such policy exists. Plaintiffs provided no evidence of such a previous policy. And such a policy would directly contradict the TPS statute, which requires consideration of the national interest in the periodic review process and mandates termination if the designation is no longer in the national interest. That is because the statute requires consideration of the national interest as part of the determination whether a country meets the requirements for TPS

7

designation under the "extraordinary and temporary conditions" ground. 8 U.S.C. § 1254a(b)(1)(C). The statute requires consideration of the national interest before an extension or termination of an "extraordinary and temporary conditions" designation by requiring periodic review of whether the country still "meet[s] the conditions for designation under paragraph 1." *Id.* §§1254a(b)(3)(B). And it mandates termination if the designation is no longer in the national interest because by specifying that the Secretary "shall terminate the designation" if the "conditions for designation"—which, again, include the national interest for "extraordinary and temporary conditions" designations—do not continue to be met. *Id.*

The court flipped the "change-in-position" doctrine on its head by applying it when there was no previous policy—no "hard-and-fast commitment" or "earlier [agency] position"—that could have conferred a legitimate reliance interest on a TPS recipient that the government would violate the TPS statute by not considering the national interest as a dispositive requirement for extension in future periodic reviews of "extraordinary and temporary conditions" designations. *Wages and White Lion*, 604 U.S. at 573–85.

Next turn to the transition period. The Secretary here afforded the statutorily required 60 days of notice prior to the termination of Burma's TPS designation. Contrary to what the statute allows for, this court concluded that the government violated the change-in-position doctrine by choosing a 60-day wind-down period instead of providing six months or more. Dkt. 51 at 47–51.

The government is again likely to succeed in challenging this conclusion on appeal, as even though this court cited other treatments of the change-in-position doctrine, it overlooked that *Wages & White Lion*, 604 U.S. at 573, itself rejected a change-in-position claim because the agency had not made "a hard-and-fast commitment" to what the plaintiffs there described as its previous policy. Whatever other questions remain regarding this doctrine, the court erred in concluding that

8

the plaintiffs could succeed without showing the previous "hard-and-fast commitment" to a different policy, as the Supreme Court deemed an essential requirement just last year.

The plaintiffs here, of course, cannot establish anything like a commitment to a policy of providing transition periods of any particular length. No previous agency statement has announced a policy of, in general, providing transition periods of any particular length. Instead, the agency has simply concluded in particular instances that a longer transition period was warranted, without generalizing any commitment to providing longer transition periods in future terminations. That does not establish a policy any more than a district court could establish a policy of not giving below-Sentencing Guidelines sentences simply by sentencing several defendants in a row to within- or above-Guidelines sentences, or any more than the previous administrations' established a policy of extending TPS designations by extending every designation ever considered.

Finally, even if the Secretary had changed positions, the *Federal Register* notice would suffice. First, the Secretary acknowledged—in a statement the court agreed was accurate, Dkt. 51 at 50—that "DHS has allowed such extended periods for certain Temporary Protected Status terminations" in the past, 90 Fed. Reg. at 53,381 n.28, and that DHS was not providing an extended period in this instance. The court concluded that that did not suffice to acknowledge a change in positions, but it accurately described the decisions the court viewed as establishing the previous policy and acknowledged that DHS was not taking the same action in this decision. Requiring anything more would be tantamount to a magic-word requirement.

Second, the Secretary gave good reasons for selecting the statutory-default of a 60-day transition period: "continuing to permit the Burmese nationals to remain in the United States is contrary to the U.S. national interest." 90 Fed. Reg. at 53,381. It would make little sense to stretch out the transition period if this conclusion were correct. Nonetheless, the court rejected this

9

conclusion because, in its view, the national interest is not a basis for terminating a TPS designation. As explained above, however, that is incorrect. *See supra* at 7–8. Regardless, the national interest would be a perfectly valid reason for an abbreviated transition period even if it were irrelevant to the termination decision itself. And again, the statute places no limitations on what the Secretary may consider in "determin[ing]," "at [her] option," whether to provide a longer transition period. 8 U.S.C. § 1254a(d)(3).

Last, the Secretary considered reliance interests and concluded that they did not favor a longer transition period, since TPS "is an inherently temporary status," all TPS holders were already on notice of the date of the periodic review of Burma's TPS designation, and all TPS holders were already on notice of the possibility of termination on 60 days' notice where, as here, that 60-day period is explicitly allowed for by statute. 90 Fed. Reg. at 53,381–82. That analysis is much more than "incanting the magic phrase 'reliance interests,'" Dkt. 51 at 51, and balancing those weak reliance interests against the national interest reflects amply reasoned decisionmaking.

