**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **AUNG DOE, NINA DOE, THURA DOE,** ) | |
| **KHIN THET DOE, CHU LET DOE,** ) | |
| **and MAUNG DOE, on their own** ) | |
| **behalf and on behalf of others** ) | |
| **similarly situated,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No. 25 C 15483** |
| ) | |
| **KRISTI NOEM, SECRETARY,** ) | |
| **UNITED STATES DEPARTMENT OF** ) | |
| **HOMELAND SECURITY, UNITED** ) | |
| **STATES DEPARTMENT OF** ) | |
| **HOMELAND SECURITY, UNITED** ) | |
| **STATES CITIZENSHIP AND** ) | |
| **IMMIGRATION SERVICES, and** ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Defendants.** ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Six Burmese nationals who currently hold Temporary Protected Status (TPS)

under the Immigration and Nationality Act (INA) have sued the government alleging that

Kristi Noem—the then-Secretary of the United States Department of Homeland Security

(DHS)—and other defendants violated the Administrative Procedure Act (APA) and the

Fifth Amendment when terminating the TPS designation of Burma, also known as

Myanmar. The Court granted the plaintiffs' motion to postpone the effective date of the

termination based on its finding that the Secretary's decision violated the APA. *See* 5

U.S.C. § 705.

The government has filed a motion to stay the Court's postponement order. For

the reasons below, the Court denies the government's motion.

## Background

TPS provides temporary work authorization and protection against removal for noncitizens present in the United States who cannot return to their home countries because of conditions enumerated in the statute.  8 U.S.C. § 1254a.  The TPS statute states that the Secretary may provide a TPS designation for a foreign nation, or part of a foreign nation, for an initial period of between six and eighteen months if she finds that at least one of three requirements has been met:

> (1) there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (2) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected, the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and the foreign state officially has requested designation under this subparagraph; or
>
> (3) there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless [the Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1); *see* 6 U.S.C. § 557 (conferring upon the Secretary of Homeland Security certain authorities granted by statute to the Attorney General, including those relating to TPS).

The TPS statute also requires the Secretary to periodically review a TPS designation to determine whether it should be extended or terminated.  *See* 8 U.S.C. § 1254a(b)(3)(A).  The Secretary, "after consultation with appropriate agencies of the

Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met." *Id.* This review must occur at least sixty days before the end of the initial or extended period of designation. *Id*.

After review, the Secretary must provide, on a timely basis, for the publication of "the notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation . . . .)." *Id.* If the Secretary determines that a foreign state (or part of a foreign state) "no longer continues to meet the conditions for designation[,]" she "shall terminate the designation by publishing notice in the Federal Register of the determination . . . (including the basis for the determination)." *Id.* § 1254a(b)(3)(B). The Secretary may postpone the effective date of a termination "in order to provide for an orderly transition." *Id*. § 1254a(d)(3).

On May 25, 2021, former Secretary Alejandro Mayorkas designated Burma for TPS based on extraordinary and temporary conditions in the country. Designation of Burma (Myanmar) for Temporary Protected Status, 86 Fed. Reg. 28 (May 25, 2021). Burma's designation was extended in 2022 and 2024. Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status, 87 Fed. Reg. 58,515, 58,518 (Sep. 27, 2022); Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status, 89 Fed. Reg. 20,682, 20,684 (Mar. 25, 2024).

In November 2025, Secretary Noem announced her decision to terminate Burma's TPS designation in sixty days, on January 26, 2026. Termination of Burma (Myanmar) Temporary Protected Status, 90 Fed. Reg. 53,378, 53,382 (Nov. 25,

2025).  The plaintiffs, six Burmese beneficiaries of TPS, filed suit in December 2025.
The plaintiffs alleged violations of the APA and the Equal Protection Clause of the Fifth
Amendment.  Under the APA, the plaintiffs claimed that the termination was contrary to
law because the Secretary failed to consult with appropriate agencies and review the
country conditions in Burma, as required by the TPS statute.  The plaintiffs also claimed
that the Secretary's decision was arbitrary and capricious because she impermissibly
relied on national interest to justify the termination of Burma's TPS designation,
provided a pretextual rationale for the termination, and departed from agency policy in
granting only the minimum sixty-day transition period without explanation.  The plaintiffs
filed a motion to postpone the termination.  The Court granted the plaintiffs' motion
based on their demonstration of a likelihood of success on the APA claims.  *See Doe v.
Noem*, No. 25 C 15483, 2026 WL 184544 (N.D. Ill. Jan. 23, 2026).  The government
then moved for a stay of the postponement pending appeal, and shortly thereafter it
filed a notice of appeal.  *See* dkt. 56.  A few days ago, on March 3, 2026, the plaintiffs
filed a motion for class certification.  *See* dkt. 63.

