**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **AUNG DOE, et al., on their own behalf and on behalf of others similarly situated,** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 25 C 15483** |
| | ) | |
| **MARKWAYNE MULLIN, SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,** | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Throughout 2025, then-Secretary of the United States Department of Homeland Security Kristi Noem decided to terminate multiple countries' designation for Temporary Protected Status (TPS). These decisions prompted lawsuits raising challenges under the Administrative Procedure Act (APA) and the Equal Protection Clause of the Fifth Amendment.

This case concerns challenges to the termination of Burma's TPS designation. The Court granted the plaintiffs' motion to postpone the effective date of the termination, finding that it had jurisdiction over the claims and that the plaintiffs had demonstrated a likelihood of success on their APA claims. *Doe v. Noem*, 822 F. Supp. 3d 893, 901 (N.D. Ill. 2026). The government appealed the order to the Seventh Circuit and moved in this Court for a stay pending appeal, which this Court denied. *Doe v. Noem*, 25 C 15483, 2026 WL 674343, at *1 (N.D. Ill. Mar. 10, 2026).

The plaintiffs then filed the present motions to compel discovery and for a protective order. At the time, two other TPS cases were before the Supreme Court, so the government moved to stay discovery pending resolution of those cases. The Supreme Court issued its decision on June 25, 2026. *Mullin v. Doe*, Nos. 25-1083 & 25-1084, 2026 WL 1825840 (June 25, 2026). This Court denied the government's motion to stay as moot and requested supplemental briefing from the parties on the effect of the Supreme Court's decision on the plaintiffs' requests, which is now complete.

The Court addresses the discovery dispute first, then the request for a protective order.

**A.      Discovery**

The plaintiffs request two categories of discovery. First, they seek to compel "extra-record discovery . . . , including . . . documents in response to" four requests for production:

> (1) documents concerning efforts to end or limit TPS as a program generally,
>
> (2) documents concerning Defendants' implementation of Executive Order 14,159, Protecting the American People Against Invasion,
>
> (3) documents regarding implementation of and compliance with the Travel Ban in relation to TPS, and
>
> (4) documents concerning implementation of Executive Order 14,163, including proposals and policies to give preference within the United States refugee system to English speakers, white South Africans, and Europeans who oppose migration or support "populist" political parties.

Pls.' Mot. to Compel at 4, 15.

Second, the plaintiffs ask the Court to order the government to "complete the administrative record," including by adding four specific items:

- An unredacted copy of the USCIS Decision Memorandum for Burma TPS;

2

- Records of Clearance and Approval for the Burma TPS termination;

- Any reports on conditions in Burma authored by the Department of State after January 20, 2025;

- Any other documents withheld based on deliberative process privilege.

*Id.* at 15.

The parties dispute three overarching issues. Prior to the Supreme Court's decision, the parties disputed (1) whether extra-record discovery is appropriate, and (2) the extent to which the deliberative process privilege applies. In their supplemental briefs following the Supreme Court's decision, the parties focus on (3) whether the discovery sought is proportionate. The Court starts with the Supreme Court's decision in *Mullin v. Doe*, then addresses each issue in turn.

### 1. *Mullin v. Doe*

In *Mullin v. Doe*, the Supreme Court reversed two lower court decisions postponing the termination of TPS designation for Syria (based on an APA claim) and Haiti (based on APA and equal protection claims). *Mullin v. Doe*, 2026 WL 1825840, at *2, *13; *see id.* at *10 n.4. First, it held that "the TPS statute's judicial-review bar applies to all non-constitutional claims." *Id.* at *10. Second, it held that the Haiti plaintiffs were "not entitled to interim relief on their equal protection claim" because they were "unlikely to prove that race was a motivating factor in the decision to terminate Haiti's TPS designation." *Id.* at *13.

