**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Aung DOE; Nina DOE; Thura DOE,
Khin Thet DOE; Chu Let DOE;
and Maung DOE, on their
own behalf and on behalf of others similarly
situated,

*Plaintiffs*,

– *versus* –

Markwayne MULLIN, Secretary, United
States Department of Homeland Security, in his
official capacity; UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY; UNITED STATES CITIZENSHIP
AND IMMIGRATION SERVICES; and UNITED
STATES OF AMERICA,

*Defendants*.

**Case No. 1:25-cv-15483**

**FIRST AMENDED COMPLAINT**

**CLASS ACTION**

1

**INTRODUCTION**

1.      Burma (also known as Myanmar) remains under siege by its military regime following a coup in 2021. For nearly 4,000 Burmese nationals currently relying on Temporary Protected Status ("TPS") to live and work in the United States, TPS provides some stability and protection from removal to a country overtaken by a campaign of intimidation and violence. TPS is a federal program, authorized by Congress, that offers individuals protection from removal to countries designated unsafe on account of dire country conditions like armed conflict, natural disaster, or other extraordinary circumstances, as well as work authorization and other related benefits.

2.      On November 25, 2025, the Department of Homeland Security ("DHS") published a Federal Register Notice announcing that TPS for Burma would end on January 26, 2026. The government's termination decision reverses the United States' prior policy of extending humanitarian support to Burmese nationals in the wake of the coup. In March 2021, the United States government for the first time granted Burmese nationals TPS, and subsequently re-designated TPS twice given continued threats to Burmese civilians' life and liberty at the hands of the authoritarian regime.

3.      In a dramatic shift, Defendants' November 2025 termination decision argues that TPS holders can safely return to Burma. Defendants make this claim despite their own sources highlighting deteriorating conditions including anti-democratic crackdowns on dissent, targeted ethnic violence, and military strikes on civilian targets.

4.      Defendants' decision was ultra vires and made in violation of the Administrative Procedure Act ("APA") and the Fifth Amendment of the United States Constitution: the Secretary lacked statutory authority to terminate TPS and predetermined her decision based on animus against Burmese TPS holders due to their race, ethnicity, and national origin, as well as

the government's bare desire to harm TPS holders as a group, rather than on the statutorily required objective country conditions review and proper consultation with executive agencies. The termination notice blatantly ignored Burma's incontrovertible ongoing humanitarian catastrophe and relied on impermissible factors in justifying the termination. Because of the Secretary's failure to follow the statutorily required procedures, Burmese TPS holders and applicants now face summary loss of work authorization and protections from detention and removal without due process. They now face a reality that threatens to separate mixed-status families, disconnect them from their home communities, and cut off access to employment altogether.

5.      TPS holders from Burma now join those of communities from the twelve other non-white, non-European countries[1] whose protections have been terminated by the Trump Administration—nearly every single TPS country that has come up for review. Secretary Noem, President Trump, and other members of the Trump Administration have repeatedly used racially charged and demeaning rhetoric to justify targeting TPS protections for immigrants from non-white, non-European countries, including Burma, based on their race, ethnicity, national origin, and status as TPS beneficiaries. These statements demonstrate a discriminatory and calculated effort to harm TPS holders.

6.      Plaintiffs are six Burmese nationals with TPS, who have lived in the United States for years and have deep ties to this country and their communities. They bring this class action to challenge Defendants' unconsidered and unlawful decision to terminate Burma's TPS

---

[1] To date, the current Trump Administration has terminated TPS for thirteen countries whose designations have been up for review. The countries subject to termination are: Burma, Syria, Nicaragua, Honduras, Nepal, Cameroon, Afghanistan, Haiti, Venezuela, Ethiopia, Somalia, and Yemen. South Sudan's TPS designation was extended in May 2025, but the government terminated it after six months the second time it came up for potential redesignation. Lebanon's TPS designation was automatically extended without any affirmative decision because the Secretary did not make a decision by the statutory deadline.

designation, effective January 26, 2026. Should TPS for Burma be terminated, all Plaintiffs will face impossible choices: to uproot their lives yet again in search of a pathway to safety in a third country; to remain in the United States without lawful immigration status, at risk of imminent immigration detention and removal; or to relocate to Burma, a country under the rule of the military junta and to which all Plaintiffs fear returning.

7. Defendants' violations of law have already caused cascading consequences for the Plaintiffs and thousands of other TPS holders. The mental distress to Plaintiffs and others—now navigating harrowing decisions about their own safety and the safety of their families—are the consequence of premeditated actions by Defendants, divorced from the required legal process and without regard for the lives the termination decision throws into the balance.

8. Given these impending harms to the Plaintiffs and the class, this Court should set aside Defendants' unlawful decision terminating TPS for Burmese nationals.

**THE PARTIES**

**Plaintiffs**

9. **Plaintiff Aung Doe** is a Burmese national and TPS holder who has lived in the United States since 2007 and currently resides in Chicago, Illinois. Aung moved to the United States to teach religious courses. He currently works as a religious leader, teaching and leading religious ceremonies. Aung currently has a pending application with U.S. Citizenship and Immigration Services ("USCIS") and will lose eligibility for the benefits if his TPS ends. He is fearful about being forced to return to Burma because he has publicly spoken out about the Burmese military junta's violent actions to suppress peaceful protesters. He fears that the military will likely arrest him upon his arrival in Burma. Losing TPS will put Aung at immediate risk of detention and being placed into removal proceedings.

4

10. **Plaintiff Nina Doe** is a Burmese national and TPS holder who has lived in the United States since 2021. Nina resides in Kansas with her husband and baby daughter, both of whom are U.S. citizens. She came to the United States on a Fulbright scholarship to study social work. Nina earned a master's degree in May 2023 and now works as a long-term caseworker for refugees in Kansas City. She serves communities that have fled war, persecution, and sexual violence, and is deeply committed to humanitarian work. Before coming to the United States, Nina worked as a physician and worked with Doctors Without Borders and the United Nations in conflict-affected regions, including Northern Rakhine and Kachin State in Burma, where she served Rohingya communities subjected to genocide by the Burmese military. This work, and her participation in peaceful protests in 2021 place her at risk for arrest by the military regime if forced to return to Burma. Losing TPS will also forcibly separate her from her U.S. citizen husband and daughter and end her ability to financially support their family.

11. **Plaintiff Khin Thet Doe** is a Burmese national who has lived in the United States since 2021. She is in her early 30s and moved to the United States because of a USAID scholarship to study in Illinois. Shortly prior to moving, Khin Thet participated in pro-democracy protests after the coup in Burma. She is concerned that if she is forced to go back to Burma, she will face retaliation due to her involvement in protests and her association with other people who the military has already targeted. She is now married in the U.S., and the termination of TPS puts her at risk of being separated from her U.S.-citizen husband. Khin Thet financially supports her parents, sending them money every month. She fears that if she loses her ability to work under TPS, her parents would be unable to meet their basic needs.

12. **Plaintiff Thura Doe** is a Burmese national and TPS holder who has lived in the United States since 2017. Thura originally came to the United States on an F-1 Visa to pursue his

undergraduate degree in Oklahoma. He graduated with a Bachelor of Science degree in education and worked as a pre-K and kindergarten teacher at Title I schools in Texas before pursuing a master's degree in education in 2024. While Thura was an undergraduate student, he became very involved in advocacy work to support human rights, religious tolerance, and democracy in Burma following the coup. The termination of TPS would subject Thura to potential arrest and detention by ICE and initiation of removal proceedings because he has no other form of immigration status in the United States. Thura's family has ties to members of the former National League for Democracy ("NLD") Party that stewarded the democratic transition in Burma and was forcibly dissolved after the military coup. Thura fears being detained for both his own activism and his family's history of political advocacy. He is also openly bisexual, and he fears being targeted for detention and harm by the military junta as a result of his sexuality, which is a crime in Burma punishable by imprisonment.

13. **Plaintiff Chu Let Doe** is a Burmese national and TPS holder who has lived in the United States since 2021. Chu Let is in her early 40s and moved to the United States on humanitarian parole after fleeing Burma during the coup. Chu Let, a sushi chef in North Carolina, lives with her two children and supports them as the family's sole breadwinner. Chu Let fled Burma after the coup in March 2021 because her activism and her family's activism on behalf of religious minorities and youth in Burma put her at risk of imminent arrest. After the coup, dozens of police officers came looking for Chu Let and her family at her home, and the U.S. Embassy helped her secure a safe house and eventually flee the country. Chu Let fears being forced to return to Burma because the junta may arrest her and imprison her for her past activism. She also is at risk of detention and deportation in the United States once her TPS status ends, leaving her children without their mother.

6

14.     **Plaintiff Maung Doe** is a Burmese national and TPS holder who has lived in the United States since 2016 and currently resides in Iowa. Maung is in his late 20s, and he moved to the United States to go to college in Kentucky. Maung is ethnically Nepali, and his family experienced routine discrimination in Burma because of their darker skin tone and the assumption that they are part of the Muslim Rohingya minority. Maung currently works in IT support in Iowa for a university. He practices Buddhism and Transcendental Meditation and is an active member of the meditation community in Iowa City. Because the coup happened when Maung was still in college, he became involved in student organizing and advocacy for democracy, freedom, and human rights in Burma. He remained involved in this advocacy throughout his graduate studies and still contributes to organizing efforts as a researcher. Losing TPS will put Maung at risk of losing his career, and he will no longer be protected from ICE arrest or removal. He will be separated from his home community in Iowa City, and it is unsafe for him to return to Burma given both his human-rights advocacy and the country's unstable conditions.

**Defendants**

15.     **Defendant Markwayne Mullin** is the Secretary of the Department of Homeland Security. As the highest-ranking officer for DHS, Defendant Mullin has asserted ultimate authority over all TPS extension, termination, and designation decisions. He is sued in his official capacity. (Defendant Mullin was preceded in office by Secretary Kristi Noem, who left the position on March 24, 2026, and was an original official-capacity defendant in this action.)

16.     **Defendant Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include USCIS, ICE, and U.S. Customs and Border Protection ("CBP"). DHS,

together with its component agencies, is responsible for administering and enforcing the TPS program.

17. **Defendant U.S. Citizenship and Immigration Services** is the component agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

18. **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

## JURISDICTION AND VENUE

19. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution. The Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the APA, 5 U.S.C. §§ 701-706.

20. The federal government has waived sovereign immunity and permitted judicial review of agency action under 5 U.S.C. § 702. *See Blagojevich v. Gates*, 519 F.3d 370, 371-72 (7th Cir. 2008) (noting that § 702 "waived sovereign immunity for most forms of prospective relief"). In addition, sovereign immunity does not bar claims against federal officials seeking to prevent violations of federal law, rather than monetary relief. *See, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697-99 nn.18-19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183-84 (1938).

21.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, and because at least one named Plaintiff resides in this District.

## THE STATUTORY SCHEME FOR TPS

22.     Congress created TPS in response to unconstrained executive discretion in humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief.[2] Between 1960 and 1989, the Attorney General granted extended voluntary departure to approximately sixteen countries, with periods of protection ranging from eight months to 15 years.[3] This practice lacked "any specific criteria."[4] The arbitrary, overtly political decisions surrounding extended voluntary departure resulted in congressional pressure to reform the system, particularly in the wake of the Attorney General's refusal to grant extended voluntary departure for Salvadoran refugees at the time.[5]

23.     Congress designed TPS to ensure that future nationality-based protections would be based on "objective factors" and "identifiable conditions" rather than "the vagaries of our domestic politics."[6] Congress also sought to replace the "ad hoc, haphazard procedures" that existed before, and provide beneficiaries with certainty about "what [their] rights are, how the Justice Department determines what countries merit [protected] status," and "how long they will

---

[2] *See* Lynda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157-60 (1986).

[3] *See* Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status*, 8 J. of Refugee Stud. 339, 362-63 (1995).

[4] *Id.* at 178 n.153 (quoting Letter from William F. Smith, Att'y Gen., to Lawrence J. Smith, Rep. (July 19, 1983)).

[5] *See Hotel & Rest. Emps. Union v. Smith*, 846 F.2d 1499, 1510-11 (D.C. Cir. 1988) (discussing termination of extended voluntary departure for El Salvador) (separate opinion of Mikva, J.).

[6] 135 Cong. Rec. H7477 (Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute).

be able to stay."[7] While establishing criteria to govern blanket humanitarian protection, Congress also overrode the executive branch and statutorily designated El Salvador for TPS.[8]

24.     Since 1990, the TPS statute has given the executive branch authority to provide nationality-based humanitarian relief to certain citizens of countries stricken by war, natural disaster or other catastrophe, who are already present in the United States. *See* 8 U.S.C. § 1254a. The statute provides that the Attorney General may designate a country for TPS where (1) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (2) "there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state" and it is "unable, temporarily, to handle adequately the return" of nationals; or (3) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)-(C).

25.     Under the statute, the "national interest" provision limits designation only under subsection (C)'s "extraordinary and temporary conditions" ground; it does not apply to designations under subsections (A) (armed conflict) or (B) (natural disasters).

26.     In keeping with its intent to free the process of designating countries for humanitarian protection from domestic politics, Congress established a statutory framework that governs the designations of countries for TPS. The statute first requires the Attorney General to consult with "appropriate agencies." 8 U.S.C. § 1254a(b)(1). After that, the Attorney General "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective

---

[7] *Id.* at 25837 (statement of Rep. Bill Richardson).
[8] *See* Immigr. Act of 1990, Pub. L. 101-649, Title III, §§ 302-303.

10

either upon notice in the Federal Register or "such later date as the Attorney General may specify." *Id.* § 1254a(b)(2).

27.     The Attorney General thus has substantial discretion over initial TPS designations. So long as she determines certain country conditions exist, she may choose whether and when to designate a country for TPS.

28.     By contrast, Congress limited, in important ways, the Attorney General's discretion to review TPS designations after the initial designation is made.[9] The statutory requirements are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

29.     The review process typically begins months before the 60-day deadline.[10] As part of the process, both USCIS and the State Department generally prepare country-conditions memoranda and recommendations.[11] Generally, USCIS manages and coordinates the TPS review process for the Attorney General, soliciting a country conditions report from the Refugee, Asylum, and International Operations ("RAIO") unit within USCIS and soliciting a country

---

[9] *See* U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (2020) ("GAO Report") at 15-18, 27 (differentiating between the discretion afforded before and after an initial designation).
[10] *See* GAO Report at 20-21.
[11] *See id.* 15-16; *see also Ramos v. Nielsen*, 336 F.Supp.3d 1075, 1082 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process). The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case in banc so the panel decision was vacated. *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 11010 (9th Cir. 2023).

conditions report and recommendation from the State Department.[12] After considering the materials provided, USCIS prepares a detailed recommendation, based on country conditions. *Id.* USCIS's recommendation is called a "Director Memo." *Saget*, 375 F.Supp.3d at 299-300.

30. Once the decision has been made, the statute requires that the Attorney General "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

31. Unless the Attorney General timely determines and publishes notice of her decision that the country "no longer to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion . . . a period of 12 or 18 months." 8 U.S.C. § 1254a(b)(3)(C). The statute thus "essentially provides extension as a default[.]" *Nat'l TPS All. v. Noem*, 773 F.Supp.3d 807, 851 (N.D. Cal. 2025), aff'd, 150 F.4th 1000 (9th Cir. 2025) ("NTPSA I PI Decision").

32. In contrast, if the Attorney General timely "determine[s]" that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal register." 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* The statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation.

---

[12] *See* GAO Report at 15-21; *see also Saget v. Trump*, 375 F.Supp.3d 280, 299-300 (E.D.N.Y. 2019).

33.     The Attorney General has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office, the agency provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period. Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago.

