**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| Aung DOE; Nina DOE; Thura DOE; Khin Thet DOE; Chu Let DOE; and Maung DOE, on their own behalf and on behalf of others similarly situated, | |
| *Plaintiffs*, | Case No. 1:25-cv-15483 |
| *– versus –* | Judge Kennelly |
| Markwayne MULLIN, Secretary, United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA, | |
| *Defendants*. | |

**RENEWED MEMORANDUM OF LAW IN SUPPORT OF MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

STATEMENT OF THE RELEVANT FACTS .................................................................... 3

LEGAL STANDARD............................................................................................................ 7

ARGUMENT ........................................................................................................................ 7

    I.     THIS COURT HAS JURISDICTION TO REVIEW PLAINTIFFS' CLAIMS ................ 7

    II.    PLAINTIFFS ARE LIKELY TO SUCCEED BECAUSE TPS TERMINATION AUTHORITY LIES EXCLUSIVELY WITH THE ATTORNEY GENERAL ......................... 8

        A.    The TPS Statute Vests TPS Termination Authority in the Attorney General ................ 9

        B.    The Homeland Security Act Did Not Transfer TPS Termination Authority to the DHS Secretary ................................................................................................................... 10

        C.    Defendants Have Failed to Identify Any Source of Authority to the Contrary ............ 13

        D.    Plaintiffs' *Ultra Vires* Claim Is Reviewable Notwithstanding *Mullin*.......................... 14

    III.    PLAINTIFFS ARE LIKELY TO SUCCEED BECAUSE THEIR DUE PROCESS RIGHTS HAVE BEEN VIOLATED ..................................................................... 16

        A.    The Termination of TPS Implicates Significant Liberty and Property Interests .......... 17

        B.    The Government's Process Was Not Constitutionally Sufficient................................ 20

        C.    Plaintiffs' Procedural Due Process Claim Is Reviewable ........................................... 23

    IV.    THE REMAINING FACTORS OVERWHELMINGLY FAVOR PLAINTIFFS....... 23

CONCLUSION.................................................................................................................... 25

i

**TABLE OF AUTHORITIES**

**Cases**

*Adame v. Holder*, 762 F.3d 667 (7th Cir. 2014) ....................................................................... 20, 21

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) .................................................... 17, 21

*Bell v. Burson*, 402 U.S. 535 (1971) ........................................................................................ 17, 21

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ........................................................... 23

*Block v. Potter*, 631 F.2d 233 (3d Cir. 1980) ................................................................................ 22

*Bridges v. Wixon*, 326 U.S. 135 (1945) ........................................................................................ 19

*Califano v. Sanders*, 430 U.S. 99 (1977) ........................................................................................ 8

*Cervantes v. Holder*, 597 F.3d 229 (4th Cir. 2010) ..................................................................... 13

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .............................................................................. 9

*City of Chicago v. Noem*, No. 25 CV 12765, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025) .......... 9

*City of Evanston v. Barr*, 412 F. Supp. 3d 873 (N.D. Ill. 2019) .................................................. 13

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) .................................................... 19, 20

*Confederation of Police v. City of Chicago*, 481 F. Supp. 566 (N.D. Ill. 1980) .......................... 17

*Cook Cnty, Illinois v. Wolf*, 962 F.3d 208 (7th Cir. 2020) .............................................................. 7

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020) ............................... 9

*Dia v. Ashcroft*, 353 F.3d 228 (3d Cir. 2003) ............................................................................... 21

*Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860 (7th Cir. 2016) ....................................................... 8

*Jimenez v. Cronen*, 317 F.Supp.3d 626 (D. Mass. 2018) ............................................................. 22

*K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604 (7th Cir. 2024) ..... 7

*Lackey v. Stinnie*, 604 U.S. 192 (2025) ........................................................................................ 16

*Landon v. Plasencia*, 459 U.S. 21 (1982) ..................................................................................... 19

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ...................................................... 2, 9

*Mansor v. USCIS*, 685 F. Supp. 3d 1000 (W.D. Wash. 2023) ...................................................... 18

*Mathews v. Diaz*, 426 U.S. 67 (1976) ........................................................................................... 16

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................................................. 17, 20

*Mejia Rodriguez v. Dep't of Homeland Sec.*, 562 F.3d 1137 (11th Cir. 2009) ............................ 13

*Mullin v. Doe*, Nos. 25-1083 & 25-1084, 2026 WL 1825840 (U.S. June 25, 2026) ............ passim

*Najera v. United States*, 926 F.3d 140 (5th Cir. 2019) ................................................................. 13

*Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817 (D.C. Cir. 2022) ................................................ 13, 14

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
595 U.S. 109 (2022).................................................................................. 9, 13

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................... 24, 25

*Nobles v. Mullin*, 177 F.4th 886 (7th Cir. 2026)............................................... 8

*Noem v. Nat'l TPS All.*, No. 24A1059 (U.S. May 1, 2025) ............................ 13

*Nozzi v. Hous. Auth.*, 806 F.3d 1178 (9th Cir. 2015)................................. 17, 21

*Perry v. Sindermann*, 408 U.S. 593 (1972)................................................. 9, 17

*Portillo-Rendon v. Holder*, 662 F.3d 815 (7th Cir. 2011) .......................... 20, 21

*Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018) ........................ 17, 18

*Reno v. Flores*, 507 U.S. 292 (1993) ............................................................. 17

*Rodas v. Chertoff*, 399 F. Supp. 2d 697 (E.D. Va. 2005) ............................. 18

*Rust v. Sullivan*, 500 U.S. 173 (1991)............................................................. 9

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................. 17

*Steidinger v. Blackstone Med. Servs.*,
No. 25-2398, 2026 WL 2028517 (7th Cir. July 14, 2026) ......................... 15

*Torres-Jurado v. Biden*, 2023 WL 7130898 (S.D.N.Y. Oct. 29, 2023)........... 24

*Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005)................................ 17

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981)......................................... 16

*Valencia v. City of Springfield, Illinois*, 883 F.3d 959 (7th Cir. 2018) ......... 16

*Webster v. Doe*, 486 U.S. 592 (1988) ........................................................ 8, 23

*Webster v. Fall*, 266 U.S. 507 (1925) ........................................................ 2, 15

*Whitman v. United States*, 135 S. Ct. 352 (2014) ......................................... 15

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)............................... 7

*Withrow v. Larkin*, 421 U.S. 35 (1975)......................................................... 23

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) .................................................... 16

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...................................................... 16

**Statutes**

5 U.S.C. § 706(2) ................................................................................ 2, 9, 14, 23

6 U.S.C. § 271(b) ................................................................................... 1, 11, 12

6 U.S.C. § 542(a) .......................................................................................... 12

6 U.S.C. § 557.............................................................................................. 13

8 U.S.C. § 1103(a) ..................................................................................... 1, 11

8 U.S.C. § 1103(g)(1) .................................................................................. 11

8 U.S.C. § 1252(b)(9) ............................................................................................... 23

8 U.S.C. § 1254a ............................................................................................... passim

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ..................................... 10

