UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AUNG DOE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | No. 25 C 15483 |
| v. | ) | |
| | ) | |
| | ) | Judge Kennelly |
| KRISTI NOEM, in her official capacity as | ) | |
| Secretary of Homeland Security, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'
RENEWED MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**

ANDREW S. BOUTROS
United States Attorney for
the Northern District of Illinois

JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
Tel: (312) 886-7625
e-Mail: joshua.press@usdoj.gov

TEMILADE F. ODUALA
Special Assistant United States Attorney
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
Tel: (312) 353-1998
e-Mail: temilade.oduala@usdoj.gov

**Table of Contents**                                                        **Page**

Introduction....................................................................................................................1

Background.....................................................................................................................2

    I.     Statutory and Regulatory Background.......................................................2

        A.    The TPS Statute ...........................................................................2

        B.    Burma's 2021 TPS Designation, and the Secretary's Termination
               Thereof...........................................................................................4

    II.    Factual and Procedural Background .........................................................5

Legal Standard ...............................................................................................................7

Argument .......................................................................................................................7

    I.     Plaintiffs Have No Likelihood of Success. ...............................................7

        A.    This Court Lacks Jurisdiction Over Plaintiffs' Claims..............7

        B.    Plaintiffs' Due Process Claim Is Equally Unlikely to Succeed. ................14

    I.     There Is No Showing of Imminent, Irreparable Harm Here. ................20

    II.    The Balance of Equities and the Public Interest Favor Defendants......................22

    III.   Any Grant of Preliminary Relief Must be Narrowly Tailored..............................24

Conclusion ...................................................................................................................25

**Table of Authorities**

**Page(s)**

**Cases**

*Adame v. Holder*,
762 F.3d 667 (7th Cir. 2014) .................................................................................. 17, 18

*Allis-Chalmers Corp. v. Lueck*,
471 U.S. 202 (1985)..................................................................................................... 15

*Am. Foreign Serv. Ass'n v. Trump*,
No. 25-5184, 2025 U.S. App. LEXIS 15297 (D.C. Cir. June 20, 2025) ................................ 23

*Arguello v. Noem*,
No. 25-cv-786, 2025 WL 2896849 (D. Utah Oct. 9, 2025)...................................................... 17

*Barbosa da Cunha v. Freden*,
175 F.4th 61 (2d Cir. 2026) ........................................................................................ 10

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972)............................................................................................... 17, 18

*Bell v. Burson*,
402 U.S. 535 (1971).................................................................................................... 17

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915).................................................................................................... 16

*CASA, Inc. v. Noem*,
792 F. Supp. 3d 576 (D. Md. 2025) ............................................................................ 11

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ......................................................................................... 7

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)........................................................................................................ 7

*Cleveland Bd. of Ed. v. Loudermill*,
470 U.S. 532 (1985)..................................................................................................... 16

*Cook County v. Wolf*,
962 F.3d 208 (7th Cir. 2020) ......................................................................................... 7

ii

*Czerkies v. U.S. Dept. of Labor*,
 73 F.3d 1435 (7th Cir. 1996) ................................................................. 14

*Dave v. Ashcroft*,
 363 F.3d 649 (7th Cir. 2004) ................................................................. 18

*Dawson v. Milwaukee Housing Auth.*,
 930 F.2d 1283 (7th Cir. 1991) ............................................................... 16

*Dep't of State v. Muñoz*,
 602 U.S. 899 (2024) .............................................................................. 13

*Dhakal v. Sessions*,
 895 F.3d 532 (7th Cir. 2018) ................................................................. 22

*DHS v. Regents*,
 591 U.S. 1 (2020) ............................................................................. 13, 14

*Evans v. Greenfield Banking Co.*,
 774 F.3d 1117 (7th Cir. 2014) ............................................................... 14

*Francisco-Diego v. Garland*,
 No. 21-3870 2022 U.S. App. LEXIS 15036 (6th Cir. 2022) ....................... 22

*Goros v. County of Cook*,
 489 F.3d 857 (7th Cir.2007) .................................................................. 16

*Gustafson v. Alloyd Co.*,
 513 U.S. 561 (1995) ................................................................................ 9

*Hanson v. District of Columbia*,
 120 F.4th 223 (D.C. Cir. 2024) .............................................................. 21

*Hecht v. Bowles*,
 321 U.S. 321 (1944) .............................................................................. 24

*Hewitt v. Helms*,
 459 U.S. 460 (1983) .............................................................................. 19

*Ill. Republican Party v. Pritzker*,
 973 F.3d 760 (7th Cir. 2020) ................................................................... 7

*Immigrant Defs. L. Ctr. v. Noem*,
 145 F.4th 972 (9th Cir. 2025) ................................................................ 25

*Int'l Union, Allied Indus. Workers of Am., AFL-CIO v. Local Union No. 589*,
   693 F.2d 666 (7th Cir. 1982) ................................................................................... 20

*J.E.F.M. v. Lynch*,
   837 F.3d 1026 (9th Cir. 2016) ................................................................................. 22

*Jimenez-Nieves v. United States*,
   682 F.2d 1 (1st Cir. 1982) ........................................................................................ 15

*Kentucky Dep't of Corr. v. Thompson*,
   490 U.S. 454 (1989) ........................................................................................... 18, 19

*Khalil v. President of the U.S.*,
   164 F.4th 259 (3d Cir. 2026) ................................................................................... 21

*Kinney-Coastal Oil Co. v. Kieffer*,
   277 U.S. 488 (1928) .................................................................................................. 24

*Loper Bright Ent. v. Raimondo*,
   603 U.S. 369 (2024) .................................................................................................. 12

*Mahdawi v. Trump*,
   2026 WL 2090981 (2d Cir. July 21, 2026) .............................................................. 21

*Marinescu v. Att'y Gen.*,
   284 F. App'x 889 (3d Cir. 2008) ............................................................................. 22

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) .................................................................................................. 16

*Mejia Rodriguez v. DHS*,
   562 F.3d 1137 (11th Cir. 2009) ............................................................................... 11

*Mullin v. Doe*,
   609 U.S. —, 2026 WL 1825840 (June 25, 2026) ............................................... passim

*Muscarello v. Winnebago County Bd.*,
   702 F.3d 909 (7th Cir. 2012) ................................................................................... 16

*National TPS Alliance v. Noem*,
   150 F.4th 1000 (9th Cir. 2025) ............................................................................... 11

*National TPS Alliance v. Noem*,
   166 F.4th 739 (9th Cir. 2026) ................................................................................. 11

*National TPS Alliance v. Noem*,
  773 F. Supp. 3d 807 (N.D. Cal. 2025) ...................................................................................... 11

*National TPS Alliance v. Noem*,
  798 F. Supp. 3d 1108 (N.D. Cal. 2025) .................................................................................... 11

*Nielsen v. Preap*,
  586 U.S. 392 (2019) .................................................................................................................. 10

*Nken v. Holder*,
  556 U.S. 418 (2009) ....................................................................................................... 21, 22, 23

