**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Aung DOE; Nina DOE; Thura DOE; Khin Thet DOE; Chu Let DOE; and Maung DOE, on their own behalf and on behalf of others similarly situated, | |
| *Plaintiffs*, | Case No. 1:25-cv-15483 |
| – versus – | Judge Kennelly |
| Markwayne MULLIN, Secretary, United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA, | |
| *Defendants*. | |

**REPLY IN SUPPORT OF PLAINTIFFS' RENEWED MOTION TO POSTPONE**
**EFFECTIVE DATE OF AGENCY ACTION**

**INTRODUCTION**

Plaintiffs face catastrophic harms from Defendants' relentless efforts to strip protection from Burmese TPS holders—loss of lawful status and employment authorization, and threats of detention and removal from the United States. Defendants have made these harms more acute by pursuing a myriad of policies that cut off avenues for TPS holders to seek other forms of protection and immigration relief. In response to Plaintiffs' renewed request for preliminary relief, Defendants ask this Court to misapply the recent Supreme Court decision in *Mullin v. Doe* and bar claims that the Supreme Court never addressed, even arguing for no review of Plaintiffs' constitutional due process rights. But neither of Plaintiffs' claims is barred by the TPS statute: First, the review bar applies to a "determination" by the "Attorney General," and Plaintiffs' *ultra vires* challenge falls outside the scope of that bar on both terms, instead asking whether the *DHS Secretary* had *authority* to terminate TPS for Burma. Second, *Mullin* explicitly left open the possibility of judicial review of constitutional claims such as Plaintiffs' due process claim.

With regard to Plaintiffs' *ultra vires* claim, Defendants do not—and cannot—offer any statutory text delegating TPS termination authority to the Secretary, instead falling back on provisions of the Homeland Security Act that address other powers, and if read as Defendants urge, would render key statutory provisions meaningless. On the procedural due process claim, Defendants do not seriously contest that the TPS statute's mandatory language brings the benefits conferred on TPS holders within the ambit of significant liberty and property interests, as numerous courts have accepted. Those liberty interests are crucial because they create a constitutional floor on the process Plaintiffs must be afforded; in fact, the Supreme Court has recognized that statutes can confer entitlement to statutory process even to individuals not yet

1

within the United States. TPS holders have strong interests here that are protected by the Fifth Amendment.

Plaintiffs have shown a likelihood of success on the merits, and all factors for preliminary relief weigh in their favor. The Court should grant Plaintiffs' motion.

**ARGUMENT**

**I.     This Court Has Jurisdiction to Review Plaintiffs' Claims**

**A.  The Judicial Review Bar Does Not Apply to Plaintiffs' *Ultra Vires* Claim**

Plaintiffs' *ultra vires* claim is justiciable. By its plain text, the TPS statute's judicial review bar applies only to TPS "determination[s] of the *Attorney General*," 8 U.S.C. § 1254a(b)(5)(A) (emphasis added), and *Mullin* did not adopt a different reading. In *Mullin,* the Supreme Court's analysis of the judicial review bar focused solely on two arguments for which the government sought review in their briefing: (1) that the bar applies only to substantive claims, not procedural errors; and (2) that the word "determination" refers only to determinations about conditions in a country designated for TPS. *Mullin v. Doe*, 146 S. Ct. 2121, 2133–37 (2026). The Supreme Court did not address the justiciability of Plaintiffs' *ultra vires* claim, which challenges not a TPS "determination," but who has authority to make any TPS determination at all. Nor could it. Instead*, Mullin* was "silent on the argument now before [this Court] for the simple reason that the parties in [the case] were silent on it too." *Retirement Plans Committee of IBM v. Jander*, 589 U.S. 49, 55 (2020) (Gorsuch, J. concurring). Consequently, the government's argument that *Mullin* forecloses this Court's review of the *ultra vires* claim runs afoul of the well-settled principle that decisions lack precedential value on issues that they "never squarely addressed." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). *See also U.S. v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (holding that where an issue was not "raised in briefs or argument nor discussed in the opinion of the Court," "the case is not a binding precedent on this point").

