**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AUNG DOE, et al., on their own behalf and on behalf of others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 25 C 15483 |
| MARKWAYNE MULLIN, SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Throughout 2025, then-Secretary of the United States Department of Homeland Security (DHS) Kristi Noem decided to terminate multiple countries' designation for Temporary Protected Status (TPS). This case concerns the decision to terminate Burma's designation. For the second time, the plaintiffs have moved to postpone the termination under section 705 of the Administrative Procedure Act (APA). 5 U.S.C. § 705. The government has moved to dismiss the plaintiffs' amended complaint. The Court assumes familiarity with the case and therefore provides only a sketch of the facts and procedural history relevant to the present motions.

The plaintiffs, six Burmese nationals, initially raised APA and Fifth Amendment equal protection challenges to the termination. The Court granted the plaintiffs' motion

to postpone the effective date of the termination, finding that it had jurisdiction over the claims and that the plaintiffs had demonstrated a likelihood of success on their APA challenges. *Doe v. Noem*, 822 F. Supp. 3d 893, 901 (N.D. Ill. 2026). On June 25, 2026, while this Court's postponement order was on appeal, the Supreme Court reversed postponement orders based on similar APA and equal protection challenges to the Secretary's decision to terminate Haiti and Syria's TPS designations. *Mullin v. Doe*, 146 S. Ct. 2121, 2127–28 (2026). The Court held that a jurisdiction-stripping provision in the TPS statute, 8 U.S.C. § 1254a(b)(5)(A), bars judicial review of nonconstitutional challenges to TPS termination decisions and that the Haiti plaintiffs had not shown a likelihood of success on their race-discrimination equal protection claim, which was the only constitutional claim before the Supreme Court. *Mullin v. Doe*, 146 S. Ct. at 2127–28. The Seventh Circuit then reversed the postponement order in this case and remanded the case to this Court for further proceedings in light of and consistent with the Supreme Court's decision. *Doe v. Mullin*, No. 26-1294, 2026 WL 2093686, at *1 (7th Cir. July 16, 2026).

The plaintiffs have filed an amended complaint adding three new claims to their previous APA and equal protection challenges. First, they assert that the Secretary's termination decision was *ultra vires* on the theory that the Attorney General, not the Secretary, has the authority to terminate TPS designations. Second, they contend that the termination decision violated their procedural due process rights by not adhering to certain processes in the TPS statute. Third, they advance a new equal protection theory in addition to their race-discrimination theory: that the TPS termination reflects a "bare animus" against TPS holders. The plaintiffs have also filed a second motion to

2

postpone the effective date of the termination based solely on the new *ultra vires* and due process claims. The government has responded with a motion to dismiss the plaintiffs' amended complaint.

For the reasons below, the Court denies the plaintiffs' motion for postponement and grants the government's motion to dismiss the APA, *ultra vires*, due process, and bare-animus equal protection claims. The Court denies the government's motion to dismiss the race-discrimination equal protection claim and certifies this issue for interlocutory appeal under 28 U.S.C. § 1292(b).

## Discussion

As a threshold matter, the government has renewed its argument that 8 U.S.C. § 1252(f)(1), a different jurisdictional bar from the one addressed by the Supreme Court in *Mullin*, strips this Court of authority to grant the plaintiffs' requested relief. The Court starts with that argument. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998). *But see Biden v. Texas*, 597 U.S. 785, 798 (2022) (holding that section 1252(f)(1) is a limitation on remedial powers, not subject-matter jurisdiction); *Mullin v. Doe*, 146 S. Ct. at 2137 (stating in a portion of the opinion that did not command a majority of the Court that *Steel Co.* does not prevent a court from denying a motion for preliminary relief based on the merits without first assessing jurisdiction).

## A.     Section 1252(f)(1)

8 U.S.C. § 1252(f)(1) was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and provides, in full:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by [IIRIRA], other than

3

with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). In the U.S. Code, section 1252 is in subchapter II. Part IV of subchapter II is titled "Inspection, Apprehension, Examination, Exclusion, and Removal" and covers 8 U.S.C. §§ 1221–1232. The TPS statute, 8 U.S.C. § 1254a, is in part V, not part IV. So, based on the U.S. Code, 8 U.S.C. § 1252(f)(1) does not apply to the TPS statute.