**National interest.** The court also concluded that plaintiffs are likely to succeed in challenging the national interest determination as arbitrary and capricious because the court found that visa overstay data and a ban on future entry of Burmese nationals are irrelevant to the assessment of the national interest. That conclusion is also unlikely to survive an appeal for at least three reasons.

*First*, assessment of the national interest, including what considerations are relevant to the national interest, is committed to the agency's discretion by law. Not to the courts' discretion or its view of what is in the national interest. *See, e.g.*, *Poursina v. USCIS*, 936 F.3d 868 (9th Cir. 2019) (observing "that the 'national interest' standard" is "firmly committed to the discretion of the Executive Branch—not to federal courts"); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 883

10

F.3d 895, 903 (D.C. Cir. 2018) ("questions of foreign policy and national interest are not subjects fit for judicial involvement").

*Second*, the court's assessment of the national interest here was plainly incorrect. Foreign nationals who overstay visas may obtain TPS, contradicting the court's view that visa overstay data "has no bearing on TPS holders *at all*." Dkt. 51 at 40 (emphasis in original); *see, e.g.*, *Melendez v. McAleenan*, 928 F.3d 425, 426 (5th Cir. 2019) (recounting grant of TPS to foreign national who overstayed his visa). And the President's conclusion that there have been past deficiencies in screening and vetting of foreign nationals from Burma is plainly relevant to whether the government should continue to permit such persons from Burma, many of whom may have been insufficiently screened or vetted given the past deficiencies the President found, to remain in the United States via TPS. 90 Fed. Reg. at 53,381 (citing the finding of "deficien[cy] with regards to screening and vetting" in 90 Fed. Reg. at 24,497).

*Third*, even on the court's view that the § 1254a(b)(5)(A) bar on judicial review does not apply to "pattern and practice" challenges, the plaintiffs did not argue and the court did not find that this arbitrary-and-capricious challenge to the specifics of the Secretary's reasoning as to the national interest in the Burma designation formed part of a generalizable pattern or practice. This claim is thus barred, even on the court's own view of the scope of § 1254a(b)(5)(A).

**Pretext and political influence.** The court also concluded that the termination was likely arbitrary and capricious because it was pretextual and prompted by political considerations. Dkt. 51 at 41–47. In particular, the court concluded that the *Federal Register* notice presented "contrived reasons for the termination" because the Secretary did not consult with other agencies, relied on "irrelevant" facts like visa overstay rates and data about ICE removals to Burma, and "did not articulate a rational connection" between the evidence of continued poor conditions in

11

Burma and her decision to terminate Burma's designation. *Id.* at 43–46. The upshot, the court concluded, was that "it would strain credulity" to conclude that "the Secretary terminated TPS for Burma because it no longer qualified under the TPS statute." Dkt. 51 at 46. Hence, this court arrived at its own conclusion that Burma must still qualify for TPS. *See id.*

This approach is wrong, and the court of appeals is likely to disagree with this analysis. As previously explained, the Secretary *did* consult with the State Department, and the information this court discounted as irrelevant was material as to whether to continue to designate Burma for TPS was in the national interest. And the court's remaining conclusion cannot be squared with the published termination notice, which pointed out reasons for optimism about conditions in Burma— none of which was questioned by this court. *See* 90 Fed. Reg. at 53,379–80. That amply suffices to draw a rational connection between the record evidence of conditions in Burma and the cessation of "extraordinary and temporary conditions . . . that prevent . . . aliens who are nationals of [Burma] from returning to [Burma] in safety." 8 U.S.C. § 1254a(b)(1)(C). A contrary conclusion amounts to impermissible substitution of the court's judgment for that of the agency, which is not allowed for in APA review. *See, e.g.*, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (courts do not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [our] judgment for that of the [agency]").

The court's conclusion that the Secretary could not possibly have terminated Burma's TPS designation "because it no longer qualified under the TPS statute," Dkt. 51 at 46, also erroneously ignored the Secretary's independently dispositive conclusion that the designation must be terminated because it was contrary to the national interest of the United States. As explained above, an "extraordinary and temporary conditions" designation can be extended only if the country continues to meet the requirements for designation, 8 U.S.C. § 1254a(b)(3)(B), and those

12

requirements cannot continue to be met if the Secretary "finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States," *id.* § 1254a(b)(1)(C). The Secretary made precisely that finding. *See* 90 Fed. Reg. at 53,380 ("[T]he termination of the Burma designation is required because it is contrary to the national interest."). That independent basis for finding that Burma no longer meets the requirements for a TPS designation does not turn on the assessment of country conditions with which the court disagreed.