In parallel to the Secretary's termination of Burma's TPS designation, the
Secretary has, since taking office, terminated the TPS designation of each country
whose designation has arisen for review.  *See Miot v. Trump*, No. 25-CV-02471 (ACR),
2026 WL 266413, at *23 (D.D.C. Feb. 2, 2026) (chronicling TPS actions between
February 2025 and January 2026).

## Discussion

A stay pending appeal is a form of "extraordinary relief."  *Castanon-Nava v. U.S.
Dep't of Homeland Sec.*, 161 F.4th 1048, 1055 (7th Cir. 2025) (quoting *Somerville Pub.

*Schs. v. McMahon*, 139 F.4th 63, 68 (1st Cir. 2025)).

The standard for a stay pending appeal of an order postponing agency action parallels the standard for a stay of a preliminary injunction. *See Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020) (standard for postponement of agency action under section 705 of the APA is the same as the standard for a preliminary injunction); *Nken v. Holder*, 556 U.S. 418, 433–34 (2009) (establishing general standard for stays of lower court orders). The stay applicant must demonstrate "(1) a likelihood of success on the merits, and (2) a threat of irreparable harm absent a stay." *Illinois v. Trump*, 155 F.4th 929, 936 (7th Cir. 2025). If the stay applicant makes this showing, the Court must consider "(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 426. When the government is a party, as in this case, the balance-of-harms and public-interest factors merge. *Id.* at 435.

## A.  Likelihood of success on the merits

The likelihood of success factor places the burden on the stay applicant to make "a strong showing" that it is "likely to succeed on the merits." *Id.* at 434.

### 1.  Jurisdiction

The government first contends that it is likely to succeed on the merits because, in its view, subsection (b)(5) of the TPS statute strips the Court of jurisdiction over the plaintiffs' claims. 8 U.S.C. § 1254a(b)(5)(A). That provision states: "There is no judicial review of any determination . . . with respect to the designation, or termination or extension of a designation, of a foreign state under [subsection (b)]." *Id.* The Court, drawing upon the Supreme Court's decision in *McNary v. Haitian Refugee Center, Inc.*,

498 U.S. 479 (1991), determined that subsection (b)(5) did not preclude jurisdiction over the plaintiffs' collateral "pattern-and-practice" claims. The government's attempts to relitigate that point are unavailing.

The government first asserts that the statutory text does not distinguish between kinds of challenges to TPS determinations. That misses the point. The word "determination" is itself a limitation on subsection (b)(5)'s scope. Even if the TPS statute bars all kinds of challenges to TPS determinations, it does not bar claims that do not challenge a TPS determination. And as *McNary* teaches, a challenge to an underlying pattern and practice is not a challenge to "a determination." *Id.* at 492. To be sure, the focus on the phrase "*a* determination" rather than the word "determination" matters. *Id.* A key part of the Court's reasoning in *McNary* was that the reference to "a determination" referred to "a single act rather than a group of decisions or a practice or procedure." *Id.*

Subsection (b)(5) refers more broadly to "*any* determination." 8 U.S.C. § 1254a(b)(5)(A). But that difference in language cannot bear the weight that the government puts on it. *McNary* did not interpret the phrase "a determination" in a vacuum. The Court also found it significant that Congress had used broader language for other jurisdictional provisions in the same statute. The Court noted, for example, that Congress could have modeled the jurisdictional bar on other provisions that barred review of "all causes . . . arising under any of the provisions" or review "on all questions of law and fact." *McNary*, 498 U.S. at 494. The fact that Congress chose not to use similarly sweeping language indicated that it did not intend to foreclose all meaningful judicial review, especially in light of the "well-settled presumption favoring interpretations

of statutes that allow judicial review of administrative action." *Id.* at 494–96.

So too here. The phrase "any determination" may reach further than "a determination," but it is still a far cry from the broader language that the Court indicated could suffice to cover collateral challenges in *McNary*. And as in *McNary*, the effect of applying the TPS jurisdictional bar to collateral challenges would be to foreclose all meaningful judicial review. Congress's decision not to use similarly broad language in the TPS statute, like the decision not to do so in the provision at issue in *McNary*, suggests that it did not intend such a result.

Though the parties have not raised the issue, this Court's opinion granting the plaintiffs' motion for postponement of agency action contained an inaccuracy. The Court said that Congress enacted the TPS statute a year after *McNary* and, based on that understanding, analyzed what Congress could have intended by its word change from "a" to "any." The Court was mistaken. The TPS statute was passed a year before *McNary*, not after.