On the equal protection claim, a threshold issue was whether *Arlington Heights* or *Trump v. Hawaii* supplied the appropriate standard of review. Under *Arlington Heights*, a court may consider "such circumstantial and direct evidence of intent as may

be available" to determine whether a "discriminatory purpose [was] a motivating factor in the decision." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). But in *Trump v. Hawaii*, 585 U.S. 667 (2018), the Court reasoned that cases involving "matters of entry and national security" required a "highly constrained" standard of review. *Id.* at 704. There, the Court considered an Establishment Clause claim that the President had imposed entry restrictions on nationals of certain foreign countries for the unconstitutional purpose of excluding Muslims. *Id.* at 697, 699–700. The Court observed that in visa denial cases, it had limited its review to "asking only whether the [government's] policy is facially legitimate and bona fide." *Id.* at 703–04. But rather than apply that standard to the entry policy, the Court assumed that it could look past the face of the policy and consider extrinsic statements to the extent of rational basis review. *Id.* at 704–705.

In *Mullin v. Doe*, the Court assumed that *Arlington Heights* rather than *Trump v. Hawaii* applied. *Mullin v. Doe*, 2026 WL 1825840, at *11. It concluded, however, that even under *Arlington Heights*, the Haiti plaintiffs were not likely to succeed. *Id.* at *13. The Haiti plaintiffs relied on statements by the President that "express strong objections to [recent] immigration," express "great displeasure with TPS," "broadly denigrate the countries for which TPS designations have been granted," and "malign Haitians who have come to the United States"—as well as statements by former Secretary Noem that "express[] antipathy toward travelers from countries covered by a renewed travel ban," made "derogatory comments about immigration and its effects," and "promised changes and criticized past implementation of TPS." *Id.* at *11; *see id.* at *20 (Kagan, J., dissenting) (quoting statements).

4

In the Court's view, "[n]one of the cited statements [were] overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications." *Mullin v. Doe*, 2026 WL 1825840, at *12. "[W]hatever one may think of the cited statements," the Court said, "they are insufficient to show that the termination of Haiti's TPS designation was based on the race of the Haitian people." *Id.* Additionally, the Court continued, there was a "strong, race-neutral explanation of these officials' statements: the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Id.* The Court therefore concluded that the Haiti plaintiffs were "not entitled to interim relief on their equal protection claim." *Id.* at *13.

**2. Extra-record discovery**

Before the Supreme Court's decision in *Mullin v. Doe*, the parties disputed whether discovery of materials beyond the administrative record is appropriate. "[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Comm. v. New York*, 588 U.S. 752, 780 (2019). This so-called record rule "reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Id.* (quoting *Arlington Heights*, 429 U.S. at 268 n.18). The Supreme Court has recognized a "narrow exception to the general rule against inquiring into 'the mental processes of administrative decisionmakers'": "On a 'strong showing of bad faith or improper behavior,' such an inquiry may be warranted and may justify extra-record discovery." *Id.* at 781 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*,

5

401 U.S. 402, 420 (1971)).

After *Mullin v. Doe*, the question is whether the record rule bars the plaintiffs from seeking their requested discovery for their equal protection claims. The Court concludes that it does not. First, it is not clear whether the record rule applies at all to the plaintiffs' equal protection claims, an issue that neither the Supreme Court nor the Seventh Circuit seem to have decided. *See Cook County v. Wolf*, 461 F. Supp. 3d 779, 792 (N.D. Ill. 2020). The record rule emerged from, and has largely been confined to, cases involving APA-style review of the adequacy of an agency's explanation for its actions. *See, e.g.*, *Overton Park*, 401 U.S. at 420; *Camp v. Pitts*, 411 U.S. 138, 141–43 (1973); *see also Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 402 (7th Cir. 2022). If the record-rule comes from the APA, and if constitutional claims are based on an implied equitable cause of action not governed by the APA, then the record rule would not apply to plaintiffs' equal protection claim at all.