34.     Once the Attorney General has designated a particular country for TPS, individuals from that country (and persons without nationality who last habitually resided in that country) may apply for immigration status under the program. To be eligible for TPS, individuals from a designated country must meet stringent requirements. These requirements include, among other things, (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date designated by the Secretary; (3) satisfaction of the criteria for admissibility as an immigrant or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history such as convictions for a single felony or multiple misdemeanors; and (5) the submission of an application, extensive documentation, and fees. *See* 8 U.S.C. § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9. Further, an individual is not eligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

35.     Congress ensured that people who are ultimately granted TPS would enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the United States; "shall not be detained" by the Secretary of Homeland Security based on

13

immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. § 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. *See id*. § 1254a(b)(1).

36.     Individuals who apply for TPS and who are *prima facie* eligible for TPS are entitled to receive work authorization and protection from deportation while the application is pending. *See* 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10(a), (e).

**BURMA'S PRIOR TPS DESIGNATIONS AND CURRENT COUNTRY CONDITIONS**

37.     Burma (also known as Myanmar) is a multi-ethnic Southeast Asian nation of 57.5 million people, currently under an authoritarian military junta since a February 2021 coup.

38.     Burma gained independence from the United Kingdom in 1948. In its early years, the country entered a period of federalism and efforts among ethnic minorities to assert greater autonomy. A 1962 coup installed a military junta that rejected autonomy for ethnic minority areas, initiating a decades-long period of military rule and ethnic conflict. After a period of one-party rule, in 1990 the military initiated a coup and promised "free and fair" elections. However, after the results of the elections showed a resounding victory by Nobel Laureate Aung San Suu Kyi's NLD, the junta refused to recognize the election results and placed Suu Kyi under house arrest.

39.     Nearly two decades later, the country undertook some political and economic reforms and released thousands of political prisoners, under the terms of the new 2008 Constitution. The military retained control of the country's security ministries, key economic assets, and a 25% (unelected) share of the seats in parliament. These reforms also led to a new round of elections in 2010 and 2015. During this period, the military continued to commit grievous human rights abuses, particularly against the Rohingya ethnic minority.

14

40.     The NLD won an overwhelming majority of parliamentary seats in both the 2015 and November 2020 elections. Claiming the results were fraudulent, on February 1, 2021, the military junta launched a coup the day before new members of the NLD-led civilian government and parliamentarians were set to be sworn in and installed a junta, known as the State Administrative Council ("SAC"), led by military commander Min Aung Hlaing.

41.     In July 2025, the SAC transitioned power to the State Security and Peace Commission ("SSPC"), also under Min Aung Hlaing's leadership. Authority remains firmly with the military.

**Initial TPS Designation of Burma**

42.     Burma was initially designated for TPS on March 11, 2021, after the February 1, 2021, coup overthrowing the democratically elected civilian government. Under the control of the military junta, the SAC declared a state of emergency, dissolved all national legislatures and assumed all executive, legislative, and judicial power.[13]

43.     After the coup, nationwide protests quickly emerged, disrupting the junta's attempts to consolidate administrative control. In response, the junta launched a sweeping and violent crackdown to extinguish public opposition. Under the direction of Min Aung Hlaing, security forces committed mass killings, torture, sexual violence, arbitrary arrests, and other abuses that constitute crimes against humanity. From February to November 2021, "the police and military killed at least 1,200 civilians, including approximately 75 children, and . . . detained over 8,700 government officials, activists, journalists, and civil servants."[14] These atrocities are

---

[13] *See* Designation of Burma (Myanmar) for Temporary Protected Status, 86 Fed. Reg. 28,132, 28,133 (May 25, 2021).
[14] *See* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Custom Report Excerpts*, https://2021-2025.state.gov/report/custom/7273252319-3/ (last visited Dec. 17, 2025).

well-documented, including by prominent international human rights organizations[15] and the U.S. Department of State.[16] The United Nations Office for the Coordination of Humanitarian Affairs reports that as of May 2025, 19.9 million people—over a third of the country's population—are in humanitarian need.

44.     On March 25, 2021, then-Secretary of Homeland Security Alejandro Mayorkas designated Burma for TPS on the basis of extraordinary and temporary conditions that made it unsafe for its nationals to return.[17] DHS cited a rapidly worsening humanitarian crisis driven by the Burmese military's escalating repression and violence against civilians, widespread human rights abuses, mass displacement, and major disruptions to essential services like medical care and humanitarian aid.[18]

**Extension and Redesignation of TPS for Burma in 2022**

45.     Following the initial 2021 designation, Secretary Mayorkas issued two extensions of Burma's TPS designation, each supported by contemporaneous review of country-conditions analyses prepared by the Department of State and other U.S. government agencies.

46.     On September 27, 2022, Secretary Mayorkas extended Burma's TPS designation until May 25, 2024, due to continued "extraordinary and temporary conditions in Burma that prevent Burmese nationals . . . from returning to Burma in safety."[19]

47.     The notice also redesignated Burma for TPS through May 25, 2024, extending eligibility to Burmese nationals who had continuously resided in the U.S. since September 25,

---

[15] *See Myanmar 2024*, Amnesty Int'l, https://www.amnesty.org/en/location/asia-and-the-pacific/south-east-asia-and-the-pacific/myanmar/report-myanmar/ (last visited Dec. 17, 2025).
[16] *See* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Burma 2024 Human Rights Report* (2024), https://www.state.gov/reports/2024-country-reports-on-human-rights-practices/burma.
[17] Designation of Burma (Myanmar) for Temporary Protected Status, 86 Fed. Reg. at 28,135.
[18] *Id.* at 28,133-35.
[19] Designation of Burma (Myanmar) for Temporary Protected Status, 86 Fed. Reg. at 28,135.

2022, were continuously physically present since November 26, 2022, and met all other criteria.[20] DHS estimated about 2,290 additional individuals became eligible under the redesignation of Burma, including Burmese nationals in the United States for tourism, study, temporary work, or without immigration status.[21]

48.     Secretary Mayorkas's decision to both extend the 2021 Designation and authorize the 2022 Designation relied on input from the Department of State, other U.S. Government agencies, and a DHS review of country conditions in Burma. The 2022 notice referenced the 2021 Department of State Country Report on Human Rights Practices for Burma, noting widespread abuses by the military junta.

**Extension and Redesignation in 2024 Based on Unimproved Country Conditions**

49.     On March 25, 2024, Secretary Mayorkas extended and redesignated Burma for TPS for an additional 18-month period, from May 26, 2024, through November 25, 2025, based on the continued presence of extraordinary and temporary conditions preventing Burmese nationals from safely returning.[22]

50.     The notice also redesignated Burma for TPS through November 25, 2025, expanding eligibility to Burmese nationals who had continuously resided in the U.S. since March 21, 2024, were continuously physically present since May 26, 2024, and met all other criteria.[23] DHS estimated about 7,300 additional individuals would become eligible under the redesignation of Burma, including Burmese nationals in the United States in nonimmigrant status or without immigration status.[24]

---

[20] *See id.* at 58,516.
[21] *See id.* at 58,518.
[22] *See* Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status, 89 Fed. Reg. 20,682, 20,686 (Mar. 25, 2024).
[23] *See id.*
[24] *See id.*

51.     Secretary Mayorkas's decisions to extend the 2022 TPS designation and to issue the 2024 redesignation were based on DHS's review of country conditions, informed by assessments from federal agencies, including the Department of State.[25] According to the notice, the Burmese military continued to perpetrate widespread and systematic violence against civilians, including targeted attacks on ethnic minorities; airstrikes, shelling, and village destruction; and torture, beheadings, and mutilation used as "psychological warfare."[26] It also reported that nearly two million people were internally displaced, facing severe food shortages, malnutrition, blocked humanitarian aid, limited health care, and deteriorating economic conditions.[27]

**Conditions in Burma**

52.     Reports from Burma in 2025 highlight grave and continued threats to the lives of civilians, ethnic minorities, and individuals and communities seen as opposing the military junta.

53.     The U.S. Special Rapporteur on the situation of human rights in Myanmar characterized Burma as a country in "crisis" and "at a critical juncture."[28] The report, released just over a month before DHS's termination decision, describes the conditions as "continu[ing] to worsen" and says "schools, clinics, monasteries, churches, mosques and the shelters of those displaced by violence have been systematically attacked by military aircraft, artillery and well-armed troops."[29] Despite announcing a "humanitarian ceasefire" in the wake of the devastating earthquake on March 28, 2025, the junta proceeded to escalate its attacks on civilians, launching more airstrikes on civilian targets in the second quarter of 2025 than any previous quarter since

---

[25] *See id* at 20,684.
[26] *See id* at 20,685.
[27] *See id* at 20,686.
[28] Thomas H. Andrews, *Report of the Special Rapporteur on the Situation of Human Rights in Myanmar*, ¶¶ 1, 16, U.N. Doc. A/80/490 (Oct. 20, 2025).
[29] *Id.* at ¶¶ 1-2.

the coup.[30] As recently as December 8, 2025, at least 18 civilians were reportedly killed and 20 wounded at a coffee shop in the Sagaing region, an area known as a stronghold against military rule.[31] On December 11, 2025, a military air-strike reportedly killed over 30 civilians at a hospital in Rakhine state, where the medical infrastructure has already been severely impacted.[32]

54. While the military junta announced elections beginning in late December 2025, human rights experts have emphasized that the elections will not be "free, fair, or inclusive" in part because the junta has imprisoned approximately 30,000 political prisoners since the 2021.[33] The junta criminalized "criticism of the election by banning all speech, organizing, or protest that disrupts any part of the electoral process."[34] Violators can face up to 20 years in prison and the death penalty, and the military has arrested at least 94 people so far under the law.[35]

**DEFENDANTS' UNLAWFUL TERMINATION OF BURMA'S TPS DESIGNATION**

55. On November 25, 2025, DHS published a notice in the Federal Register purporting to terminate Burma's TPS designation, effective January 26, 2026.[36] Secretary Noem

---

[30] *Id.* at ¶ 3.

[31] *See* Grant Peck, *Myanmar Military Air Strike on a Tea Shop Kills 18 Watching a Football Match on TV*, ABC News (Dec. 8, 2025), https://abcnews.go.com/International/wireStory/myanmar-military-air-strike-tea-shop-kills-18-128206092.

[32] *See Dozens Killed in Hospital Strike in Myanmar's Western Rakhine State*, The Guardian (Dec. 11, 2025), https://www.theguardian.com/world/2025/dec/12/dozens-killed-in-hospital-strike-in-myanmars-western-rakhine-state.

[33] News Release, Hum. Rts. Watch, Myanmar: Elections a Fraudulent Claim for Credibility (Nov. 16, 2025), https://www.hrw.org/news/2025/11/16/myanmar-elections-a-fraudulent-claim-for-credibility.

[34] *Id.*

[35] *Id.*; *see also* Thomas H. Andrews, *Report of the Special Rapporteur on the Situation of Human Rights in Myanmar*, U.N. Doc. A/80/490 (Oct. 20, 2025).

[36] *See* Termination of the Designation of Burma (Myanmar) for Temporary Protected Status, 90 Fed. Reg. 53,378 (Nov. 25, 2025).

described the termination decision as another success in the administration's ongoing efforts to "restor[e] TPS to its original status as temporary."[37]

56. In DHS's notice of termination, the Secretary acknowledged the persistence of "certain extraordinary and temporary conditions" and humanitarian challenges in Burma, including ongoing military operation and the need for humanitarian assistance.[38] Nonetheless, she concluded that such conditions no longer hinder the safe return of Burmese nationals to the country, citing the official end of Burma's state of emergency in July 2025. This conclusion directly contradicts the President's February 4, 2025, renewal of Burma's "national emergency" under the International Emergency Economic Powers Act, which found that the emergency created by the 2021 coup— during which the military arbitrarily arrested civilians and government leaders and undermined democracy and the rule of law—continued.[39]

57. Secretary Noem's assessment also fails to mention or consider other U.S. government agencies' concerning assessments of human rights abuses and humanitarian crisis in Burma.

58. Secretary Noem failed to consult with other appropriate federal agencies regarding the country conditions in Burma before making her decision to terminate TPS for Burmese nationals. On information and belief, Secretary Noem's decision also was not based on an objective review of Burma's country conditions. Rather, the decision to terminate TPS for Burma was made as part of a preordained plan to eliminate existing TPS designations based on

---

[37] News Release, U.S. Citizenship & Immigr. Servs., DHS Terminating Temporary Protected Status for Burma (Nov. 24, 2025), https://www.uscis.gov/newsroom/news-releases/dhs-terminating-temporary-protected-status-for-burma
[38] Termination of the Designation of Burma (Myanmar) for Temporary Protected Status, 90 Fed. Reg. at 53,380.
[39] *See* Continuation of the National Emergency with Respect to the Situation in and in Relation to Burma, 90 Fed. Reg. 9,111 (Feb. 4, 2025).

animus against TPS holders and to reduce the number of immigrants in the United States from non-white, non-European countries.

59.     The termination notice wholly ignored key factors considered in the most recent extension and redesignation of Burma's TPS, including pervasive human trafficking, targeted violence towards certain ethnic minorities, widespread food insecurity, and an eviscerated economy.[40] References to input or reports from the Department of State or other federal agencies—aside from boilerplate language that the Secretary "consult[ed] with appropriate U.S. Government agencies"—were also conspicuously missing.[41]

60.     Many other federal agency reports, statements, and recommendations on TPS factors made throughout 2025 directly contradict the Secretary's findings about improved conditions in Burma. For example:

- On January 31, 2025, the Department of State asserted that as of 2025, humanitarian needs in Burma had increased twenty-fold since the coup; over one-third of the population—19.9 million people—required humanitarian assistance; 15.2 million needed food aid; and 3.4 million people were internally displaced, nearly one million more than the previous year.[42]

---

[40] *Compare* 90 Fed. Reg. 53378 *with* 89 Fed. Reg. 20684.
[41] *Compare* 90 Fed. Reg. 53378 *with* 89 Fed. Reg. 20682 (asserting input received from the Department of State on country conditions and citing to Department of State sources on Burma) *and* 87 Fed. Reg. 58515 (same).
[42] *See* Press Release, U.S. Mission Geneva, Four Years from the Military Coup in Myanmar: Joint Statement by Australia, Canada, the European Union, the Republic of Korea, New Zealand, Norway, Switzerland, the United Kingdom and the United States (Jan. 31, 2025), https://geneva.usmission.gov/2025/01/31/joint-statement-on-myanmar/.

21

- After a 7.7 magnitude earthquake struck Burma on March 28, 2025—killing nearly 4,000 people and injuring over 5,000—the Department of State stated that the devastation "worsen[s] an already-dire humanitarian situation in Myanmar."[43]

- In March of 2025, the United States Commission on International Religious Freedom published its 2025 Annual Report, which recommended Burma be redesignated as a "country of particular concern" "for engaging in systematic, ongoing, and *egregious* violations of religious freedom, as defined by the International Religious Freedom Act," and describing how "religious freedom conditions in Burma continued to worsen" throughout the prior year.[44]

- In May of 2025, the Department of State issue a Level 4 "Do Not Travel" to Burma advisory, warning travelers about "armed conflict, the potential for civil unrest, arbitrary enforcement of local laws, poor health infrastructure, land mines and unexploded ordnance, crime, and wrongful detentions."[45] The travel advisory remains in place as of December 17, 2025.

- On July 1, 2025, the Secretary of State, in a joint statement with representatives of Australia, India, and Japan, affirmed that they remained "deeply concerned by the worsening crisis in Myanmar," while calling for the safe delivery of humanitarian

---

[43] *See* Vibhu Mishra, *'Still reeling': Myanmar Quakes Worsen Humanitarian Crisis in Fractured Country*, U.N. News (June 24, 2025), https://news.un.org/en/story/2025/06/1164881; Media Note, U.S. Dep't of State, Joint Statement by the Quad Partners on Myanmar Earthquake Response (Apr.3, 2025), https://www.state.gov/joint-statement-by-the-quad-partners-on-myanmar-earthquake-response

[44] *Annual Report*, U.S. Comm'n on Int'l Religious Freedom, 14 (Mar. 2025) (emphasis added), https://www.uscirf.gov/sites/default/files/2025-03/2025%20USCIRF%20Annual%20Report.pdf.