**Other Authorities**

101 Cong. Rec. H25811 (daily ed. Oct. 25, 1989) ........................................................ 19

Continuation of the National Emergency with Respect to the Situation in and in Relation to
  Burma, 90 Fed. Reg. 9,111 (Feb. 4, 2025) ............................................................... 5

Department of Homeland Security Reorganization Plan, H.R. Doc. No. 108-16 (2002) ............. 12

Designation of Burma (Myanmar) for Temporary Protected Status,
  86 Fed. Reg. 28,132 (May 25, 2021) ...................................................................... 4

Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3,476 (Jan. 21, 2010) ......... 13

Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status Burma,
  89 Fed. Reg. 20,682 (Mar. 25, 2024) ...................................................................... 5

Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status,
  87 Fed. Reg. 58,515 (Sep. 27, 2022) ...................................................................... 5

Extension of the Designation of Honduras under Temporary Protected Status Program,
  68 Fed. Reg. 23,744 (May 5, 2003) ........................................................................ 10

Extension of the Designation of Somalia under the Temporary Protected Status Program,
  67 Fed. Reg. 48950 (July 26, 2002) ....................................................................... 12

H.R. Rep. No. 100-627 (1988) ................................................................................... 3

Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991) ...................................... 10, 12

Termination of Bosnia-Herzegovina Under the Temporary Protected Status Program,
  65 Fed. Reg. 52,789 (Aug. 30, 2000) ..................................................................... 10

Termination of Designation of Kuwait Under Temporary Protected Status Program,
  57 Fed. Reg. 2,930 (Jan. 24, 1992) ....................................................................... 10

Termination of Designation of Lebanon Under Temporary Protected Status Program,
  58 Fed. Reg. 7,582 (Feb. 8, 1993) ........................................................................ 10

Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-
  Month Extension, 63 Fed. Reg. 15,437 (Mar. 31, 1998) .............................................. 10

Termination of the Designation of Burma (Myanmar) for Temporary Protected Status,
  90 Fed. Reg. 53,378 (Nov. 25, 2025) ............................................................. 5, 13, 22

Termination of the Designation of Sudan for Temporary Protected Status,
  82 Fed. Reg. 47,228 (Oct. 11, 2017) ..................................................................... 13

iv

**INTRODUCTION**

Plaintiffs renew their motion for emergency postponement of the effective date of the termination of Burma's Temporary Protected Status ("TPS") designation (the "Termination"). The Court should grant the request because Plaintiffs are likely to succeed on the merits of two new claims that the Supreme Court did not consider, and because the equities overwhelmingly favor relief.

First, the Termination is *ultra vires* because the Attorney General, not the Secretary of Homeland Security, has the exclusive authority to terminate a TPS designation. When Congress established TPS in 1990, it made clear that only the "Attorney General" possesses the authority to terminate a TPS designation. *See* 8 U.S.C. § 1254a(b)(3)(B), (d)(3). For more than a decade, the TPS statute was administered consistent with that statutory delegation, with the Attorney General alone terminating TPS designations. But in 2003, the DHS Secretary began to make TPS designations and terminations. That shift was based on a misreading of the statutory scheme.

The Immigration and Nationality Act (the "INA") tasked the DHS Secretary with "the administration and enforcement of" immigration related laws "except insofar as . . . such laws relate to the powers, functions, and duties conferred upon the . . . Attorney General" and a few other officials. 8 U.S.C. § 1103(a). The Homeland Security Act did separately transfer many immigration-related and even some TPS-related authorities to DHS, including those that had formerly been exercised by the Immigration and Naturalization Service ("INS") within the Department of Justice ("DOJ"). *See* 6 U.S.C. § 271(b) (transferring all adjudications performed by INS before effective date, including immigrant visa and naturalization petitions, asylum and refugee applications, and those performed at service centers). But the Attorney General—not INS—had consistently exercised the authority to terminate a TPS designation prior to the

1

Homeland Security Act's passage. So TPS termination authority did not pass from DOJ to DHS by the same mechanism, contrary to DHS's understanding. Because "an agency literally has no power to act . . . unless and until Congress confers power upon it," *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), the DHS Secretary's Termination is *ultra vires*, is not shielded by the jurisdiction-stripping provision of 8 U.S.C. § 1254a(b)(5)(A) (which only applies to determinations "of the Attorney General"), and must be "set aside." 5 U.S.C. § 706(2).

Second, the Termination deprives Plaintiffs of protected liberty and property interests without constitutionally adequate procedures, in violation of the Due Process Clause. TPS confers mandatory work authorization and removal protections upon TPS holders and TPS applicants who are prima facie eligible for TPS. Such benefits are liberty and property interests that trigger procedural safeguards under the Constitution. In recognition of these interests, Congress included mandatory procedural protections in the statute to ensure that once a country has been designated for TPS, the designation—and thereby the corresponding benefits of those with TPS—cannot be summarily stripped away. 8 U.S.C. § 1254a(b)(3)(A). The Secretary flouted those safeguards when issuing the Termination.

The Supreme Court's decision in *Mullin v. Doe* did not address these new claims, much less foreclose them. *Mullin* declined to extend the judicial review bar to constitutional claims, like Plaintiffs' procedural due process claim. *See Mullin v. Doe*, Nos. 25-1083 & 25-1084, 2026 WL 1825840, at *10–11 (U.S. June 25, 2026). Plaintiffs' *ultra vires* claim was not presented to the Court, which resolved more than a century ago that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). Besides, *Mullin*'s

2

rulings were self-avowedly "predictive," not "final," and therefore subject to being revisited in light of new arguments and claims. *Mullin*, 2026 WL 1825840, at *11.

Plaintiffs have been unlawfully deprived of constitutionally protected interests by an official with no authority to take the challenged action. This Court should grant interim relief.

## STATEMENT OF THE RELEVANT FACTS

A complete recitation of facts concerning the history of the TPS program and the Trump administration's actions to end the program by executive fiat is provided in Plaintiffs' initial Motion to Postpone Effective Date of Agency Action, Dkt. 27 at 2–17, and this Court's order granting Plaintiffs' initial postponement motion, Dkt. 51 at 2–8. Plaintiffs summarize pertinent facts previously provided and include new facts relevant to the present motion.

**The Temporary Protected Status Statute**

Congress created TPS in 1990 to provide humanitarian protection of individuals "from countries experiencing turmoil." H.R. Rep. No. 100-627 at 4 (1988). While a country is designated for TPS, beneficiaries are entitled to employment authorization and protection from immigration detention and removal. 8 U.S.C. § 1254a(a)(1), (d)(4).