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014) .................................................................................................................. 12

*Noem v. National TPS Alliance*,
  606 U.S. 909 (2025) ................................................................................................................ 1, 24

*Noem v. National TPS Alliance*,
  605 U.S. 1062 (2025) .............................................................................................................. 1, 24

*Nozzi v. Housing Auth. of City of L.A.*,
  806 F.3d 1178 (9th Cir. 2015) .................................................................................................. 17

*Olim v. Wakinekona*,
  461 U.S. 238 (1983) ............................................................................................................. 18, 19

*Portillo-Rendon v. Holder*,
  662 F.3d 815 (7th Cir. 2011) ............................................................................................... 17, 18

*Saget v. Trump*,
  375 F. Supp. 3d 280 (2019) ...................................................................................................... 11

*Sampson v. Murray*,
  415 U.S. 61 (1974) .................................................................................................................... 24

*Sanchez v. Mayorkas*,
  593 U.S. 409 (2021) .................................................................................................................... 3

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024) .................................................................................................................. 24

*Tiktok Inc. v. Trump*,
  490 F. Supp. 3d 73 (D.D.C. 2020) ........................................................................................... 23

*Town of Castle Rock, Colo. v. Gonzales*,
   545 U.S. 748 (2005) .......................................................................................... 18, 19

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) .......................................................................................... 24, 25

*Trump v. Int'l Refugee Assistance Project*,
   582 U.S. 571 (2017) ............................................................................................... 23

*United States v. Fla. E. Coast Ry. Co.*,
   410 U.S. 224 (1973) ............................................................................................... 16

*United States v. Martinez-Fuerte*,
   428 U.S. 543 (1976) ............................................................................................... 23

*United States v. Sanapaw*,
   366 F.3d 492 (7th Cir. 2004) ................................................................................. 11

*Verde-Rodriguez v. Att'y Gen.*,
   734 F.3d 198 (3d Cir. 2013) ................................................................................... 22

*W. Va. v. Env't Prot. Agency*,
   597 U.S. 697 (2022) ............................................................................................... 12

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ............................................................................................... 13

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ............................................................................................... 22

*Winter v. NRDC*,
   555 U.S. 7 (2008) ........................................................................................... 7, 8, 22

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ............................................................................... 21

*Yang v. Lynch*,
   611 F. App'x 357 (7th Cir. 2015) .......................................................................... 22

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ............................................................................................... 23

**Statutes**

5 U.S.C. § 705 .............................................................................................. passim

5 U.S.C. § 706(2)(A) ........................................................................................... 6

6 U.S.C. § 552(d) .......................................................................................................... 10

6 U.S.C. § 557 .................................................................................................. 3, 9, 10, 11

8 U.S.C. § 1101(a)(47) ................................................................................................... 20

8 U.S.C. § 1103 ........................................................................................................... 9, 11

8 U.S.C. § 1103(a) ..................................................................................................... 3, 9, 11

8 U.S.C. § 1103(g) ........................................................................................................... 9

8 U.S.C. §§ 1252(a)(5) ............................................................................................. 21, 22

8 U.S.C. §§ 1252(b)(9) ............................................................................................. 21, 22

8 U.S.C. §§ 1252(g) ........................................................................................................ 21

8 U.S.C. § 1254a ................................................................................................ 10, 11, 23

8 U.S.C. § 1254a(a)(1)(A)–(B) ....................................................................................... 3

8 U.S.C. § 1254a(a)(5) ................................................................................................... 20

8 U.S.C. § 1254a(b) .......................................................................................................... 6

8 U.S.C. § 1254a(b)(1) ................................................................................................ 3, 12

8 U.S.C. §§ 1254a(b)(1)(B)(i) ...................................................................................... 20

8 U.S.C. §§ 1254a(b)(1)(B)(ii) ..................................................................................... 20

8 U.S.C. § 1254a(b)(1)(C) ......................................................................................... 3, 20

8 U.S.C. § 1254a(b)(2) ..................................................................................................... 3

8 U.S.C. § 1254a(b)(3)(A) ......................................................................................... 3, 19

8 U.S.C. § 1254a(b)(3)(B) ................................................................................. 3, 8, 12, 20

8 U.S.C. § 1254a(b)(3)(C) ............................................................................................... 3

8 U.S.C. § 1254a(b)(5)(A) ...................................................................................... passim

8 U.S.C. § 1254a(d)(3) ..................................................................................................... 8

8 U.S.C. § 1254a(i) ............................................................................................................... 12

8 U.S.C. §§ 1254a(g) ............................................................................................................ 20

Pub. L. No. 101-649, 104 Stat. 4978 (1990)........................................................................... 3

Pub. L. No. 107-296, § 1517, 116 Stat. 2135, 2311 (2002)..................................................... 3

**Regulations**

*Designation of Burma (Myanmar) for Temporary Protected Status*,
    86 Fed. Reg. 28,132 (May 25, 2021) .............................................................................. 4

*Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status*,
    87 Fed. Reg. 58,515 (Sept. 27, 2022) ........................................................................... 4

*Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status*,
    89 Fed. Reg. 20,682 (Mar. 25, 2024)............................................................................ 4

*Termination of the Designation of Burma (Myanmar) for Temporary Protected Status*,
    90 Fed. Reg. 53,378 (Nov. 25, 2025)............................................................................ 4

**Introduction**

Last month, the Supreme Court rejected challenges materially indistinguishable from plaintiffs' to the termination of two other countries' TPS terminations, reversing district courts that had postponed those terminations. *Mullin v. Doe*, 609 U.S. —, 2026 WL 1825840 (June 25, 2026). That decision came after the Supreme Court twice stayed other district court orders postponing the termination of another country's TPS designation. *Noem v. National TPS Alliance*, 605 U.S. 909 (2025) ("*NTPSA I*"); *Noem v. National TPS Alliance*, 606 U.S. 1062 (2025) ("*NTPSA II*"). On the strength of those decisions, the Seventh Circuit summarily reversed this court's postponement order—the very relief plaintiffs now ask this court to reinstate. Order, *Aung Doe v. Mullin*, No. 26-1294 (7th Cir. July 16, 2026). Plaintiffs invite the court to try again, offering two (supposedly) new claims—an ultra vires claim and a procedural due process claim. *See* Dkt. 90 ("Am. Compl.") at ¶¶ 224–31. But plaintiffs are scraping past the bottom of the barrel. Their second-string claims have no prospect of succeeding where their first-round picks have already admittedly failed. The court should therefore deny plaintiffs' renewed motion for another stay under 5 U.S.C. § 705, Dkt. 98, and dissolve its orders granting an administrative stay, Dkt. 96, 97.