2

### B. This Court May Review Plaintiffs' Procedural Due Process Claim

*Mullin* left intact this Court's ability to review constitutional challenges to TPS determinations, 146 S. Ct. at 2137; indeed, the government never even argued that constitutional challenges to TPS determinations were unreviewable. *See* Br. for the United States at 45-52, *Mullin v. Doe*, No. 25-1083 (U.S. Mar. 30, 2026). Plaintiffs' procedural due process claim is no exception. The government contends that Plaintiffs' procedural due process claim is simply a statutory claim cloaked in constitutional terms. But the government ignores the core factor that distinguishes Plaintiffs' Fifth Amendment claim from those arising purely from statutory procedural failures: Plaintiffs' constitutionally protected liberty and property interests in TPS and its attendant benefits. *See* infra Section II.B. In other words, Plaintiffs have answered the "threshold question in any due process challenge," which is "whether a protected property or liberty interest actually exists." *Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 694 (7th Cir. 2013) (citation modified). The government cites *Czerkies v. U.S. Department of Labor*, 73 F.3d 1435 (7th Cir. 1996) (en banc), as instructive; that decision reinforces Plaintiffs' position. Defs.' Br. 14–15, Dkt. 106. *Czerkies* held that the Federal Employees' Compensation Act's review bar did not foreclose constitutional claims seeking adequate proceedings and dismissed the claim only because the employee identified no substantial procedural defect. 73 F.3d at 1439–43. Plaintiffs, by contrast, identify protected interests and specific statutory safeguards that DHS ignored. Having done so, Plaintiffs' claim properly sounds in due process and cannot be dismissed on jurisdictional grounds as a relabeling of a purely statutory claim.

## II. Plaintiffs Are Likely to Succeed on the Merits

### A. Plaintiffs' *Ultra Vires* Claim is Likely to Succeed

Congress never transferred the authority to terminate TPS from the Attorney General to the Secretary. The government's arguments to the contrary point to statutory provisions that do not

indicate any such transfer and ask this Court to ignore the text simply because the question has not been presented before to any relevant body.

### i. No Statute Transfers TPS Authority to the Secretary

An agency bears the burden to "identify statutory authority for any action it takes." *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022) (citation modified). Congress expressly authorized one—and only one—executive official to terminate TPS designations: the Attorney General. The TPS statute provides: "If the *Attorney General* determines . . . that a foreign state . . . no longer continues to meet the conditions for [TPS] designation . . . the *Attorney General* shall terminate the designation[.]" 8 U.S.C. § 1254a(b)(3)(B) (emphasis added).

The government argues 8 U.S.C. § 1103 transferred TPS termination authority to the Secretary. *See* Defs.' Br. 9–10, Dkt. 106.[1] But that provision explicitly and broadly carves out all authorities held by the Attorney General from the transfer of power. *See* 8 U.S.C. § 1103(a). This includes the authority to terminate TPS. *See* 8 U.S.C. § 1254a(b)(3)(B). The government points to § 1103(g) as evidence that, despite Section 1103(a)'s broad carveout, the Attorney General retained only specifically listed authorities, and argues that Plaintiffs' reading renders Section 1103(g) redundant. *See* Defs.' Br. 9, Dkt. 106; *see also* 8 U.S.C. § 1103(g) ("The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by [the Executive Office for Immigration Review (EOIR)]. . ."). But that reasoning is backwards. Defendants' reading makes the broad language of Section 1103(a) largely meaningless, while Plaintiffs' reading shows that both § 1103(a) and § 1103(g) reserved some authorities for the Attorney General at the time of

---

[1] Contrary to Defendants' claims, as discussed in Plaintiffs' opening brief, Pls.' Br. 13-14, 6 U.S.C. § 557 does *not* independently transfer any authorities to the Secretary. The provision clarifies statutory language related to transfers of power effectuated by other statutes or means of delegating authority—it does not serve as a transfer of authority itself.

transfer. Where parties offer two competing interpretations of a statute, the rule against superfluities "favors that interpretation which avoids surplusage." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012) (emphasis omitted) (citation modified). Section 1103(g) does not state that the *only* functions retained by the Attorney General relate to EOIR. In fact, multiple provisions indicate other immigration authorities retained by the Attorney General. *See, e.g.*, 8 U.S.C. § 1103(a)(9) (specifying the Attorney General's authority to authorize officers of a foreign country to be stationed at preclearance facilities in the United States). If the government is correct, there is no point to the broad exception clause in § 1103(a)—the full set of powers that remain with the Attorney General would already be otherwise described in other portions of the statute.[2]

In sum, the government cannot point to any textual provision that transfers TPS termination authority to the Secretary, because none exists.