The government's counterargument is that the U.S. Code deviates from the statutes at large, and in the event of a conflict between the two, the statutes at large control. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993); 1 U.S.C. § 112; *id.* § 204. There are two relevant differences. First, section 242(f)(1) of the Immigration and Nationality Act (INA)—the statutes at large analog to 8 U.S.C. § 1252(f)(1)—cross-references "chapter 4 of title II," the organization within the statutes at large. IIRIRA, Pub. L. No. 104-208, div. C, sec. 306(a)(2), 110 Stat. 3009-546, 3009-614. Second, the public law for IIRIRA contains an amendment titled "Conforming Amendment to Table of Contents; Overview of Reorganized Chapters," which lists the TPS statute under chapter 4 instead of chapter 5, where it was previously. *Id.* sec. 308(a)(2). So, in the statutes at large, subsection (f)(1) appears to apply to the TPS statute.

A few issues inject some uncertainty into the government's reading. For one, as the Court previously noted, the Supreme Court has repeatedly read subsection (f)(1) as applying to 8 U.S.C. §§ 1221–1232, the provisions in part IV of subchapter II of the U.S. Code. *See, e.g.*, *Biden*, 597 U.S. at 797; *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022); *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (Alito, J., joined by Roberts,

4

C.J., and Kavanaugh, J.); *id.* at 424 (Thomas, J., concurring); *Jennings v. Rodriguez*, 583 U.S. 281, 312 (2018); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). *But see Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022).

The apparent move of the TPS statute to chapter IV is also somewhat unusual. Before IIRIRA, chapter 4 dealt with "Entry and Exclusion," and chapter 5 addressed "Deportation" and "Adjustment of Status." *See* INA, Pub. L. No. 82-414, ch. 477, 66 Stat. 163, 163 (1952). IIRIRA revised the INA to combine "deportation" and "exclusion" proceedings into one "removal" procedure. *See Cirrus Rojas v. Olson*, No. 25-3127, 2026 WL 2198315, at *13 (7th Cir. July 30, 2026). As part of that restructuring, chapter 4 was renamed "Inspection, Apprehension, Examination, Exclusion, and Removal," and chapter 5 was renamed "Adjustment and Change of Status." *See* IIRIRA sec. 308(a)(2). The TPS statute seems to fit most naturally in the latter. *See Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 825 (N.D. Cal. 2025).

Additionally, subsection (f)(1) seems to be a poor fit for the TPS statute. For whatever provisions subsection (f)(1) applies to, it says that courts may "enjoin or restrain the operation of" those provisions only "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). As applied to 8 U.S.C. §§ 1221–1232, provisions that deal with issues like admissibility, detention, and removal, that makes sense: it precludes class-wide injunctive relief but permits courts to enjoin admissibility, detention, and removal proceedings against individual noncitizens. *See Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 481–82. In contrast, subsection (f)(1)'s language is an uncomfortable fit for the TPS statute. This case illustrates the point. The plaintiffs

claim that the Secretary failed to comply with 8 U.S.C. § 1254a(b)(3)(A), which requires the Secretary to consult with appropriate agencies and review conditions in the foreign state. That provision governs the Secretary's decision regarding an entire country's TPS designation. It is never applied to an individual noncitizen, and individual proceedings against that noncitizen would be an inapt forum to raise a challenge to the Secretary's broader TPS decision.

In any event, the Court need not decide whether 8 U.S.C. § 1252(f)(1) applies to the TPS statute. Even assuming that it applies, the Court concludes that it does not limit declaratory relief. Several courts of appeals have reached the same conclusion. *See, e.g.*, *Onosamba-Ohindo v. Ball*, No. 23-6804, 2026 WL 2176738, at *5–6 (2d Cir. July 29, 2026) (citing decisions from the First, Third, Ninth, and D.C. Circuits). *But see Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018). And although the Supreme Court has not squarely decided the issue, several Justices have suggested that section 1252(f)(1) does not apply to declaratory relief. *See Preap*, 586 U.S. at 402–03 (Alito, J., joined by Roberts, C.J., and Kavanaugh, J.); *Aleman Gonzalez*, 596 U.S. at 571–72, 572 n.9 (Sotomayor, J., concurring).

The Court also concludes—in accordance with the other lower courts to decide the issue, including the Fifth, Ninth, and D.C. Circuits—that section 1252(f)(1) does not preclude vacatur or postponement under the APA. *See, e.g.*, *Texas v. United States*, 126 F.4th 392, 419 (5th Cir. 2025); *Nat'l TPS All. v. Noem*, 166 F.4th 739, 758–61 (9th Cir. 2026); *Make the Road N.Y. v. Noem* (*Make the Road III*), No. 25-5320, 2025 WL 3563313, at *15–18 (D.C. Cir. Nov. 22, 2025); *Make the Road N.Y. v. Mullin* (*Make the Road IV*), 179 F.4th 16, 30–33 (D.C. Cir. 2026). For both issues, the cited decisions

6

provide thorough analyses of both sides of the argument. Rather than exhaustively retread the same ground, this Court will simply underscore the main points underlying its decision.