In sum, the government is likely to succeed on the merits on appeal.

**II.     The Non-Merits Factors Also Favor Defendants.**

The remaining factors likewise favor the government. This is because the court is "not writing on a blank slate" when it assesses these factors, "because the Supreme Court has twice stayed district court orders blocking the Secretary's vacatur of TPS for Venezuela." *NTPSA v. Noem*, No. 26-199 (9th Cir. Feb. 9, 2026) (staying district court's vacatur of TPS terminations). Those "stay applications involved similar assertions of harm by both parties," and the Supreme Court has "admonished" lower courts that its "stay orders must inform 'how [lower courts] should exercise [their] equitable discretion in like cases.'" *Id.* (quoting *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025)); *see also id.* (Hawkins, J., concurring in part and in the result) (explaining that a stay was necessary to "heed[] the Supreme Court's stay orders in the Venezuela TPS status case"). The Supreme Court, for its part, clearly views its first stay as controlling similar future stay applications in TPS cases. *See NTPSA*, 146 S. Ct. at 23 (granting second stay in TPS case because "the parties' legal arguments and relative harms generally" remained unchanged since first stay in TPS case). For that reason alone, the Court should conclude that these factors support the government.

That would be the correct result if the court were writing on a blank slate, too, as the government faces irreparable harm from the denial of a stay. This is because the court's decision represents "an improper intrusion by a federal court into the workings of a coordinate branch of

the Government." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers). Especially so here, in a context that implicates "a fundamental sovereign attribute exercised by the Government's political departments[,] *largely immune from judicial control*." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (emphasis added). Applying this principle here is apt because setting aside the termination overrides the Secretary's considered judgment on a matter of foreign affairs and requires the United States to continue to permit thousands of foreign nationals to remain within its borders. That alone establishes irreparable harm. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

The balance of the equities and public interest also tip decisively in defendants' favor because "[t]he interest in preserving national security is an urgent objective of the highest order." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (per curiam). That is the challenge that this court is reviewing: the Secretary's discretionary judgment in concluding that the conditions for Burma's TPS designation are no longer met. The clear congressional purpose of § 1254a is to allow the Secretary to make a determination as to whether a foreign state's TPS designation is to be terminated and to do so in a timely manner. Undermining both concerns is therefore contrary to the public interest, especially as courts have recognized how courts "must, of course, give deference to the Executive Branch's evaluation of the facts and the sensitive and weighty interests of national security and foreign affairs, including the timing of those . . . decisions." *Tiktok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002)).

Further, the significance of the public interest in the enforcement of the United States' immigration laws is well settled. *See, e.g.*, *Nken*, 556 U.S. at 435; *United States v. Martinez-*

*Fuerte*, 428 U.S. 543, 556–58 (1976). The Secretary's termination determination in this case is meant to advance the enforcement of those laws, such as ending the unlawful presence of foreign nationals who would remain in the United States in violation of law, and explicitly touches on the political branch's assessment of a foreign country's political landscape. *See Nken*, 556 U.S. at 436. Preserving the political branches' authority to control such policy choices serves "the obvious necessity that the Nation speak with one voice" on such matters. *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001).

On the other side of the balance, the plaintiffs maintain that termination could lead to the loss of employment or health benefits, possible removal, and family separation following future removal proceedings. But the end of TPS's inherently *temporary* protection is nowhere close to a final order of removal, and the loss of associated benefits is inherent in the temporary status Congress crafted. And the Supreme Court itself has previously concluded that "removal alone cannot constitute the requisite irreparable injury" for a foreign national. *Nken*, 556 U.S. at 435.

As the Supreme Court has twice concluded, the equities favor the government.

## Conclusion

For the foregoing reasons, the court should grant a stay pending appeal.

> Respectfully submitted,
>
> ANDREW S. BOUTROS
> United States Attorney
>
> By: s/ Joshua S. Press
>     JOSHUA S. PRESS
>     Assistant United States Attorney
>     219 South Dearborn Street
>     Chicago, Illinois 60604
>     (312) 886-7625
>     joshua.press@usdoj.gov