Nonetheless, the Court's interpretation of the TPS statute remains the same. The fact that Congress did not write the TPS statute with *McNary* in mind can cut both ways. On the one hand, one cannot infer that Congress, by using similar language in the TPS statute, intended to incorporate the limitations in *McNary*, which did not exist at that point. On the other hand, it simplifies the analysis for why Congress used the word "any" in the TPS statute. The Court previously analyzed that word choice on the premise that it was a congressional response to *McNary*. But with the correct timeline in mind, the choice to use "any" instead of "a" could not have been a response to *McNary*, which had not yet been decided. The difference instead likely reflects the fact

7

that the TPS statute contemplates multiple determinations, whereas the statute at issue in *McNary* contemplates only one. *Compare* 8 U.S.C. § 1254a(b)(5) (authorizing "designation," "termination," and "extension" decisions), *with* 8 U.S.C. § 1160 (authorizing a single adjustment-of-status decision). The word "any" may have been a grammatical adjustment to cover all three of the three types of decisions in the TPS statute.

More fundamentally, the difference between "a determination" and "any determination" is not enough to overcome the presumption in favor of judicial review. *McNary* provided examples of language that could suffice as a clear enough statement. The change from "a" to "any" does not similarly evince Congress's intent to foreclose collateral claims that, under *McNary*, are otherwise preserved. That inference is bolstered by the fact that Congress has not changed the language in the TPS jurisdictional bar, despite the obvious similarities to the provision at issue in *McNary* and despite the Court in *McNary* clearly indicating how Congress could bar collateral claims if it wished to do so.

The government next argues that the plaintiffs' challenges in this case are not truly collateral, pattern-and-practice claims. That is so, the government says, because they challenge only the decision to terminate Burma's TPS designation rather than a freestanding policy or procedure.

The Court does not agree. Start with the plaintiffs' claims that the Burma TPS termination decision was contrary to law. The plaintiffs allege that the Secretary did not undertake the consultation requirements or the objective review of country conditions required by the TPS statute. The plaintiffs also argue that the Secretary misinterpreted

the statute by considering national interest as a termination factor.  Importantly, the plaintiffs assert that a string of TPS termination decisions have been based on the same erroneous understanding of what the TPS statute requires.  The government does not deny that other TPS termination decisions have been predicated on that same understanding of the requirements of the TPS statute.  As a result, the plaintiffs' challenge—that the Secretary has adopted an erroneous position on "a first-order question" of statutory interpretation regarding multiple TPS decisions—is, in fact, a collateral challenge to a pattern and practice.  *See Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1017 (9th Cir. 2025).

The plaintiffs also assert arbitrary and capricious claims.  The government insists that "at a minimum, § 1254a(b)(5)(A)" must bar those claims.  Mot. for Stay at 3.  A contrary reading, the government warns, "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology."  *See* Mot. for Stay at 3 (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 506 (D.C. Cir. 2019)).

Note the alteration in the quote.  The original quote from *DCH* refers to "estimates" for Medicare payments to hospitals.  The court in *DCH* reasoned that a challenge to the methodology underlying such estimates is "unavoidably a challenge to the estimates themselves."  *Id.*  That makes sense.  A Medicare estimate is effectively a mathematical product of plugging data into a formula.  Altering either the data or the formula necessarily changes the estimate.  As the district judge in *Miot* observed, TPS decisions are different.  *Miot*, 2026 WL 266413, at *13.  Requiring the Secretary to comply with the APA's procedural requirements does not necessarily change the

Secretary's ultimate decision.

Indeed, that precise difference distinguished the permissible collateral challenge in *McNary* from the barred claim for benefits in *Heckler v. Ringer*, 466 U.S. 602 (1984). *See McNary*, 498 U.S. at 495. As the Court explained in *McNary*:

> Unlike the situation in *Heckler*, the individual respondents in this action do not seek a substantive declaration that they are entitled to SAW status. Nor would the fact that they prevail on the merits of their purportedly procedural objections have the effect of establishing their entitlement to SAW status. Rather, if allowed to prevail in this action, respondents would only be entitled to have their case files reopened and their applications reconsidered in light of the newly prescribed INS procedures.

*Id. McNary* thus appreciated the concern that a jurisdictional bar might be evaded by relabeling a claim as a collateral challenge, as opposed to raising a truly collateral challenge. But it distinguished the two on the basis of remedy—whether the claim would change the substantive decision or rather would require compliance with procedural requirements.