Neither premise is entirely free from debate. Regarding the first premise, the record rule arguably can be traced to *United States v. Morgan*, 313 U.S. 409, 422 (1941), which predated the APA's enactment. The issues and analysis in *Morgan*, however, closely resemble modern APA-style review, and *Morgan* only cautioned against requiring an agency head to testify—a much narrower principle than the record rule that exists today. Regarding the second premise, some have argued that constitutional challenges to agency action are channeled through the APA. *See, e.g.*, *Make the Road N.Y. v. Mullin*, No. 25-5320, 2026 WL 1792978, at *9 (D.C. Cir. June 23,

6

2026) (citing *Webster v. Doe*, 486 U.S. 592, 607 n.* (1988) (Scalia, J., dissenting)).[1] The Supreme Court, however, has very recently reaffirmed the existence of an implied equitable cause of action, even for a claim that the dissent argued did not satisfy the APA's final agency action requirement. *Trump v. Cook*, No. 25A312, 2026 WL 1855613, at *11 n.2 (June 29, 2026); *see id.* at *31 (Thomas, J., dissenting). This suggests that constitutional claims are not channeled through the APA.

In any event, the reasoning underlying the record rule and its applications is a poor fit for constitutional claims that turn on government intent, like the plaintiffs' equal protection claim. *Cf. In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 156 F.3d 1279, 1279 (D.C. Cir. 1998) ("Agency deliberations not part of the record are deemed immaterial . . . because the actual subjective motivation of agency decisionmakers is immaterial as a matter of law . . . ."). As another district judge observed:

> The Court's rationale in *Department of Commerce* for presumptively limiting discovery to the administrative record sounds in the register of a prototypical APA challenge to agency action on the ground that it is arbitrary and capricious, an abuse of discretion, or unsupported by the evidence. . . . That rationale is a mismatch for an equal protection challenge alleging that an agency['s] [action], while facially race-neutral, is intended to disadvantage certain races and succeeds in doing so.
>
> Most people know by now that the quiet part should not be said out loud. . . . So if a facially neutral agency action is motivated by racial animus, that animus almost certainly will not be "disclose[d]" in the agency's "contemporaneous explanation" for that action. [Citing *Department of Commerce*.] And because evidence of racial animus (if any) will reside outside the administrative record, presumptively limiting discovery to the record can allow the racial motivations underlying racially motivated

---

[1] *See also* Braden Currey, Note, *Rationalizing the Administrative Record for Equitable Constitutional Claims*, 133 Yale L.J. 2017, 2083–95 (2024) (describing the debate); Conley K. Hurst, Comment, *The Scope of Evidentiary Review in Constitutional Challenges to Agency Action*, 88 U. Chi. L. Rev. 1511, 1525–27 (2021) (same).

policymaking to remain concealed.

*Wolf*, 461 F. Supp. 3d at 794–95.

And even if the record rule applies to the plaintiffs' equal protection claims, extra-record discovery would be warranted under the bad-faith exception. In *Department of Commerce v. New York*, 588 U.S. 752 (2019), the Supreme Court held that extra-record discovery was warranted by evidence suggesting that the government's proffered justification for its action was pretextual because it "played an insignificant role in the decisionmaking process." *Id.* at 782. Even the dissenters in *Department of Commerce*—who would have held that pretext was not a basis to "venture beyond the agency's 'administrative findings'" on arbitrary and capricious review—acknowledged that challenges to agency action "based on an unstated, unlawful bias or motivation" might present a different question. *Id.* at 791 & n.4 (Thomas, J., concurring in part and dissenting in part). In this Court's preliminary injunction opinion, it found that the Secretary's justifications for terminating Burma's TPS designation are likely pretextual. That justifies extra-record discovery, especially because the plaintiffs' equal protection claim requires them to prove an unlawful bias or motivation.

The government resists this conclusion by arguing that the Court's "preliminary likelihood determination on an expedited . . . record" does not amount to finding the "'strong' showing' of bad faith that extra-record discovery requires." Defs.' Resp. to Mot. to Compel at 2. The government also asserts that the Court's opinion established that extra-record discovery is unnecessary, citing a portion of the opinion stating that the Court could adequately assess the plaintiffs' pretext theory without consulting extra-record evidence. According to the government, that "confirms that the Secretary's is

8

discernible on the record." *Id.*

Neither argument is availing. The Court's previous finding was preliminary, but the record has not changed since then. The problem at this point is how to confirm or deny whether the Secretary's proffered justification is pretextual and, on an equal protection claim like this one, what the Secretary's actual motivations were. In short, the problem is that the Secretary's decisionmaking is not discernible on the record. Under *Department of Commerce*, that warrants considering extrinsic evidence.