[45] *Burma (Myanmar) Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/burma-travel-advisory.html (last visited Dec. 17, 2025).

assistance; highlighting concerns about the prevalence of transnational crime; and committing to fight cybercrime and online scam operations.[46]

- On August 24, 2025, Principal Deputy Spokesperson for the Department of State, Thomas Pigott, stated that the United States "expresses its support for the people of Burma, including Rohingya and other ethnic groups who have been subjected to violence and displacement."[47] He further commended other countries in the region for hosting Burmese refugees.[48]

- On September 29, 2025, the Department of State released its 2025 *Trafficking in Persons Report: Burma*, describing the military's continued pattern of forcibly recruiting children and adults for forced labor to support military operations, including the use of child soldiers.[49] The report also documented ongoing sex and labor trafficking risks, particularly for populations experiencing displacement and financial hardship in the wake of the 2021 military coup.[50]

- On November 19, 2025, just six days before the Secretary's termination of TPS for Burma, State Department official Michael Heath expressed support for a United Nations General Assembly resolution addressing the military regime's pattern of "appalling human rights violations and abuses," including arbitrary detention, the killing of unarmed

---

[46] Media Note, U.S. Dep't of State, Joint Statement from the Quad Foreign Ministers' Meeting in Washington (July 1, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/07/joint-statement-from-the-quad-foreign-ministers-meeting-in-washington.

[47] Press Release, Thomas Pigott, Principal Deputy Spokesperson, U.S. Dep't of State, Violence in Burma (Aug. 24, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/08/violence-in-burma.

[48] *See id.*

[49] *See* U.S. Dep't of State, *2025 Trafficking in Persons Report: Burma*, https://www.state.gov/reports/2025-trafficking-in-persons-report/burma/#:~:text=In%20March%202025%2C%20the%20media,including%20victims%20of%20forced%20criminality (last visited Dec. 18, 2025).

[50] *See id.*

23

civilians, and sexual violence, and called for *further* measures banning the sale of weapons "that could be used to attack civilians" to Burma.[51]

61.     The Secretary's conclusion that Burmese nationals can safely return to Burma is inconsistent with documented evidence, including from the federal government, demonstrating that deportees face ongoing persecution, arrest, and torture, making return life-threatening.

62.     Between April and May 2025, at least 65% of Burmese nationals deported from the United States were immediately arrested upon arrival and detained at the notorious Aung Tha Pyay interrogation center.[52] Aung Tha Pyay is widely known for its brutal treatment of detainees and as the site where numerous protesters were tortured and killed following the February 2021 coup.[53]

63.     Many of these deportees, particularly individuals from minority ethnic groups such as the Karen and the Chin, arrived without identification documents, leaving them extremely vulnerable. Their lack of documentation makes survival in Burma uncertain and makes leaving effectively impossible.[54]

64.     The Secretary's assessment overlooks the Department of State's firsthand knowledge that these risks extend beyond Burmese nationals to U.S. citizens of Burmese descent. For example, in November 2025, after months of negotiating with the military junta, Department of State officials secured the release of the Venerable U Pyinya Zawta, a senior monk and U.S.

---

[51] Statement by Michael Heath, U.S. Mission to the U.N., Explanation of Position for UNGA 80 Third Committee Resolution: Situation of human rights of Rohingya Muslims and other minorities in Myanmar (Nov. 19, 2025), https://usun.usmission.gov/explanation-of-position-for-unga-80-third-committee-resolution-situation-of-human-rights-of-rohingya-muslims-and-other-minorities-in-myanmar/.
[52] *See* Sa Tun Aung, *Myanmar nationals deported by US being held in notorious junta detention centre*, Myanmar NOW (May. 23, 2025), https://myanmar-now.org/en/news/myanmar-nationals-deported-by-us-being-held-in-notorious-junta-detention-centre/
[53] *Id.*
[54] *Id.*

24

citizen who had been detained in Burma for a year.[55] During his detention, he endured interrogation, physical assault, and sleep deprivation. Although Department of State officials met with him monthly, his release required an entire year of sustained diplomatic effort.[56]

65.     This example reflects the broader reality faced by Burmese nationals in the United States, who consistently face credible, documented threats of persecution if forced to return and recount firsthand experiences of family members being arrested, beaten, or tortured.[57]

66.     Instead of addressing these ongoing risks, Secretary Noem relied on speculative improvements in governance and stability, including a projected election timeline and "the promising possibility" that emerging local and ethnic administrations could eventually address gaps in education, health care, the judicial system, and law enforcement. *Id.* at 53380. The Secretary also relied heavily on assumptions that Burmese nationals can safely return to the country based on two tangential facts—namely, the percentage of advance parole document requests for travel to Burma among Burmese nationals between 2021 and 2025 and an unspecified number of U.S. Immigration and Customs Enforcement ("ICE")'s removals to Burma in Fiscal Year 2025. *Id.* at 55380.

67.     Remarkably, some of the Secretary's examples of purported improvements were cherrypicked from a 2025 UNHCR report, which asserts that a "human rights crisis characterized by violence and atrocities has affected every single aspect of life" in Burma since the military coup; details the "dire human rights situation" plaguing the country; and urges members of the

---

[55] *See* Mark Sommer, *'Never Forgot Me': How a Monk's Supporters Helped Him Survive Prison,* N.Y. Times (Nov. 15, 2025) https://www.nytimes.com/2025/11/15/nyregion/monk-myanmar-pyinya-zawta-buffalo.html

[56] *Id.*

[57] *See* Lorcan Lovett, *'A constant fear': Myanmar nationals face imprisonment back home as US ends protected status*, The Guardian (Nov. 27, 2025), https://www.theguardian.com/world/2025/nov/28/usa-terminating-myanmar-protected-status-deportation-fears

United Nations ("UN") to grant international protections to civilians fleeing violence in Burma and seeking safety abroad.[58] In a similar vein, the termination notice focuses on the military regime's promise of free and fair elections without any apparent consideration of widespread and credible concerns that such elections are a sham exercise that will entrench the regime's power and deepen oppression and instability.[59] Inexplicably, the very sources cited by the Secretary in the termination notice report on the broad skepticism about the legitimacy of the elections, yet there is no indication the Secretary considered these concerns.[60] Even more striking, the Secretary disregarded the State Department's unambiguous condemnation of the elections mere months before the termination decision.[61]

68. The Secretary further attempted to justify her purported termination decision by declaring that continuing TPS for Burma was contrary to the "national interest." *Id.* To support this finding, the Secretary pointed to Burma's higher than average rate of visa overstays, as well as a recent Presidential Proclamation (the "Travel Ban") banning entry of Burmese nationals and nationals from 11 other countries into the United States and placing a partial entry ban on 8 other countries.[62] On December 17, 2025, the President expanded the Travel Ban to 39 total countries and kept Burma on the list of countries whose nationals are fully restricted from entry.[63] The

---

[58] Thomas H. Andrews, *Report of the Special Rapporteur on the Situation of Human Rights in Myanmar*, U.N. Doc. A/80/490, 2-3, 15 (Oct. 20, 2025).

[59] RFA Burmese, *Myanmar Junta Announces Schedule for December, January Election*, RFA (Mar. 26, 2025), https://www.rfa.org/english/myanmar/2025/03/26/myanmar-junta-election-schedule/; Tom Bennett, *Myanmar's Military Government Says It Will Hold Elections in Next* Year, BBC News (Mar. 8, 2025), https://www.bbc.com/news/articles/c757qk1lnq4o.

[60] RFA Burmese, *supra* note 62; Bennett, *supra* note 62.

[61] Statement by Charles Harder, U.S. Mission to the U.N., Remarks at A High-Level Conference on The Situation of Rohingya Muslims and Other Minorities in Myanmar (Sep. 30, 2025), https://usun.usmission.gov/remarks-at-a-high-level-conference-on-the-situation-of-rohingya-muslims-and-other-minorities-in-myanmar/.

[62] Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 Fed. Reg. 24,497 (Jun. 10, 2025).

[63] Proclamation No. 10998, 90 Fed. Reg. 59,717 (Dec. 16, 2025).

termination notice for Burma is the first time the government has used a travel ban to justify a termination in the over 35 years since the TPS program was enacted.

69.     The Secretary's reliance on the Travel Ban and visa overstay rates to justify termination overlooks critical context. When individuals who entered the country on visas obtain another form of lawful status like TPS or have work permits through their pending asylum applications, overstay reports often lag behind these changes, making the overstay numbers an unreliable measurement for evaluation.[64] This omission is especially significant following Burma's February 2021 military coup, which likely prompted an increase in Burmese nationals seeking TPS and other humanitarian protections in the United States.[65] By failing to account for this, DHS treats overstays as an independent compliance problem without recognizing that TPS itself and asylum filings likely explain much of the reported increase.

**Departure from Reasoned Analysis Evident in Prior Decisions**

70.     The chart below demonstrates that, at every relevant review period from the initial designation on May 25, 2021, through the last re-designation and extension on March 25, 2024, conditions in Burma continued to meet the statutory criteria for TPS. The record shows pervasive political repression and widespread human rights abuses, chronic deprivation of basic services, severe economic deterioration, escalating mass internal and external displacement, ongoing threats to vulnerable minority groups, and human trafficking, all documented by numerous intergovernmental and human rights organizations. These ongoing crises reflect the very

---

[64] National Foundation for American Policy, "An Analysis of the DHS Overstay Reports," June 2025, at 1, https://nfap.com/wp-content/uploads/2025/06/Analysis-of-DHS-Overstay-Report.NFAP-Policy-Brief.2025.pdf ("Problems with DHS systems correctly identifying individuals who changed status inside the U.S. or left the country render the reports inappropriate for policy purposes.").

[65] *Id.* at 2 (stating that "DHS systems may record and treat [] as overstays" people who are "from countries experiencing violence [who] may not have overstayed their visas but applied for asylum, received Temporary Protected Status, or remained in the country via other lawful means, such as marriage.").

conditions that supported both the initial designation and subsequent extensions and that

Congress intended to be evaluated under § 1254a(b)(3)(A).

71.     Rather than adhere to the statutory thresholds and procedural safeguards

governing TPS review, the termination notice summarily ignored the factors evaluated in the

initial designation, re-designations, and extensions. The termination notice purports to conclude

that conditions have improved but does so with vague, unexplained assertions that fail to identify

the facts or sources reviewed or to provide a reasoned analysis. And examination of the sources

cited in the termination notice reveals that the notice selectively cites cherry-picked facts from

sources that do not support the Secretary's conclusions but rather depict an unsafe country that

continues in crisis. Unlike prior notices regarding TPS for Burma, the termination notice does

not meaningfully grapple with the record evidence or explain why enduring conditions that

previously justified TPS no longer do so.

| Issue | Initial Designation (05/25/21) | Re-designation & Extension (09/27/22) | Re-designation & Extension (03/24/24) | Termination Announced (11/25/25) |
|---|---|---|---|---|
| **Political Repression & Human Rights Abuses** | • Internet restrictions, arbitrary arrests, curfews in 36 towns<br>• Over 650 killed & 3,200 + detained<br>• Elected leaders detained/charged | • 10,870 detained + 13,926 arrested<br>• 1,833 killed<br>• Widespread sexual violence, disappearances, excessive force<br>• Civil war conditions; heavy weapons & air assaults to destroy villages | • 4,000+ killed<br>• Violence in 315/330 townships<br>• Airstrikes, shelling, village destruction, blocked aid<br>•Disappearances torture, gender-based violence reported | • Notes Burma ended state of emergency on 07/31/25. Omits President's renewed "national emergency" for 1 year on 02/04/25, citing ongoing crisis.[66]<br>• Cites military promise of "free and fair elections" while |

---

[66] Continuation of the National Emergency With Respect to the Situation in and in Relation to Burma, 90 Fed. Reg. 9,111 (Feb. 4, 2025).

| Issue | Initial Designation (05/25/21) | Re-designation & Extension (09/27/22) | Re-designation & Extension (03/24/24) | Termination Announced (11/25/25) |
|---|---|---|---|---|
| | | | | ignoring House Foreign Affairs Committee (11/19/25) & bipartisan lawmaker statement (11/20/25) calling them a sham.[67] • Describes China-brokered ceasefire with NDAA as successful despite violations.[68] |
| **Access to Basic Services - Shelter, Food Security, Water, Hygiene, Health, and Education)** | • Bank closures & payment interruptions • Price increases (food, fuel, materials) • Limited medical care | • 4.1M food insecure • Severe acute malnutrition • 2% of eligible children treated • 50% of targeted relief unmet • Major issue re access to basic services • 26,000 | • 12.9M food insecure • Only 17% of children received malnutrition aid in 2023 • Health infrastructure collapsed; hospitals damaged | • Speculates that ethnic administrations offer "promising possibilities" to fill gaps (education, health, justice). |

---

[67] *No Exit Strategy: Burma's Endless Crisis and America's Limited Options: Hearing Before the E. Asia & Pac. Subcomm. and S. & Cent. Asia Subcomm.*, 119th Cong. (Nov. 19, 2025),https://foreignaffairs.house.gov/committee-activity/hearings/no-exit-strategy-burma-s-endless-crisis-and-america-s-limited-options; Press Release, Ami Bera, Representative, House of Representatives, Reps. Bera, Kim, Kamlager-Dove, & Huizenga Joint Statement on Crisis in Burma (Nov. 20, 2025), https://bera.house.gov/news/press-releases/reps-bera-kim-kamlager-dove-and-huizenga-issue-joint-statement-on-crisis-in-burma?fbclid=IwY2xjawOMsD1leHRuA2FlbQIxMQBzcnRjBmFwcF9pZBAyMjIwMzkxNzg4MjAwODkyAAEeQziy1xXSYf_BepN2qJONWlroQOCAeCgwUhs7u2D-dYyTChdVNy0ztOtseLI_aem_bTNqXo1G9A8SGIPsoFrfTQ.
[68] *TNLA Defies Myanmar Junta Push to Cede Shan Towns in China Talks*, The Irrawaddy (July 7, 2025), https://www.irrawaddy.com/news/burma/tnla-defies-myanmar-junta-push-to-cede-shan-towns-in-china-talks.html.

| Issue | Initial Designation (05/25/21) | Re-designation & Extension (09/27/22) | Re-designation & Extension (03/24/24) | Termination Announced (11/25/25) |
|---|---|---|---|---|
| | | properties destroyed | | |
| **Danger to Vulnerable Minority Groups** | • Increased danger for Rohingya, Karen (200,000 displaced), and Kachin | • US genocide determination re Rohingya<br>• Rohingya movement restricted; increased arrests | • Karen & Karenni targeted<br>• 50,000 Chin fled & 48,000 displaced<br>• Rohingya abuse/genocide | • Not addressed |
| **Economic Conditions** | • Not addressed | • Kyat depreciation, high inflation, 18% GDP contraction<br>•Household income loss >50% | • Partial recovery but still at pre-pandemic levels<br>• 2023 inflation >14% | • Not addressed |
| **Displacement (Internal & External)** | • 330,000 internally displaced | • Internal: 974,000 displaced since coup<br>• Total Internal Displaced: 1.3M<br>• External: 45,500 refugees | • Internal: 694,300 → 1.7M (+146%)<br>• External: 40,200 → 54,900 (+37%)<br>**Total Displacement: 2.6M** | • Displacement not addressed;<br>• Safety determination based on 26% who applied for advance parole to visit Burma.<br>• No data on approval, travel, safety, or 74% who did not apply. |
| **Trafficking** | • Not addressed | • Not addressed | • 120,000 trafficked<br>• Trafficking linked to online scams | • Not addressed |
| **U.S Government References / Int'l Orgs / Human Rights Groups** | • UNHCR<br>• DOS<br>• UN OCHA<br>• UN Special Envoy for Burma<br>• OHCHR<br>• Human Rights Watch | • 2021 DOS Country Report<br>• DOS Genocide Report<br>• OHCHR & UNHCR<br>• UN OCHA | • 2022 DOS Country Report<br>• 2023 DOS Trafficking Report:<br>• DOS Genocide Report | • DHS Entry/Exit Overstay Report (2023-24)<br>• Presidential Proclamation on Entry Restrictions<br>• OHCHR Report |

| Issue | Initial Designation (05/25/21) | Re-designation & Extension (09/27/22) | Re-designation & Extension (03/24/24) | Termination Announced (11/25/25) |
|---|---|---|---|---|
| | | • Int'l Crisis Group & USIP | • OHCHR Report | |

## THE FIRST TRUMP ADMINISTRATION'S EFFORTS TO ELIMINATE TPS PROTECTIONS

72.     The first Trump Administration attempted to end TPS designations for six non-white, non-European countries. Between 2017 and 2018, DHS announced terminations of TPS designations for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *See Ramos v. Nielsen*, 709 F.Supp.3d 871, 877-78 (N.D. Cal. 2023). If the terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, comprising approximately 98 percent of all TPS holders at the time.[69] In each case, the Secretary announced either a 12- or 18-month orderly transition period, which would have delayed the effective date of termination.