Congress established a statutory framework with specific procedural steps that dictate TPS decision-making. At the initial designation stage, the statute provides the Attorney General with substantial discretion, but it is not without key limits. The statute first requires the Attorney General to consult with "appropriate" agencies. *Id*. § 1254a(b)(1). After that, he "may designate" a country based on armed conflict, environmental disaster, or other extraordinary and temporary conditions. *Id.* The Attorney General's assessment of "national interest" limits designation only under Subsection 1254a(b)(1)(C)'s "extraordinary and temporary conditions" ground; it does not apply to designations under Subsections 1254a(b)(1)(A) or (B) (*i.e.*, armed conflict or natural

disasters, respectively). *Id*. A designation lasts 6 to 18 months, effective either upon notice in the Federal Register or "such later date as [the Secretary] may specify." *Id*. § 1254a(b)(2)(a).

After a country is designated for TPS, the statute requires periodic review and substantially limits the Attorney General's discretion. *See id*. § 1254a(b)(3)(A). At least 60 days before the end of each designation period, the Attorney General, "after consultation with appropriate agencies of the Government," must "review the conditions in the foreign state" and determine whether the conditions for TPS designation "continue to be met." *Id*. The review process generally begins months before the 60-day deadline. *See* Dkt. 16, Ex. 1 at 20–21.

Unless a country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months. 8 U.S.C. § 1254a(b)(3)(B), (C). In contrast, if a country "no longer continues to meet the conditions for designation under" Section 1254a(b)(1), the TPS designation "shall terminate" through the publication of a notice in the Federal Register. 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than sixty days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.*

**Burma's TPS Designation and Termination**

Burma was first designated for TPS in 2021 based on extraordinary and temporary conditions—the "humanitarian crisis" triggered by the Burmese military's overthrow of the democratically elected civilian government and the violence against civilians that came soon after. Designation of Burma (Myanmar) for Temporary Protected Status, 86 Fed. Reg. 28,132, 28,133 (May 25, 2021). Burma was extended and redesignated for TPS twice—first in 2022 and again in 2024—due to the persistence of "extraordinary and temporary conditions" preventing the safe return of Burmese nationals. Extension and Redesignation of Burma (Myanmar) for Temporary

Protected Status, 87 Fed. Reg. 58,515, 58,518 (Sep. 27, 2022); Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status Burma, 89 Fed. Reg. 20,682, 20,684 (Mar. 25, 2024).

On November 25, 2025, then-Secretary of the Department of Homeland Security Kristi Noem published a notice in the Federal Register purporting to terminate Burma's TPS designation, effective January 26, 2026. Dkt. 16, Ex 20. Noem acknowledged the persistence of "certain extraordinary and temporary conditions" and humanitarian challenges in Burma that had previously warranted TPS and ignored other factors. Termination of the Designation of Burma (Myanmar) for Temporary Protected Status, 90 Fed. Reg. 53,378, 53,380 (Nov. 25, 2025) ("Notice"). Noem concluded that those conditions no longer hindered the safe return of Burmese nationals to the country, *id.*, despite contradictory actions by the Trump administration and other executive agencies, including President Trump's renewal of Burma's "national emergency" stemming from the 2021 coup*, id.* (citing Continuation of the National Emergency with Respect to the Situation in and in Relation to Burma, 90 Fed. Reg. 9,111 (Feb. 4, 2025)), and the Department of State's Level 4 "Do Not Travel" to Burma advisory, which remains in place to this date. *Burma (Myanmar) Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/burma-travel-advisory.html (last visited July 19, 2026); *see also* Dkt. 16, Ex. 33. Noem also justified her decision to terminate based on her assessment that continuing TPS for Burma was contrary to the "national interest." Notice, 90 Fed. Reg. at 53,380–81.

Prior to issuing the Termination, Noem failed to consult with the requisite and appropriate agencies (here, the Department of State) under the statute. Mem. Op. and Order 28–32, Dkt. 51; AR 291-92, Dkt. 39-2. Indeed, the extent of DHS's consultation with the Department of State

5

consisted of a two-sentence email that "addressed the TPS termination of four different countries [including Burma]" but "did not individually consider the circumstances in those nations." Mem. Op. and Order, Dkt. 51 at 29–30; AR 291-92, Dkt. 39-2.

Plaintiffs filed this litigation following the announcement of the Termination and simultaneously sought preliminary relief to postpone its effective date. After briefing and argument on Plaintiffs' initial request for preliminary relief, this Court granted Plaintiffs' motion. *See* Order Granting Mot. to Postpone Effective Date of Agency Action, Dkt. 52.

On June 25, 2026, the Supreme Court issued its decision in two consolidated cases challenging the terminations of TPS for Syria and Haiti. *See Mullin*, 2026 WL 1825840. Because the Court addressed the cases in a preliminary posture, the Court made "only a predictive—not a final—decision about the outcome[s]" of the Syria and Haiti TPS cases by assessing the "likelihood" that the Court had jurisdiction over the claims in those cases and the "likelihood" that those claims were meritorious. *Id.* at *11. In that context, the Court concluded that the plaintiffs were not entitled to interim relief on their statutory APA claims based on an interpretation of the word "determination" in the TPS statute's judicial review bar. *See id.* at *9–10. The Court declined to extend the review bar to constitutional claims. *See id.* at *10-11. The Court concluded that the *Miot* plaintiffs were unlikely to succeed on their equal protection claim, the only constitutional claim that was before the Court. *See id.* at *10-13.

In light of the Supreme Court's decision in *Mullin*, which Plaintiffs conceded reached their statutory claims, the Seventh Circuit Court of Appeals summarily reversed this Court's postponement order and set the mandate for that order to issue on July 27, 2026. *See* Order, *Doe v. Mullin*, No. 26-1294 (7th Cir. July 16, 2026), Dkt. 34.

6

Simultaneously, Plaintiffs amended their complaint, raising claims challenging the legality of the Termination, two of which form the basis of this motion: (1) that then-DHS Secretary Noem acted *ultra vires* when issuing the Termination because such authority lies exclusively with the Attorney General and was never properly delegated to the DHS secretary; and (2) that the Termination violated Plaintiffs' procedural due process rights. Plaintiffs now renew their motion for preliminary relief based on a likelihood of success on the two claims and a balance of the equities that continues to decidedly favor Plaintiffs.