The plaintiffs here lack any prospect of success that could support further interim or preliminary relief. To start, their procedural due process claim is not "new." *See* Dkt. 99 ("Plaintiffs' Motion" or "Pls.' Mot.") at 16–23. It raises the same alleged process defects that plaintiffs asserted previously and that the Supreme Court deemed categorically unreviewable. Plaintiffs now affix a constitutional label to those allegations, but that is a transparent attempt to evade Congress's limits on judicial review and the Supreme Court's holding effectuating that limitation, by the simple expedient of labeling. Relatedly, plaintiffs' ultra vires claim is nonconstitutional in nature, so it is plainly foreclosed by the judicial review bar. *See* Pls.' Mot. at 8–16. And even if that were not so, it fails on its own terms. This is because plaintiffs' ultra vires

1

claim is premised on their belief that the termination of Burma's TPS designation was invalid because only the Attorney General—not the Secretary of Homeland Security—has authority over TPS determinations. But even if that were true, it would only mean that Burma was not lawfully designated for TPS in the first instance (since that designation was made by the putatively-without-authority Secretary), rendering void *ab initio* the very protections they now seek to preserve.

Plaintiffs' new claims are unreviewable and fail on their merits. Plaintiffs have failed to establish irreparable harm, and the balance of equities and public interest weigh against preliminary relief. And both defendants and the public share an interest in ensuring that the Secretary can carry out the responsibilities, assigned by Congress, to weigh the statutory factors governing TPS designations and make TPS determinations. In this case, and as the Secretary found, the conditions for Burma's TPS designation are no longer met. Delay of the Secretary's determination threatens to undermine the United States' foreign policy and national interest, particularly where Congress has provided the Secretary with broad discretion to assess conditions in foreign countries and reach determinations regarding TPS.

For these reasons and those discussed below, Plaintiffs' Motion should be denied, and the court should immediately dissolve the administrative stay.

**Background**

**I.      Statutory and Regulatory Background**

**A.  The TPS Statute**

The Immigration Act of 1990 established a program to create a means for providing temporary and discretionary protection in the United States for foreign nationals from designated countries experiencing ongoing armed conflict, environmental disaster, or "extraordinary and temporary conditions" that temporarily rendered the country unable to adequately handle the return

2

of its nationals.[1] Pub. L. No. 101-649, 104 Stat. 4978 (1990). As relevant here, the statute authorizes the United States Department of Homeland Security ("DHS"),[2] "after consultation with appropriate agencies of the Government," to designate countries for TPS if there are:

> extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1)(C).

Foreign nationals who are granted TPS based on a country designation are eligible for work authorization and may not be removed while that status is in effect. 8 U.S.C. § 1254a(a)(1)(A)–(B); *see also Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021) (explaining what TPS can provide for such foreign nationals). Initial determinations to designate a country for TPS are discretionary, 8 U.S.C. § 1254a(b)(1), and DHS must conduct periodic reviews to determine whether the conditions underlying a country's TPS designation continue to be met, 8 U.S.C. § 1254a(b)(2), (b)(3)(A). If the DHS Secretary "does not determine" that the foreign state "no longer meets the conditions for designation," then the TPS designation is extended. 8 U.S.C. § 1254a(b)(3)(C). On the other hand, if the Secretary determines that the foreign state "no longer continues to meet the conditions for designation," he "*shall* terminate the designation[.]" 8 U.S.C. § 1254a(b)(3)(B) (emphasis added). And Congress did not want such reviews to be judicially reviewed: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or

---

[1] This memorandum uses the term "foreign national" as equivalent to the statutory term of "alien" within the Immigration and Nationality Act ("INA").

[2] As will be discussed in more detail below, although the INA still includes many references to the Attorney General, Congress transferred the Attorney General's TPS authority to the DHS Secretary. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1517, 116 Stat. 2135, 2311 (2002) (codified at 6 U.S.C. § 557) (hereinafter, "HSA"); 8 U.S.C. § 1103(a).

termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A).

**B. Burma's 2021 TPS Designation, and the Secretary's Termination Thereof**

In March 2021, former Secretary of Homeland Security Alejandro Mayorkas designated Burma for TPS for 18 months, based on a February 2021 military coup. *See* DHS, *Designation of Burma (Myanmar) for Temporary Protected Status*, 86 Fed. Reg. 28,132 (May 25, 2021). This designation allowed Burmese nationals who had been continuously residing in the United States since March 11, 2021, to apply for TPS. *See id.* Following that initial designation, former Secretary Mayorkas extended the designation and newly designated Burma for TPS in 2022. *See* DHS, *Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status*, 87 Fed. Reg. 58,515 (Sept. 27, 2022). And the former Secretary again extended and newly designated Burma's designation from May 26, 2024, to November 25, 2025. *See* DHS, *Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status*, 89 Fed. Reg. 20,682 (Mar. 25, 2024).

On November 25, 2025, former Secretary of Homeland Security Kristi Noem announced the termination of TPS for Burma, with the termination effective January 26, 2026. *See* DHS, *Termination of the Designation of Burma (Myanmar) for Temporary Protected Status*, 90 Fed. Reg. 53,378 (Nov. 25, 2025). Former Secretary Noem concluded that the situation in Burma had improved enough for Burmese nationals to return home safely, citing progress in governance and stability—including the end of a state of emergency, plans for free and fair elections, successful ceasefire agreements, and improved local governance. *Id.* She also emphasized that the termination restored TPS to its *temporary* nature and was made after consultation with appropriate U.S. government agencies. *Id.*

4

## II.    Factual and Procedural Background

Almost four weeks later, this putative class action was filed by six Burmese TPS holders on behalf of a nationwide class of what they estimate to be 4,000 individuals seeking to block the Secretary's TPS termination. *See* Dkt. 1 ("Compl.") at ¶ 1. They disagree with the Secretary's determinations, arguing that Burma remains engulfed in violent conflict, and contending that the termination is part of a broader effort to systematically end TPS designations. *Id.* at ¶¶ 4–6. They therefore brought three claims: (1) an Administrative Procedure Act ("APA") claim arguing that DHS's termination of TPS for Burmese nationals deviated from past practice, was predetermined, "pretextual[,] and animated by animus based on the perceived race and ethnicity of Burmese national TPS holders," *id.* at ¶¶ 191–97; (2) another APA claim arguing that the same determination, made "with only 60 days' notice," was arbitrary and capricious because it differed from past agency practices, *id.* at ¶¶ 198–201; and (3) a constitutional claim arguing that the Secretary's determination violated the Fifth Amendment's equal protection component because it "impermissibly and intentionally discriminates against Plaintiffs because of their race, ethnicity, or national origin," *id.* at ¶¶ 202–06. And to get out ahead of the termination's effective date of January 26, 2026, the plaintiffs moved for a stay under the APA's 5 U.S.C. § 705, as they wished to postpone its effective date and stave off the TPS termination as long as possible. *See* Dkt. 15.

On January 23, 2026, this court granted the plaintiffs' first postponement motion under 5 U.S.C. § 705 of the APA, postponing the termination of Burma's TPS effective date pending resolution of the merits. Dkt. 52; *see also* Dkt. 51 (opinion). Defendants appealed.