### ii. Neither Courts nor Congress Have Addressed Whether TPS Authority Was Properly Transferred to the Secretary

Failing to find any textual support for their position, Defendants ask this Court to ignore the text and instead rely on the historical response and practices of both Congress and courts to the Secretary's TPS-related actions. Neither Congress nor the courts have ever addressed the issue of whether the Attorney General's authority to designate and terminate countries for TPS was transferred to the Secretary. Thus, the statute—which indicates no such transfer—still controls.

The government cites language from *Mullin* to assert that the Supreme Court has ruled on these issues. Defs.' Br. 10, Dkt. 106 (quoting *Mullin*, 146 S. Ct. at 2129) ("[r]esponsibility for TPS

---

[2] Even the regulations implementing the Homeland Security Act indicated that the statute itself did not transfer TPS designation and termination authorities to the Secretary. *See Aliens and Nationality; Homeland Security; Reorganization of Regulations*, 68 Fed. Reg. 9,824, 9,827 (Feb. 28, 2003) (stating that the regulations would "require further refinement to clarify the authority of Secretary of Homeland Security to designate countries for temporary protected status purposes").

decisions rests with the Secretary of Homeland Security."). But relying on this lone statement to foreclose a challenge to the Secretary's authority stretches far beyond the logic of the decision.

First, the question of the Secretary's authority was never raised in *Mullin*; nor are there any other cases that address this issue. Courts evaluate the questions presented to them, and their dicta on other matters are not binding in future decisionmaking when new questions are clearly presented. *See, e.g.*, *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) ("The Court is not bound to follow its dicta in a prior case in which the point at issue was not fully debated.") (citation modified); *see also supra* Section I.A (discussing this same principle in the context of the jurisdiction arguments). The same reasoning applies to the other cases the government cites—the issue of the Secretary's authority was not contested, and references that assume a proposition without addressing the question directly are unpersuasive.

Defendants' congressional acquiescence argument too must fail. First, the government ignores that the Supreme Court has stated that absent "*overwhelming evidence* of acquiescence," courts should be "loath to replace the plain text and original understanding of a statute with an amended agency interpretation." *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (emphasis in original) (plurality opinion) (quoting *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001)). Second, the factual predicate for the claim of congressional acquiescence is thin; all the government can point to is the history of DHS providing annual reports to Congress about TPS. That is not enough. *Compare* Defs.' Br. 11, Dkt. 106, *with Brown v. Gardner*, 513 U.S. 115, 121-22 (1994) (nullifying Veterans' Affairs regulation which was inconsistent with statute, despite 60-year "Congressional silence" as to the regulation). The receipt of general reports about TPS that did not consider the issue of whether the Homeland Security Act transferred TPS termination authority to DHS does not serve as evidence that Congress

6

"considered and rejected the *precise* issue" presented here. Thus, Defendants cannot rely on acquiescence. *Rapanos*, 547 U.S. at 750 (emphasis in original).

### iii. The Executive Branch Construction is Unpersuasive

Similarly, past Executive Branch practice is not persuasive on the question of the Secretary's TPS authority. *See* Defs.' Br. 12–13, Dkt. 106. The Supreme Court recognized that "[t]he views of the Executive Branch could inform the judgment of the Judiciary, but did not supersede it." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (citation modified). However, "[w]hatever respect an Executive Branch interpretation was due, a judge certainly would not be bound to adopt the construction given by the head of a department." *Id.* (citation modified). If this Court's "own judgment . . . differ[s] from that of other high functionaries," the Court is "not at liberty to surrender, or to waive it." *Id.* at 386–87 (quoting *United States v. Dickson*, 40 U.S. 141, 162 (1841)). Thus, this Court should thoroughly assess on its own the question of whether TPS authority was transferred from the Attorney General.