By its terms, section 1252(f)(1) only limits courts' authority to "enjoin or restrain" the government's implementation of the immigration laws. The Supreme Court has interpreted "enjoin" to refer to an "'injunction,' which is a judicial order that 'tells someone what to do or not to do.'" *Aleman Gonzalez*, 596 U.S. at 548–59 (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)). A declaratory judgment is not an injunction. *Brito v. Garland*, 22 F.4th 240, 251 (1st Cir. 2021). Neither are vacatur and its temporary form—postponement. *Nat'l TPS All.*, 166 F.4th at 759–61; *Make the Road IV*, 179 F.4th at 32.

The difference is not just in the label. "'[T]he extraordinary remedy of injunction,' . . . directs the conduct of a party, and does so with the backing of its full coercive powers." *Nken*, 556 U.S. at 428. In contrast, a declaratory judgment is a "much milder form of relief than an injunction" that may be persuasive but is "not ultimately coercive" and does not carry the threat of contempt for noncompliance. *Steffel v. Thompson*, 415 U.S. 452, 471 (1974); *see Brito*, 22 F.4th at 251. Likewise, vacatur and postponement operate directly on the agency action at issue rather than "direct[ing] individuals to act or not to act." *Make the Road III*, 2025 WL 3563313, at *16. And importantly, apart from invalidating the agency action, they "neither compel[] nor restrain[] further agency decision-making." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022).

That leaves the question of whether Congress intended to limit declaratory relief or vacatur / postponement through the word "restrain." In interpreting section

7

1252(f)(1), the Supreme Court has said that "to restrain" means "to 'check, hold back, or prevent (a person or thing) from some course of action.'" *Aleman Gonzalez*, 596 U.S. at 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989)).  But the Court also noted that the scope of "restrain" might depend on context:  it "sometimes has a 'broad meaning' that refers to judicial orders that 'inhibit' particular actions, and at other times it has a 'narrower meaning' that includes 'orders that stop (or perhaps compel)' such acts." *Id.*

In section 1252(f)(1), there are good reasons to think that "restrain" does not refer to declaratory judgments, vacatur, or postponement.  As an initial matter, it is not clear that "restrain" must be interpreted to have independent meaning from "enjoin," as the government urges.  As the D.C. Circuit has noted, "the phrase 'enjoin or restrain' is a familiar legal doublet" that can easily be read as "a conventional pairing of terms for emphasis and breadth, not an invitation to parse each word for independent meaning." *Make the Road IV*, 179 F.4th at 32 n.15.  And one obvious reason to include the word "restrain" would be to encompass temporary restraining orders.  *Id.*  The Federal Rules of Civil Procedure use the phrase "enjoined or restrained" for this very reason.  Fed. R. Civ. P. 65(c).  The heading of section 1252(f)(1), "Limit on injunctive relief," further supports reading "enjoin and restrain" this way.

The government counters that "restrain" must have independent meaning because Congress omitted the word in subsection (f)(2).  That subsection, titled "Particular cases," says, "Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order

8

is prohibited as a matter of law." 8 U.S.C. § 1252(f)(2). The government's argument raises the question of why Congress would establish a "clear and convincing evidence" standard for injunctive relief but not for a declaratory judgment, vacatur, postponement, or whatever other relief is captured by "restrain." That reading seems more unusual than accepting that "enjoin or restrain" is a legal doublet rather than two words with independent meanings. Additionally, the D.C. Circuit has offered one explanation for the difference in language, though not one that helps the government: perhaps "restrain" captures forms of coercive relief (not declaratory judgments, vacatur, or postponement) that "enjoin" might not—such as mandamus, which compels official action and thereby places restraints on the operation of the immigration laws. *Make the Road IV*, 179 F.4th at 32 n.15.

Moreover, comparing subsection (f)(1) to other statutory language cuts more decisively against the government. 8 U.S.C. § 1252(e)(1)—a neighboring provision to subsection (f)(1), in the same section, added at the same time in IIRIRA—says:

> Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may . . . enter *declaratory*, injunctive, or *other equitable relief* in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection.

8 U.S.C. § 1252(e)(1)(A) (emphasis added). The fact that Congress expressly precluded declaratory relief and included a catchall for other equitable relief in subsection (e)(1) but omitted similar language in subsection (f)(1) bolsters the reading that subsection (f)(1) is confined to injunctive relief. *See Brito*, 22 F.4th at 251.