Here, as in *McNary*, the plaintiffs do not seek an order dictating the Secretary's decision. Rather, they seek, and this Court has ordered, only that the Secretary reconsider Burma's TPS designation in accordance with the procedures dictated by the TPS statute and the APA. The same is true of the plaintiffs' claim that the Secretary's change in position regarding the transition period was arbitrary and capricious. Even if that claim were successful, the Secretary could still decline to provide a longer transition period if she provided a "satisfactory explanation" for why she was doing so. *See FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025). The fact that the plaintiffs have identified an actual pattern and practice that they are challenging—the string of TPS decisions that have followed similarly abbreviated processes and reflect a

similarly unacknowledged change in position—further mitigates the risk of allowing a disguised substantive challenge to an individual decision to slip past the statutory bar. *See Morales v. Yeutter*, 952 F.2d 954, 957 (7th Cir. 1991).

The government, perhaps recognizing the significance of the remedy sought, argues that this case is distinguishable from *McNary* because the plaintiffs seek reconsideration of the termination of TPS only for Burma. In contrast, according to the government, the injunction in *McNary* required vacatur of "large categories of denials because the unlawful procedures had infected all *individual* adjudications." Defs.' Reply at 4. Nothing in *McNary*, however, suggests that a plaintiff must seek relief for nonparties to show that its challenge is truly collateral.[1] To the contrary, the analysis in *McNary* focused solely on the nature of the relief to the plaintiffs. *See McNary*, 498 U.S. at 495.

The government also contends that *McNary* is distinguishable because the claims there "*could not* proceed on the administrative record in a challenge to an individual decision." Mot. for Stay at 3. But that point in *McNary* was not to say that to be a collateral challenge, extra-record evidence is required. Rather, it was to show that the alternative route of judicial review was inadequate, thus triggering the presumption in favor of judicial review. *See McNary*, 498 U.S. at 496–98. That applies equally here. On the government's view, the only available judicial review would be in removal proceedings. Individual removal proceedings likely would not generate an adequate

---

[1] Indeed, the government almost certainly would object to the scope of relief if the plaintiffs here sought to vacate all TPS decisions affected by the allegedly unlawful policies. Moreover, the plaintiffs likely would lack standing to challenge the termination of other countries' TPS designations.

administrative record to assess challenges to the process by which the Secretary makes TPS decisions.

Finally, the government argues that the Court must lack jurisdiction at least over the arbitrary and capricious claims because of two Supreme Court emergency orders staying district court orders postponing the termination of Venezuela's TPS designation. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025); *Noem v. Nat'l TPS All.*, 146 S. Ct. 23 (2025). Such orders are not conclusive regarding the merits, but their reasoning carries precedential weight. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring). Here, however, the orders the government relies on do not reveal the reason for the stays.

To solve that problem, the government says in its opening brief that its only argument regarding the arbitrary and capricious claims in the stay cases was that section (b)(5) stripped the court of jurisdiction. But even assuming that is true, that does not mean that the stay was based on the Supreme Court's assessment of the jurisdictional argument, let alone that the reasoning would apply equally here. As the Second Circuit has noted, "those orders involved a TPS designation of a different country, with different factual circumstances, and different grounds for resolution by the district court." *Dahlia Doe v. Noem*, No. 25-2995, 2026 WL 544631, at *1 (2d Cir. Feb. 17, 2026); *see Miot v. Trump*, No. 26-5050, at 3–4 (D.C. Cir. Mar. 6, 2026) (per curiam) (noting that foreign policy concerns and timing considerations unique to Venezuela may have motivated the Supreme Court's stay orders).

Nonetheless, the government argues that this Court should interpret the stay orders as establishing its lack of jurisdiction because the Supreme Court "expressly

pointed to 'the parties' legal arguments,' . . . which encompassed the government's jurisdictional defense."  Reply at 2–3 (quoting *Nat'l TPS All.*, 146 S. Ct. at 23).  But the fact that a stay is granted does not mean that *all* the arguments tilt in the government's favor.  A stay could be justified, for example, by a judgment that the plaintiffs would be unlikely to prove that the termination decision at issue violated the law.  That basis—or any other basis for the stay—may not apply equally to this case.  Without a way to ascertain the underlying reasoning, the stay orders provide little guidance on how this Court should exercise its discretion in this case.  *Cf. Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (stating that interim orders may "inform how a court should exercise its equitable discretion in *like* cases" (emphasis added)).

### 2.    APA claims

Turning to the merits, the government argues that it has made a strong showing of success on each of the plaintiffs' APA claims.