The Court therefore concludes that the plaintiffs' discovery requests are not barred by the record rule.

### 3.    Deliberative process privilege

The parties next dispute whether four specific items should be part of the administrative record. Given the conclusion above that extra-record discovery is warranted, whether they are discoverable as part of the "whole" administrative record or as extra-record documents does not seem to be a material distinction. With that issue to the side, the substance of the parties' dispute seems to center on whether the items are shielded by the deliberative process privilege.

The deliberative process privilege "shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021). The purpose is to avoid chilling candid communication in agency decisionmaking. *Id.* In accordance with this rationale, the privilege "distinguishes between predecisional, deliberative documents, which are exempt from disclosure, and documents reflecting a final agency decision and the

9

reasons supporting it, which are not." *Id.* at 268.  In determining whether a document represents a final decision, the question is "whether the agency treats the document as its final view on the matter."  *Id.*  That inquiry is a functional one—an agency cannot invoke the privilege by hiding a functionally final decision in draft form.  *Id.* at 272–73. Even when the privilege applies, it can be overcome by a "particularized need" that "outweigh[s] the reasons for confidentiality."  *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993).

As with the record rule, an issue at the outset is whether the deliberative process privilege may be used to bar discovery for the plaintiffs' equal protection claims.  Some lower court decisions have reasoned that the privilege cannot be asserted when the "cause of action is directed at the government's intent."  *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998).  Other decisions, however, have avoided a categorical rule and instead treated the motive-based nature of the claim as a factor in determining whether the plaintiffs' particularized need outweighs the reasons for confidentiality.  *See, e.g.*, *Ill. Coal. for Immigr. & Refugee Rights, Inc. v. Wolf*, No. 19 C 6334, 2020 WL 7353408, at *2 (N.D. Ill. Dec. 15, 2020).

The Court agrees with the latter approach, which entails a document-by-document review.  As a result, the Court denies the plaintiffs' catchall request for all documents withheld under the deliberative process privilege.  That leaves the plaintiffs' more specific requests for an unredacted copy of the USCIS Decision Memorandum for Burma TPS, records of clearance and approval for the Burma TPS termination, and any reports on conditions in Burma authored by the Department of State after January 20,

2025.  The parties' briefs do not contain sufficient information regarding these documents—including what exactly the plaintiffs seek to use them for and the nature of the government's confidentiality interest—for the Court to decide whether to compel production.  Part of the problem is that the government's response brief contained two potentially material errors that it identified in a notice of correction.

First, the government initially asserted that the USCIS Decision Memorandum was predecisional because the final agency action was the determination in the federal register.  The government has since clarified that the "operative agency decision . . . is the determination on the signature page of the decision memorandum."  Notice of Corr. at 1.  Thus it is unclear whether the government still intends to assert the deliberative process privilege against unredacting the USCIS Decision Memorandum.

Second, the government initially asserted that records of clearance and approval merely memorialize a decision after it is made, and it relied upon the record rule based on that understanding.  The government has since clarified that the records "are not created after the relevant decision being made, but instead indicate a potential decision has cleared the temporary-protected-status package within the agency before going to the Secretary for signature / ultimate decision."  *Id.* at 2.  That sounds like a contention that the records are predecisional, but it is unclear whether the government intends to assert the deliberative process privilege (or resist production on other grounds).

### 4. Proportionality

That brings the Court to the parties' dispute over proportionality.  Before the Supreme Court's decision, the government argued that if *Trump v. Hawaii* supplies the appropriate standard for the equal protection claims, the plaintiffs' discovery requests

would not be relevant.  Strictly speaking, the *Mullin v. Doe* decision did not definitively establish the appropriate standard of review, leaving this argument open.  But even assuming *Trump v. Hawaii* is the appropriate standard, the plaintiffs' discovery requests would still be relevant.  *Trump v. Hawaii* itself applied rational basis review and, in doing so, considered extrinsic evidence.  The plaintiffs' discovery requests here seek material relevant under that standard.