73.     Litigation and congressional investigations subsequently revealed that the termination decisions were not based on an objective review of country conditions as required by statute—and as had been the past practice over multiple administrations, both Democratic and Republican—but rather were part of a "predetermined presidential agenda to end TPS." *Ramos v. Nielsen*, 336 F.Supp.3d 1075, 1094-99 (N.D. Cal. 2018) (vacated and remanded on different grounds; quoting then-DHS Secretary Duke's assurance to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close").[70]

---

[69] Marcela Valdes, *Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call*, N.Y. Times (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.
[70] *See also* MINORITY STAFF OF S. COMM. ON FOREIGN RELS., 116th Cong., PLAYING POLITICS WITH HUMANITARIAN PROTECTIONS: HOW POLITICAL AIMS TRUMPED U.S. NATIONAL SECURITY AND THE SAFETY OF TPS RECIPIENTS 41 (U.S. Gov't Publ'g Off. Wash. 2019) (finding that termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).

74. Moreover, every district court to consider the question of whether animus was a motivating factor for the agency action found that the terminations were part of a policy "to decrease the presence of non-white immigrants in the United States." *Saget*, 375 F.Supp.3d at 368-372 (also finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti); *see also Ramos*, 336 F.Supp.3d at 1100 (noting "evidence that President Trump harbors an animus against non-white, non-European [noncitizens] which influenced his (and thereby the Secretary's) decision to end . . . TPS designation[s]"); *Centro Presente v. DHS*, 332 F.Supp.3d 393, 415 (D. Mass. 2018) ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador, and Honduras).

75. DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual terminations of TPS designations for nearly everyone who held the status. *Ramos*, 336 F.Supp.3d at 1101. For example, in terminating TPS for Nepal, career officials were instructed not to devote research to crises not directly related to the earthquake, and when drafts did not adequately support the proposal to terminate, career officials omitted or deemphasized ongoing problems in Nepal.

76. The courts considering challenges to these decisions consistently found that DHS had radically changed the way it approached TPS decisions, justifying the terminations by considering a much narrower range of country conditions than had been considered in the past. *See Saget v. Trump*, 375 F.Supp.3d 280, 346 (E.D.N.Y. 2019); *Ramos*, 336 F.Supp.3d at 1097-

98; *Centro Presente v. DHS*, 332 F.Supp.3d 393, 412-14 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F.Supp.3d 307, 321 (D. Md. 2018).

77.     To justify the termination of designations, and undermine the TPS program, political appointees during the first Trump Administration sought to paint TPS holders as criminals and manufactured evidence to support this implausible claim. A court in the Eastern District of New York found that Acting Secretary Duke decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute. *Saget*, 375 F.Supp.3d at 343, 347-48, 359-62. Acting Secretary Duke specifically sought out a rationale to "[s]eparate out Haiti." *Id.* at 348. Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance, despite that virtually any criminal record is disqualifying for TPS. *Id.* at 307-09. Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest." *See id.* at 352; *cf.* 8 U.S.C. § 1254a (b)(1)(C), (c)(2)(B). Another federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – *i.e.*, that non-whites commit crimes and are on the public dole." *Ramos*, 336 F.Supp.3d at 1105.

78.     After analyzing "a wealth of record evidence" regarding the terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, a federal district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad . . . The evidence . . . suggests this change may have been made in order to implement and justify a pre-ordained result." *Id.* at 1092, 1097-98; *see also Centro Presente v. DHS*, 332

F.Supp.3d at 416 (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees"). A court in the Eastern District of New York came to the same conclusion after a four-day bench trial regarding Haiti's TPS termination, finding that the termination "was preordained and pretextual" and "was made in part due to political influence," violating the TPS statute's requirement that decisions be based on country conditions. *Saget*, 375 F.Supp.3d at 346.

79.      Indeed, then-Acting Secretary Duke's writings revealed that "she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS." *Ramos*, 336 F.Supp.3d at 1099. Specifically, she expressed that her TPS decision-making was based on "an America first view," a term that invoked President Trump's preference for immigration from majority-white European countries. *Id.* at 1099-1100, 1104. Notably, Secretary Noem expressly included the same "America First" objectives in the published Federal Register Notice terminating TPS for Burma and other countries in 2025.

80.      As a result of injunctions issued in these cases and subsequent stipulated orders, the terminations sought by the first Trump Administration did not go into effect. *See, e.g.*, *Ramos*, 709 F.Supp.3d at 878-79. And in 2023, DHS rescinded the TPS terminations for Honduras, Nicaragua, Nepal, and El Salvador and extended TPS designations for those countries instead. *See id.* DHS issued new extensions for Haiti and Sudan on May 21, 2021, and April 19, 2022, respectively, effectively overturning their TPS terminations.[71] *See id.* In doing so, DHS

---

[71] *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863 (Aug. 3, 2021); Designation of Sudan for Temporary Protected Status, 87 Fed. Reg. 23,202 (Apr. 19, 2022).

extensively criticized the flawed country-conditions analyses in the termination decisions issued under the first Trump Administration.[72]

### THE SECOND TRUMP ADMINISTRATION'S PROMISE TO END TPS

**Secretary Noem, President Trump, and Vice President Vance Publicly Commit to Terminating TPS**

81.     Secretary Noem, President Trump, and Vice President Vance have repeatedly characterized TPS itself as illegal and committed to ending protections for TPS holders well before the Secretary conducted any statutorily required review. Secretary Noem's TPS termination decisions treated both the program and its beneficiaries as illegal from the outset. The Administration's approach reduced the statutory periodic review process to a foregone conclusion in which termination and harm to TPS holders was predetermined and every review served only to rationalize that outcome.

82.     Even before she became Secretary of DHS, Secretary Noem publicly committed to ending TPS protections in statements reflecting her antipathy toward TPS holders.

83.     Secretary Noem repeatedly insinuated that TPS was an illegal program and denigrated its beneficiaries. In announcing her decision to end TPS for Venezuela, for instance, she said she would not allow Venezuelan TPS holders to "stay here and violate our laws."[73] In her press statement announcing the partial vacatur of TPS for Haiti, Secretary Noem emphasized

---

[72] *See* Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day."); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40,294, 40,297 (June 21, 2013) (same for Nicaragua); Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023) (same for Nepal).

[73] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad686037 (at approximately 1:00).

35

that "TPS is a type of immigration status available to nationals of certain designated countries that allows aliens, *even if they entered the country illegally*, the ability to reside *temporarily* in the U.S."[74] Secretary Noem further cited Haiti as an "example" of the "exploit[ation]" of the system because "Haiti has been designated for TPS since 2010"; and because "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."[75]

84. President Trump, Vice President Vance, and Trump surrogates have likewise expressed their disagreement with TPS, characterizing designations as illegal, or, in Vice President Vance's words, "a magic amnesty wand."[76]

85. Both the President and the Vice-President made clear their intent to target TPS holders before taking office.[77] President Trump, while campaigning, said that he would "[a]bsolutely . . . revoke" TPS from Haitians, saying, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal."[78] He decried TPS as a "little trick,"

---

[74] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphasis in original).

[75] *Id.* (Here, Defendant Noem presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit from TPS).

[76] Gabe Whisnant, *JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims*, Newsweek (Sep. 16, 2024), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036.

[77] *See* Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. Times (Oct. 22, 2024), *https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html*; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. Times (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

[78] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,* NewsNation (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:00); *see also* Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. Times (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

asserting that Haitian migrants "are illegal immigrants" who were "destroying the town"[79] and that he would "do large deportations" of Haitian TPS holders.[80]

86. Vice-President Vance repeatedly stated during the campaign that he intended to eliminate TPS and remove protections for TPS holders, declaring, "We're going to stop doing mass grants of Temporary Protected Status."[81] In a September 2024 CNN interview, he rejected the legal status of TPS holders, characterizing TPS designations as "magic amnesty" and asserting that granting TPS "does not mean they are here legally."[82]

87. According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of status from TPS holders as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[83]

88. Project 2025, "the 2025 Presidential Transition Project," a product of current and former Trump political appointees, also called for the "[r]epeal [of] TPS designations" without

---

[79] Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far as I'm Concernced'*, Rolling Stone (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621/.

[80] Soo Rin Kim et al., *Trump calls US 'garbage can for the world' in latest anti-immigrant rhetoric*, ABC News (Oct. 24, 2024), https://abcnews.go.com/Politics/trump-calls-us-garbage-world-latest-anti-immigrant/story?id=115149893; Alexandra Ulmer et al., *Trump Pledges to Deport Haitians in Ohio City if Elected*, Reuters, (Sep. 14, 2024), https://www.reuters.com/world/us/biden-says-attacks-haitian-immigrants-have-stop-2024-09-13/.

[81] Chris Cameron, *Vance Vows an End to Programs for Legal Migrants*, N.Y. Times (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html.

[82] Interview of Senator J.D. Vance, CNN (Sep. 16, 2024) at approx. 5:00, http://youtube.com/watch?v=djpTr5r0zMQ.

[83] *See* Charlie Savage et al., *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. Times (Nov. 11, 2023), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

37

elaboration as to any consideration of individual country conditions or any other statutory requirements.[84]

## DEFENDANTS' RENEWED EFFORTS TO END TPS

89.     Neither the adverse decisions of federal courts nor DHS's 2023 analysis have deterred the second Trump Administration from pursuing the termination of TPS protections for beneficiaries and enacting harm on TPS holders consistent with campaign promises. To date, the Administration has attempted to terminate all but one TPS designation that has come up for review. The purported termination decisions—including the termination of TPS for Burma—reflect preordained outcomes driven by animus against TPS holders and nonwhite immigrants, and the very sort of domestic politics the statute is intended to forestall.

90.     On his first day in office, President Trump issued an executive order titled "Protecting the American People Against Invasion."[85] The supposed "invasion" at issue involved purportedly "unprecedented" levels of irregular entry into the United States.[86] The executive order describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans."[87] "Invasion" is a "code word" often used to "express[] that Racial/Ethnic Minorities spread something harmful within communities, institutions, or other societal domains."[88]

91.     The Executive Order directs the DHS Secretary to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led

---

[84] *Mandate for Leadership: The Conservative Promise* 150 (Paul Dans & Steven Groves eds., 2025) (chapter written by Ken Cuccinelli). https://static.project2025.org/2025_MandateForLeadership_FULL.pdf.

[85] Exec. Order No. 14159 § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025) ("Invasion EO").

[86] *Id.* § 1

[87] *Id.*

[88] Deirdre Pfeiffer & Xiaoqian Hu, *Deconstructing Racial Code Words*, 58 L. & Soc'y Rev. 294, 310 (2024).

to the increased or continued presence of illegal aliens[89] in the United States," including by reviewing "designations of Temporary Protected Status."[90] Although TPS holders are, by definition, lawfully present in the United States, the Executive Order demanded that TPS designations be "appropriately limited in scope" to restrict the "continued presence of illegal aliens in the United States."[91]

92.     Immediately after Secretary Noem was confirmed as Secretary of DHS, Defendants began to implement the Executive Order's mandate and several of Secretary Noem's termination orders rely explicitly on this order. In fact, when publicizing the Venezuela TPS vacatur described below, Secretary Noem explained that the vacatur reflected President Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives a directive, the Department of Homeland Security will follow it."[92]

**Venezuela**

93.     Within days of taking office, Secretary Noem made the unprecedented decision to reverse and vacate the prior Administration's extension of Venezuela's 2023 TPS designation. *See NTPSA I* PI Decision at 819-20. The termination of Venezuelan TPS followed soon after. A federal court later found that Secretary Noem's official justification for her unprecedented

---

[89] "Illegal alien" is widely recognized as a derogatory term used to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such). *See, e.g.,* Kai Wei et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) Soc. Scis. J. 1, 10-11 (2019), https://www.mdpi.com/2076-0760/8/3/93#B63-socsci-08-00093. The administration's use of this term "conveys a message of rejection and exclusion" and further evinces its animus against non-white immigrants. *See also infra* ¶¶ 91-113.

[90] Invasion EO § 16(b).

[91] Invasion EO § 16(b).

[92] Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 18:57 ET), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (statement appears in posted video clip from CNN interview).

vacatur was a pretext to cover "the desire to totally undo" the redesignation signed by then-Secretary Alejandro Mayorkas. *Id.* at 855.[93]

94. Secretary Noem's decisions were not based on the statutorily required country conditions review. Rather, the limited review the agency conducted was designed to find support for a termination decision that had already been made. Information produced as part of litigation challenging these decisions revealed that DHS had begun drafting the vacatur decision even before Secretary Noem had been confirmed as Secretary. The hasty process Defendants' undertook for Venezuela illustrates the decision's pretextual nature; "just two days after a draft of the vacatur decision was prepared and/or circulated . . . a draft of the termination decision was prepared and/or circulated," indeed the termination notice was prepared "even before the vacatur decision was finalized," and "DHS staff was asked to 'focus on any improvements in Venezuela,' implicitly to advance and support termination of Venezuela's TPS." *Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 2578045 at *29 (N.D. Cal. Sep. 5, 2025) ("NTPSA I SJ Decision").

95. A comparison of Venezuela's two competing decision memos—dated only three weeks apart—is illustrative. USCIS's earlier decision memo, dated January 9, 2025, recommended extension, describing Venezuela's country conditions as a "complex, serious and multidimensional humanitarian crisis." In sharp contrast, USCIS's January 31, 2025, memo

---

[93] This decision issuing preliminary relief was stayed by the Supreme Court in a non-precedential decision with no analysis. *See Noem v. Nat'l TPS All.*, 145 S.Ct. 2728 (2025). The Ninth Circuit later upheld the district court's preliminary relief decision in a detailed opinion, *Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025), terminating the Supreme Court's stay, 145 S.Ct. at 2729. Meanwhile, the district court issued a decision on summary judgment in the same case, holding that plaintiffs had established that the agency's vacatur and termination decisions were unlawful and/or arbitrary and capricious. *Nat'l TPS All. v. Noem,* No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025) ("*NTPSA I* SJ Decision"). That merits decision was then stayed as to the vacatur by the Supreme Court in another non-precedential decision with no analysis. *Noem v. Nat'l TPS All.,* No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025).

recommended termination and was terse. In justifying its recommendation, it focused on insignificant positive changes, including a "permit for [a U.S. corporation] to operate in Venezuela," while ignoring relevant country conditions the January 9th memo assessed, including food insecurity, political repression and human rights abuses, and restricted access to certain basic services.