## LEGAL STANDARD

The standard for a stay postponing agency action under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction. *See Cook Cnty, Illinois v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020). Plaintiffs are therefore entitled to a stay if they show (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *See K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 613 (7th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

## I.  THIS COURT HAS JURISDICTION TO REVIEW PLAINTIFFS' CLAIMS

This Court has the authority to review Plaintiffs' new claims. The TPS statute's jurisdiction stripping provision provides that "[t]here is no judicial review of any determination of the *Attorney General*" with respect to the designation, termination, or extension of designation of TPS. 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). Therefore, by its plain language, the jurisdictional review bar applies only to challenges to "determination[s]" made by the "Attorney General." Here, Plaintiffs do not challenge a determination by the Attorney General. Instead, they challenge the DHS

7

Secretary's authority to make any TPS termination decisions at all, *see infra* Section II—a claim that 8 U.S.C. § 1254a(b)(5)(A) in no way even implicates. With questions of statutory interpretation, the Court "start[s] with the text," *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016), and here, the text could not be more straightforward.

Nor does the judicial review bar, as interpreted by the Supreme Court in *Mullin*, bar Plaintiffs' procedural due process claim. *See Mullin*, 2026 WL 1825840, at *7–11. *Mullin* did not extend the review bar to constitutional claims challenging TPS determinations. *Id*. Instead, the Court proceeded directly to the merits of the equal protection challenge, reaffirming the bedrock principle that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Here, there is no clear evidence that Congress intended to preclude review of constitutional claims. *See Nobles v. Mullin*, 177 F.4th 886, 898 (7th Cir. 2026) ("[W]e will not read a statutory scheme to take the extraordinary step of foreclosing jurisdiction unless Congress' intent to do so is manifested by clear and convincing evidence.") (quoting *Califano v. Sanders*, 430 U.S. 99, 109 (1977)). In addition, the claim is not barred because the actions of the DHS Secretary are not subject to Section 1254a(b)(5)(A).

## II. PLAINTIFFS ARE LIKELY TO SUCCEED BECAUSE TPS TERMINATION AUTHORITY LIES EXCLUSIVELY WITH THE ATTORNEY GENERAL

When the TPS scheme was established in 1990, Congress vested sole authority to terminate TPS designations in the Attorney General. Since then, Congress has never transferred that authority to any other official, even when delegating other immigration authority—including a limited set of TPS-related functions—to DHS. The DHS Secretary nonetheless purported to terminate TPS for Burma, in excess of her authority.

"'[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.'" *City of Chicago v. Noem*, No. 25 CV 12765, 2025 WL 3251222, at *7 (N.D. Ill. Nov. 21, 2025) (quoting *Louisiana Pub. Serv. Comm'n.*, 476 U.S. at 357). As "creatures of statute," agencies therefore "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). Thus, when federal agencies "act beyond their jurisdiction, what they do is ultra vires" because "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). The DHS Secretary acted *ultra vires* in purporting to terminate Burma's TPS designation, and the Termination must therefore be "set aside." 5 U.S.C. § 706(2).[1]

**A. The TPS Statute Vests TPS Termination Authority in the Attorney General**

Congress clearly assigned the authority to terminate TPS designations to the Attorney General. The TPS statute provides: "If the *Attorney General* determines . . . that a foreign state . . . no longer continues to meet the conditions for [TPS] designation . . . the *Attorney General* shall terminate the designation[.]" 8 U.S.C. § 1254a(b)(3)(B) (emphasis added). This delegation is consistent with Congress's choice to vest the "Attorney General" with other key TPS authorities, including the authority to "grant [an] alien temporary protected status in the United States" and "authorize the alien to engage in employment[,]" 8 U.S.C. § 1254a(a)(1) ; to "designate any foreign state" for TPS status, *id.* § 1254a(b)(1); and to extend TPS designations, *id.* § 1254a(b)(3)(C).

---

[1] If the Court agrees that the DHS Secretary lacked the authority to issue the Termination, that finding would not also invalidate the initial TPS designation for Burma, for at least three reasons. First, this APA suit challenges only one final agency action—the Termination—and a challenge to the initial TPS designation would need to be considered in the context of a separate and otherwise justiciable lawsuit. Second, even when the cited basis for an agency program turns out to be invalid, the APA requires the government to consider alternatives to outright termination. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 24–28 (2020). Third, "mutually explicit understandings" related to TPS and the legitimate reliance interests of TPS holders and applicants give rise to vested due process interests notwithstanding any statutory violation. *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (overruled on other grounds by *Rust v. Sullivan*, 500 U.S. 173 (1991); *see also infra* Section II.

Subsequently adopted regulations for TPS reaffirmed the delegation of these authorities to the Attorney General. For example, in 1991, the DOJ and the former INS adopted regulations governing TPS. *See* Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991) (codified as amended at 8 C.F.R. §§ 244.1–244.19). Those regulations delegated certain operational TPS functions to INS, including the authority to initially find individual aliens eligible and award protected status, *see id.* at 619 (codified as amended at 8 C.F.R. § 244.2), and to receive and process applications for protected status, *see id.* at 620 (codified as amended at 8 C.F.R. §§ 244.6, 244.7). The regulations, however, did *not* authorize any subordinate official to exercise the *Attorney General*'s authority to terminate a foreign state's designation under 8 U.S.C. § 1254a. Indeed, the regulations defined an eligible state to mean a "foreign country or part thereof as designated *by the Attorney General* pursuant to section 244A(b) of the Homeland Security Act." *See id.* at 619 (codified as amended at 8 C.F.R. § 244.1) (emphasis added). And in practice, the Attorney General issued all TPS country designations and terminations for more than a decade.[2]

## B. The Homeland Security Act Did Not Transfer TPS Termination Authority to the DHS Secretary

DHS has claimed that the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, transferred authority to terminate TPS designation from the Attorney General to DHS. *See, e.g.*, DHS, Extension of the Designation of Honduras under Temporary Protected Status Program, 68 Fed. Reg. 23,744 (May 5, 2003) (claiming that because "the Immigration and Naturalization

---

[2] *See, e.g.*, Termination of Bosnia-Herzegovina Under the Temporary Protected Status Program, 65 Fed. Reg. 52,789, 52,791 (Aug. 30, 2000) ("By the authority vested in me as Attorney General under section 244(b)(3) of the Homeland Security Act . . . I have determined that Bosnia-Herzegovina no longer meets the conditions for designation of TPS . . ."); Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension, 63 Fed. Reg. 15,437, 15,438 (Mar. 31, 1998); Termination of Designation of Lebanon Under Temporary Protected Status Program, 58 Fed. Reg. 7,582 (Feb. 8, 1993); Termination of Designation of Kuwait Under Temporary Protected Status Program, 57 Fed. Reg. 2,930, 2,931 (Jan. 24, 1992).

10

Service (INS) transferred from the Department of Justice to [DHS] . . . [t]he responsibilities for administering the TPS program were transferred to the Bureau of Citizenship and Immigration Services (BCIS)."). But the Homeland Security Act did not make such a transfer, and DHS has not identified statutory provisions that prove otherwise.