On June 25, 2026, the Supreme Court held that "the TPS statute's judicial-review bar applies to all non-constitutional claims," reserved ruling on whether the judicial-review bar applies to constitutional claims, and held that an equal-protection claim—analogous to the one asserted by plaintiffs here—was not viable. *Mullin v. Doe*, 2026 WL 1825840, at *10–13. In the face of the

5

Supreme Court's ruling, and following position statements from the parties, the Seventh Circuit summarily reversed this court's postponement order on July 16, 2026. The court of appeals' mandate issued today (July 27, 2026). Nonetheless, on July 19, 2026, this court administratively stayed the termination's effect through August 7, 2026, to permit orderly briefing as to plaintiffs' latest postponement request. Dkt. 97.

The backdrop to Plaintiffs' Motion is that, on July 14, 2026, they filed their amended complaint. Dkt. 90. After the Supreme Court and Seventh Circuit's rulings, the plaintiffs added two "new" claims: (1) a procedural due process claim under the Due Process Clause; and (2) an excess of authority claim under the APA or as a freestanding, nonstatutory ultra vires claim. Am. Compl. ¶¶ 224–31. Thus, the amended complaint asserts five claims arising from the Secretary's termination of Burma's designation: (1) that the termination of Burma's TPS was arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A); (2) that it was contrary to law and in excess of statutory authority, including for asserted noncompliance with the review, consultation, and notice requirements of 8 U.S.C. § 1254a(b); (3) that it violated the Fifth Amendment's equal protection component, whether as motivated by animus based on race, ethnicity, and national origin or as targeting TPS holders as a politically unpopular group; (4) that it deprived plaintiffs of procedural due process; and (5) that the Secretary's termination (although not the earlier designation) was ultra vires because, in plaintiffs' view, the Homeland Security Act of 2002 never transferred TPS authority from the Attorney General to the Secretary of Homeland Security. *See* Am. Compl. ¶¶ 207–31. Plaintiffs again seek declaratory relief, an order setting aside the termination, and classwide injunctive relief barring the implementation of the Secretary's termination of Burma's TPS. *Id. at* 81 (Prayer for Relief).

Plaintiffs' Motion to Postpone rests exclusively on Counts Four and Five (the two claims

6

they added by amendment after the Court's decision in *Mullin v. Doe*) and does not contend that the amended complaint's APA or equal protection claims can support postponement.

## Legal Standard

The same standard that governs the issuance of a stay under § 705 is the standard that governs the issuance of a preliminary injunction. *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020). Accordingly, to obtain their requested relief, plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). As the Seventh Circuit has explained, an "applicant must make a strong showing that he is likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). "[A] possibility of success is not enough. Neither is a 'better than negligible' chance." *Id.* Movants must also demonstrate clearly, and through specific factual allegations, that immediate and irreparable injury will result to them absent the order. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (citations omitted). Only if the movants meet their burden of showing both a likelihood of success on the merits and an imminent risk of irreparable harm will courts then engage in further analysis. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

## Argument

**I.     Plaintiffs Have No Likelihood of Success.**

**A.  This Court Lacks Jurisdiction Over Plaintiffs' Claims.**

**1.  8 U.S.C. § 1254a(b)(5)(A) Deprives This Court of Jurisdiction Over Plaintiffs' Ultra Vires Claim.**

Start with plaintiffs' ultra vires claim, where they argue that the DHS Secretary's decision to terminate Burma's TPS designation was ultra vires because, in their view, only the Attorney

7

General has the authority to terminate a country's TPS designation. Pls.' Mot. at 8–14. This claim is unreviewable from the start because it is a non-constitutional claim, and the Supreme Court has held that "the TPS statute's judicial-review bar applies to *all* non-constitutional claims." *Mullin v. Doe*, 2026 WL 1825840, at *10 (emphasis added). The court cannot and should not proceed further despite plaintiffs' contention that the Supreme Court's treatment of this issue was a "drive-by" ruling. Pls.' Mot. at 15.

Plaintiffs' argument to the contrary is that the judicial-review bar does not apply because § 1254a(b)(5)(A) refers only to the Attorney General. *Id.* at 9–14. But that gets *Mullin v. Doe* wrong because the Supreme Court squarely held that the statute barred judicial review of a TPS determination made by the DHS Secretary. Confining the review bar solely to decisions of the Attorney General is a non-starter in the wake of that decision, which would upend the Supreme Court's actual *holdings.*

Even if plaintiffs' ultra vires claim were reviewable, it fails on the merits. To begin with, plaintiffs are correct that when Congress created TPS in 1990, the "Attorney General" possessed the authority to terminate a TPS designation. *See id.* at 9–10 (citing 8 U.S.C. § 1254a(b)(3)(B), (d)(3)). Plaintiffs are also correct that, in the decade that followed, the Attorney General decided when to designate a country for TPS and when to extend or terminate a TPS designation. *Id.* at 10 & n.2.

That changed after Congress created DHS and reorganized responsibility for numerous Executive Branch immigration functions. A straightforward reading of the statutes, the Supreme Court's decision last month, every lower-court decision for the past 24 years, and longstanding Executive Branch practice confirm that the DHS Secretary holds the statutory authority to designate countries for TPS and to extend or terminate those designations.

**Statutes.** The key event here occurred in 2002, when Congress passed the Homeland Security Act ("HSA"), which unambiguously transferred all immigration functions—including TPS-related functions—from the Attorney General to the DHS Secretary. *See* 8 U.S.C. § 1103 (charging the DHS Secretary "with the administration and enforcement" of all laws "relating to the immigration and naturalization of aliens," subject to limited exceptions for duties specifically conferred on the President, Attorney General, or other executives). Section 1103(a) carves out functions conferred upon the Attorney General, but this same section specifies that these conferred—and thus reserved—functions pertain to those previously exercised by the Executive Office for Immigration Review ("EOIR"): "The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by [EOIR], or by the Attorney General with respect to [EOIR] . . . ." 8 U.S.C. § 1103(g).

EOIR did not previously administer the TPS statute. Therefore, the Attorney General did not retain such functions, which have been transferred to the Secretary. If, as Plaintiffs contend, § 1103(a) reserved to the Attorney General *all* functions that the Attorney General previously exercised, then § 1103(g) would prove redundant: There would be no need to specify that the Attorney General continues to have the functions that the Attorney General previously exercised with respect to EOIR, because § 1103(a) would have already reserved those functions to the Attorney General. And it is a cardinal rule of statutory construction that courts should "avoid" interpreting a statute in a way that would render "some words altogether redundant." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995).

Congress did not change the TPS statute's text to specifically refer to the DHS Secretary because it did not need to. Instead, it relied on a series of transfer and reference-updating

9

provisions built into the HSA to accomplish the shift in authority. While 8 U.S.C. § 1103 charged the DHS Secretary with the "administration and enforcement" of the immigration laws, 6 U.S.C. § 557 operated to update all other federal laws with respect to functions that were transferred to the Secretary under the HSA:

> With respect to any function transferred by or under this chapter…reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.