Beyond these attempts to point to non-statutory evidence, the government also argues that Plaintiffs' challenge to the Termination based on the Secretary's lack of authority would, if successful, also invalidate the TPS designation for Burma. *See* Defs.' Br. 13, Dkt. 106. Not so. First, the TPS statute provides that the Attorney General may terminate TPS designation if she determines, "after consultation with appropriate agencies of the Government" that the country "no longer continues to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3). There is no provision that allows for termination for other reasons, and Defendants cannot simply end TPS benefits by declaring a designation unlawful. *See A.C.R. v. Noem*, 809 F. Supp. 3d 103, 121 (E.D.N.Y. 2025) ("[A]n agency must always consider serious reliance interests, even when it concludes an earlier policy was unlawful."); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 33 (2020) (noting the need to accommodate particular reliance

interests).[3] TPS holders have similar reliance interests to the DACA recipients in *Regents*—they have "embarked on careers," *id.* at 31, and the "consequences of the [termination]. . . would radiate outward" to their families, schools, and employers. *Id*. (citation modified). Second, the challenged agency action here for which Plaintiffs seek relief is the Termination. If the Defendants are arguing that the determination also is invalid, that must be adjudicated through a separate process and effort. Third, as explained *infra*, Plaintiffs have liberty and property interests in TPS, and thus due process rights, that require that the government at least follow the procedures outlined by Congress when terminating TPS. *See infra* Section II.B.[4]

### B. Plaintiffs' Procedural Due Process Claim Is Likely to Succeed

#### i. Section 1254a's Mandatory Protections Create Protected Liberty and Property Interests

Section 1254a gives TPS holders concrete protections that DHS may not withdraw at will. TPS "protects [holders] from removal and authorizes them to work here for as long as the TPS designation lasts." *Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021); *see also* 8 U.S.C. § 1254a(a)(4)(B) (conferring the same benefits to applicants who establish prima facie eligibility). A recipient has a protected entitlement to an existing benefit when the government may withdraw it only on specified grounds. *Board of Regents v. Roth*, 408 U.S. 564, 576–78 (1972) (finding a

---

[3] The government also attempts to limit the holding of *Regents* regarding reliance interests by arguing that because the DACA program was not wholly unlawful, the reliance interests of DACA recipients somehow differed from those of TPS holders. Defs.' Br. 13, Dkt. 106. But the holding in *Regents* refutes that false distinction—the Supreme Court held that the rescission of DACA was arbitrary and capricious on multiple grounds, including that the Secretary failed to "address[] the options of retaining forbearance *or* accommodating particular reliance interests." 591 U.S. at 33 (emphasis added). The inclusion of the word "or" indicates those matters are both separate holdings, and broadly that reliance interests must be evaluated even when an agency otherwise find a program to be illegal.

[4] In addition, because "[t]he Constitution's safeguard against retroactivity is especially appropriate where it protects an unpopular group or individual," a retroactive termination of TPS status would likely raise significant due process concerns. *St. Cyr v. I.N.S.*, 229 F.3d 406, 416 n.6 (2d Cir. 2000), *aff'd*, 533 U.S. 289 (2001).

property interest in benefits where a statute defines eligibility for them); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–41 (1985) (same). Burma's designation "shall remain in effect" until an effective termination. 8 U.S.C. § 1254a(b)(2)(B). The Attorney General "shall review" current conditions and "shall determine" whether the statutory conditions continue; absent a negative determination, the designation "is extended." *Id.* § 1254a(b)(3)(A)–(C). These are "substantive predicates" with a mandated outcome. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 462-63 (1989). TPS holders and applicants who are prima facie eligible therefore have a legitimate claim to those protections unless and until DHS makes the required negative determination and termination becomes effective. *See* Defs.' Br. 3, Dkt. 106 (acknowledging extension absent that determination).