Similarly, the Hobbs Administrative Orders Review Act, which generally governs judicial review of final orders of removal, states that courts of appeal have exclusive

9

jurisdiction to "make and enter . . . a judgment determining the validity of, and enjoining, setting aside, or suspending" an agency order. 28 U.S.C. § 2349(a). Again, the fact that Congress uses language specific to declaratory judgments, vacatur, and postponement / stays here but not in section 1252(f)(1) supports the reading that the latter does not extend to those forms of relief. The Hobbs Act also uses the word "restrain" as distinct from "suspending" or "setting aside." *Id.* § 2349(b); *cf. Make the Road III*, 2025 WL 3563313, at \*18 (pointing out that equating "restrain," "suspend," and "stay" in the Hobbs Act creates a surplusage problem). That further cautions against equating "restrain" in section 1252(f)(1) with postponement or vacatur. And looking to statutes outside of the immigration context adds additional confirmation that Congress knows how to clearly preclude APA remedies but did not do so in section 1252(f)(1). *See Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 990 (9th Cir. 2025) (citing 16 U.S.C. § 1855(f)(1)(A); 42 U.S.C. § 7607(d)(1)).

Reading subsection (f)(1) to limit declaratory relief, postponement, and vacatur also creates conflict with subsection (e)(3) of the same section. Subsection (e)(3) is titled "Challenges on validity of the system" and expressly authorizes judicial review of challenges to 8 U.S.C. § 1225(b) "and its implementation" for "whether such section, or any regulation issued to implement such section, is constitutional," as well as "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued . . . to implement such section, is . . . in violation of law." 8 U.S.C. § 1252(e)(3)(A). Importantly, such challenges "must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." *Id.* § 1252(e)(3)(B). That is in tension with subsection (f)(1)'s channeling

regime.  It makes little sense to authorize broad challenges to the validity of a statute, regulations, and policies but then channel them and limit the scope of relief to individual proceedings.  *See Make the Road III*, 2025 WL 3563313, at *17.  Indeed, subsection (f)(1)'s channeling, in conjunction with subsection (e)(3)(B)'s 60-day deadline, presents the risk of nullifying the review provided by subsection (e)(3) if, for example, an agency implements a policy but waits sixty days before applying it to any individual noncitizen.

Perhaps "first implemented" in subsection (e)(3) can be interpreted to mean when the challenged policy is first applied to an individual noncitizen.  *See id.* at *39 (Rao, J., dissenting).  That would avoid completely nullifying review under subsection (e)(3), but even then subsection (f)(1) would let the government pin the legality of its policy to a single case involving a plaintiff of the government's choosing.  Reading subsection (f)(1) as limited to injunctive relief resolves this tension and harmonizes the provisions.  It would permit review under subsection (e)(3) outside of individual proceedings for purposes of awarding a declaratory judgment, postponement, or vacatur—natural remedies for the kind of systemic challenges that subsection (e)(3) authorizes.

Finally, reading subsection (f)(1) as limited to injunctive relief makes sense of the parenthetical exempting the Supreme Court.  That parenthetical is apparently a unique one, and the Supreme Court has not said how it would work in practice.  *See Biden*, 597 U.S. at 838–39 (Barrett. J., dissenting).  But one possibility is this:  a lower court could grant vacatur, postponement, or class-wide declaratory relief; the issue would go up on appeal; and if, for example, the Supreme Court held that the lower court correctly decided that the agency action was unlawful, it could issue appropriate injunctive relief.

11

*See Aleman Gonzalez*, 596 U.S. at 572 n.9 (Sotomayor, J., concurring). If, on the other hand, subsection (f)(1) withdraws all of those remedies from the lower courts, then it is much less clear how the Supreme Court would have the opportunity to exercise the power reserved to it. *Id.*

In sum, the Court concludes that 8 U.S.C. § 1252(f)(1) does not bar the plaintiffs' claims.

## B. Merits

Section 705 of the APA authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending . . . review." 5 U.S.C. § 705. The standard for a postponement order under section 705 is the same as that for a preliminary injunction. *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020). That standard requires the plaintiffs to show: (1) a likelihood of success on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that preliminary relief is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In a case against the government, like this one, the third and fourth factors merge. *Nken*, 556 U.S. at 435.

The plaintiffs' motion to postpone is based solely on their *ultra vires* and due process challenges. The Court addresses each in turn.

### 1. Ultra vires

The plaintiffs assert that the Secretary's decision was *ultra vires* because the Attorney General, not the DHS Secretary, has the authority to terminate a TPS designation. That theory is rooted in the fact that the provision concerning TPS

12

terminations, 8 U.S.C. § 1254a(b)(3)(B), refers to the Attorney General rather than the Secretary. The government responds that this is a nonconstitutional claim that is unreviewable under the TPS statute's jurisdictional bar, 8 U.S.C. § 1254a(b)(5)(A), as interpreted by the Supreme Court's decision in *Mullin*. On the merits, the government contends that the Homeland Security Act of 2002 (HSA), specifically its amendments to 8 U.S.C. § 1103(a), transferred TPS authority from the Attorney General to the DHS Secretary. The government further points out that courts and the executive branch have consistently adhered to that view for over two decades, without any intervention by Congress.