First, in one sentence, the government suggests that the plaintiffs' challenge to the predetermination of the termination of TPS for Burma does not challenge a final agency action and therefore cannot be reviewed under the APA.  Mot. for Stay at 4.  But the government did not previously raise this point and has not substantively presented or supported it in the present motion, so it has forfeited (or waived) the point.  *See United States v. Kopp*, 922 F.3d 337, 341 (7th Cir. 2019) ("[A] party forfeits an issue when it 'fails to raise an argument due to accident or neglect.'" (quoting *United States v. Seals*, 813 F.3d 1038, 1044–45 (7th Cir. 2016)); *Planned Parenthood Fed'n of Am., Inc. v. Kennedy*, No. 1:25-CV-11913-IT, 2025 WL 2495955, at *5 (D. Mass. Aug. 29, 2025) (holding that argument raised for the first time in motion to stay had been waived).

Even so, the government does not credibly contend that the challenged termination of TPS was a "preliminary, procedural, or intermediate agency action" that is not reviewable under the APA.  5 U.S.C. § 704.  The action was the "consummation of the agency's decisionmaking process," and the termination of Burma's TPS designation was a decision "from which legal consequences will flow[.]"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).  The plaintiffs' challenge to a final agency action is consistent with the jurisdictional bar in the TPS statute, as the plaintiffs do not seek review of the merits of the Secretary's decision to terminate TPS for Burma but instead challenge the  alleged pattern of the Secretary's pretextual TPS terminations.

The government next objects to the Court's holding that the Secretary's decision was pretextual and thus arbitrary and capricious.  The government asserts that an administration appropriately may have a policy agenda and may work with agencies to implement that agenda.  *See, e.g.*, *Dep't of Comm. v. New York*, 588 U.S. 752, 783 (2019).  Of course that is true; the Court acknowledged in its opinion that this principle is well settled.  *Doe*, 2026 WL 184544, at *20.  But the Court rested its assessment that the Secretary's decision to terminate TPS for Burma was pretextual on lack of compliance with "the APA's requirement that an agency disclose a 'genuine justification[ ]' for an action."  *Id.* (quoting *Dep't of Comm.*, 588 U.S. at 785).  The APA's procedural restrictions and the requirements of the TPS statute remain in force even as an administration pursues its policy preferences.

The government has not made a strong showing that the Secretary offered genuine reasons for the termination of TPS.  An agency's decision is arbitrary and capricious when it fails to "'disclose the basis' of its action[,]" even if its pretextual basis

14

may be rational. *Dep't of Comm.*, 588 U.S. at 780 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–69 (1962)). "[I]f the Secretary of Homeland Security fails to provide 'the basis'—not just any basis, but 'the' true basis—for her termination determination in the Federal Register, she acts contrary to the TPS statute." *Afr. Cmtys. Together v. Noem*, No. 25 C 13939, 2026 WL 395732, at *9 (D. Mass. Feb. 12, 2026) (quoting 8 U.S.C. § 1254a(b)(3)(B)). The termination of TPS for Burma was likely arbitrary and capricious because the Secretary did not terminate Burma's designation due to a change in country conditions and instead did so as part of a larger effort to end TPS entirely. The Court's finding regarding pretext was well-supported by the evidence it cited: the Secretary's and the President's hostility towards TPS, as manifest in public statements and Executive Order 14159; the Secretary's termination of TPS designations for every country whose designation was up for review; and the abrupt change in DHS's own assessment of conditions in Burma absent consultation with other agencies, as the Court will discuss next. *See Doe*, 2026 WL 184544, at *20– 21. It is very hard to believe that the "extraordinary and temporary conditions . . . that prevent[ed]" the safe return of nationals from Venezuela, Haiti, Afghanistan, Cameroon, Nepal, Honduras, Nicaragua, South Sudan, Ethiopia, Syria, Somalia, and Burma, and warranted TPS designations for these nations, all somehow resolved shortly after the Secretary took office. 8 U.S.C. § 1254a(b)(1)(C).

The government also contends that it made a strong showing of success on the plaintiffs' contrary to law claims related to consultation and review of country conditions. The TPS statute provides that the Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state

(or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The government asserts now, as it did in response to the plaintiffs' motion to postpone agency action, that the Secretary consulted with the State Department. The Court once again disagrees. Consultation is "[t]he act of asking the advice or opinion of someone (such as a lawyer)" or "[a] meeting in which parties consult or confer." Consultation, Black's Law Dictionary (12th ed. 2024); *see* Consultation, Black's Law Dictionary (6th ed. 1990) ("Act of consulting or conferring; *e.g.* patient with doctor; client with lawyer. *Deliberation* of persons on some subject." (emphasis added)). The administrative record revealed an email from a DHS official to a State Department official listing the upcoming termination dates of TPS designations for Burma, Syria, South Sudan, and Ethiopia. *Doe*, 2026 WL 184544, at *13–15. The State Department official responded, "I confirm that State has no foreign policy concerns with ending these TPS designations on or before those dates. As you are aware, sanctions on Syria have recently been lifted, and we have partnered with South Sudan on immigration-related issues." Administrative Record at 291. The DHS official responded and added the United States Citizenship and Immigration Services (USCIS) Chief of Staff to the email chain "so the State consultation makes it into the memo." *Id.*