To be sure, *Trump v. Hawaii* only assumed that rational basis review was appropriate.  But in *Mullin v. Doe*, the government, in its briefing and at oral argument, consistently described the *Trump v. Hawaii* standard as permitting rational basis review. *See, e.g.*, Brief for Petitioners at 18, 46–49, *Mullin v. Doe*, 2026 WL 1825840 (Nos. 25-1083 & 25-1084); Transcript of Oral Argument, *id.*, at 8:20–10:9.  Additionally, *Trump v. Hawaii* and the visa-denial cases it relied upon specifically addressed entry restrictions. The issue of terminating TPS for foreign nationals already in the United States is a distinct issue that may be subject to a less restrictive standard of judicial review.  *See* Transcript of Oral Argument, *supra*, at 8:20–9:2, 27:9–27:15.  The Court therefore sees no basis to conclude that the correct standard of review in this case is *Trump v. Hawaii* rather than *Arlington Heights*—contrary to the Supreme Court's assumption in *Mullin v. Doe*—or, moreover, to venture past what either party proposed in *Mullin v. Doe* and conclude that it is a new, more stringent version of *Trump v. Hawaii* that does not permit even rational basis review.

Since the Supreme Court's decision, the government has instead argued that the plaintiffs' discovery requests are not "proportional to the needs of the case" under Rule 26(b)(1) because the Supreme Court has already decided that the plaintiffs are unlikely

12

to succeed on their equal protection claim.  *See* Defs.' Suppl. Mem. at 5 (quoting Fed. R. Civ. P. 26(b)(1)).  The plaintiffs respond that the Supreme Court's decision, based on a limited, developing factual record, "neither disposes of [their] equal protection claim nor undermines their entitlement to discovery in support of that claim."  Pls.' Suppl. Mem. at 2.

The Court agrees with the plaintiffs.  *Mullin v. Doe* was an interim decision, and in concluding that the Haiti plaintiffs lacked the requisite likelihood of success, it only analyzed public statements.  Nothing in the decision suggests that the plaintiffs here cannot try to marshal the additional evidence necessary to prove their equal protection claim.  Nor is there a basis to conclude, at this stage, that such discovery will be futile: it is of course possible that evidence of internal decisionmaking may reveal a discriminatory motive not clearly reflected in public statements.  That said, not all evidence regarding internal decisionmaking is equally likely to do so.  And for some categories of evidence, it is possible that the likelihood of uncovering material evidence is too small to justify the burden and intrusion.  This calls for more targeted and specific arguments on each discovery request than what the parties have provided in their briefs.

The Court therefore overrules the government's argument that the plaintiffs are completely barred from pursuing discovery, but it defers ruling on proportionality and privilege issues regarding specific requests for discovery.  Those should be resolved in the normal course, request by request, during a hearing after the parties have conferred and attempted in good faith to resolve any disputes.

13

**B.      Protective order**

Finally, the Court turns to the plaintiffs' request for a protective order.  The parties' dispute centers on a portion of the proposed protective order prohibiting the use of identifying information obtained in this litigation to initiate enforcement proceedings against the plaintiffs:

> No party or person employed by the parties shall use any information or knowledge of Pseudonymous Plaintiffs' identities, or documents wherein Pseudonymous Plaintiffs' identity information is disclosed, derived therefrom, to bring enforcement proceedings against, retaliate against, intimidate, report or refer an individual to any governmental authorities, discriminate against in any manner, or harass any other party, or any individuals associated with the parties in any way.  Nothing in this Protective Order shall limit or in any way restrict the use of information obtained outside of this litigation.

Pls.' Mot. to Compel, Ex. 8 ¶ 2.

The government contends that this proposal "is not a discovery protective order; it is an injunction against immigration enforcement for these plaintiffs in the future." Defs.' Resp. to Mot. to Compel at 12.  Relying on that characterization, the government argues that:  (1) the Court lacks jurisdiction to enter it under section 1252(g) of the INA, which provides in relevant part that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary] to commence proceedings, adjudicate cases, or execute removal orders," *id.* at 12 (quoting 8 U.S.C. § 1252(g)); and (2) the protective order is improper under Rule 26(c).