96. Defendants could not even agree on a justification for terminating Venezuelan TPS. USCIS suggested—despite the absence of supporting evidence—that conditions in Venezuela had improved. Secretary Noem, however, based her decision primarily on national interest grounds, asserting that because Venezuela was designated for TPS on the grounds of extraordinary and temporary conditions (rather than natural disaster or war), she did not need to find improved conditions in order to terminate its TPS.[94] The Venezuela termination was the first termination in the history of the TPS program based on national-interest grounds.

**Haiti**

97. Defendants targeted Haiti next. DHS partially vacated an existing TPS extension for Haiti and purported to retroactively shorten the expiration dates of all documents issued under the prior Secretary's extension by six months. Defendants' hasty and limited review process for Haiti mirrored that of Venezuela and, as a district court has found, similarly reflects Defendants' preordained plan to terminate TPS designations and remove protections from TPS holders. *NTPSA I* SJ Decision at *34.

98. Secretary Noem's press statement on Haiti's partial vacatur also underscores the pretextual nature of her decision. The release announced that Secretary Noem "vacated a

---

[94] Termination of the October 3, 2023, Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 ("[E]ven assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States.").

decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."[95] The press statement also referenced the recission of Venezuela's TPS extension, explicitly linking the two vacaturs as part of the same project to change "the TPS system."[96]

99.    The justifications provided by Secretary Noem in the Federal Register for the partial vacatur of TPS for Haiti had no basis in the TPS statute and were inconsistent with the history of TPS decision-making. For example, Secretary Noem substantially based the vacatur decision on a critique of former DHS Secretary Mayorkas for purportedly failing to explain why he chose an 18-month extension period or why extension and redesignation for Haiti's TPS were not contrary to the national interest.[97] But as a federal district court found, "the absence of a specific justification for the length of a [TPS] extension," once that decision has been made, is neither "unusual [n]or impermissible." *NTPSA I* SJ Decision at *33. Similarly, "DHS Secretaries typically have not given explanations as to why allowing TPS holders to remain in the United States is not contrary to the national interest." *Id.* at *34. The court held that Defendants' decision "was preordained" and made without "any meaning[ful] analysis and review [of country conditions]." *Id.*

---

[95] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status [hereinafter "Haiti Termination Press Release"].
[96] *Id.*
[97] Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511, 10,513-14 (Feb. 24, 2025).

100.    On June 27, 2025, Defendants terminated Haiti's TPS designation.[98] Because Haiti, like Venezuela, was designated for TPS on the grounds of extraordinary and temporary conditions, the Secretary believed she could justify termination based solely on a finding that extension is not in the national interest. And that is what she did—claiming that crisis-level conditions actually *required* termination because continuing TPS for a country facing total societal collapse is contrary to the U.S. national interest.[99] Secretary Noem also identified the actions of one individual convicted of numerous violent crimes as "underscor[ing] the broader risk posed by rising Haitian migration." DHS' press release, however, proclaimed that "country conditions have improved to the point where Haitians can return home in safety."[100]

101.    On July 1, 2025, the Eastern District of New York held that the partial vacatur exceeded the Secretary's authority and set it aside, with the effect that no termination could take place before February 3, 2026, the expiration of the most recent extension. *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp 3d 255, 267, 272-73 (E.D.N.Y. 2025). In view of that ruling, the Secretary made "a new, superseding determination," announced November 28, 2025, resting on an assertion that no extraordinary and temporary conditions prevent safe return and on the same national-interest ground. 90 Fed. Reg. 54,733, 54,734-35.

**Afghanistan**

102.    On May 12, 2025, DHS announced the termination of TPS for Afghanistan. Despite an ongoing State Department warning against any travel to the country "due to civil

---

[98] Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760 (July 1, 2025).

[99] *Id.* at 28,763 (terminating Haitian TPS despite acknowledging "[w]idespread gang violence . . . sustained by the country's lack of functional governmental authority" has "destabilized Haiti," and that "'Haiti is in the grip of severe humanitarian and human rights crisis'").

[100] *See DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status*, U.S. Citizenship & Immigr. Serv., https://www.uscis.gov/newsroom/news-releases/dhs-terminates-haiti-tps-encourages-haitians-to-obtain-lawful-status.

unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"[101] Secretary Noem claimed that conditions had "notabl[y] improve[d]." She cited the fact that only 23.7 million (rather than 29 million) Afghan nationals relied on humanitarian assistance to support the conclusion that "the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety."[102] She also failed to address entire categories of conditions previously identified as bases for Afghanistan's TPS designation and prior extensions, including human rights abuses and the welfare of women and girls.[103]

103.    Secretary Noem also asserted that extending TPS would be contrary to the national interest. Her sole explanation for this conclusion was that "DHS records indicate that there are Afghan nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security."[104]

**Cameroon**

104.    Defendants terminated TPS for Cameroon on June 4, 2025.[105] Cameroon had been designated for TPS because of the existence of armed conflict and extraordinary and temporary conditions. Secretary Noem issued the termination despite acknowledging that "Cameroon is experiencing two major conflicts" that "remain active."[106] Secretary Noem again failed to address conditions previously cited as a basis for TPS, including human rights abuses,

---

[101] *Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Afghanistan.html (last visited Dec. 19, 2025).

[102] Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. 20,309, 20,310 (May 13, 2025).

[103] *Compare* Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,730-33 (Sept 25, 2023), *with* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,310.

[104] Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,311

[105] Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697 (June 4, 2025).

[106] *Id*. at 23,698.

food insecurity, a cholera epidemic, and ongoing mass displacement.[107] Documents produced as part of litigation demonstrated that Secretary Noem's decision to terminate TPS for Cameroon was made without any recommendation or input from the Department of State. *See CASA, Inc. v. Noem,* 792 F.Supp.3d 576 (D. Md. 2025).

105.    As with the other terminations, she insisted that continuing TPS would be "contrary to the national interest."[108] In this instance, Secretary Noem reached her conclusion based solely on the executive order directing her to limit TPS and President's Trump's broader "policy imperatives" related to immigration.[109]

**Nepal**

106.    On June 6, 2025, Defendants terminated TPS for Nepal.[110] Repeating the pattern developed in the prior terminations, Secretary Noem claimed that "notable improvements" justified ending Nepal's designation while ignoring entire categories of conditions—such as widespread food insecurity and lack of access to sanitation—that DHS had previously considered.[111]

---

[107] *Compare* Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023), *with* Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,697.

[108] Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,698.

[109] *Id.*

[110] Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025).

[111] *Compare Id.* at 24,151 *with* Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023).

**Honduras and Nicaragua**

107.    On July 8, 2025, Defendants announced the termination of TPS for Honduras and Nicaragua.[112] These notices came two days after the expiration of the most recent previous extension for each country and were thus untimely.[113] .

108.    The Honduras termination notice cites to the Invasion E.O., noting that "the Secretary should . . . ensur[e] that designations of Temporary Protected Status . . . are appropriately limited in scope and made for only so long as may be necessarily to fulfill the textual requirements of that statute."[114]

109.    Repeating the pattern developed in the prior terminations, Secretary Noem identified certain positive indicators—such as increasing tourism and real estate investment—while ignoring major categories of conditions that had previously been considered, including "political violence" and "staggering levels of crime" with "[g]angs that originated in the United States . . . la[ying] siege to communities and . . . plung[ing] the country into a state of crisis."[115] The Nicaragua termination notice similarly relies on the Invasion E.O.[116] It recognizes that "certain conditions for the TPS designation of Nicaragua may continue," but nonetheless terminates Nicaragua's designation on the ground that "notable improvements . . . allow Nicaragua to adequately handle the return of its nationals."[117] The termination notice fails to acknowledge or consider numerous categories of conditions that formed the basis of prior

---

[112] Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,089 (July 8, 2025) ("Honduras Termination Notice"); Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30,087 (July 8, 2025) ("Nicaragua Termination Notice").

[113] *See* 8 U.S.C. § 1254a(b)(3)(B)

[114] Honduras Termination Notice, at 30091 n.10.

[115] Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,310 (June 21, 2023) (internal quotation marks and citations omitted); *see* Honduras Termination Notice (not addressing political violence or crime).

[116] Nicaragua Termination Notice, at 30088 n.4.

[117] Nicaragua Termination Notice, at 30,088.

extensions, including "political instability," a "deteriorat[ing]" "human rights situation," and a related "humanitarian crisis."[118]

110. In finding that Honduras and Nicaragua can "handle adequately the return" of their nationals, *see* 8 U.S.C. § 1254a(b)(1)(B), Secretary Noem adopted a new definition of "adequate," defining the term to mean "[s]atisfactory, but worthy of no stronger praise or recommendation; barely reaching an acceptable standard; just good enough."[119]

111. Discovery produced in litigation challenging Defendants' termination of TPS for Nepal, Honduras and Nicaragua[120] confirms that USCIS drafted decision memoranda recommending termination for Honduras and Nicaragua *before* drafters had reviewed USCIS country conditions reports—and for Nepal and Nicaragua, without ever receiving any recommendation or contemporaneous conditions report from the State Department. This process violated the statutory directives to engage in interagency consultation and further evidences Defendants' ends-oriented approach.

**Syria**

112. On September 19, 2025, Defendants announced the termination of Syria's TPS designation. The termination was published in the Federal Register on September 22, 2025, with a termination date of November 21, 2025—a mere 60 days later and the minimum required by statute.[121]

113. Secretary Noem acknowledged that "the civil war in Syria displaced over half of the country's population, resulted in the deaths of more than 500,000 people, destroyed critical

---

[118] Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40,294, 40,300. *See* Nicaragua Termination Notice (failing to address the political or humanitarian situation).
[119] *See* Honduras Termination Notice, at 3,009 n.23; Nicaraguan Termination Notice, at 30,088 n.14.
[120] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*").
[121] *See* Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. 45,398 (Sep. 22, 2025).

infrastructure, and significantly weakened the Syrian economy."[122] However, she stated that, in large part due to the fall of the Assad regime in December 2024, "the situation [in Syria] no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals."[123]

114.    With respect to Syria's designation due to "extraordinary and temporary conditions," Secretary Noem dismissed the dire security and humanitarian situation, acknowledging that "most Syrians require some form of humanitarian assistance" but nonetheless concluding that "this does not prevent nationals from returning in safety."[124]

115.    Remarkably, the Trump Administration took a contradictory position regarding Syria's country conditions on September 30, 2025, just days *after* DHS announced the termination of TPS for Syria. On that date, President Trump renewed Syria's "national emergency" designation pursuant to the International Emergency Economic Powers Act, finding that the "situation in and in relation to Syria undermines the campaign to defeat . . . ISIS, endangers civilians, and further threatens to undermine the peace, security, and stability in the region."[125]

**South Sudan**

116.    On November 5, 2025, Defendants published a Federal Register notice terminating TPS for South Sudan.[126] Defendants attempt to justify the termination based on an end to the civil war, "diplomatic developments between the U.S. Department of State and South

---

[122] Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. at 45,400.
[123] *Id.*
[124] *Id.*
[125] Continuation of the National Emergency With Respect to the Situation in and in Relation to Syria, 90 Fed. Reg. 47,967 (Oct. 2, 2025).
[126] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484 (Nov. 6, 2025)

48

Sudan's transitional government," and "improvements in displacement trends, infrastructure, and governance."[127] While the termination notice says there is ongoing "inter/intra-communal violence linked to border disputes, cross-border violence, cyclical and retaliatory attacks, and ethnic polarization," it does not cite any sources regarding those threats nor does it address the potential impact on TPS holders.[128] Instead, it focuses more on the U.S. government's national interest in ensuring South Sudan accepts people who are deported from the U.S. and the termination notes the government of South Sudan's willingness to facilitate deportations, including deportations of people from third-countries.[129] While pointing generally to webpages for the UN Mission to South Sudan, the termination notice ignores findings of "escalating conflict" in South Sudan, and also reports of continued widespread conflict and forced displacement, impacting at least 300,000 people in 2025 alone.[130]

**Ethiopia**

117.     On December 15, 2025, Defendants announced the termination of TPS for Ethiopia. Similarly to the South Sudan termination, the termination focuses on some improvements in armed conflict between government forces and other militia groups, while simultaneously noting reports show attacks on civilians in some regions have increased.[131] The termination also points to changes in conditions regarding healthcare and displacement.[132] It

---

[127] *Id.* at 50,485.

[128] *Id.* at 50,485.

[129] *Id.* at 50,485-86.

[130] Press Release, Comm'n on Hum. Rts. in S. Sudan, Hum. Rts. Council, South Sudan: UN Commission urges AU and UN Security Council to act decisively as crisis deepens, demanding urgent action and renewed commitment to peace, accountability and a credible transition, U.N. Press Release (Oct. 13, 2025), https://www.ohchr.org/en/press-releases/2025/10/south-sudan-un-commission-urges-au-and-un-security-council-act-decisively.

[131] Termination of the Designation of Ethiopia for Temporary Protected Status, 90 Fed. Reg. 58,028 (Dec. 15, 2025).

[132] *Id.* at 58,031.

49

cites the Invasion EO as well to justify national interest in ending TPS, and points to vague national security, public safety, and fraud-focused administrative investigations of some Ethiopian TPS holders, including a footnote that leads to no citation or additional information.

**Somalia**

118. On January 14, 2026, Defendants issued a notice in the Federal Register, terminating Somalia's TPS designation, effective 11:59 p.m. on March 17, 2026. 91 Fed. Reg. 1,547. Despite the fact that Congress tasked the Attorney General with reviewing TPS designations, President Trump posted on social media that he was terminating TPS for Somalis "effective immediately."[133] The termination announcement declines to provide country conditions, does not specify by name any other agency consulted during the process, and does not mention that on April 8, 2025, President Trump himself renewed recognition of Somalia's "national emergency" status under the International Emergency Economic Powers Act, citing to the deterioration of the security situation and the "persistence of violence" that is "committed against civilians" and attributable to al-Shabaab. Nor does the notice mention the Level 4 State Department travel advisory for Somalia or explain why such conditions are consistent with safe return for Somali nationals.

**Yemen**

119. On February 13, 2026, Secretary Noem announced her intent to terminate Yemen's TPS designation.[134] In her press announcement, she stated: "Allowing TPS Yemen beneficiaries to remain temporarily in the United States is contrary to our national interest. TPS was designed to be temporary, and this administration is returning TPS to its original temporary

---

[133] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 21, 2025, at 8:37 PM), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464

[134] *See* USCIS, DHS Terminates Temporary Protected Status for Yemen (Feb. 13, 2026), available at https://www.uscis.gov/newsroom/news-releases/dhs-terminates-temporary-protected-status-for-yemen.

intent. We are prioritizing our national security interests and putting America first." The press announcement offered a "complimentary plane ticket" and "$2,600 exit bonus" payment for any Yemeni TPS beneficiaries willing to voluntarily self-deport.

120. DHS formally announced the termination of Yemen's Temporary Protected Status, effective May 4, 2026, via a notice published under Secretary Noem's name in the Federal Register on March 3, 2026. 91 Fed. Reg. 10402 (Mar. 3, 2026). In the notice, Secretary Noem conceded that "Yemen still experiences extraordinary and temporary conditions" "that prevent Yemeni nationals from returning in safety, *id.* at 10,404-10,405, but determined that "it is contrary to the national interest" to allow Yemini TPS holders to remain in the U.S. *Id.* at 10404.