For example, 8 U.S.C. § 1103(a)(1), which outlines the DHS Secretary's authorities under the INA, provides that:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter [the INA] and all other laws relating to the immigration and naturalization of aliens, *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General*, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers

(emphasis added). The power to terminate a TPS designation falls squarely within the "except" clause, which makes clear that "powers, functions, and duties" expressly "conferred upon" the "Attorney General"—even those "relating to the immigration and naturalization of aliens"—would remain vested in the Attorney General notwithstanding the transfer of *other* such authorities to DHS. Other provisions confirm that particular immigration-related powers remain with the Attorney General. *See, e.g.*, 8 U.S.C. § 1103(g)(1) (providing that Attorney General would retain authority over functions "exercised by the Executive Office for Immigration Review").

The Homeland Security Act did transfer many immigration-related functions and a specific set of TPS-related functions from DOJ to DHS, but termination is not one of them. For example, the Homeland Security Act created the Bureau of Citizenship and Immigration Services as a branch of DHS and "transferred" specific INS functions "from the Commissioner of Immigration and Naturalization [within DOJ] to the Director of the Bureau of Citizenship and Immigration Services" within DHS. *See* 6 U.S.C. § 271(b). Among the functions transferred were "all . . . adjudications performed by the [INS] immediately before" the effective date of the Homeland

11

Security Act. *Id.* § 271(b)(5). That included the authority to initially find individual aliens eligible and award TPS, since those adjudications were performed by *INS* rather than the Attorney General before the Homeland Security Act was passed. *See supra* section I.A. But TPS country designations and terminations were *not* "performed by [INS] immediately before" the Homeland Security Act's "effective date," so those broader authorities were *not* transferred to DHS by operation of 6 U.S.C. § 271.[3]

The Homeland Security Act also required the President to submit an executive Reorganization Plan to Congress by "[n]ot later than 60 days after November 25, 2002" detailing "[t]he transfer of agencies, personnel, assets, and obligations to" DHS. 6 U.S.C. § 542(a). In accordance with that provision, the President issued an executive Reorganization Plan, which purported to "[t]ransfer the . . . functions of [INS]"—including delegated functions "performed by" INS "immediately before" the transfer—to DHS. *See* Department of Homeland Security Reorganization Plan, H.R. Doc. No. 108-16, at 4, 12 (2002). But the Plan made no mention of TPS, nor did it address those immigration-related powers expressly vested in the Attorney General as opposed to the INS or other subsidiary divisions. By contrast, other portions of the Plan did specifically address the transfer of particular Attorney General functions. *See, e.g.*, *id.* (transferring "the National Domestic Preparedness Office of the FBI, *including the functions of the Attorney General relating thereto*" (emphasis added)).

---

[3] Although DOJ adopted regulations that gave INS responsibility over much of the day-to-day workings of TPS, those regulations recognized that topline foreign-state designations were made "by the Attorney General pursuant to section 244A(b) of the Homeland Security Act," Temporary Protected Status, 56 Fed. Reg. 618, 619 (Jan. 7, 1991) (codified at 8 C.F.R. § 240.1) and the Attorney General herself continued to make such designations including up until the effective date of the Homeland Security Act, *see, e.g.*, Extension of the Designation of Somalia under the Temporary Protected Status Program, 67 Fed. Reg. 48950 (July 26, 2002).

### C. Defendants Have Failed to Identify Any Source of Authority to the Contrary

"Administrative agencies . . . possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117. As such, an agency bears the burden to "identify statutory authority for any action it takes." *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022); *see also City of Evanston v. Barr*, 412 F. Supp. 3d 873, 886 (N.D. Ill. 2019) (finding Attorney General's condition on federal funding to be *ultra vires* when the government failed to "identify any source of statutory authority" for the challenged condition). Defendants cannot carry that burden here.

The termination notice for Burma does not cite any authority vesting the power to terminate in the Secretary of DHS. *See* 90 Fed. Reg. at 53378-53382. DHS has interpreted 6 U.S.C. § 557 as having "transferred the Attorney General's TPS authority to the DHS Secretary." Resp. in Opp. to Pltfs' Mot. 2, n. 3, Dkt. 34. But this provision, along with those cited in prior termination notices and litigation,[4] did not independently transfer any authority at all; they just streamlined the process of amending the code by providing that certain "references" would be "deemed to refer" to the Secretary *to the extent that* they relate to functions that were *actually transferred* to the Secretary. *See* 6 U.S.C. § 557; *see also supra* n.4 (collecting similar provisions).

The plain text makes clear that these are housekeeping provisions, not substantive grants of authority. For example, 6 U.S.C. § 557 provides that "*[w]ith respect to any function transferred*

---

[4] In the past, DHS has cited 6 U.S.C. § 552(d) and 6 U.S.C. § 557 to justify the Secretary's purported TPS decision-making authority. *See, e.g.*, Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3,476, 3,477 n.1 (Jan. 21, 2010); Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47,228, 47,229 n.1 (Oct. 11, 2017); Pet'rs' Appl. for Stay 5 at n.2, *Noem v. Nat'l TPS All.*, No. 24A1059 (U.S. May 1, 2025). And in dicta, various courts have done the same. *See, e.g.*, *Najera v. United States*, 926 F.3d 140, 142 (5th Cir. 2019); *Cervantes v. Holder*, 597 F.3d 229, 231 n.2 (4th Cir. 2010); *Mejia Rodriguez v. Dep't of Homeland Sec.*, 562 F.3d 1137, 1140 n.3 (11th Cir. 2009). In these cases, however, the courts did not grapple with—and the parties did not appear to seriously contest—the issue. Nor was it contested in the earlier stages of this case. *See* Mem. Op. and Order 2–3, Dkt. 51.

*by or under this chapter* . . . and exercised on or after the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office *the functions of which are so transferred* shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred." (emphasis added). Similarly, 6 U.S.C. § 552(d) provides: "References *relating to an agency that is transferred* to the Department in statutes, Executive orders, rules, regulations, directives, or delegations of authority that precede such transfer or the effective date of this chapter shall be deemed to refer, as appropriate, to the Department, to its officers, employees, or agents, or to its corresponding organizational units or functions." (emphasis added). Both provisions are aimed at clarifying statutory language related to transfers of power effectuated by other statutes or means of delegating authority—they do not serve as transfers of authority themselves.

The DHS Secretary therefore terminated Burma's TPS without meeting the burden of identifying a valid statutory grounding for that authority. *See Nat'l Ass'n of Broads.*, 39 F.4th at 819. Plaintiffs are thus likely to succeed on their claim that the Secretary's decision to terminate TPS for Burma was *ultra vires*. *See* 5 U.S.C. § 706(2).