*Id.* Because TPS administration was a function of the Attorney General that was transferred to DHS, Section 557 operates to update every reference to the Attorney General in 8 U.S.C. § 1254a to mean the Secretary of DHS. *Id.* Since passage of the HSA in 2002, and for more than two decades, the Secretary of Homeland Security has consistently exercised authority over the designation, extension, and termination of TPS for dozens of countries.

**Judicial Constructions and Congressional Acquiescence.** Reflecting the statutes' clarity, *every* court to discuss the issue for the last 24 years has recognized the transfer of TPS authority to the Secretary of Homeland Security. It should also be controlling that the Supreme Court clearly stated that "[r]esponsibility for TPS decisions rests with the Secretary of Homeland Security." *Doe v. Mullin*, 2026 WL 1825840, at \*4. This was no offhand or unreasoned statement. As support, the Supreme Court cited 6 U.S.C. §§ 552(d) and 557—making clear that it specifically considered and accepted the transfer of TPS authority from the Attorney General to the Secretary. *Id.* And throughout its decision, the Supreme Court unequivocally interpreted the TPS statute as pertaining to the Secretary. *Cf. Barbosa da Cunha v. Freden*, 175 F.4th 61, 85 (2d Cir. 2026) ("[W]e are obligated to accord great deference to Supreme Court dicta[.]" (cleaned up)). Indeed, it would be passing strange if this court concluded that the Supreme Court misdescribed the very

10

statute it was construing, especially where the Court has been consistent regarding the transfer of authority from the Attorney General to the Secretary based on the HSA. *See, e.g.*, *Nielsen v. Preap*, 586 U.S. 392, 398 n.2 (2019) ("We replace 'Attorney General' with 'Secretary' because Congress has empowered the Secretary to enforce the Immigration and Nationality Act[.]").

Lower courts have universally adopted this construction, too. The Eleventh Circuit in *Mejia Rodriguez v. DHS*, 562 F.3d 1137 (11th Cir. 2009), recognized that although the TPS statute references the Attorney General, decision-making authorities were transferred to the Secretary of DHS by statute (citing 8 U.S.C. § 1103(a)). The district court in *Saget v. Trump*, 375 F. Supp. 3d 280, 297 (2019), likewise recognized 8 U.S.C. § 1103 and 6 U.S.C. § 557 as the basis for the transfer of TPS designation authority to the Secretary. More recently, in *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 582 (D. Md. 2025), the District of Maryland explicitly described 6 U.S.C. § 557 as "conferring certain authorities granted by statute to the Attorney General, including those relating to TPS, to the Secretary of Homeland Security." The district courts in *National TPS Alliance v. Noem*, 773 F. Supp. 3d 807 (N.D. Cal. 2025), *National TPS Alliance v. Noem*, 798 F. Supp. 3d 1108 (N.D. Cal. 2025), and the Ninth Circuit in its 2025 and 2026 decisions in that same litigation, *National TPS Alliance v. Noem*, 150 F.4th 1000 (9th Cir. 2025), *National TPS Alliance v. Noem*, 166 F.4th 739 (9th Cir. 2026), all proceeded on the premise that the DHS Secretary exercises the authority granted by 8 U.S.C. § 1254a.

With this backdrop in mind, the plaintiffs cannot point to a single decision in which a court has concluded the DHS Secretary lacked the authority to designate a country for TPS or terminate a country's TPS designation. Consequently, there is as strong a record as any for congressional acquiescence to DHS having authority over TPS decisionmaking. *Cf. United States v. Sanapaw*, 366 F.3d 492, 495 (7th Cir. 2004) ("Congress's thirty-year acquiescence to a definition

11

of marijuana that includes all Cannabis containing THC indicates that the courts have properly interpreted the Act."). Underscoring this, DHS submits an annual report to Congress regarding its operation of the TPS authority. 8 U.S.C. § 1254a(i). Congress can hardly have missed that that report has been submitted by the Secretary of Homeland Security, not the Attorney General, for decades. *See, e.g.*, Dep't of Homeland Security, *Temporary Protected Status: Calendar Year 2023 Annual Report*, https://www.uscis.gov/sites/default/files/document/reports/TPS_CY23_Congressional_Report.pdf

**Executive Branch Constructions.** Moreover, the consistent, unbroken practice of DHS exercising TPS authority—including designating, extending, and terminating TPS for dozens of countries over more than two decades—constitutes a contemporaneous and long-standing administrative construction of the transfer that courts have universally accepted. *See, e.g.*, *Loper Bright Ent. v. Raimondo*, 603 U.S. 369, 386 (2024) (recognizing that "the longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is." (alterations accepted; internal quotation marks omitted)); *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014); *West Virginia. v. Env't Prot. Agency*, 597 U.S. 697, 747 (2022) (Gorsuch, J., concurring) ("A 'contemporaneous' and long-held Executive Branch interpretation of a statute is entitled to some weight.").

Finally, as a practical matter, if this court were to adopt Plaintiff's theory, it would mean that the Secretary lacked authority to *designate* Burma for TPS in the first instance. Plaintiffs do not contend otherwise and offer no theory to distinguish the authority to terminate from the authority to designate. Both provisions of the TPS statute refer to the "Attorney General." 8 U.S.C. § 1254a(b)(1), (b)(3)(B). If the Court were to find that the Secretary lacks authority over TPS determinations—such that the termination of Burma's TPS designation lacks effect—it would

12

likewise mean that Burma's initial TPS designation (and subsequent extensions) lacked legal effect as well. Plaintiffs' success on this claim actually would strip them of the very protections they seek to maintain, making this claim self-defeating.

Plaintiffs attempt to address this glaring internal contradiction in four makeweight sentences jammed into a footnote. Pls.' Mot. at 9 n.1. All acknowledge that success on this theory would doom the validity of Burma's TPS designation. Each is merely an attempt to squeeze a little more time out of what would be, on their theory, a TPS designation that has violated the law since day one. The first is an unattractive appeal to remedial hyperformalism. The second misreads *DHS v. Regents*, as the passage at issue rested on the conclusion that the program in question was *not* wholly unlawful ab initio—but no similar escape hatch would apply here if plaintiffs' ultra vires theory were to succeed. *See DHS v. Regents*, 591 U.S. 1, 28–29 (2020) (criticizing decisionmaker's reasoning which "treated the Attorney General's conclusion regarding the illegality of benefits as sufficient to rescind both benefits and forbearance, without explanation"). And the third is a mystifying reference to "mutually explicit understandings" creating "vested due process interests." To the extent plaintiffs mean by this to assert a *substantive* due process right to maintaining a TPS designation that they argue has been ultra vires from the start, nothing in this nation's history or tradition could even begin to support that argument. *See, e.g.*, *Dep't of State v. Muñoz*, 602 U.S. 899, 910–11 (2024); *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). Indeed, "it would be remarkable to put the Government to the most demanding test in constitutional law in the field of immigration, an area unsuited to rigorous judicial oversight." *Muñoz*, 602 U.S. at 911. And to the extent plaintiffs instead mean to argue that they have a *procedural* due process claim, that argument fails for the reasons explained below.