TPS holders retain protected interests while Burma's designation remains in effect, even though the Attorney General may later determine that the statutory conditions for termination are met. That does not render current TPS protections discretionary. *See Rock River Health Care, LLC v. Eagleson* 14 F.4th 768, 773–76 (7th Cir. 2021) (holding that nursing-care facility operators had a protected entitlement to Medicaid reimbursement at the legally prescribed rate, even though a later audit could establish a lawful basis for reducing that rate). Defendants' cited cases instead involve decisions left to official discretion: whether to enforce a restraining order, transfer a prisoner, or grant cancellation. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760–68 (2005); *Olim v. Wakinekona*, 461 U.S. 238, 249–50 (1983); *Adame v. Holder*, 762 F.3d 667, 670–71 (7th Cir. 2014). They do not implicate the type of mandatory grants of work authorization and protection from removal that the TPS statute affords, which confer concrete liberty and property interests to Plaintiffs. These interests cannot be described as "entitlement to nothing but procedure." Defs.' Br. 19, Dkt. 106 (quoting *Town of Castle Rock*, 545 U.S. at 764).

9

### ii. DHS Omitted Constitutionally Required Safeguards

At a minimum, due process required the core safeguards Congress prescribed: consultation, review of current conditions, determination under statutory criteria, and publication of the determination and basis. 8 U.S.C. § 1254a(b)(3)(A)–(B). These safeguards constitute minimum process here because each reduces the risk of error or provides notice, and requiring what Congress *already mandates* imposes virtually no additional burden. See *Mathews v. Eldridge*, 424 U.S. 319, 335, 343–49 (1976); *Rock River*, 14 F.4th at 776–80. Plaintiffs protected by the Due Process Clause are guaranteed—at minimum—the process Congress made available to them by statute. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 138, 140 (2020) (holding that even a noncitizen on the threshold of entry who has not "acquired any domicil or residence within the United States" has "those rights regarding admission that Congress has provided by statute"); *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as [a noncitizen] denied entry is concerned.").[5]

Defendants argue the irregularities "fall flat" because DHS complied with the statute. Defs.' Br. 19, Dkt. 106. But this Court found only "a few brief emails" with no substantive information exchange, found that the termination "appears to have occurred without a review of conditions" in Burma, and concluded that accepting DHS acted because Burma no longer qualified would "strain credulity." Mem. Op. and Order 32, 37, 46, Dkt. 51. The relevant question is whether DHS could withdraw existing protections after materially bypassing the minimum process due, not whether Burma continues to satisfy the statutory criteria. Section 1254a(b)(5)(A) does not prevent the Court from relying on its previous findings in relation to this claim. The provision

---

[5] The government's attempt to rely on *Portillo-Rendon v. Holder*, *see* Defs.' Br. 17–18, Dkt. 106, is inapposite: cancellation of removal was discretionary, and the petitioner alleged neither deficient procedures nor denial of required process. 662 F.3d 815, 817 (7th Cir. 2011). Here, complex and changing country conditions create risk of material error, which the prescribed safeguards directly reduce.

forecloses nonconstitutional review of the Attorney General's termination determinations, not constitutional claims that consider some of the same historical facts. *Mullin* did not address the constitutional interests or the facts in relation to the constitutional sufficiency of the process. On this record, Plaintiffs are likely to prevail.

### iii. Due Process Applies Beyond Individual Adjudications

Defendants wrongly argue that procedural due process applies only to individual adjudications. Defs.' Br. 16-17, Dkt. 106. But this ignores the facts of this case, the nature of the constitutional right, and existing precedent applying due process in challenges to unconstitutional government actions that impact large groups.

First, this case involves benefits that are afforded to individual TPS holders, who each hold liberty and property interests. *See supra* Section II.B.i. Multiple courts assessing due process as it relates to TPS holders themselves have recognized these interests, and have applied an analysis of the property and liberty interests even where the government's policy impacted a group of TPS holders. *See, e.g.*, *Mansor v. USCIS*, 685 F. Supp. 3d 1000, No. C23-0347JLR, 2025 WL 4274509, at *8 (W.D. Wash. Dec. 1, 2025), *amended*, 824 F. Supp. 3d 1155 (W.D. Wash. 2026) (holding at summary judgment that government violated TPS applicants' procedural due process rights by failing to issue work authorization in violation of the statutory requirements); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1122 (N.D. Cal. 2018) (identifying protected "property interest in loss of TPS status"); *Saget v. Trump*, 375 F. Supp. 3d 280, 333 (E.D.N.Y. 2019) (recognizing TPS "involves a substantial liberty interest—immigration status" and that "[p]rotecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law").