Starting with jurisdiction, the Court does not agree that the plaintiffs' *ultra vires* claim is unreviewable. The TPS jurisdictional bar states that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A). The government seizes on the fact that an *ultra vires* claim is nonconstitutional, and the Supreme Court in *Mullin* expressly held that "the TPS statute's judicial-review bar applies to all non-constitutional claims." *Mullin v. Doe*, 146 S. Ct. at 2137.

The government overreads that statement. No party in *Mullin* raised the issue of who has TPS authority in the first place under the statute. In stating that the jurisdictional bar applied to all nonconstitutional claims, the Supreme Court assumed the undisputed premise that the jurisdictional bar, whatever its scope, applied to the Secretary's determinations. If the plaintiffs' reading is correct, then the jurisdictional bar applies only to "determination[s] of the Attorney General," not to determinations by the

Secretary, and does not preclude their claims in this case. Of course, if the plaintiffs' reading is wrong, then the jurisdictional bar does apply. The jurisdictional issue is intertwined with the merits of the statutory interpretation issue, and the default rule in situations of intertwinement is to proceed to the merits. *See Bell v. Hood*, 327 U.S. 678, 682 (1946); *Land v. Dollar*, 330 U.S. 731, 739 (1947); *Perttu v. Richards*, 605 U.S. 460, 472–74 (2025); *cf. Brownback v. King*, 592 U.S. 209, 217–19 (2021) (stating that because "a federal court always has jurisdiction to determine its own jurisdiction," in cases of intertwinement, a court may issue a decision that is simultaneously a ruling that it lacks jurisdiction and a judgment on the merits).

On the merits, the Court agrees with the government that the HSA, and subsequent amendments in 2003, transferred TPS authority to the Secretary. Congress enacted 8 U.S.C. § 1103 in the original INA under the title "Powers and Duties of the Attorney General and the Commissioner." INA § 103. It stated, in relevant part, that:

> The Attorney General shall be charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens, except insofar as [the INA] or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers . . . .

*Id.* Congress enacted the TPS statute in 1990 amendments to the INA. In accordance with the INA's designation of the Attorney General as the primary administrator of the immigration laws, the TPS statute's provisions referred to the Attorney General. *See* Immigration Act of 1990, Pub. L. No. 101-649, sec. 302, 104 Stat. 4978, 5030–36.

The HSA and follow-up amendments in 2003 made several relevant changes to 8 U.S.C. § 1103. First, they changed the title of 8 U.S.C. § 1103 to "Powers and Duties of the Secretary, the Under Secretary, and the Attorney General." HSA, Pub. L. No. 107-

14

296, sec. 1102(1), 116 Stat. 2135, 2273. Second, they substituted "Secretary of Homeland Security" for "Attorney General" in both the title and text of (a)(1). Homeland Security Act Amendments of 2003, Pub. L. No. 108-7, div. L, sec. 105, 117 Stat. 526, 531. Third, the HSA added "Attorney General" to the "except" clause. HSA sec. 1102(2). Because of these changes, 8 U.S.C. § 1103(a)(1) now reads: "The *Secretary of Homeland Security* shall be charged with the administration and enforcement of . . . laws relating to the immigration and naturalization of aliens, except insofar as . . . such laws relate to the powers, functions, and duties conferred upon the President, *Attorney General*, [etc.]" 8 U.S.C. § 1103(a)(1) (emphasis added). Fourth, the HSA codified the existence of the Executive Office for Immigration Review (EOIR) as an agency under the Attorney General and added subsection (g) to section 1103. HSA sec. 1102(2). That subsection is titled "Attorney General" and states that "[t]he Attorney General shall have such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by the [EOIR] . . . ." *Id.*; 8 U.S.C. § 1103(g)(1).

These changes established the Secretary of Homeland Security as the primary administrator of the immigration laws, which include the TPS statute. The plaintiffs challenge this interpretation by pointing out that section 1103(a)'s "except" clause carves out from the Secretary's authority the "powers, functions, and duties conferred upon . . . the Attorney General." They assert that some of those reserved powers are in the rest of section 1103, which enumerates some powers that the text assigns to the Attorney General. *See, e.g.*, 8 U.S.C. § 1103(a)(8). Likewise, because the TPS statute continues to refer to the Attorney General, the plaintiffs contend that TPS decisions

15

belong to the Attorney General rather than the Secretary.