The Court held that this did not qualify as a consultation because it could not legitimately be considered a discussion, conferral, or effort to obtain advice before taking an action. *Doe*, 2026 WL 184544, at *13–14. The termination of TPS designations for these countries was apparently set in stone, and DHS contacted the

16

State Department to check a box rather than shape its decision-making process. The State Department official did not comment on the merits of terminating these TPS designations but rather on the dates of the terminations. Regardless of an administration's policy goals, the TPS statute requires consultation, a term that carries some substantive weight. The Court did not purport to require a certain manner or mode of communication. Still, the government has not demonstrated a strong likelihood of success on the plaintiffs' claim that DHS failed to perform the consultation required by the TPS statute.

The government has also not made a strong showing of success on the plaintiffs' claim that the Secretary acted contrary to law by failing to review Burma's country conditions. As the Court explained, "[t]he pattern that the plaintiffs describe—the Secretary's termination of TPS [designations of twelve countries] at every opportunity against the backdrop of the President's efforts to eliminate TPS—suggests that the Secretary did not review the evidence regarding any of these countries, including Burma, as required by the TPS statute." *Id.* at *16. The Court considered the Secretary's notice in the Federal Register, as the government urges it to do. *Id.* at *17. But it found the notice to be in tension with a March 2025 report from USCIS Refugee, Asylum and International Operations Directorate (RAIO) showing little evidence of improved conditions in Burma. *Id.* at *17. That report, issued about six months before the Secretary's termination, explained that violence had spread to all but a handful of Burma's hundreds of townships and that bombing of civilian areas had increased. *Id.* The Court did not itself weigh this evidence but rather concluded that the Secretary had not reviewed country conditions in Burma before terminating its TPS designation. The

government merely reiterates its previous argument, and the Court's assessment of the plaintiffs' likelihood of success on the merits of this claim is unchanged.

Turning to the remaining arbitrary and capricious claims, the government contends that it has made a strong showing of success on the plaintiffs' claims regarding national interest and the orderly transition period. The plaintiffs claimed that the government acted arbitrarily and capriciously by changing its position regarding the relevance of national interest to the termination of a TPS designation. With respect to both national interest and the orderly transition period, the Court applied the change-in-position doctrine articulated in *FDA v. Wages & White Lion Investments, L.L.C.*, 604 U.S. 542 (2025). That doctrine presents "two questions." *Id.* at 569. First, a court asks "whether an agency changed existing policy." *Id.* Second, a court considers whether the agency "'display[e]d awareness that it *is* changing position' and offer[ed] 'good reasons for the new policy[.]'" *Id.* at 570 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Courts have not settled on the scope of the change-in-position doctrine, and they differ on whether it applies only to policies established by formal regulations or guidance memoranda or also to longstanding agency practices and customs. *Doe*, 2026 WL 184544, at *22. The Seventh Circuit has not considered the question before or after *White Lion*. But the language in *White Lion* did not clearly preclude change-in-position claims based on a change in a longstanding policy, even if that policy is not commemorated in a formal statement. *See id.* at *23.[2]

---

[2] Even if the government may ultimately prevail in arguing that the change-in-position doctrine does not apply to the Secretary's consideration of national interest or to the orderly transition period, it has not made a strong showing of likely success on the plaintiffs' other APA claims.

In its motion to stay, the government argues that regardless of whether it has changed its position, the TPS statute requires the Secretary to consider national interest in reviewing a TPS designation and mandates termination if a designation runs contrary to the national interest. That statutory interpretation argument was not raised in the briefing regarding the motion for postponement, so it is waived or forfeited for present purposes. *Kopp*, 922 F.3d at 341.

The government separately contends that it demonstrated a strong likelihood of success on the plaintiffs' arbitrary and capricious claim based on national interest because assessment of national interest is committed to agency discretion. It is true that the government deserves some deference in this realm. But simply invoking the concept of the national interest is not sufficient under the APA, and the government did not effectively articulate why Burmese TPS holders threaten the United States.