This sleight of hand is unpersuasive.  The protective order is not equivalent to an injunction precluding immigration enforcement against the plaintiffs.  It only restricts the use of identifying information obtained in this litigation, and it expressly permits enforcement based on information obtained by other means.  Those are the proper

14

bounds of a protective order under Rule 26(c).  *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984).  And section 1252(g), which strips jurisdiction to hear "cause[s]" and "claim[s]," does not overwrite Rule 26(c), which does not provide a cause of action but rather authorizes courts to craft appropriate restrictions on information obtained through discovery.  *See* Fed. R. Civ. P. 26(c).[2]

The government also contends that "[t]he speculative prospect" of immigration enforcement against the plaintiffs does not constitute good cause under Rule 26(c). The Court disagrees.  As other courts have found, noncitizens who challenge the government's immigration policies draw attention to their immigration status.  The risk that doing so might result in targeted immigration enforcement is not a speculative one. *See Does 1-158 v. Rubio*, No. 25-3032, 2025 WL 2709775, at *2 (D.D.C. Sep. 23, 2025).  And that risk can chill plaintiffs from seeking to vindicate their rights.  A protective order limited to information obtained through this litigation mitigates these problems without intruding on the government's ability to initiate immigration enforcement through independent means.

The government's final argument presents a difficult question.  The government points out that for the pending appeal on the preliminary injunction order, the Seventh Circuit permitted the plaintiffs to proceed pseudonymously but ordered them to disclose their names to the government.  *See* Order, *Aung Doe v. Mullin*, No. 26-1294 (7th Cir.

---

[2] The government also takes issue with part of the proposed order purporting to reserve jurisdiction to enforce the order after the case ends.  But that does not change the key point—that it only governs the use of information obtained through discovery. Additionally, an express retention of jurisdiction to enforce a protective order is not uncommon, and it is appropriate here to ensure that the Court can enforce, modify, or dissolve the protective order as needed in the future.  *See Bond v. Utreras*, 585 F.3d 1061, 1078–79 (7th Cir. 2009).

Mar. 9, 2026) ("Appellees have not furnished any legal basis for keeping their identities secret from the defendants.  Litigation in which one does not know who one is litigating against is not permissible.").  The government argues that it "received plaintiffs' identities not through discovery but pursuant to [the Seventh Circuit's] order."  Defs.' Resp. to Mot. to Compel at 13.

This argument appears to be a novel one that pertains to the scope of the protective order, and the parties do not direct the Court to authority that provides an answer.  The underlying premise seems to be that information received on appeal is different from information received in the district court.  But if that were right, then appeals would present an easy workaround to protective orders—a party could often assert that they learned the information from the appellate record.  The better view, it seems, is that protective orders are more functional:  a limit on the disclosure or use of information obtained through litigation applies irrespective of whether that information was also presented on appeal.  Of course, a district court is bound to follow any guidance from an appellate court on whether to issue a protective order, and its decision remains subject to reversal by the appellate court.  But here, the Seventh Circuit's order only seems to address the issue of whether the plaintiffs could conceal their identities entirely from the government, not the more specific question of whether to restrict the government's ability to use identifying information obtained through this litigation for immigration enforcement purposes.

## Conclusion

For the reasons stated above, the Court grants the plaintiffs' request for a protective order and continues the motion to compel discovery [dkt. 75] pending further

16

efforts by the parties to resolve or narrow their disputes.  A draft protective order was previously provided but may require updating based on the Court's decision, so an updated version, in Word format, is to be provided to the undersigned judge's proposed order email address by July 14, 2026.  The case is set for a telephonic status hearing on July 28, 2026 at 9:15 a.m., using call-in number 650-479-3207, access code 2305-915-8729.  A joint status report identifying, and giving the parties' positions on, any remaining discovery-related disagreements is to be filed on July 21, 2026.

Date:  July 9, 2026

_____
MATTHEW F. KENNELLY
United States District Judge