**Defendants' Departure from Past Practice Regarding Timing and Transition**

121. In another break with past practice, Secretary Noem provided that, for every country whose TPS designation was terminated (Venezuela, Haiti, Cameroon, Afghanistan, Nepal, Nicaragua, Honduras, Syria, Burma, South Sudan, Ethiopia, Somalia, and Yemen), the TPS termination would take effect in 60 days—the minimum period permitted under the TPS statute. *See* 8 U.S.C. § 1254a(b)(3)(B)

122. Prior to this administration, DHS maintained a clear practice over the past twenty years of providing at least a six-month orderly transition period for any TPS termination. But in each termination notice this year— including for Burma— the Secretary provided only a sixty-day wind-down period and failed to acknowledge DHS's twenty-year practice of providing at least a six-month orderly transition period when ending a TPS designation.

**SECRETARY NOEM AND PRESIDENT TRUMP EXPRESSED DISCRIMINATORY ANIMUS BASED ON RACE, ETHNICITY, NATIONAL ORIGIN, AND MEMBERSHIP IN A POLITCALLY UNPOPULAR GROUP**

123.     Secretary Noem's TPS termination decision was driven in substantial part by animus against Burmese TPS holders based on their race, ethnicity, national origin, and membership in a politically unpopular group: TPS holders. Public statements by Secretary Noem, President Trump, and other Administration officials—some of which are described herein—make clear that the decisions to terminate TPS for Burma and 12 other countries were motivated by discriminatory animus.

**Secretary Noem's Statements Against Non-White, Non-European Immigrants and TPS Holders**

124.     Secretary Noem has repeatedly disparaged non-white, non-European immigrants, calling them "dirt bags"[135] and labeling them as "criminals." In many comments between February 2024 through the present, Secretary Noem has "equated . . . TPS holders with gang members, criminals, mentally unstable persons, and the like." *NTPSA I* PI Decision at *39-45 (finding Plaintiffs likely to succeed on their claim that the Secretary's decision to vacate and terminate Venezuela's TPS designation was motivated by animus in violation of the Constitution).

125.     She has described migration as "an invasion happening on purpose…to remake the foundation of this country," reflecting the so-called "replacement theory." That theory posits that non-white immigrants will "replace" the white population and undermine the country's perceived white foundation, history, and culture.[136]

---

[135] Secretary Kristi Noem (@Sec_Noem, X. (Jan. 28, 2025, 10:35 ET), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off these streets.").
[136] *See The 'Great Replacement' Theory, Explained*, National Immigration Forum, 1-2 (Dec. 1, 2021), https://forumtogether.org/wp-content/uploads/2021/12/Replacement-Theory-Explainer-1122.pdf.

126.    DHS recently amplified this message with a one-word social media post: "Remigrate."[137] This term is widely understood as a call for the mass expulsion of non-white immigrants and is closely associated with white nationalist ideology, where it functions as a euphemism for ethnic cleansing.[138]

127.    Under Secretary Noem's leadership, DHS claimed that TPS allowed "half a million poorly vetted migrants into this country—from MS-13 gang members to known terrorists and murderers," despite the program being limited to individuals already in the U.S. and excluding those with more than a single misdemeanor.[139] These types of baseless stereotypes and statements about TPS holders demonstrate bare animus toward them simply because of their status as TPS holders.

128.    Secretary Noem's termination order for Burma explicitly relies on President Trump's Travel Ban which imposes full or partial entry restrictions on nationals of nineteen countries—all non-white countries—including Burma.

129.    On December 1, 2025, mere days after publishing her termination notice for Burma, Secretary Noem posted on social media that she had met with the President and was recommending "a full travel ban on every damn country that's been flooding our nation," describing immigrants as "killers," "leeches," and "foreign invaders," and stating, "WE DON'T WANT THEM. NOT ONE."[140] Since Burma is one of the countries on the Travel Ban, Secretary Noem's disparaging remarks evince animus towards Burmese nationals specifically.

---

[137] Homeland Security (@DHSgov), X (Oct. 14, 2025, 15:06 ET), https://x.com/DHSgov/status/1978175527329358094.
[138] *See* Connor Greene, *Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism*, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate-homeland-security/.
[139] Homeland Security (@DHSgov), X (May 19, 2025, 17:18 ET), https://x.com/DHSgov/status/1924575437344186612.
[140] Secretary Kristi Noem (@Sec_Noem), X (Dec. 1, 2025, 18:25 ET), https://x.com/Sec_Noem/status/1995642101779124476?s=20.

**President Trump's Racist Statements Against Non-White, Non-European Immigrants**

130.     From his candidacy through his presidency, President Trump has repeatedly disparaged immigrants perceived to be non-white and non-European, and has specifically targeted groups based on their national origin and status as TPS holders.

131.     On December 9, 2025, at a rally in Pennsylvania, President Trump praised his administration's decision to bar nationals of nineteen countries—all non-white and non-European—from entering the United States, stating: "I've also announced a permanent pause on Third World migration, including from hellholes like Afghanistan, Haiti, Somalia and many other countries."[141]

132.     Although the President did not specifically mention Burma in his December 9, 2025, remarks, Burma is among the countries affected by the restrictions he described—a country whose location he admitted in July 2019 that he did not know.[142]

133.     In addition to exhibiting limited familiarity with the region, the President has resorted to crude and derogatory stereotypes to denigrate certain South Asian countries and their peoples. For example, during his first term, while studying a map in preparation for a meeting with the Prime Minister of India, the President deliberately mispronounced "Nepal" as "nipple"

[141] Alexandra Marquez, *Trump Revives Slur while Discussing Immigrants from Somalia and Other 'Disgusting' Nations*, NBC News (Dec. 10, 2025), https://www.nbcnews.com/politics/donald-trump/trump-immigrants-somalia-slur-rcna248395

[142] Susie Heller, *Trump Asked 'Where Is That?' When a Rohingya Refugee Asked Him if He was Doing Anything to Stop the Genocide in Myanmar*, Bus. Insider (July 18, 2019), https://www.businessinsider.com/trump-asked-rohingya-refugee-where-myanmar-is-2019-7

and mockingly referred to Bhutan as "button."[143] He also faked an Indian accent to imitate Prime Minister Narendra Modi during Oval Office meetings.[144]

134.     At the recent December 9, 2025, rally, the President recounted telling Democratic Senators that the United States "was going to hell" and asked, "Why is it we only take people from shithole countries? Why can't we have some people from Norway, Sweden, just a few? Let us have a few from Denmark. Do you mind sending us a few people?" He added, "[w]e always take people from Somalia, places that are a disaster, right? Filthy, dirty, disgusting, ridden with crime."[145]

135.      These recent statements reflect a continuation of the President's longstanding racist and discriminatory rhetoric—expressed during his current term, his first administration, and his campaigns—directed against immigrants from non-white, non-European countries.

136.     During his first term, President Trump repeatedly denigrated immigrants from TPS-designated countries. Most notoriously, he referred to TPS-designated countries as "shithole" countries in a conversation with legislators about TPS, saying, "[w]hy do we need more Haitians?" He asked officials to "[t]ake them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway."[146]

---

[143] Daniel Lippman, *Trump's Diplomatic Learning Curve: Time Zones, 'Nambia' and 'Nipple'*, POLITICO, (Aug. 13, 2018) (https://www.politico.com/story/2018/08/13/trump-world-knowledge-diplomatic-774801.

[144] Cristina Maza, *Trump Fakes Indian Accent When Speaking About Indian Prime Minister Modi, Report Claims,* Newsweek (Jan. 22, 2018), https://www.newsweek.com/trump-racist-president-imitates-modis-indian-accent-meetings-787071.

[145] Heller, *supra* note 96.

[146] Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

137.    On his recent campaign trail, he repeatedly contrasted "nice countries, like Denmark, Switzerland, Norway" with "unbelievable places…countries that are a disaster," signaling a preference for white immigrants while disparaging Black and non-white nations as inherently undesirable, criminal, and filthy.[147]

138.    These longstanding racist views persist in the President's current term. On December 2, 2025, the President declared at a cabinet meeting, "We're going to go the wrong way if we keep taking in garbage into our country," specifically referring to individuals from Somalia, a TPS-designated country.[148] He continued, "I don't want them in our country. I'll be honest with you. Somebody will say, 'Oh, that's not politically correct.' I don't care. I don't want them in our country. Their country is no good for a reason. Their country stinks. And we don't want them in our country. I could say that about other countries too . . . We don't want them."[149] He disparaged Somalia further, claiming, "With Somalia, which is barely a country…they have no anything. They just run around killing each other. There's no structure."[150] This language demonstrates not only racism but also animus toward TPS holders on account of their nationality and as members of a politically unpopular group.

139.    Yet, despite denigrating TPS-designated countries for their lack of infrastructure and stability, the President has simultaneously condemned efforts to address the resulting humanitarian crises. At the United Nations General Assembly, he denounced international

[147] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[148] Max Matza & James FitzGerald, *Trump says he does not want Somalis in US as ICE plans Minnesota operation,* BBC News (Dec. 3, 2025), https://www.bbc.com/news/articles/c208x9v68w3o

[149] Associated Press, *WATCH: Trump Says He Doesn't Want Somali Migrants in the U.S., Calls People 'Garbage'*, PBS News (Dec. 2, 2025), https://www.pbs.org/newshour/politics/watch-trump-says-he-doesnt-want-somali-migrants-in-the-u-s-calls-people-garbage.

[150] Matza & FitzGerald, *supra* note 148.

humanitarian aid for migrants as "funding an assault on Western countries and their borders," warning that "immigration and their suicidal energy ideas will be the death of Western Europe."[151]

140. Just days before his attack on Somali immigrants, and in the wake of the November 26, 2025 shooting of two National Guard members in Washington, D.C., in which the suspect is an Afghan national who had been granted asylum by the Trump Administration, President Trump posted on social media that he would "permanently pause migration from all Third World Countries," remove noncitizens deemed not to be a "net asset" to the United States, terminate federal benefits for noncitizens, "denaturalize migrants who undermine domestic tranquility," and deport noncitizen he described as incompatible with "Western Civilization,"[152] concluding that "[o]nly REVERSE MIGRATION can fully cure this situation."[153]

141. The President has consistently portrayed non-white, non-European immigrants as incompatible with Western civilization, a view he has expressed throughout his campaigns and first term. While campaigning in 2023, he repeatedly asserted that non-white, non-European, and non-Christian immigrants were "poisoning the blood of our country."[154]

142. At the Republican Convention speech in July 2024, President Trump escalated his rhetoric, declaring: "The greatest invasion in history is taking place right here in our country.

---

[151] *Trump Speaks at U.N.*, rev, https://www.rev.com/transcripts/trump-speaks-at-un (last visited Dec. 18, 2025).

[152] Robert Tait, *Trump Vows to Slam America's Doors Shut as He Heaps Scorn on Immigrants*, The Guardian (Dec. 7, 2025), https://www.theguardian.com/us-news/2025/dec/07/trump-immigration-ice.

[153] Josh Boak, *Trump Says He Wants to 'Permanently Pause' Migration to the U.S. from Poorer Countries*, PBS (Nov. 28, 2025), https://www.pbs.org/newshour/politics/trump-says-he-wants-to-permanently-pause-migration-to-the-u-s-from-poorer-countries.

[154] *Donald Trump on Illegal Immigrants 'Poisoning the Blood of Our Country''*, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15); Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, YouTube (Sep. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45).

They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East. . . . They're coming at levels that we've never seen before. . . . and [the Biden] administration does absolutely nothing to stop them."[155]

143. At a rally in Arizona in August of 2024, President Trump described immigrants as "mak[ing] our criminals look like the nicest people on earth. That's how tough they are. They come from the Middle East. They come from areas that we're fighting. They come from enemy terrain."[156]

144. A few months later, at a campaign event in October 2024, President Trump stated: "They're coming from the Congo, . . . from Asia, from the Middle East, they're coming out of Yemen . . . A lot of people coming out of Yemen. And they're known terrorists . . . and they are released into our country."[157]

145. Also in October 2024, during an interview with conservative radio host Hugh Hewitt, the President claimed that non-white, non-European immigrants were genetically inferior, asserting that many had "murdered far more than one person" and that "it's in their genes."[158]

---

[155] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. Times (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.
[156] *Speech: Donald Trump Holds a Political Rally in Glendale, Arizona - August 23, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-glendale-arizona-august-23-2024/#90.
[157] *Trump directs serious accusations against Yemeni immigrants in America*, Yemen Press Agency (Oct. 6, 2024) https://en.ypagency.net/337276
[158] Jake Traylor & Alana Satlin, *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC News (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.

146.    By contrast, when addressing a predominantly white audience at a Minnesota campaign rally, he described them as having "good genes," highlighting a stark racial distinction.[159]

147.    President Trump has used overtly dehumanizing rhetoric to describe non-white, non-European immigrants as "animals,"[160] and compared them to snakes that will bite and kill anyone foolish enough to shelter them.[161] At a March 2024 rally, he questioned whether undocumented immigrants could be considered human, stating, "I don't know if you call them people. . . . In some cases they're not people, in my opinion, but I'm not allowed to say that."[162]

148.    He has specifically targeted non-white TPS holders, repeatedly spreading false claims that Haitian TPS recipients in Springfield, Ohio, were "eating the dogs," "eating the cats," and "eating the pets of the people that live there."[163] He further labeled Haitian TPS holders as "illegal migrant[s]" who "descended upon a town of 58,000 people, destroying their way of

---

[159] *Id.*

[160] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* Politifact (May 17, 2018), https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[161] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John T. Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, Roll Call (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. . . .And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.]").

[162] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, Missouri Independent (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/.

[163] *See, e.g.*, *Simulcast - ABC News Presidential Debate*, C-SPAN (Sep. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 (at approximately 29:26).

life."[164] Following these statements, Springfield experienced multiple bomb threats against hospitals, government buildings, and schools.[165]

149.    In stark contrast, President Trump has consistently favored immigrant populations perceived as white. He has repeatedly retweeted white nationalists, such as @WhiteGenocideTM, and dined publicly with self-declared white supremacists, amplifying their racist views.[166]

150.    On February 7, 2025, President Trump signed Executive Order No. 14204, directing Secretary Noem and others to prioritize humanitarian relief, including admission and resettlement through the U.S. Refugee Admissions Program, for Afrikaners in South Africa—remarkably, on the grounds that they are "victims of unjust racial discrimination."[167] The presidential determination for refugee admissions in 2025 explicitly provides only 7500 refugee slots for white Afrikaners (down from 125k slots for refugees from across the world the prior year).[168]

---

[164] Sam Levine, *'They've Destroyed the Place': Trump Repeats Racist, Anti-immigrant Lies*, The Guardian (Sep. 13, 2024https://www.theguardian.com/us-news/2024/sep/13/trump-repeats-lies-haitian-immigrants; *see also* Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed'*, NewsNation (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (at approximately 12:45, "Springfield is such a beautiful place. Have you seen what's happened to it? It's been overrun. You can't do that to people. . . . I'd revoke [TPS], and I'd bring [the migrants] back to their country.").

[165] Edward Helmore, *More Bomb Threats Hit Springfield, Ohio, After Trump Elevates False Claims About Haitians*, The Guardian (Sep. 14, 2024), https://www.theguardian.com/us-news/2024/sep/14/more-bomb-threats-hit-springfield-ohio-after-trump-elevates-false-claims-about-haitians.

[166] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC News (Jan. 22, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *OPINION: Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?*, USA Today (Sep. 23, 2024), https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

[167] Exec. Order No. 14204, 90 Fed. Reg. 9,497, 9,497 (Feb. 12, 2025).

[168] Presidential Determination on Refugee Admissions for Fiscal Year 2026, 90 Fed. Reg. 49,005 (Oct. 31, 2025).

**Statements of Trump Surrogates Against Non-White, Non-European Immigrants and TPS Holders**

151. Like President Trump, senior officials who influence DHS's TPS decision-making have acted out of blatant animus. Racial hostility, as well as discriminatory animus against Burmese nationals, nationals from other countries, and TPS holders as a group, drove them to interfere in and manipulate the TPS process, deliberately pushing for termination and stripping protections from vulnerable immigrant populations.