### D. Plaintiffs' *Ultra Vires* Claim Is Reviewable Notwithstanding *Mullin*

This Court has jurisdiction to review Plaintiffs' *ultra vires* claim. The TPS statute's jurisdiction-stripping provision does not apply to Plaintiffs' claim that the DHS Secretary lacks authority to terminate Burma's TPS designation because it does not challenge a determination of the Attorney General. It instead disputes the DHS Secretary's authority to make termination decisions at all. By its plain language, the judicial review bar does not apply to this claim. *See* 8 U.S.C. § 1254a(b)(5)(A) ("There is no judicial review of *any determination of the Attorney*

14

*General* with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.") (emphasis added).[5]

The Supreme Court's decision in *Mullin* did not hold otherwise. The issue of the Secretary's authority to make any TPS termination decisions was never presented, disputed, or addressed in *Mullin*.[6] The Supreme Court did state in passing that the DHS Secretary exercises TPS authority, *see Mullin*, 2026 WL 1825840, at *7, but that was merely a "drive-by" statement about an unpresented question that was "lurk[ing]" in the background; it therefore carries no precedential effect. *Webster*, 266 U.S. at 511 (collecting cases) (prior ruling was not precedential because relevant issue was not "suggested or decided" in that case); *see also Whitman v. United States*, 135 S. Ct. 352, 353–54 (2014) (Scalia, J., statement respecting denial of certiorari) (prior decision's "drive-by ruling . . . deserve[d] little weight" in part because the decision included "scarcely any explanation" on the issue); *Steidinger v. Blackstone Med. Servs.*, No. 25-2398, 2026 WL 2028517, at *3 (7th Cir. July 14, 2026) (considering question of whether text messages are telephone calls within the meaning of 47 U.S.C. § 227(c)(5) unanswered by the Supreme Court despite its observation on the issue in a different case). And in addressing the judicial review bar, the Court analyzed the meaning of the term "determination" without any mention of the review bar's focus on actions "of the Attorney General." 8 U.S.C. § 1254a(b)(5)(A); *see Mullin*, 2026 WL

---

[5] The government may argue that the phrase "Attorney General" should be replaced with "Secretary" by operation of 6 U.S.C. § 557 and 6 U.S.C. § 552(d). But again, those housekeeping provisions did not independently transfer any authority from DOJ to DHS. *See supra*, I.C. They apply only to the extent there was an independent transfer of authority, and no such transfer exists.

[6] The parties' briefing agreed, with little explanation, that the DHS Secretary possessed the requisite TPS authority and could issue a valid TPS termination as long as she complied with the statute's *procedural* requirements. *See, e.g.*, Br. for Pet'rs at 6 n.2 (noting in passing that "Congress has transferred the authority to the Secretary of Homeland Security"); Br. for Resp'ts *Doe*, et al., at 5 ("The TPS statute gives the Secretary authority to provide humanitarian relief to people"); *and* Brief for Resp'ts *Miot*, et al., at 5 (listing procedural requirements the "Secretary" must follow to "terminate a country's TPS designation").

15

1825840, at *2. As a result, *Mullin* left unaddressed the question of whether the DHS Secretary has *any* statutory authority to terminate TPS.

Moreover, *Mullin* was decided in a preliminary posture, such that the Supreme Court is free to revisit its conclusions, including based on the consideration of new arguments. Due to the differing standards for preliminary and final relief, preliminary injunctions "do not conclusively resolve legal disputes." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025); *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (explaining that "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" at final judgment); *see also Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 967 n. 8 (7th Cir. 2018) ("The propriety of preliminary relief and resolution of the merits are significantly different issues") (citation modified).

This Court therefore retains jurisdiction to consider Plaintiffs' *ultra vires* claim.[7]

### III.   PLAINTIFFS ARE LIKELY TO SUCCEED BECAUSE THEIR DUE PROCESS RIGHTS HAVE BEEN VIOLATED

Plaintiffs are also likely to succeed on their procedural due process claim because the Termination deprived Plaintiffs of constitutionally protected property and liberty interests without constitutionally adequate process. "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (collecting cases); *accord Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). It "imposes constraints on governmental decisions which deprive individuals of 'liberty' or

---

[7] Indeed, because the TPS statute's review bar does not apply to any determinations rendered by the Secretary, it does not in any way limit judicial review of the Secretary's actions. The Court retains jurisdiction to consider Plaintiffs' claims that arise directly under the APA, including their contention that the Secretary's stated rationale was pretextual and based on a deficient periodic review process.

'property' interests," *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *see also Bell v. Burson*, 402 U.S. 535, 539 (1971).

### A. The Termination of TPS Implicates Significant Liberty and Property Interests

Because Plaintiffs have property and liberty interests in TPS, they are entitled to due process, which at minimum requires the procedural safeguards embedded in the TPS statute. To bring a due process claim, a plaintiff must carefully describe the asserted right. *Reno v. Flores*, 507 U.S. 292, 302 (1993). The Fifth Amendment protects a due process right to a government benefit if the plaintiff has "a legitimate claim of entitlement to it," *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972), but "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion," *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). The Government's TPS termination decisions implicate significant liberty and property interests. A legitimate property interest may stem from laws conferring a specific benefit or from "rules or mutually explicit understandings that support (the) claim of entitlement." *Confederation of Police v. City of Chicago*, 481 F. Supp. 566, 569 (N.D. Ill. 1980) (citing *Perry*, 408 U.S. at 601 (overruled on other grounds)); *see also Nozzi v. Hous. Auth.*, 806 F.3d 1178, 1190–91 (9th Cir. 2015) (citing *Roth*, 408 U.S. at 576) ("[A] person receiving . . . benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process.")).

Numerous other district courts have found that TPS recipients have either a property or liberty interest in their designation. *See Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1122 (N.D. Cal. 2018) (stating that "Plaintiffs arguably have a property interest in loss of TPS status" in evaluating challenges to TPS terminations of four countries); *Saget v. Trump*, 375 F. Supp. 3d 280, 333 (E.D.N.Y. 2019) ("[p]rotecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law"); *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1013 (W.D.

17

Wash. 2023) (holding, in class action challenging USCIS's policy of refusing to provide work permits for pending TPS applicants, that "a prima facie eligible TPS applicant has a property interest in temporary employment authorization subject to due process protections"); *see also Rodas v. Chertoff*, 399 F. Supp. 2d 697, 702 (E.D. Va. 2005) ("plausible argument may be made that TPS is a property right that cannot be withdrawn without due process").[8]

Plaintiffs are entitled to non-arbitrary decision making with respect to TPS terminations because the statutory framework *requires* the Government to extend TPS if the statutory criteria are met; it has no discretion to terminate TPS where conditions warrant maintaining it. The statute thus gives Plaintiff TPS holders an expectation that they will retain their designations where country conditions so warrant. They therefore have a legitimate claim of entitlement to TPS status once it is granted.