13

**B. Plaintiffs' Due Process Claim Is Equally Unlikely to Succeed.**

Plaintiffs' constitutional claim that the termination of Burma's TPS designation violated their procedural due process rights is equally off-base. *See* Pls.' Mot. at 16–23. They allege that they have protected liberty and property interests in having TPS, and that the termination determination deprived them of those interests without due process of law because, in their view, it was made without following the requisite procedural steps in the TPS statute. *See id.* at 17–21. The core of plaintiffs' theory in this regard is that the DHS Secretary did not properly consult other appropriate agencies and improperly relied on the national interest in making her determination to terminate Burma's TPS designation. *See id.* at 21–22. Based on this premise, they allege that the termination was predetermined, "pretextual, and motivated by factors not enumerated by the [TPS] statute." *Id.* at 22. Here again, however, the plaintiffs are wrong for at least four independently sufficient reasons.

*First*, and most fundamentally, § 1254a(b)(5)(A) bars review of this claim. That provision bars "judicial review" of decisions to terminate TPS, without distinguishing between statutory and constitutional claims anymore than it distinguishes between procedural and substantive claims.

The Supreme Court reserved the question whether the judicial review bar applies to constitutional claims. But even if some constitutional claims could theoretically proceed despite the blanket prohibition on "judicial review" of TPS termination decisions, it is particularly clear that plaintiffs' "due process" claim is barred because it is a straightforward retread of the same claims the Supreme Court already held were covered by the judicial-review bar. *Cf., e.g.*, *Evans v. Greenfield Banking Co.*, 774 F.3d 1117, 1124 (7th Cir. 2014) ("Creative pleading does not create jurisdiction."); *Czerkies v. U.S. Dept. of Labor*, 73 F.3d 1435, 1443 (7th Cir. 1996) (en banc) (dismissing "a case . . . cloaked in constitutional terms," where the plaintiff "affixed the

14

constitutional label to a garden-variety claim for benefits plainly barred by" a statute).

The plaintiffs in *Mullin v. Doe*—like plaintiffs here—sought to challenge a TPS termination "based on alleged procedural errors," including that the Secretary did not adequately consult with appropriate federal agencies and that the Secretary's decision was pretextual, preordained, and politically motivated. 2026 WL 1825840, at \*8. The Supreme Court, however, held that the judicial-review bar applied to precisely those claims. *Id.* at \*8–9. And, in so doing, it took care to emphasize the "importan[ce]" of "ensur[ing] that challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering," such as labeling as "procedural" claims that are really substantive in nature. *Id.* at \*10. Plaintiffs' actions here illustrate the foresight of that discussion, attempting to circumvent the Supreme Court's endorsement of the judicial-review bar by admittedly seeking to challenge the *same* alleged procedural violations under a constitutional label. The Court should look beyond the mere "constitutional" label and recognize this claim for what it clearly is: a challenge based on the Secretary's purported failure to adhere to *statutory* requirements. *See Jimenez-Nieves v. United States*, 682 F.2d 1, 6 (1st Cir. 1982) ("In examining a complaint we are bound to look beyond the literal meaning of the language used to ascertain the real cause of the complaint."). "Any other result would elevate form over substance and allow parties to evade" the TPS judicial-review bar "by relabeling their" statutory claims as constitutional ones. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).

It would be extraordinary if the plaintiffs could—like the flip of a switch—so easily and completely sidestep § 1254a(b)(5)(A) by restyling the same *previously unreviewable* procedural disputes as constitutional ones. Under plaintiffs' theory, the DHS Secretary's alleged failure to meaningfully consult with appropriate agencies was unreviewable before—but has become reviewable now—merely because they have called this alleged statutory violation a constitutional

15

one.  If that were how things worked, what is the significance of the Supreme Court's conclusion that the judicial review bar applies to claims based on alleged procedural errors?  *All of the claims* that *Mullin v. Doe* took off the table could be reasserted as procedural due process claims.  Indeed, that is precisely what plaintiffs' amendments to their complaint seek to accomplish.

*Second*, the procedural due process constraints that plaintiffs seek to invoke do not apply to the government's across-the-board determinations to designate, extend, or terminate a TPS designation for a specific country.  *See, e.g.*, *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption."); *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245–46 (1973) (distinguishing, for due process purposes, between agency decisions that "adjudicate disputed facts in particular cases" and those that involve "the formulation of a basically legislative-type judgment, for prospective application only").  In this regard, plaintiffs' procedural due process claim is predicated on the "three-part balancing test articulated" in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  Pls.' Mot. at 16–17, 20.  But *Mathews* is entirely the wrong framework, as it applies to individual adjudications, rather than to legislation or regulatory actions.  As the Seventh Circuit has explained, it is well-settled that "the due process clause does not require individual hearings before a governmental body takes decisions that affect the interests of persons in the aggregate."  *Dawson v. Milwaukee Housing Auth.*, 930 F.2d 1283, 1286 (7th Cir. 1991); *see also Goros v. County of Cook*, 489 F.3d 857, 859–60 (7th Cir.2007) ("[I]t has been understood for a long time that the due process clauses do not require hearings to resolve disputes about the meaning and effect of laws, regulations, and contracts.").  Simply put, "[w]here a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption."  *Muscarello v. Winnebago County Bd.*, 702 F.3d 909, 914 (7th Cir.

16

2012) (cleaned up). Underscoring this category error, the cases plaintiffs rely upon all arose in the context of individual adjudications. *See* Pls.' Mot. at 20; *Mathews*, 424 U.S. at 323 (Social Security disability benefits); *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 535 (1985) (public employee termination); *Bd. of Regents v. Roth*, 408 U.S. 564, 566 (1972); *Bell v. Burson*, 402 U.S. 535, 535-37 (1971) (driver's license suspension); *Adame v. Holder*, 762 F.3d 667, 669 (7th Cir. 2014) (cancellation of removal); *Portillo-Rendon v. Holder*, 662 F.3d 815, 816 (7th Cir. 2011); *Nozzi v. Housing Auth. of City of L.A.*, 806 F.3d 1178, 1183 (9th Cir. 2015) (housing vouchers). None even suggests any effort to contradict the rule just explained or to apply individual adjudication-style due process requirements to generally applicable, aggregate actions like the termination of a country's TPS designation, even if a benefit was awarded under a previously applicable regime. Plaintiffs' due process claim cannot be analyzed under the individualized adjudication framework they propose, and plaintiffs thus have no prospect of succeeding on a challenge based on *Mathews* to the termination of Burma's TPS designation.

*Third*, plaintiffs' allegations turn exclusively on statutory procedural requirements and thus fail to state a due process claim on their own terms. Plaintiffs claim that Burma's TPS designation was terminated without due process of law based solely on their allegations that the Secretary failed to follow certain "procedural safeguards in *the TPS statute*." Pls.' Mot. at 17 (emphasis added). But "a statutory violation does not necessarily amount to a constitutional procedural due process violation." *Arguello v. Noem*, No. 25-cv-786, 2025 WL 2896849, at *6 (D. Utah Oct. 9, 2025).