Other courts have found procedural due process violations even where the government makes a decision that impacts a large group of people who individually have constitutionally

11

protected interests. For example, *Nozzi v. Hous. Auth. of City of L.A.* applied the notice principle from *Mathews,* 424 U.S., to a program-wide Section 8 reduction expected to affect approximately 45% of 45,000 recipients and held the notice of reduction inadequate. 806 F.3d 1178, 1186–87, 1192–99 & n.16 (9th Cir. 2015), *cert. denied*, 580 U.S. 817 (2016). Defendants' remaining authorities concern generalized zoning or resource-allocation decisions, or claims with no request for process, not a country-specific withdrawal of existing protections subject to fixed criteria. Defs.' Br. 16–17, Dkt. 106.

Defendants argue that the Termination's "across-the-board" effect makes it legislative action to which procedural due process does not apply. *Id.* That argument mistakes a decision's groupwide effect for legislative policymaking. Legislative action formulates generally applicable policy for prospective application. It does not include every groupwide application of existing standards to specific facts. *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445–46 (1915) (holding that assessment decision of State Tax Commission was not an act required "to be done in town meeting or an assembly of the whole."); *United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 245–46 (1973) (reaching similar result in challenge to per diem rates set by Interstate Commerce Commission). But Congress already supplied the governing policy specifying when a designation continues, the grounds permitting termination, and the country-level process for determining whether those grounds exist. 8 U.S.C. § 1254a(b)(2)(B), (b)(3)(A)–(C). That the Termination affected all Burmese TPS holders does not convert this fact-bound statutory process into a "legislative-type judgment," Defs.' Br. 16, Dkt. 106.

## III.    The Remaining Factors Overwhelmingly Favor Plaintiffs

The remaining factors weigh decisively in Plaintiffs' favor. Defendants recycle their arguments that the government's immigration enforcement and purported national security interests are more urgent than the loss of employment, risk of arrest and detention, and family

separation for vetted TPS holders. But Plaintiffs face certain, immediate, and irreversible harms already recognized to outweigh those interests by this Court.

Plaintiffs would be immediately subject to arrest and detention pending deportation if the Termination goes into effect, Mem. Op. and Order 52, Dkt. 51, and these risks have only increased since the filing of the Complaint. The Trump Administration's recent push for mass immigration arrests soared in June to a record high since May 2019. *See* Maanvi Singh, Amy Qin & Andrew Witherspoon, *US immigration agents arrested a record number of people in June, data shows*, Guardian (July 21, 2026, 19:06 EDT), https://www.theguardian.com/us-news/2026/jul/21/immigration-agents-arrest-june-data. Arrest rates have roughly doubled to 2,000 a day, the "new standard for enforcement." Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, N.Y. Times (July 1, 2026), https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html. Plaintiffs' credible fears of arrest and deportation are neither speculative nor reparable: The Supreme Court has long recognized that deportation is a "drastic measure, often amounting to lifelong banishment or exile," and "a particularly severe penalty." *Sessions v. Dimaya*, 584 U.S. 148, 157 (2018) (citation modified).

While Defendants contend that "nothing is stopping" TPS holders from pursuing other individual forms of immigration relief if TPS ends, Defs.' Br. 22, Dkt. 106, they fail to acknowledge their own efforts to foreclose these pathways. Last year, USCIS issued a pause on applications for alternative immigration benefits such as LPR status or asylum for nationals of countries subject to the travel bans, including Burmese nationals. *See* Policy Memorandum, U.S. Citizenship & Immigr. Servs., Hold and Review of all Pending Asylum Applications and all

13

USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025).[6] And just days ago, USCIS announced a rule change that would allow USCIS to deny affirmative asylum applications before the interview stage, effectively fast-tracking applicants to removal proceedings. *See USCIS Announces Rule Change to Asylum System to Reduce Backlog*, U.S. Citizenship & Immigr. Servs. (July 27, 2026), https://www.uscis.gov/newsroom/news-releases/uscis-announces-rule-change-to-asylum-system-to-reduce-backlog.