One problem with this reading is that it draws implausible lines between the powers of the Attorney General and those of the Secretary. The plaintiffs' reliance on section 1103's enumerated powers illustrates the point. Paragraph (a)(2) says, "He shall have control, direction, and supervision of all employees and of all the files and records of the Service." *Id.* § 1103(a)(2). On the plaintiffs' reading, "he" refers to the Secretary. Paragraphs three through seven likewise would refer to the Secretary. Paragraphs eight, ten, and eleven, on the other hand, expressly refer to the Attorney General. The plaintiffs read this difference in language as a deliberate allocation of authority between the Secretary and the Attorney General, but it was already in the original INA, when both "he" and "Attorney General" referred to the same person. *Compare id.* § 1103, *with* INA, § 103(a). It is therefore unlikely that the express references to the Attorney General reflect a congressional intent to carve out that power from the Secretary's overarching authority over the immigration laws.

That conclusion is reinforced by a broader picture of the HSA. Congress did not go through the INA and change specific references to the Attorney General to instead refer to the Secretary. Instead, it broadly reassigned functions and added a provision that "deem[s]" references to other officers to refer to the Secretary. 6 U.S.C. § 557. As a result, the INA is replete with references to the Attorney General that, under the plaintiffs' reading, were never transferred to the Secretary. The TPS statute is one example. Given the statutory history, the Court declines to read those residual references to the Attorney General to significantly undermine the Secretary's role as primary administrator of the immigration laws under section 1103(a)(1).

16

Another problem with the plaintiffs' reading is that it renders section 1103(g) superfluous. They seem to suggest that section 1103(a)(1) merely preserves the Attorney General's preexisting authority unless there is a separate express transfer of power. That reading finds some support in other parts of the HSA that expressly transfer certain immigration functions to DHS officials. *See, e.g.*, HSA secs. 441, 451(b). But under that interpretation, section 1103(a)(1) would already preserve the Attorney General's preexisting authority over EOIR, and there would be little reason for Congress to enact 1103(g). The better reading is that section 1103(a) effected a general transfer of immigration authority to the Secretary; section 1103(g), enacted at the same time, clarified that the Attorney General would reserve authority previously exercised by EOIR; and the carve out in section 1103(a)(1) of the "powers, functions, and duties conferred upon . . . the Attorney General" refers primarily to that reservation.

Longstanding practice confirms that TPS authority lies with the Secretary. The government asserts that since Congress enacted the HSA, every court has interpreted the statute as transferring authority to the Secretary. That includes the Supreme Court. *See, e.g.*, *Mullin v. Doe*, 146 S. Ct. at 2129; *Preap*, 586 U.S. at 397 & n.2. Likewise, the government points out that the DHS Secretary has exercised TPS authority since Congress enacted the HSA. The plaintiffs do not dispute this practice, but they say that no decision has squarely addressed their argument and that courts are not bound by executive interpretations of statutes. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). Even so, it is unlikely that everybody has misinterpreted the allocation of immigration authority in the HSA for the past two decades and that Congress has simply let it slide.

17

Finally, even if the plaintiffs' reading of the statute were correct, it would defeat their own claim to relief. The portion of the TPS statute authorizing designations, like the portion addressing termination, refers to the Attorney General. The plaintiffs' reading would therefore mean that the Secretary lacked authority to designate Burma for TPS in the first place. The plaintiffs offer a few arguments for why their contention is not self-defeating, but none work.

First, they assert that the statute only authorizes TPS termination based on country assessment. But there is a distinction between terminating TPS and there never being a valid TPS designation in the first place. Second, they contend that they only challenge the TPS termination decision, and they say that a challenge to the initial designation would have to be raised in a separate lawsuit. Putting aside the fact that this argument does not get the plaintiffs far as a practical matter, the Court does not see a reason why a challenge to the initial designation would have to be raised separately. The plaintiffs do not provide any authority for that rigid view, nor is the Court aware of any.

Third, the plaintiffs argue that reliance interests require the government to consider alternatives to terminating Burma's TPS designation. They rely on the Supreme Court's decision in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), but that case addressed a different question. The Court in *Regents* held that the Secretary's decision to rescind the Deferred Action for Childhood Arrivals program on the basis that it was unlawful was arbitrary and capricious in part because he had failed to consider whether there were legitimate reliance interests. *Id.* at 30–33. The need to consider reliance interests is a constraint

18

on agency decisionmaking imposed by the APA. It does not follow from that principle that a court may uphold *ultra vires* agency action solely because of reliance interests.

The Court therefore dismisses the plaintiffs' *ultra vires* claim. And because the Court has concluded that the TPS statute and its jurisdictional bar apply to the Secretary's decision, *Mullin v. Doe* controls and requires dismissal of the plaintiffs' other nonconstitutional (*i.e.*, APA) claims.