In its motion to stay, the government articulates new arguments on this front: visa overstay rates are relevant to the national interest because TPS may be granted to individuals who have overstayed visas, and concerns about insufficient screening and vetting of foreign nationals from Burma also have a bearing on national interest. Again, however, these arguments were not previously raised and have therefore been forfeited for present purposes. *Id.*

In part because the argument was forfeited and not briefed, the Court lacks sufficient information on the process for screening applicants for TPS to assess the second argument, but the government's argument regarding visa overstays is unlikely to succeed. Congress set eligibility requirements for TPS. It stated that a national of a country designated for TPS is eligible for TPS if the person "has been continuously

physically present in the United States since the effective date of the most recent designation of that state[,]" "has continuously resided in the United States since such date as the [Secretary] may designate[,]" and "is admissible as an immigrant[.]" *See* 8 U.S.C. § 1254a(c)(1)(A). Congress further provided that nationals of countries designated for TPS were ineligible for TPS based on specific violations of criminal or immigration laws. *Id.* § 1254a(c)(2)(B). Nowhere did Congress state that overstaying a visa makes an immigrant ineligible for TPS. In light of the statute and the government's failure to make its visa overstay argument in response to the motion for postponement of agency action, the government has not demonstrated a strong showing of success on the plaintiffs' claim that the Secretary's reliance on national interest was arbitrary and capricious.

The plaintiffs also contend that the Secretary changed position in violation of the APA by providing only the sixty-day transition period required by the TPS statute. The government argues that it has not violated the change-in-position doctrine because that doctrine does not apply to its longstanding practice of providing longer periods of transition. Once again, the government forfeited or waived this argument by failing to raise it when briefing the motion for postponement of agency action. *See Doe*, 2026 WL 184544, at *22 ("The defendants do not respond to this claim at all."). The government's argument also lacks merit. The statute provides that termination "shall not be effective earlier than sixty days after the date the notice is published or, if later, the expiration of the most recent previous extension." 8 U.S.C. § 1254a(b)(3)(B). Although DHS had no formal policy articulating that it would provide a transition period beyond that required by statute,

20

> [f]or the past twenty years, DHS has provided an orderly transition period of at least six months in twelve TPS terminations.  Pls.' Ex. 2.  Between 2017 and January 20, 2025, the agency provided for termination periods of twelve or eighteen months in each of its six TPS terminations.  *See id.*  Prior to 2025, TPS designations had been terminated without an orderly transition period only four times, most recently in 2003.

*Doe*, 2026 WL 184544, at *22.  This pattern of past practice establishes significant reliance interests, as TPS holders use transition periods to seek adjustment of status in the United States or arrange their affairs to return home or to another country.  It would be fallacious to presume or assume that individuals could obtain immigration relief in this country in sixty days, which makes the agency's practice of providing longer transition periods significant.  The Secretary's notice did not acknowledge the agency's change in position or provide a reason for it beyond a loose reference to national interest.  *Id.* at *23.  In sum, the government has not made a strong showing of success regarding its changed approach to the orderly transition period.

## B.    Other stay factors

Turning to the remaining factors, the government has not established that it would face irreparable injury absent a stay.  To support irreparable harm, the government again cites the Supreme Court's stay of two district court orders related to the Secretary's termination and vacatur of TPS for Venezuela.  *See Nat'l TPS All.*, 145 S. Ct. at 2728; *Nat'l TPS All.*, 146 S. Ct. at 23.  The government notes that the Supreme Court has also recently stated that "[a]lthough our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases."  *Boyle*, 145 S. Ct. at 2654.  As discussed above, that is of course true, but the Supreme Court did not provide its reasoning regarding its assessment of the equitable factors in its TPS stay orders; it did not individually identify or analyze the factors at all.

By contrast, the case on which the government draws, *Trump v. Boyle*, applied reasoning from a prior stay order in a similar context. *Boyle* related to the removal of members of the Consumer Product Safety Commission, and it quoted the Supreme Court's prior assessment "that the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Id.* (quoting *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025)). Although some justices found the two-sentence analysis in *Trump v. Wilcox* lacking, *id.* at 2656 (Kagan, J., dissenting), the Supreme Court's stay orders regarding TPS termination decisions do not include *any* analysis of the *Nken* stay factors upon which the Court could draw today. The Court cannot simply assume that the factors apply similarly because the present case also involves the termination of TPS. *See Dahlia Doe*, 2026 WL 544631, at *1.