152. For example, Vice President Vance has repeatedly amplified baseless rumors that Haitian immigrants were eating pets. With full knowledge of the lack of any evidence, he openly admitted that he was willing to manufacture a story about Haitian migrants to manipulate the media and public perception, declaring that if "I have to create stories" about Haitian migrants "so that the American media actually pays attention to the suffering of the American people, then that's what I'm going to do."[169]

153. Additionally, Vice President Vance attacked TPS holders by invoking longstanding stereotypes of immigrants as disease carriers, claiming they were driving "a massive rise in communicable diseases, rent prices, car insurance rates, and crime." [170] He falsely asserted that Haitian TPS holders were responsible for increases in TB and HIV.[171]

154. Stephen Miller, Deputy Chief of Staff and principal architect of the Administration's immigration agenda, has made the restriction of immigration—particularly

---

[169] Kit Maher & Chris Boyette, *JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets*, CNN (Sep. 15, 2024), https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv.

[170] J.D. Vance. (@JDVance), X (Sep. 13, 2024, at 9:25 ET), https://x.com/JDVance/status/1834584115825226087?s=20*; see also* Video posted by WCNC (@WCNC), YouTube, *JD Vance Has Heated Exchange Over Claims Migrants Are Eating Pets in Ohio,* (Sep. 11, 2024), https://www.youtube.com/watch?v=LqjLoSNkyDs.

[171] JD Vance (@JDVance), X (Sep. 10, 2024, at 9:58 ET), https://x.com/jdvance/status/1833505359513661762?s=46.

from non-white countries—his defining priority.[172] As the President's senior advisor during his first term, Miller repeatedly pressured DHS officials to terminate TPS. He has openly embraced white nationalist ideology, including promoting white nationalist literature, pushing racist immigration narratives to the media, and praising historical immigration laws that imposed racially discriminatory quotas under the guise of defending "Western civilization."[173]

155.    For years, Miller has advanced the racist premise that non-white immigrants are inherently violent and uniquely dangerous to Americans.[174] In November 2025, following the shooting of two National Guard members in Washington, D.C. by an Afghan asylum seeker—whose status had been granted by the Trump Administration itself—Miller exploited the tragedy to promote collective racial blame. Rejecting calls to protect Afghans who assisted the United States, he asserted that "[a]t scale, migrants and their descendants recreate the conditions, and terrors, of their broken homelands,"[175] endorsing a core white nationalist belief that non-white populations are permanently violent and incompatible with American society.

---

[172] Lauren Villagran, *Who Is Stephen Miller, Architect of Donald Trump's Mass Deportation Plans?*, USA Today (Nov. 25, 2024), https://www.usatoday.com/story/news/politics/elections/2024/11/21/stephen-miller-trumps-mass-deportation-architect/76260908007/; Elliot Spagat, *Trump Picks a Pair of Experienced Advisers Motivated to Carry Out His Immigration Crackdown*, Associated Press (Nov. 12, 2024), https://www.usatoday.com/story/news/politics/elections/2024/11/21/stephen-miller-trumps-mass-deportation-architect/76260908007/; Elliott Spagat, *Trump Picks a pair of Experienced Advisers Motivated to Carry Out His Immigration Crackdown*, Associated Press (Nov. 12, 2024), https://apnews.com/article/immigration-deportation-homan-miller-trump-border-abb1a75497d11c978c369cb20016eecb.

[173] Adam Serwer, *Trump's White-Nationalist Vanguard*, The Atlantic (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . show Miller praising racist immigration restrictions from a century ago, while bitterly lamenting the law that repealed them.").

[174] Nicole Narea, *Stephen Miller Sought to Link Immigrants to Crime and Terrorism in Private Emails to Breitbart*, VOX (Nov. 25, 2019), https://www.vox.com/policy-and-politics/2019/11/12/20961458/stephen-miller-white-supremacist-anti-immigrant-emails-breitbart-southern-poverty-law-center.

[175] Tait, *supra* note 152.

**Other Evidence of Bare Animus Towards TPS Holders**

156. The multiple disparaging statements that Trump Administration officials have made about TPS holders show that their efforts to end TPS protections go beyond program hostility. Instead, the Administration has displayed bare animus towards TPS holders themselves.

157. The Trump Administration's animus towards TPS holders has expressed not just in word but also in deed. For example, the President's June 4, 2025, Travel Ban suspended entry of nationals of twelve countries, six of which are TPS countries, including Burma, Afghanistan, Haiti, Somalia, Sudan, and Yemen.[176]

158. On December 2, 2025, USCIS issued a memorandum directing officers to freeze pending benefit requests from nationals of the Travel Ban countries and to re-review already-approved benefits, thus preventing TPS holders with pending immigration applications from obtaining permanent or otherwise stable status.[177]

159. On December 16, 2025, President Trump issued Proclamation 10988, re-asserting the prior Travel Ban and expanding the number of countries subjected to full or partial entry restrictions, effective January 1, 2026. Eight of the thirteen countries whose TPS designation this Administration has stripped are covered by the extended Travel Ban.

160. On January 1, 2026, USCIS issued a new memorandum expanding the freeze on pending benefits requests to nationals of Travel Ban countries, including Burma and several other countries whose nationals in the United States have been beneficiaries of TPS, including Afghanistan, Haiti, Somalia, South Sudan, Sudan, Syria, Venezuela, and Yemen. Again, TPS

---

[176] Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 Fed. Reg. 24,497 (Jun. 10, 2025).
[177] USCIS Memorandum, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High Risk Countries, PM 602-0192 (Dec. 2, 2025).

holders already in the United States with pending immigration applications would be unable to change or adjust status.[178]

161.    On January 21, 2026, the Department of State paused the issuance of all immigrant visas to applicants who are nationals of certain countries.[179] Thirteen out of seventeen countries with TPS designations in effect on January 20, 2025, are subject to the pause.

162.    Having terminated TPS for Venezuela, Haiti, Afghanistan, Cameroon, Nepal, Honduras, Nicaragua, Syria, South Sudan, and Burma, in the ensuing months, Secretary Noem continued the campaign to terminate TPS for countries experiencing devastating crises: Ethiopia, Somalia, and Yemen.

163.    In the wake of the Supreme Court's June 25, 2026, decision overturning postponement orders in *Doe v. Mullin*, challenging the termination of TPS for Syrians, and *Miot v. Trump*, challenging the termination of TPS for Haitians, the Administration has continued its attacks on TPS holders. Although in both cases a mandate is expected to issue on July 27, 2026, the Department of Justice took the time to ask the appellate courts to issue immediate stays in advance of the mandate issuing so as to deprive these TPS holders of a mere two to three weeks of work authorization, income, and protection from detention and deportation. *See* Appellants' Renewed Stay Motion, *Miot v. Trump*, No. 26-5050, (D.C. Cir. July 1, 2026) ECF No. 2181436; Defendant-Appellants' Renewed Motion for a Stay, *Doe v. Mullin*, No. 25-2995, (2d Cir. July 1, 2026) ECF No. 57.

---

[178] USCIS Memorandum, Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries, PM-602-0194 (Jan. 1, 2026).
[179] Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance, Dept. of State (Feb. 2, 2026), https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-processing-updates-for-nationalities-at-high-risk-of-public-benefits-usage.html.

164. Taken together with a series of denigrating and inflammatory statements against TPS holders, these actions—terminating more than a dozen countries whose countries of origin remain in dire crisis; providing just 60 days' notice of termination for people who have lived in lawfully in the United States for years; freezing the adjudication of many TPS holders' applications for other immigration statuses; and expending extensive resources to cut protective status short by a matter of days—evince a desire to harm a politically unpopular group and cannot be explained by policy preferences or disagreement with the TPS program or its implementation.

## HARMS CAUSED BY DEFENDANTS' TERMINATION OF TPS FOR BURMA

**Harms to TPS Holders and Their Families**

165. Defendants' decision to terminate TPS for Burma would strip nearly 4,000 Burmese nationals of lawful status overnight and prevent over 236 Burmese nationals with pending applications from securing further protection. Many have lived in the United States for years, raising and caring for family members who are U.S. citizens or permanent residents, and are deeply embedded in their communities. Should Defendants' biased and unlawful termination stand, the resulting harm will be immediate, profound, and far-reaching.

166. The loss of TPS exposes Burmese TPS holders to the constant and imminent threat of detention and deportation. They are forced into an impossible choice: return to a country in dire humanitarian crisis under the rule of a violent military junta, remain in the United States without lawful immigration status and live in perpetual fear of detention and deportation, or uproot themselves once again to find refuge in a third country, if they have the means to do so. None of these options offer safety, dignity, or stability.

167.     Some TPS holders may currently be seeking other legal avenues to remain in this country (such as asylum, adjustment of status, or employment-based nonimmigrant status). However, due to the years-long asylum backlog, affirmative asylum applications remain long pending and do not guarantee protection from either detention or deportation in the interim.

168.     In addition, as of December 2, 2025, the U.S. Citizenship and Immigration Services announced a pause on adjudication of all pending affirmative asylum applications for nationals of any country, as well as a pause on adjudication of all USCIS immigration benefit applications filed by individuals from Burma and 18 other countries,[180] throwing into question when and how TPS holders from Burma who otherwise qualify for asylum will be able to obtain asylum, and when Burmese TPS holders who have applied for other benefits will have those applications adjudicated. USCIS expressly identifies nationality in a country subject to the administration's re-entry ban—here, Burma—as a "significant negative factor" when adjudicating discretionary benefits applications.[181] Accordingly, Burmese TPS holders with pending discretionary applications, including applications for adjustment of status, face a substantially heightened risk that USCIS will deny those applications.[182]

169.     Defendants' actions also eliminate viable pathways to lawful status for many TPS holders. Although some are pursuing asylum or other forms of relief, those processes often take

---

[180] Policy Memorandum from U.S. Citizenship and Immigration Services, Hold and Review of all *Pending Asylum Applications and all USCIS Benefit Applications Fild by Aliens from High-Risk Countries* (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf; note that just days later, the Trump administration added 20 additional countries to the Travel Ban, *see supra* ¶¶ 68, 159.

[181] Policy Alert, U.S. Citizenship & Immigr. Servs., Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits, PA-2025-06 (Nov. 7, 2025), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20251127-Discretion.pdf

[182] A recent decision in a separate lawsuit has set aside the USCIS adjudication pause policy. *Dorcas Int'l Inst. of Rhode Island v. U.S. Citizenship & Immigr. Servs.*, No. 26-CV-132-JJM-PAS, 2026 WL 1622708, at *57 (D.R.I. June 5, 2026), judgment entered, No. 26-CV-132-JJM-PAS, 2026 WL 1695954 (D.R.I. June 11, 2026).

years and often provide no protection from detention or removal while applications remain pending. That uncertainty has been compounded by USCIS's December 2, 2025, announcement pausing adjudication of affirmative benefit applications filed by Burmese nationals, effectively freezing access to lawful status for many who qualify.[183] The government has withdrawn protection from individuals who have complied with every requirement asked of them.

170.    TPS exists precisely to protect this population—individuals who cannot safely return home but may not fit the narrow technical requirements of asylum. The loss of TPS exposes them to detention and deportation and, in many cases, permanently forecloses immigration options that require lawful status as a prerequisite.[184] Compounding this harm, a recent Presidential Proclamation categorically banning Burmese nationals from reentering the United States means that most TPS holders now face the prospect of permanent exile if deported.[185]

171.    Even TPS holders who may be entitled to a fear-based form of immigration relief—such as withholding of removal or protection pursuant to the Convention Against Torture—are not safe and face the prospect of deportation to unsafe third countries. At the same time the government stripped Burmese TPS holders of any affirmative path to asylum by freezing all asylum adjudications for Burmese nationals—including long-pending applications— it has also pursued removals to third countries without meaningful notice or a genuine

---

[183] Individuals can still obtain some forms of immigration relief from immigration judges in defensive removal proceedings, but they face detention and possible deportation to third countries while their claims are evaluated.
[184] *See Temporary Protected Status: An Overview*, American Immigration Council (Sep. 2025), https://www.americanimmigrationcouncil.org/wp-content/uploads/2017/08/Temporary-Protected-Status-An-Overview-0925.pdf (noting some TPS recipients may be eligible to adjust status).
[185] 8 U.S.C. §§ 1182(a)(9)(A)(ii), (B)(i)(II).

opportunity to present protection claims—a practice the Supreme Court has allowed to proceed while litigation continues.[186]

172.    Terminating TPS will also strip TPS holders of their ability to work legally. Many will lose their jobs immediately, plunging families into financial crisis. Without stable employment, they face eviction, loss of housing, and the collapse of years of hard-earned stability. Many TPS holders also face the imminent loss of their driver's licenses and or state-identification in many states, cutting off mobility, freedom of movement, and basic participation in daily life.[187] TPS holders and their families also risk losing health insurance, access to medical care, and Social Security benefits they have earned through years of work. Because the Secretary's termination goes into effect so quickly, TPS holders have been afforded almost no time to pursue alternative relief. The human cost extends far beyond economic harm. Termination of TPS places families on the brink of separation. Many Burmese TPS holders live in mixed-status families with U.S. citizen children, spouses, and elderly parents. They now face an agonizing choice: leave their children behind in the United States or uproot them to a country devastated by violence, repression, and humanitarian collapse—a place many of those children have never lived or even visited.

173.    Returning to Burma is not merely unsafe—it is life-threatening. The military junta has revoked and cancelled passports of its citizens abroad, denied citizenship to ethnic and religious minorities, and targeted perceived opponents for arrest, torture, and disappearance.[188]

---

[186] *Dep't of Homeland Sec. v. D.V.D.*, 145 S.Ct. 2153, 2155 (2025) (Sotomayor, J. dissenting). TPS holders now face the terrifying possibility of being sent to countries where they have no ties and no protection—or returned directly to danger.

[187] *See Driver's Licenses*, Nat'l Immig. L. Ctr. (Mar. 2023), https://www.nilc.org/work/drivers-licenses/.

[188] *See* Will Jackson, *Myanmar Junta Revoking Citizenship of Actors, Singers and Other Celebrities*, ABC (Sep. 22, 2025), https://www.abc.net.au/news/2025-09-23/myanmar-celebrities-left-stateless-after-criticising-junta/105787574.

TPS holders who have been involved in political activism, or who belong to minority ethnic and religious communities, face a real and imminent risk of detention, torture, and death if they are forced to return.[189] Some have already experienced the current regime detaining and torturing their family members or friends because of their political advocacy.[190]

174. Finally, the ever-present threat of deportation inflicts severe emotional and psychological harm on TPS holders and their loved ones. Since the termination was announced, TPS holders from Burma have reported heightened anxiety, trauma, insomnia, and depression—harms that will only intensify as the effective date approaches.

175. These devastating injuries are compounded by a fundamental constitutional violation. TPS holders have been subjected to an agency action motivated by racial, ethnic, or national-origin discrimination. The law does not permit the government to dismantle lives, tear apart families, and expose people to grave danger based on who they are or where they are from.

**Harms to the Named Plaintiffs**

176. Aung Doe is 51 and a Burmese TPS holder living in Chicago, Illinois. He serves as a religious leader in his community, teaching courses, leading ceremonies, and providing spiritual guidance. TPS provides his only protection from deportation and his sole means to maintain lawful status while his pending religious worker visa application is adjudicated.