The TPS statute mandates that the Attorney General "*shall* review the conditions in the foreign state . . . and *shall* determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). Plaintiffs have, at minimum, a reasonable expectation of entitlement to the "statutorily mandated 'review' and 'determination.'" *Ramos*, 321 F.Supp.3d at 1122. In setting forth the requirements for "periodic review" of TPS designations, Congress imposed an automatic, mandatory extension of TPS absent a determination that the foreign state "no longer continues to meet the conditions for designation under paragraph

---

[8] TPS holders and applicants also have protected interests in the related state benefits conferred through TPS status, such as driver's licenses. *See, e.g.*, *Bell*, 402 U.S. at 539 (holding that a driver's license is a protected interest that, once issued, cannot be revoked or suspended "without that procedural due process required by the Fourteenth Amendment." (citations omitted)); *Est. of Wobschall by Wobschall v. Ross*, 488 F. Supp. 3d 737, 748 (E.D. Wis. 2020) ("A person has a property interest in her driver's license which, once issued, may not be taken away without that procedural due process. . .". ) (citation modified).

18

(1)." 8 U.S.C. § 1254a(b)(3)(C). "If the Attorney General does not determine . . . that a foreign state . . . no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state *is extended* for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months)." *Id.* (emphasis added). Thus, while the Government has initial discretion whether to designate a foreign state for TPS, *see* 8 U.S.C. § 1254a(b)(1) (providing that "[t]he Attorney General, after consultation with appropriate agencies of the Government, *may* designate any foreign state . . . .") (emphasis added), the statute provides no such discretion when deciding whether to terminate a designation. Indeed, the word "discretion" only appears in subsection 1254a(b)(3)(C), which permits discretion to lengthen the automatically imposed 6-month extension to a period of 12 or 18 months. 8 U.S.C. § 1254a(b)(3)(C).[9]

Plaintiffs' liberty interest in rational TPS-related decision making also arises from the right to live and work in this country that TPS provides. The Constitution protects individuals from deprivation of these protected interests without due process. *Bridges v. Wixon*, 326 U.S. 135, 155 (1945) (finding a liberty interest at stake because deportation "visits a great hardship on the individual and deprives him of the right to stay and live in this land of freedom."); *Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982)*; see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) ("We have frequently recognized the severity of depriving a person of the means of livelihood."). Congress intended the TPS program to be insulated from "the vagaries of our domestic politics." 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep.

---

[9] Plaintiff TPS holders' property interest in extension of TPS where the conditions for designation continue to be met also arises from statutory and regulatory standards defining individual eligibility for an individual's TPS beneficiary status. *See* 8 C.F.R. 244.2, 244.3, 244.4, 244.10(b) (setting forth eligibility requirements); 8 U.S.C. 1254a(a)(1) (TPS benefits conferred include nondiscretionary removal and work authorization documents).

Levine) (debating the immediate precursor to the TPS statute). The statutorily mandated procedures for termination were designed at least in part to protect the status of TPS holders.

**B. The Government's Process Was Not Constitutionally Sufficient**

The Government violated Plaintiffs and other TPS holders' procedural due process rights by failing to follow the mandatory review procedures in the TPS statute and by considering extra-statutory factors in its decision to terminate without notice.

The TPS periodic review process requires: 1) "consultation with appropriate agencies of the Government," 2) a "review" of "the conditions in the foreign state," and 3) notice of the actual "basis for the determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A). The first two provisions mitigate "the risk of an erroneous deprivation," *Mathews*, 424 U.S. at 335. These basic safeguards impose a minimal administrative burden on the government while reducing the risk that termination decisions will be based on inaccurate information. *See Mathews*, 424 U.S. at 343–49 (emphasizing that the risk of erroneous deprivation was mitigated by extensive information gathering, agency review, and administrative reconsideration procedures). The requirement that the Attorney General publish the "basis for the determination" in the Federal Register ensures notice of the reasons for the government's decision. 8 U.S.C. § 1254a(b)(3)(A); *see Loudermill*, 470 U.S. at 546. All three procedures safeguard the liberty and property interests of TPS holders and conform with the requirements of the Due Process Clause. *See, e.g.*, *Adame v. Holder*, 762 F.3d 667, 672 (7th Cir. 2014) ("[S]tatutorily required procedures assure compliance with constitutional due process requirements, and . . . a petitioner may have a legal claim when she can show statutory procedural shortfalls . . . .") (citing *Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011)).

The government failed to comply with any of the statute's procedural requirements and thus violated Plaintiffs' due process. First, this Court has already determined that the government

20

failed the basic statutory requirement to consult with (any) appropriate agencies in the course of gathering information about country conditions. *See* Mem. Op. and Order 28–32, Dkt. 51. The Court found that "a few brief emails that do not involve any substantive exchange of information" was "not enough," *Id.* at 32, and held Plaintiffs were likely to succeed on their claim that the lack of consultation was contrary to law. *Id.* Second, this Court held "[t]he termination of TPS for Burma appears to have occurred without a review of conditions in that country . . . and plaintiffs have demonstrated a likelihood of success on their contrary to law claim. . . ." *Id.* at 18. The Court explained that although political administrations may have different policy goals, "the executive must pursue its policy goals under the governing laws." *Id.* And third, the government failed to publish the "basis for the determination" in the Federal Register. This Court recognized that the stated reasons for the termination were likely false and thus do not provide meaningful notice of the government's decision. *Id.* at 46 ("[I]t would strain credulity to accept a contention that the Secretary terminated TPS for Burma because it no longer qualified under the TPS statute. Rather, it is more likely that the Secretary made an overall decision to eliminate TPS based on factors irrelevant under the controlling statute. . . .").

Once the Government confers a benefit that implicates protected interests, it may not terminate that benefit in an arbitrary manner. *Nozzi*, 806 F.3d at 1190–91; *see also Roth*, 408 U.S. at 576–77; *Bell*, 402 U.S. at 539. Due process requires that the Government carry out the statute's periodic review process in a non-arbitrary manner that comports with applicable statutory, regulatory, and constitutional requirements.[10] The government's established practice since the

---

[10] *See Adame*, 762 F.3d at 672 ("[S]tatutorily required procedures assure compliance with constitutional due process requirements, and ... a petitioner may have a legal claim when she can show statutory procedural shortfalls....") (citing *Portillo-Rendon*, 662 F.3d at 817); *cf. Dia v. Ashcroft*, 353 F.3d 228, 239 (3d Cir. 2003) ("The due process afforded aliens stems from those

creation of the TPS statute has been to engage in consultation with agencies, particularly the State Department, in the course of evaluating any changes in country conditions since the initial TPS designation. Mem. Op. and Order 30–31, Dkt. 51. This practice created reasonable expectations among Plaintiff TPS holders that, so long as the conditions for designation continued (and they individually satisfied the requirements for eligibility and re-registration), the Government would extend the TPS designation, along with their individual benefits; and they would not be compelled to quit their jobs, sell their homes and businesses, remove their children from school, and leave this country.