The two cases that plaintiffs cite on this issue helpfully illustrate the point. *See* Pls.' Mot. at 20. In *Portillo-Rendon*, the Seventh Circuit took pains to distinguish between alleged due process violations and alleged statutory or regulatory violations: "it is appropriate to consider the

17

Constitution only if the statute and regulations are deficient." 662 F.3d at 817. The court of appeals explained that if an agency failed to provide the "process required by the statute," the court could "provide relief on statutory grounds." *Id.* And it cautioned that "intoning 'due process'" would not "cover" the same ground as the procedural protections afforded by statutes and regulations. *Id.* Subsequently, in *Adame*, the Seventh Circuit cited *Portillo-Rendon* and included a parenthetical explanation stating that "a petitioner may have a legal claim when she can show statutory procedural shortfalls." 762 F.3d at 672. The point being that an agency's failure to abide by statutory procedures may give rise to a *statutory* claim—not a constitutional one.

In short, a failure to abide by statutory *procedural* requirements would only amount to a due process violation if those requirements encompassed or were coextensive with the demands of the Due Process Clause itself. And plaintiffs' due process claim does not allege or even suggest that the Due Process Clause itself—independent of the TPS statute—would require the Secretary to consult with appropriate agencies or publish the basis for their determination in the *Federal Register* before terminating a country's TPS designation. Accordingly, plaintiffs' due process claim fails on its merits.

*Fourth*, to assert a procedural due process claim, plaintiffs must "first" show that "there exists a liberty or property interest" to which they have "a legitimate claim of entitlement." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *see Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); *Dave v. Ashcroft*, 363 F.3d 649, 652–53 (7th Cir. 2004). Where a statute creates a benefit, the plaintiff must "have more than a unilateral expectation of it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "[A] benefit is not a protected entitlement if government officials may grant

18

or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005). Accordingly, a statute may give rise to a legitimate claim of entitlement only where it places "substantive limitations" on the government's exercise of discretion, *Wakinekona*, 461 U.S. at 249, and "mandat[es] the outcome to be reached upon a finding that the relevant criteria have been met," *Thompson*, 490 U.S. at 462.

Plaintiffs have no legitimate claim of entitlement to Burma's TPS designation being extended. The TPS statute provides in relevant part that—in deciding whether to extend or terminate a designation—the Secretary "shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). It does not, however, impose any "substantive limitations" on the Secretary in determining whether these conditions continue to be met. *Wakinekona*, 461 U.S. at 249. And while the statute mandates *termination* in specified circumstances, it does not mandate *extending* a country's TPS designation upon a finding that certain criteria have been met. In other words, it does not channel agency direction by providing that, if certain "substantive predicates are present, a particular outcome must follow." *Thompson*, 490 U.S. at 463 (citing *Hewitt v. Helms*, 459 U.S. 460, 472 (1983)).

And insofar as plaintiffs claim a constitutional entitlement to have the Secretary follow the TPS statute's procedural provisions before terminating a TPS designation, that "would be an entitlement to nothing but procedure," which the Supreme Court has deemed "inadequate" to form the basis of a protected interest under the Due Process Clause. *Town of Castle Rock*, 545 U.S. at 764.

*Last*, for the reasons already explained in the government's opposition to plaintiffs' first motion for a stay based on these alleged procedural faults, plaintiffs' underlying claims of procedural irregularities all fall flat. The termination complied with the statute and the APA;

19

plaintiffs due-process framing just superadds problems on a foundation that was already baseless.

## I.     There Is No Showing of Imminent, Irreparable Harm Here.

This court should also deny Plaintiffs' Motion because they cannot carry their burden to show that they are likely to suffer imminent, irreparable harm. *See Int'l Union, Allied Indus. Workers of Am., AFL-CIO v. Local Union No. 589*, 693 F.2d 666, 674 (7th Cir. 1982). This is because plaintiffs' entire argument on irreparable harm is primarily rooted in the fear of potentially being placed into removal proceedings, detention during that removal process, and possible deportation. *See* Pls' Br. at 23–24. But that is not *irreparable* harm because the removal process is inherent in the statutory scheme *Congress* designed here, which provides "temporary" status— meaning that foreign nationals have no right to stay here freely after that temporary status has come to an end. *See* 8 U.S.C. §§ 1254a(b)(1)(B)(i), (ii), (C), and (g). The Secretary's termination decision here occurred as a result of congressionally prescribed periodic review and provided the requisite 60-day notice of termination. And the Secretary's decision to terminate TPS here is not equivalent to a final removal order. See 8 U.S.C. § 1101(a)(47). Instead, when a TPS designation terminates, beneficiaries return to the immigration status they held before Burma's 2021 designation. And putative class members who are TPS beneficiaries may have other immigrant or nonimmigrant status, 8 U.S.C. § 1254a(a)(5); those who have a credible fear of persecution in their home country may apply for asylum. Plaintiffs' speculative concerns at this stage are therefore insufficient to outweigh the concrete harms to preventing the Secretary from undertaking and implementing precisely the type of periodic review of TPS determinations that Congress wanted to occur in 8 U.S.C. § 1254a(b)(3)(B).

Moreover, plaintiffs cannot rely on *potential* threats of removal, detention, or loss of employment authorization by themselves or collectively, to establish irreparable harm. As a threshold concern, considering removal and removal-related detention as harms would effectively

invite the court to weigh in on questions of law and fact that arise from actions or proceedings to remove foreign nationals, and Congress specifically divested federal district courts of authority to review such questions. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9), (g).[3] Even if the court were to review plaintiffs' alleged removal concerns, "[t]he Supreme Court has held that 'simply showing some *possibility* of irreparable injury' is not sufficient to make the irreparable harm showing needed to obtain preliminary relief." *Hanson v. District of Columbia*, 120 F.4th 223, 245 (D.C. Cir. 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)), *cert. denied*, 145 S. Ct. 2778 (2025). And indeed, the same *Nken* Court confirmed that, while a serious burden, removal "is not categorically irreparable." 556 U.S. at 435. None of the plaintiffs allege that they have ever been subject to removal proceedings, let alone that they have orders of removal. Therefore, speculative fears about removal are nothing more than "remote conjecture" at this point, and that is simply not enough to meet their high burden. *Hanson*, 120 F.4th at 245. Similarly for detention, there is nothing in the record that even *suggests* that plaintiffs would be subject to detention immediately upon TPS being terminated. Such speculation is instead "pure conjecture" that makes preliminary injunctive relief improper. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 676 (D.C. Cir. 1985).