Defendants rely on a slew of irrelevant cases to bolster their argument on the equities that pits undefined national security interests against stripping lawful residents of status, work authorization, and safety. These cases do not pertain to lawful residents facing injury within the United States, instead addressing foreign nationals abroad with no U.S. ties, *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017); restrictions on Foreign Service employees' collective-bargaining rights, *American Foreign Service Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025); a social media ban tied to alleged national security risks from China, *TikTok, Inc. v. Trump*, 490 F.Supp.3d 73 (D.D.C. 2020); and vehicle stops at border checkpoints, *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976). Nor can Defendants rely on the Supreme Court's emergency stays in *Noem v. National TPS Alliance* ("*NTPSA I*"), summary orders that provide no commentary on the strength of the government's equitable arguments here, when the Supreme Court majority in *Mullin* did not cast doubt on the irreparable harm TPS holders would face given a termination of status. *See Mullin,* 146 S. Ct. at 2150 ("[N]either the Government, in its briefing here, nor the majority contests the point" that absent postponement, TPS holders "will lose their legal status and work authorization.").

---

[6] This adjudication hold was enjoined by the District Court of Rhode Island in June, but the government swiftly appealed to the First Circuit, where last week, it moved for an administrative stay to restore the restrictive policy as soon as possible. *See Dorcas Int'l Inst. of Rhode Island v. USCIS*, 26-1703 (1st Cir. Jul 22, 2026) Dkt. 108480099.

14

## IV.    Postponement Relief Should Extend to the Putative Class

This Court has repeatedly reaffirmed its "authority to preliminarily stay or set aside []
agency actions" under the APA and confirmed that preliminary relief "need not be limited to the
plaintiffs" in an action. *City of Chicago v. Dep't of Homeland Sec.*, No. 25-cv-5463, 2025 WL
3171302, at *2 (N.D. Ill. Nov. 13, 2025) (Kennelly, J.); *see also* Mem. Op. and Order 57, Dkt. 51
("[N]either the Supreme Court nor the Seventh Circuit has departed from the longstanding view
that the APA authorizes courts to act against agency action directly."). The relief Plaintiffs seek
acts directly on the agency action, "postpone[ing] the effective date of an agency action or to
preserve status or rights pending conclusion of the review proceedings," 5 U.S.C. § 705, and
"hold[ing] unlawful and sett[ing] aside agency action . . . not in accordance with law." 5 U.S.C. §
706(2)(A). Postponement under the APA therefore extends to the putative class.[7]

Defendants' argument that relief should be limited to named Plaintiffs has already been
rejected by this Court. Plaintiffs seek postponement of an agency action, not an injunction of an
executive order as in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Nor does *CASA* limit the Court's
ability to "grant or deny the functional equivalent of a universal injunction . . . by preliminarily
setting aside or declining to set aside an agency rule under the APA." *CASA, Inc.*, 606 U.S. at 873;
*see also* Mem. Op. and Order 56, Dkt. 51 ("[T]his Court disagrees with the government's claim
that limitations on universal injunctions apply just as squarely to relief under the APA.").

## CONCLUSION

Plaintiffs respectfully ask the Court to postpone the effective date of the Termination
pending final judgment.

---

[7] Regardless, because there is a putative class here, class-wide relief is also appropriate. Despite
Defendants' contention that "no class certification motion has even been filed," Opp. at 24, the parties
have fully briefed the issue of class certification, which Plaintiffs moved for on March 3, 2026 (Dkt. 63).

Dated: July 30, 2026

Respectfully submitted,

ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
*/s/ Dinesh McCoy*
Dinesh McCoy
Phi Nguyen
Helen Anne Schutz Lo
Razeen Zaman
Niji Jain
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 922-5932
dmccoy@aaldef.org
pnguyen@aaldef.org
alo@aaldef.org
rzaman@aaldef.org
njain@aaldef.org

THE LAW OFFICES OF JUNE J. HTUN
*/s/ June Htun*
June Htun
3643 West Belmont Avenue
Chicago, Illinois 60618
(773) 362-5000
june@htunlaw.com

INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
*/s/ Guadalupe Aguirre*
Guadalupe Aguirre
Pedro Sepulveda
One Battery Park Plaza, Fl 33
New York, NY 10004
(929) 246-0154
laguirre@refugeerights.org
psepulveda@refugeerights.org

Megan Hauptman
650 Massachusetts Ave NW
Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org

*Counsel for Plaintiffs*

16