### 2. Due process

The plaintiffs' other basis for preliminary relief is their procedural due process claim. That claim "consists of two elements: (i) deprivation by [government] action of a protected interest in life, liberty, or property, and (ii) inadequate . . . process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). To establish the first element, the plaintiffs argue that the TPS statute provides them with a "legitimate claim of entitlement" to TPS status and the benefits that come with it. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). On the second element, the plaintiffs contend that the Secretary's alleged failure to consult appropriate agencies, review country conditions, and publish the "actual 'basis for the determination'"—as required by the statute—meant that the Secretary's process was inadequate. *See* Pls'. Renewed Mem. in Supp. of Mot. to Postpone at 20.

The government responds that the plaintiffs' claim is a relabeled statutory argument that is precluded by the TPS statute's jurisdictional bar. On the merits, the government argues that: the plaintiffs lack a legitimate claim of entitlement because the statute does not impose substantive constraints on the Secretary's determination on whether country conditions continue to be met; the decision to terminate TPS is a

19

legislative decision that satisfied due process; and the plaintiffs received all the process that they were due because the Secretary was not required by the Constitution to follow the statutory process and that in any event she did so.

The Court again disagrees with the government on the jurisdictional issue but agrees that the due process claim falls short on the merits.  Starting with jurisdiction, the Supreme Court in *Mullin* assumed—based on the government's concession—that constitutional claims would still be reviewable under the TPS statute's jurisdictional bar, and this Court sees no reason to depart from that assumption.  *See Mullin v. Doe*, 146 S. Ct. at 2137.  It is true that the plaintiffs' due process claim relies exclusively on statutory violations.  But if the plaintiffs are right that the statutory procedures are required by due process—a floor set by federal constitutional law—the claims are distinct.  *See Czerkies v. U.S. Dep't of Labor*, 73 F.3d 1435, 1442 (7th Cir. 1996) (en banc).  *Compare id.* at 1448 (Easterbrook, J., concurring) (emphasizing the need to distinguish "systematic and personal challenges" to avoid "dress[ing] ordinary legal arguments in constitutional garb"), *with* Am. Compl. ¶¶ 89–122 (alleging pattern of similar TPS terminations).

Turning to the merits, the Court need not resolve the parties' disputes over whether the plaintiffs have a protected interest or whether TPS terminations are legislative or adjudicative.  Even assuming that the plaintiffs prevail on those points, their alleged procedural defects do not state a due process violation.  The core of due process is notice and an opportunity to be heard.  *See, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).  The plaintiffs do not claim that they were entitled to hearings before the Secretary's decision to terminate TPS.  And the decision was

20

published in the federal register, providing notice. The plaintiffs argue that the rationale in the federal register was not the *actual* basis for the decision, but that amounts to a challenge to the merits of the decision or APA review—both barred after *Mullin*—not a due process claim. So too with the alleged failure to (adequately) assess country conditions.

The remaining procedural defect, the failure to consult with appropriate agencies, is a statutory requirement, not one imposed by the Constitution. The plaintiffs have not pointed to any case imposing a similar requirement under the name of due process, nor can the Court find any. And if appropriate consultation is a due process requirement, then it presumably would apply to all sorts of government decisionmaking. The Court sees no basis for imposing that kind of internal government consultation.

The plaintiffs argue that due process in the immigration context is equivalent to statutory process, citing two Supreme Court decisions, *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), and *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950). Both cases, however, establish that whatever processes Congress provides for the lawful admission of noncitizens into the United States automatically satisfy due process. It does not follow that a failure to follow statutorily prescribed procedures also always *violates* due process. In other words, compliance with statutory procedures in this context is sufficient but not always necessary for due process.

The Court therefore dismisses the plaintiffs' due process claim and denies their motion to postpone.

### 3. Equal protection

The final claim remaining is the plaintiffs' equal protection claim, which the government has moved to dismiss. On a motion to dismiss, the question is whether the plaintiffs' complaint alleges sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiffs present two theories for their equal protection claim: (1) the TPS determination was racially discriminatory, and (2) the TPS termination reflects a "bare animus" against TPS holders as a politically unpopular group.

The first theory is substantially similar to the claim the Supreme Court held was unlikely to succeed in *Mullin v. Doe*, 146 S. Ct. at 2138–40. There, the plaintiffs relied on a pattern of allegedly preordained TPS terminations in combination with statements by the President and the Secretary that, in their view, reflected racial discrimination against non-white people. *Id.* Those statements included some from the President that "express strong objections to [recent] immigration," express "great displeasure with TPS," "broadly denigrate the countries for which TPS designations have been granted," and "malign Haitians who have come to the United States"—as well as statements by former Secretary Noem that "express[] antipathy toward travelers from countries covered by a renewed travel ban," made "derogatory comments about immigration and its effects," and "promised changes and criticized past implementation of TPS." *Id.*; *see id.* at 2149–50 (Kagan, J., dissenting) (quoting statements).