The Court is also skeptical of the government's argument that this case and the Supreme Court's Venezuela TPS stay orders are "like cases." *Boyle*, 145 S. Ct. at 2654; *see Miot*, No. 26-5050, at 3 (explaining with respect to a challenge to the termination of TPS for Haiti that "[a] closer examination shows that *NTPSA* is meaningfully distinct from this case"). TPS for Burma benefits less than 4,000 people, whereas TPS for Venezuela benefits about 300,000 people. *See* 90 Fed. Reg. at 53,381 (describing DHS's estimate that 3,969 people from Burma have been granted TPS and 236 have pending applications); *Dahlia Doe*, 2026 WL 544631, at *2 (contrasting the 6,100 Syrian TPS holders with the 300,000 Venezuelan TPS holders). The government argued for a stay before the Supreme Court in part because of the impact of Venezuelan TPS holders on "police stations, city shelters, and aid services in

local communities[.]"  Stay Application at 37, *Noem v. Nat'l TPS All.*, No. 24A1059; *see also* Stay Application at 24, *Noem v. Nat'l TPS All.*, No. 25A326.  The government has not raised such arguments in this case.  The Court will not exhaustively analyze the differences and similarities between TPS for Venezuela and Burma, but there are glaringly apparent differences both as to the characteristics of TPS for these two countries and the government's argument as to the harm it faces.  Those differences counsel hesitancy in granting a stay based on the fact that the Supreme Court entered stay orders relating to the termination of TPS for Venezuela.

In the present case, the government argues that it faces irreparable harm absent a stay because the order intrudes on the sovereign powers of the Executive Branch related to foreign affairs.  The government does not say much more than this.  The suggestion seems to be that the government is harmed by any judicial action related to immigration or foreign policy.  That does not hold water in this case.  Courts often interpret statutes that bear on both issues, and the authority of other branches in these realms does not categorically place their actions beyond judicial review.  *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (a party's "request[] that the courts enforce a specific statutory right . . . is a familiar judicial exercise").  Furthermore, the government's contention that "setting aside the termination overrides the Secretary's considered judgment on a matter of foreign affairs" conflates the non-merits factors with the merits, which the Court views differently.  *Id.*  Finally, the government has not argued that it is engaged in "complex and ongoing negotiations" with Burma, a point it argued before the Supreme Court regarding Venezuela.  Stay Application at 37, *Noem v. Nat'l TPS All.*, No. 24A1059*; see Dahlia Doe*, 2026 WL

544631, at *2 (noting the government's failure to make similar arguments in its application for a stay of the termination of the TPS designation of Syria); *Miot*, No. 26-5050, at 3 (denying government's motion to stay postponement of termination of TPS designation for Haiti and noting lack of ongoing negotiations between the United States and Haiti).

As for the third stay factor, "whether issuance of the stay will substantially injure the other parties interested in the proceeding[,]" and the fourth factor, the public interest, the plaintiffs have demonstrated that issuance of a stay would cause them substantial injury. *Nken*, 556 U.S. at 426. As the Court explained in its prior opinion, if the TPS designation of Burma is terminated, the plaintiffs face a risk of arrest and removal, mandatory detention in removal proceedings, inability to work, inability to renew their driver's licenses, and family separation. *Doe*, 2026 WL 184544, at *24–25 (citing plaintiffs' declarations). Many of these serious harms are imminent and do not hinge on removal, such as the expiration of the plaintiffs' work authorizations and the financial impact of inability to work. *See id.*

Additionally, although "removal alone cannot constitute the requisite irreparable injury[,]" *Nken* so held in the context of review of a removal order, where the government had a policy of facilitating the return to the United States of improperly removed individuals and, if necessary, restoring their pre-removal immigration status. *Nken*, 556 U.S. at 435 (citing Brief for Resp't at 44, *Nken v. Holder*, 556 U.S. 418 (2009)). The government has made no promises to do so here. Resp. at 12. To the contrary, the government has prohibited individuals from Burma from entering the country and placed a hold on asylum and USCIS benefits applications from individuals

24

from Burma. *See* Proclamation No. 10,949, 90 Fed. Reg. 24,497, 24,500 (June 4, 2025) (suspending entry into the United States of nationals of Burma based on visa overstay rates and Burma's lack of cooperation with removals); USCIS, PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries, at 1 (Dec. 2, 2025).

The government contends that the third and fourth stay factors support a stay because "[t]he interest in preserving national security is an urgent objective of the highest order." Mot. for Stay at 14 (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (per curiam)). As the Court previously explained, however, the government has not supported its broad assertions of national security risks and fraud on the immigration system by Burmese nationals. Although the government unquestionably has an interest in enforcing immigration laws and enacting its foreign policy priorities, those interests do not outweigh the harm to the plaintiffs and the public interest.

## Conclusion

For the reasons stated above, the Court denies the government's motion to stay its postponement order pending appeal [dkt. 54]. The case remains set for a telephonic status hearing on March 16, 2026 at 9:00 a.m., using call-in number 650-479-3207, access code 2305-915-8729. The parties should be prepared to discuss further proceedings, including how the Court should proceed with respect to the motion for class certification.

Date: March 10, 2026

MATTHEW F. KENNELLY
United States District Judge

25