177. If the TPS termination goes into effect, Aung will lose his work authorization and the ability to maintain lawful status, putting his pending visa at risk and exposing him to possible immigration detention and deportation. He cannot return to Burma because he publicly criticized the military regime and led fundraising efforts for disaster relief—activities the military views as

---

[189] Lorcan Lovett, *'A Constant Fear': Myanmar Nationals Face Imprisonment Back Home as US Ends Protected Status*, The Guardian (Nov. 27, 2025), https://www.theguardian.com/world/2025/nov/28/usa-terminating-myanmar-protected-status-deportation-fears.
[190] *Id.*

69

oppositional. Burmese authorities have already detained returning religious leaders, and Aung would face immediate detention, persecution, torture, and death.

178. TPS termination would also devastate Aung's community in Chicago, depriving them of spiritual guidance, teachings, and leadership for critical life events such as weddings, births, and funerals. Losing their religious leader would destabilize the community and strip members of the guidance they rely on for both daily life and major life events. Defendants' two-month notice forces Aung to live in constant fear for his future and the safety of his community while leaving him no time to prepare or seek alternatives.

179. Nina Doe is 33 and a Burmese TPS holder living in Kansas with her U.S.-citizen husband and 13-month-old daughter. She came to the United States on a Fulbright scholarship and earned a Master's degree in Social Work in 2023. A trained doctor, she spent years serving conflict-affected populations in Burma, including Rohingya communities, providing medical care, psychological support, and training local staff in regions devastated by violence and persecution.

180. TPS allows Nina to work full-time as a caseworker for refugees at Catholic Charities in Kansas City, supporting survivors of war, sexual violence, and persecution. Losing TPS would strip her of work authorization, destroying her family's financial and emotional stability and abruptly ending her ability to serve both the refugees she works with professionally and the vulnerable populations she supports through volunteer efforts. These communities would lose a trusted caregiver and advocate.

181. Without TPS, Nina would face forced separation from her husband and infant daughter—or be compelled to take her child to Burma, a country where she risks detention, torture, sexual violence, or death. The Burmese military has already surveilled and threatened her

family and frozen her bank account, signaling that she is known and targeted. She cannot safely bring her daughter, and leaving her behind would be equally devastating, forcing her to choose between remaining unlawfully to stay with her child without the ability to support her or leaving her daughter behind to grow up without her mother.

182.    Khin Thet Doe is 32 and a Burmese TPS holder living in Southern Illinois with her husband. She is ethnically Karen and Chin—minority groups persecuted in Burma—and is a practicing Christian. She holds a master's degree in economics and works for a nonprofit coordinating international development and healthcare programs, including work related to Burma. TPS is her only protection from deportation and her sole authorization to work. She also financially supports her elderly parents, who rely entirely on her income for basic survival.

183.    If TPS ends, Khin Thet will immediately lose her ability to work, cutting off the only means of supporting herself and her parents. She will face forced separation from her spouse, with whom she has built a life in Illinois, and will lose any realistic opportunity to pursue lawful status from within the United States.

184.    Defendants' termination of TPS would expose Khin Thet to grave danger. She participated in pro-democracy protests after the 2021 coup, maintains close associations with activists detained by the military, and bears a visible tattoo symbolizing resistance to the regime—markings the Burmese authorities use to identify, detain, and torture dissidents. She knows of individuals arrested upon return to Burma based on political activity conducted abroad. If forced to return, she faces a serious risk of detention, torture, or death.

185.    Defendants' two-month notice has caused her to endure severe fear and emotional distress, leaving her without time to prepare or seek alternatives, and leaves her in constant fear for her future and her family's survival.

71

186. Thura Doe is 28 and a Burmese TPS holder living in Boston, Massachusetts. He is an early childhood learning specialist at Boston Public Schools, where he supports pre-K and kindergarten students, including multilingual learners and students with learning disabilities. He has worked in early childhood education since 2021 and has devoted years of training and experience to reach his current role. He has also volunteered extensively in his community, earning recognition for his service.

187. TPS is the only lawful status he holds, keeping him safe from immigration detention and the threat of deportation. If Defendants end TPS, he will be at risk of ICE detention given his lack of status.

188. He cannot safely return to Burma. He fears immediate detention, indefinite imprisonment, or extortion by the military for information about her family or political associates. His family's ties to the NLD political party put them at risk of arrest and retaliation. Thura has spoken out in support of democracy and against the military junta, and he is openly bisexual, exposing him to further danger under Burma's criminalization of homosexuality. His friends who have returned to Burma have been detained, restricted, or remain in detention.

189. The threat of losing TPS has already taken a severe toll on Thura's mental and physical health. He struggles to eat or sleep, has lost weight, and cannot fully focus or engage at work or in his personal life because of constant anxiety and fear. If Thura loses his TPS and is detained, this would also devastate the students and educators he serves, depriving classrooms of essential support for vulnerable students, and disrupting education for children who rely on his guidance and assistance. Defendants' two-month notice forces Thura to live in constant fear for his safety, his students, and his family, leaving him no time to prepare or seek alternatives.

190. Maung Doe is 28 and a Burmese TPS holder living in Iowa City, Iowa. He works in IT support at a university and is active in the local meditation and Buddhist community. He first came to the United States in 2016 on an F-1 student visa, earning his bachelor's degree in Kentucky and a master's degree in Iowa. He became involved in Burmese student organizing and human rights advocacy after the 2021 military coup and continues to contribute to these efforts as a researcher.

191. TPS is Maung's only lawful immigration status and only protection from being placed in detention and deportation proceedings. If he loses TPS and is detained, he would likely lose his job, ending his career prospects after 8 years of higher education and professional investment in the United States.

192. Maung cannot safely return to Burma. His family, ethnically Nepali, faces routine discrimination under the military regime, and because of their darker skin, the military assumes they are Rohingya, putting them at risk of persecution. His parents periodically flee to Thailand for safety. Maung personally faces retaliation due to his political activism and prior public association with advocacy groups. The Burmese military surveils and targets those connected to political organizing, putting Maung at risk of detention, torture, or worse if he returns.

193. Defendants' two-month notice has already caused Maung severe fear and emotional distress. He lives in constant anxiety about his future, his ability to support himself, and the safety of his family. He has no time to prepare or seek alternatives.

194. Chu Let Doe is a Burmese TPS holder living in Durham, North Carolina with her two children. She works as a chef and is the sole provider for her children, as well as for her parents in Burma. She has a long history of political advocacy for religious minorities and youth in Burma. When the military coup occurred in 2021, soldiers immediately targeted her and her

family. Dozens of police came to her home searching for them, and the U.S. Embassy had to help her secure a safe house to hide from the military junta. Recognizing the ongoing danger, she fled Burma in March 2021 and came to the United States through humanitarian parole.

195.    TPS is Chu's only lawful immigration status, shielding her from deportation and authorizing her to work. Losing TPS could strip Chu Let of her livelihood if she is detained, preventing her from supporting her children and family abroad, and exposing her to detention. She cannot safely return to Burma, where the military continues to target activists like her, and her family there has been forced to hide and sell their businesses.

196.    Chu Let faces an impossible choice: take her children to a country where their lives would be in danger or leave them in the United States without her care and guidance, in turn putting their safety, well-being, and education at serious risk. TPS termination would shatter her family's stability and deprive her children of their primary caregiver. It could also strip her of the means to support relatives in Burma who rely on her financially.

197.    Defendants' two-month notice forces Chu Let to live in constant fear for her life and her children's well-being while leaving her no time to prepare or seek alternatives.

198.    All Plaintiffs are potentially targets for immigration detention here in the United States prior to future removal.

199.    All Plaintiffs have expressed deep fear and anxiety over forcibly returning to Burma given the continuing violence after the coup there, as well as given the potential for being arrested and imprisoned by the military based on their actual or perceived political involvement.

200.    TPS for Burmese nationals serves the purpose intended by Congress—providing nationality-based humanitarian relief regardless of whether individuals meet the more stringent eligibility requirements for other forms of humanitarian protection, such as asylum. Immigrants,

74

including TPS holders, are integral to the social and economic fabric of the United States and, as the named Plaintiffs exemplify, contribute to their communities and this country in countless ways. The length of time TPS holders have lived in the United States and the deep ties they have built with families and communities make the loss of legal status especially devastating and, equally important, highlight the real human cost of Defendants' unlawful actions.

## CLASS ACTION ALLEGATIONS

201. This case is brought as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of Burmese nationals (or individuals having no nationality who last habitually resided in Burma) who had TPS status or a pending application for TPS status on November 25, 2025.

202. The proposed class is sufficiently numerous so as to make joinder impracticable. Based on Defendants' own accounting in the Federal Register notice, the class consists of 3,969 TPS holders from Burma, and 236 pending applicants.

203. There are common questions of law and fact affecting the members of the class, including (a) whether Defendants' decision to terminate TPS for Burmese nationals was preordained, without regard to country conditions and prior to consulting with other appropriate agencies in violation of the TPS statute; (b) whether the TPS statute authorizes the Secretary to consider national interest as a sole justification to terminate TPS; (c) whether Defendants' decision to terminate TPS was impermissibly motivated by animus based on race, ethnicity, national origin, or membership in a politically unpopular group; (d) whether the termination caused a deprivation of a liberty and/or property interest without due process of law; and (e) whether the purported termination is *ultra vires* because the power over termination decisions continues to reside with the Attorney General rather than the DHS Secretary.

204.    The claims of Aung, Nina, Khin Thet, Thura, Chu Let, and Maung Doe are typical of those of the class with respect to the legality of Defendants' actions. Plaintiffs will fairly and adequately protect the interests of the class. None of the named Plaintiffs are aware of any conflicts that would preclude fair and adequate representation.

205.    Proposed class counsel has substantial experience litigating both cases involving challenges to federal immigration policies and class actions.

206.    Defendants' illegal termination of TPS for Burma applies to the entire class, making class-wide relief appropriate.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### (Administrative Procedure Act)

207.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

208.    The Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, ensures that executive agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

209.    The APA provides that a Court "shall—hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). The right of review under the APA includes a right to judicial review of actions that "fail[] to meet statutory, procedural, or constitutional requirements." *See Widakuswara v. Lake*, 773 F.Supp.3d 46, 56

76

(S.D.N.Y. 2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971); *accord FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009)

210. Defendants' termination of the TPS designation for Burma is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

211. Defendants' termination of the TPS designation for Burma violates the APA because, among other things:

a. Defendants' decision to terminate TPS for Burma occurred prior to the requisite consultation with other appropriate agencies as required by 8 U.S.C. § 1245a(b)(3);

b. Defendants' decision to terminate was not based on an objective review of country conditions, as required by 8 U.S.C. § 1254a(b)(3). Rather, it was based on a discriminatory effort to harm TPS holders based on their race, ethnicity, national origin, and status as TPS beneficiaries; a consideration of extra-statutory factors; and a selective review of country conditions designed to identify only improvements and ignore entire categories of conditions that did not support Defendant's preordained end goal to terminate TPS;

c. The research, consultation, and review process leading up to the termination of Burma's TPS designation deviated dramatically from past practice without explanation;

d. To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute;

e. Defendants relied on statutorily impermissible factors to justify their decision to terminate;

77

f.  Defendants' decision to terminate occurred under circumstances and a timeline that reflect that they were pretextual and motivated by animus against Burmese TPS holders based on their perceived race, national origin, ethnicity, and status as TPS holders;

212.  Plaintiffs will suffer irreparable injury from the unlawful termination.

213.  Defendants' decision to terminate Burma's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

## SECOND CLAIM
### (Administrative Procedure Act)

214.  All the foregoing allegations are repeated and realleged as though fully set forth herein.

215.  To engage in appropriate decision-making, an agency must ordinarily "display awareness that it *is* changing position." *Fox Television Stations, Inc.*, 556 U.S. at 515 (emphasis in original). Agencies "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id*. And the APA requires a "reasoned explanation. . . for disregarding facts and circumstances that underlay . . . the prior policy." *Id*. at 515-16.

216.  Defendants' termination of the TPS designation for Burma with only 60-days' notice was arbitrary, capricious, and contrary to law in violation of the APA because it represented an unacknowledged and unexplained departure from decades of decision-making practices and ordinary procedures.

217.  Plaintiffs will suffer irreparable injury from the unlawful terminations.

**THIRD CLAIM**
**(Fifth Amendment of the U.S. Constitution—Equal Protection)**

218.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

219.    The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that is motivated in part by a discriminatory intent or purpose based on race, national origin, or ethnicity. Classifications based these characteristics receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than the protected characteristics. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

220.    Defendants' decision to terminate Burma's TPS designation impermissibly and intentionally discriminates against Plaintiffs because of their race, ethnicity, or national origin.

221.    Defendants' decision to terminate Burma's TPS designation, like its decision to terminate TPS for country after country still experiencing devastating humanitarian conditions, impermissibly and intentionally discriminates against Plaintiffs because of explicit animosity and desire to harm holders of TPS as a group. *See Romer v. Evans*, 517 U.S. 620, 634 ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.") (emphasis in original).

222.    Plaintiffs will suffer irreparable injury resulting from the unlawful termination.

223.    Defendants' termination of Burma's TPS designation must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment's guarantee of equal protection.

79

**FOURTH CLAIM**
**(Fifth Amendment of the U.S. Constitution—Due Process)**

224.     All the foregoing allegations are repeated and incorporated as though fully set forth herein.

225.     The Due Process Clause of the Fifth Amendment applies "to all 'persons' within the United States, including aliens,"[191] and "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests."[192]

226.     Plaintiffs have liberty and property interests in their TPS status and related benefits, including employment authorization and removal protection. Defendants' purported termination of TPS for Burma without following the statutorily mandated requirements for termination deprives Plaintiffs of their liberty and property interests without due process of law.

227.     Plaintiffs will suffer irreparable injury resulting from the unlawful termination.

228.     Defendants' purported termination of Burma's TPS designation must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment's guarantee of due process.

**FIFTH CLAIM**
**(Ultra Vires / Administrative Procedure Act)**

229.     All the foregoing allegations are repeated and incorporated as though fully set forth herein.

230.     The power to terminate TPS designations is assigned by statute to the Attorney General of the United States, *see* 8 U.S.C. § 1254a(b)(3)(B), who has not exercised it to terminate the designation of Burma.

---

[191] *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).
[192] *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

231.    That power was never properly transferred to the Secretary of Homeland Security, and therefore former Secretary Noem's purported March 3, 2026, termination of Burma's TPS designation is void as statutorily *ultra vires* and is contrary to law and in excess of statutory jurisdiction, authority, or limitations in violation of the Administrative Procedure Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

232.    Declare that Defendants' termination of TPS for Burma was *ultra vires,* unlawful under the APA, and unconstitutional under the Due Process Clause of the Fifth Amendment;

233.    Set aside or otherwise vacate the termination of TPS for Burma as beyond Defendants' authority and/or unlawful under the APA;

234.    Postpone or stay the termination of TPS for Burma from taking effect or being put into effect;

235.    Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of TPS for Burma;

236.    Order Defendants to take all steps necessary to ensure that the TPS designation for Burma remains in full force and effect;

237.    Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

238.    Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: July 14, 2026

Respectfully submitted,

ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
*/s/ Phi Nguyen*
Phi Nguyen
Dinesh McCoy
Razeen Zaman
Helen Anne Schutz Lo
Niji Jain
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 922-5932
dmccoy@aaldef.org
pnguyen@aaldef.org
rzaman@aaldef.org
alo@aaldef.org
njain@aaldef.org

THE LAW OFFICES OF JUNE J. HTUN
/s/ *June Htun*
June Htun
3643 West Belmont Avenue
Chicago, Illinois 60618
(773) 362-5000
june@htunlaw.com

INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
/s/ *Guadalupe Aguirre*
Guadalupe Aguirre
Pedro Sepulveda
One Battery Park Plaza, Fl 33
New York, NY 10004
(929) 246-0154
laguirre@refugeerights.org
psepulveda@refugeerights.org

Megan Hauptman
650 Massachusetts Ave NW
Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org

*Counsel for Plaintiffs*