In addition, the government relied on multiple impermissible factors in terminating TPS, which are themselves grounds for a procedural due process violation. *Block v. Potter*, 631 F.2d 233, 236 (3d Cir. 1980) (reviewing constitutional due process claim where Plaintiff alleged parole board decision was arbitrary and based decision on impermissible ground). First, the government relied extensively on a national interest finding to justify termination. Notice, 90 Fed. Reg. at 53,380. As this Court recognized, Mem. Op. and Order 51, Dkt. 51, the consideration of "national interest" in the decision to terminate is not authorized by the TPS statute in the periodic review process. 8 U.S.C. § 1254a(b)(3)(A). The government also considered other impermissible factors, including "that the Secretary made an overall decision to eliminate TPS based on factors irrelevant under the controlling statute…" Mem. Op. and Order 46, Dkt. 51. A decision that was pretextual, and motivated by factors not enumerated by the statute, violates the due process right to a neutral

---

statutory rights granted by Congress and the principle that '[m]inimum due process rights attach to statutory rights.'"). In the context of regulations, some courts have held that "[w]hen regulations are promulgated to protect a fundamental right derived from . . . a federal statute, . . . the Due Process Clause requires federal agencies to follow them, even when those regulations provide greater protection than is constitutionally required." *Jimenez v. Cronen*, 317 F.Supp.3d 626, 638 (D. Mass. 2018).

decisionmaker who has not made a preordained decision *before* reviewing the evidence. *See, e.g.*, *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (due process forbids practice that poses "risk of actual bias or prejudgment").

Defendants' Termination thus violates the Due Process Clause under the Fifth Amendment of the U.S. Constitution and was an act "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

### C.   Plaintiffs' Procedural Due Process Claim Is Reviewable

Plaintiffs' procedural due process claim is reviewable because the TPS statute's review bar does not bar constitutional claims. The Government conceded at oral argument in *Mullin* that it would "have to be fighting with [Supreme Court precedent] . . . to argue that there's no judicial review of [] constitutional claims" under Section 1254a(b)(5)(A). Tr. of Oral Arg. 26:22–27:8, *Mullin*, No. 25-1083 (U.S. Apr. 29, 2026). And in its opinion, the Supreme Court declined to extend the review bar to constitutional claims. *Mullin*, 2026 WL 1825840, at *7–10. Instead, the Court proceeded directly to the merits of the equal protection challenge, reaffirming the bedrock principle that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. at 603. Congress expressed no "clear" intent to bar constitutional claims here, as it has elsewhere. *See, e.g.*, 8 U.S.C. § 1252(b)(9) (precluding "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions").

### IV.   THE REMAINING FACTORS OVERWHELMINGLY FAVOR PLAINTIFFS

Irreparable harm is among the two most important factors for preliminary relief. *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023), *cert. denied sub nom*, *Harrel v. Raoul* 144 S.Ct. 2491 (2024). This Court already found that Plaintiffs "will suffer numerous irreparable harms" if TPS terminates, Mem. Op. and Order at 54, Dkt. 51, and the Supreme Court's decision in *Mullin* in no way undermines that analysis. *See Mullin*, 2026 WL 1825840, at *17 (Kagan, J.,

23

dissenting) ("There is no dispute that plaintiffs will suffer irreparable harm absent postponement of the TPS decisions."). Specifically, Plaintiffs would be immediately subject to arrest and detention—and "thus loss of liberty"—a risk that this Court recognized as "particularly acute" in the face of the government's recent changes in detention practices. Mem. Op. and Order 52, Dkt. 51; *see* Dkt. 16, Exs. 55-60 (plaintiffs have no other status). "The deprivation of [a noncitizen's] liberty is, in and of itself, irreparable harm." *Torres-Jurado v. Biden*, 2023 WL 7130898, at \*5 (S.D.N.Y. Oct. 29, 2023) (citation modified). Moreover, Plaintiffs would face deportation to a country where many reasonably fear imprisonment and political persecution, Dkt. 16, Exs. 55-60, and separation from their loved ones. Dkt. 16, Exs. 55-57. Loss of TPS protections would also extinguish Plaintiffs' permission to work, their livelihoods, and ability to pursue long-held professions and financially support their children and family. Mem. Op. and Order 54, Dkt. 51; Dkt. 16, Exs. 55 ¶ 22, 56 ¶ 18, 57 ¶ 11. As this Court already concluded, these injuries constitute "significant, irreparable harms" favoring preliminary relief. Mem. Op. and Order 54, Dkt. 51.

The final considerations—the balance of the equities and public interest—merge when the government is the party opposing the relief. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As this Court has concluded before, "the balance of harms and public interest weighs in favor" of postponement because the government simply relies on its proposition that Burmese TPS holders present a "national interest" risk while presenting "no evidence." Mem. Op. and Order 54, Dkt. 51. And despite the government's claim of a "public interest in the enforcement of … immigration law," Resp. in Opp. to Pltfs' Mot. 50, Dkt. 34, this Court has credited the countervailing public interest "in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." Mem. Op. and Order 55, Dkt. 51 (quoting *Nken*, 556 U.S. at

24

436). Thus, as before, because all factors relevant to the § 705 analysis favor Plaintiffs, this Court should grant Plaintiffs' motion to postpone.

## CONCLUSION

Plaintiffs respectfully ask the Court to postpone the effective date of the Termination pending final judgment.

Plaintiffs respectfully ask the Court to postpone the effective date of the Termination pending final judgment.

Dated: July 20, 2026

Respectfully submitted,

ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
*/s/ Dinesh McCoy*
Dinesh McCoy
Phi Nguyen
Helen Anne Schutz Lo
Razeen Zaman
Niji Jain
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 922-5932
dmccoy@aaldef.org
pnguyen@aaldef.org
alo@aaldef.org
rzaman@aaldef.org
njain@aaldef.org

THE LAW OFFICES OF JUNE J. HTUN
*/s/ June Htun*
June Htun
3643 West Belmont Avenue
Chicago, Illinois 60618
(773) 362-5000
june@htunlaw.com

INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
*/s/ Guadalupe Aguirre*
Guadalupe Aguirre
Pedro Sepulveda
One Battery Park Plaza, Fl 33
New York, NY 10004
(929) 246-0154
laguirre@refugeerights.org
psepulveda@refugeerights.org

Megan Hauptman
650 Massachusetts Ave NW
Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org

*Counsel for Plaintiffs*

26