Even if the threat of removal were not merely theoretical, plaintiffs cannot establish that the threat of removal is irreparable. If relief from removal can be afforded later, then there is no irreparable harm for the purpose of awarding extraordinary relief. *See Nken*, 556 U.S. at 434. None of the plaintiffs alleges that they could not obtain review of their fear of return to Burma through regular immigration proceedings if such proceedings were to be commenced. If so,

---

[3] Detention claims are subsumed into the jurisdictional bars within 8 U.S.C. §§ 1252(b)(9) and (g), which both strip federal district courts of habeas jurisdiction over claims related to removal. *See, e.g.*, *Mahdawi v. Trump*, — F.4th —, 2026 WL 2090981 (2d Cir. July 21, 2026); *Khalil v. President of the U.S.*, 164 F.4th 259 (3d Cir. 2026).

plaintiffs can then present fear claims before an immigration judge, appeal an adverse ruling to the Board of Immigration Appeals, and from there file a petition for review with the appropriate court of appeals. 8 U.S.C. §§ 1252(a)(5), (b)(9); *see also J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) ("Taken together, § 1252(a)(5) and § 1252(b)(9) mean that any issue – whether legal or factual – arising from any removal-related activity can be reviewed only through the [petition-for-review] process."); *Verde-Rodriguez v. Att'y Gen.*, 734 F.3d 198, 201 (3d Cir. 2013). And even if proceedings are not commenced, nothing is stopping the plaintiffs from affirmatively seeking relief from removal by filing applications with USCIS. *See generally Dhakal v. Sessions*, 895 F.3d 532 (7th Cir. 2018) (discussing the affirmative asylum application of a Nepalese TPS recipient). Putative class members who are in removal proceedings can raise and obtain Article III review of issues related to removal, including fears about ongoing medical treatment[4] and potential employment opportunities.[5] Similarly, if plaintiffs are detained (which is a permissible component of the removal process), they may seek review of their detention through habeas.

Accordingly, the plaintiffs have failed to carry their burden that they will suffer irreparable harm absent injunctive relief.

## II. The Balance of Equities and the Public Interest Favor Defendants.

The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. A court "'should pay particular regard for the public consequences'" of injunctive relief. *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-*

---

[4] *See, e.g.*, *Yang v. Lynch*, 611 F. App'x 357, 359 (7th Cir. 2015) (recognizing that the Board of Immigration Appeals would review claims related to medical care in determining whether to reopen proceedings).

[5] *See, e.g.*, *Marinescu v. Att'y Gen.*, 284 F. App'x 889, 894 (3d Cir. 2008) (discussing employment prospects established in evidentiary record); *Francisco-Diego v. Garland*, No. 21-3870 2022 U.S. App. LEXIS 15036, at *8 (6th Cir. 2022) (same).

*Barcelo*, 456 U.S. 305, 312 (1982)). Here, the balance of the equities and public interest tips decisively in defendants' favor because "[t]he interest in preserving national security is an urgent objective of the highest order." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (per curiam). That is the challenge that this court is reviewing: the Secretary's discretionary judgment in concluding that the conditions for Burma's TPS designation are no longer met. The clear congressional purpose of § 1254a is to allow the Secretary to make a determination as to whether a foreign state's TPS designation is to be terminated and to do so in a timely manner. Granting plaintiffs relief here would "inflict[] irreparable harm on the [Secretary of Homeland Security] by interfering with the national-security" and national interests "determinations entrusted to [her] by Congress." *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 U.S. App. LEXIS 15297, at *9 (D.C. Cir. June 20, 2025). In a case in which the court "must, of course, give deference to the Executive Branch's evaluation of the facts and the sensitive and weighty interests of national security and foreign affairs, including the timing of those . . . decisions," the public interest favors the government. *Tiktok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (citation modified) (citations omitted).

Additionally, the significance of the public interest in the enforcement of the United States' immigration laws is well-settled. *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Nken*, 556 U.S. at 435. The Secretary's termination determination is meant to advance the enforcement of those laws, such as ending the unlawful presence of foreign nationals who would remain in the United States in violation of law. *See Nken*, 556 U.S. at 436. Preserving the political branches' authority to control such policy choices serves "the obvious necessity that the Nation speak with one voice" on such matters. *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001). This is why the Supreme Court has already concluded, twice, that the government suffers irreparable

23

harm from erroneous stays of TPS terminations. *See NTPSA I*, 605 U.S. 909 (2025); *NTPSA II*, 606 U.S. 1062 (2025).

## III.    Any Grant of Preliminary Relief Must be Narrowly Tailored.

If the court grants the relief sought, it should be strictly limited to those plaintiffs in this matter who have established standing, a likelihood of success, and irreparable harm. It should not inure to a putative class where, as here, no class certification motion has even been filed. This is shown by how the Supreme Court made clear that universal preliminary injunctive relief, untethered to the plaintiffs in a litigation, is unlawful. Specifically, the Supreme Court ruled that a "universal injunction . . . falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025). At most, a court "may administer complete relief between the parties" and should not go beyond that to enjoin action or implementation more broadly. *Id.* at 851 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)).

Those limitations on courts' equitable authority apply just as squarely to § 705 relief as to preliminary injunctions. Nothing in § 705 rebuts the presumption that traditional equitable rules apply to relief ordered under § 705, so § 705, like the Judiciary Act of 1789, does not authorize universal relief. To the contrary, § 705's language embraces principles of equity, authorizing "all necessary and appropriate process" and making clear that "irreparable harm," a traditional equitable inquiry, is a key consideration. 5 U.S.C. § 705; *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (interpreting similar statutory text to incorporate traditional equitable principles); *Hecht v. Bowles*, 321 U.S. 321, 330 (1944) (courts should not "lightly imply" a "major departure" from the "long tradition" of equity). The Supreme Court and commentators thus recognize that § 705 "was primarily intended to reflect" the "existing law," not to "fashion new

24

rules," unmoored from principles of equity, governing remedies. *Sampson v. Murray*, 415 U.S. 61, 80 n.15 (1974); *see also* Louis L. Jaffe, *Judicial Control of Administrative Action* 662 (1965) (§ 705 merely "relates the power granted under the All Writs statute to the review of administrative orders"); Tom C. Clark, *Attorney General's Manual on the Administrative Procedure Act* 106 (1947) (§ 705 "is an equitable power, to be exercised 'upon such conditions as may be required.'"); H.R. Rep. No. 1980, 79th Cong., 2d Sess. 43 (1946) (explaining that the authority granted by what is now § 705 "is equitable" and "would normally, if not always, be limited to the parties complainant"). In sum, there is no basis to read § 705 to depart from the "party-specific principles" that "permeate our understanding of equity." *CASA*, 606 U.S. at 844; *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995–96 (9th Cir. 2025) (court "limit[ed a] district court's § 705 stay order" to plaintiff's clients in light of *CASA*).

## Conclusion

For the foregoing reasons, the court should deny the Plaintiffs' Motion.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Joshua S. Press
JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7625
joshua.press@usdoj.gov

By: s/ Temilade F. Oduala
TEMILADE F. ODUALA
Special Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-1998
Temilade.Oduala@usdoj.gov

25