The majority concluded that this evidence was not enough. In its view, "[n]one of the cited statements [were] overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications." *Mullin v. Doe*, 146 S. Ct. at 2138.

22

"[W]hatever one may think of the cited statements," the Court said, "they are insufficient to show that the termination of Haiti's TPS designation was based on the race of the Haitian people." *Id.* at 2139. Additionally, the Court continued, there was a "strong, race-neutral explanation of these officials' statements: the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Id.* In a footnote, the Court acknowledged that the plaintiffs had presented additional, newly discovered evidence, but it dismissed that evidence as cumulative. *Id.* at 2140 n.7. The Court therefore concluded that the Haiti plaintiffs were "not entitled to interim relief on their equal protection claim." *Id.* at 2140.

The plaintiffs here rely upon much of the same evidence for their race-discrimination claim. Some of the Haiti-specific statements in *Mullin* do not apply equally to Burma, but the plaintiffs' theory is less about discrimination against Burma in particular, and more about racial discrimination as between white and non-white people. Several of the statements that could be read as country-specific nonetheless fit the plaintiffs' broader theory of race discrimination against non-white people. *See, e.g.*, *id.* at 2149 (Kagan, J., dissenting) (quoting the President's statement that Haitians and other immigrants are "poisoning the blood" of our country).

This Court has previously concluded, as the Supreme Court assumed in *Mullin*, that *Arlington Heights* supplies the relevant framework. *See Doe v. Mullin*, No. 25 C 15483, 2026 WL 1983721, at *6 (N.D. Ill. July 9, 2026) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). And as the Court previously noted, the Supreme Court's decision in *Mullin* was decided under a likelihood of success standard based on only public statements. *Id.* The Supreme Court did not

23

decide that the plaintiffs had failed to state a plausible claim for relief. It is hard to say that the statements here are not enough to get past the motion to dismiss stage and provide the plaintiffs with at least an opportunity to prove their case through discovery. *Arlington Heights* calls for a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. And based on the public statements here, it seems plausible that the plaintiffs could uncover evidence that might have changed the outcome in *Mullin*. *Cf. Cook County v. Wolf*, 461 F. Supp. 3d 779, 794 (N.D. Ill. 2020) ("Most people know by now that the quiet part should not be said out loud."); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) ("[O]fficials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority.").

On the other hand, the Supreme Court's reasoning in *Mullin* suggests that it might not be so limited by its procedural posture. In determining that the plaintiffs were unlikely to succeed at showing that discriminatory purpose was a motivating factor in the Secretary's decision, *Mullin* emphasized that the evidence provided a "strong, race-neutral explanation" for the TPS terminations and public statements: "the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Mullin v. Doe*, 146 S. Ct. at 2138–39. Following the reasoning in *Mullin*, the same could be said of the allegations here. *Cf. Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotations omitted)). If that is enough to defeat the race-discrimination

24

claim, then it is hard to see what evidence, short of an outright admission that racial animus motivated the decision to terminate TPS, would help the plaintiffs.

The Court does not view *Mullin*, decided under a different standard, as controlling the motion to dismiss at issue here. The Court therefore denies the government's motion to dismiss the race-discrimination claim. But because there is substantial ground for difference of opinion on the scope of *Mullin*, and because resolution of this controlling question of law may materially advance the ultimate termination of this litigation, the Court certifies this ruling for interlocutory appeal under 28 U.S.C. § 1292(b).

Finally, the Court addresses the plaintiffs' alternative theory that the TPS termination violates equal protection because it is based on a bare animus against TPS holders. This theory is based on the principle that "a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Romer v. Evans*, 517 U.S. 620, 635 (1996). But there is a distinction between bare desire to harm TPS holders and animus against TPS policy (and immigration as a whole). The Supreme Court's reasoning in *Mullin* points to the latter, not the former.

The Court therefore grants the government's motion to dismiss the plaintiffs' bare animus equal protection claim.

## Conclusion

In conclusion, the Court denies the plaintiffs' motion to postpone [dkt. 98]; grants the government's motion to dismiss [dkt. 109] as to the plaintiffs' APA, *ultra vires*, due process, and bare animus equal protection claims; denies the motion to dismiss as to the plaintiffs' race-discrimination equal protection claim; and certifies that denial for

25

interlocutory appeal under 28 U.S.C. § 1292(b).  The Court also denies as moot the

government's motion to stay discovery pending resolution of these motions [dkt. 108].

Date:  August 7, 2026

_____
MATTHEW F. KENNELLY
United States District Judge