# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AUNG DOE, et al., | ) | Case No. 25 C 15483 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| KRISTI NOEM, Secretary of the Department of Homeland Security, in Her Official Capacity, et al., | ) | Chicago, Illinois<br>August 5, 2026<br>10:30 a.m. |
| | ) | |
| Defendants. | ) | |

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiffs: ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
BY: MR. DINESH KEITH McCOY
MS. PHI UYEN NGUYEN
MS. HELEN ANNE SCHUTZ LO
MS. RAZEEN ZAMAN
99 Hudson Street, 12th Floor
New York, New York 10013

Court Reporter: CAROLYN R. COX, RPR, F/CRR
Official Court Reporter
219 S. Dearborn Street, Suite 2102
Chicago, Illinois 60604
(312) 435-5639
Carolyn_Cox@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

APPEARANCES (Cont'd):

LAW OFFICES OF JUNE J. HTUN
BY: MS. JUNE J. HTUN
3643 W. Belmont Avenue, Suite G
Chicago, Illinois 60618

INTERNATIONAL REFUGEE ASSISTANCE PROJECT
BY: MS. GUADALUPE VICTORIA AGUIRRE
One Battery Park Plaza, Floor 33
New York, New York 10004

For the Defendant: DOJ-USAO
U.S. Attorney's Office - Northern District of Illinois
BY: MR. JOSHUA SAMUEL PRESS
219 S. Dearborn Street, Room 500
Chicago, Illinois 60604

(Proceedings heard telephonically:)

THE CLERK: Case 25 C 15483, Doe v. Noem.

THE COURT: All right. Let me get everybody's names for the record, please, starting with you guys.

MR. McCOY: Good morning, your Honor. I'm Dinesh McCoy. I'm here on behalf of the plaintiffs. I'm here on behalf of the plaintiffs. I'm here with my co-counsel, Phi Nguyen, Guadalupe Aguirre, and our colleague June Htun should be here very soon.

THE COURT: Okay. Your turn.

MR. PRESS: Good morning, your Honor. AUSA Joshua Press.

THE COURT: I thought you were going to be out of town.

MR. PRESS: I was.

THE COURT: Is that next week?

MR. PRESS: That was last week.

THE COURT: It was last week. Okay.

MR. PRESS: I came back.

THE COURT: Got it. Okay.

All right. There's motions going both ways here, and I'm not sure who makes sense to have go first, so I'm going to pick you. So I'd rather you do it from up here, if you wouldn't mind. I think your other colleague just got here.

Go ahead.

MR. McCOY: Your Honor, I'm planning to address our motion to postpone the agency action. My colleague intends to cover any of the discovery issues that we've raised, if that's all right.

THE COURT: Okay. The motion to postpone it, are you also going to talk about things that are relevant on the motion to dismiss? Because they kind of overlap.

MR. McCOY: Yeah. I'm certainly happy to do that as well.

THE COURT: Okay. Go ahead.

MR. McCOY: Your Honor, we brought forward two new claims for preliminary relief. The first is a claim regarding the lack of authority of the secretary of DHS to actually terminate Burma's TPS designation. That authority --

THE COURT: This is the thing about -- whether it's the Attorney General or the Secretary of Homeland Security?

MR. McCOY: Yes, your Honor.

THE COURT: So if I go your way on that, basically the decision is going to say, but CF the Supreme Court?

MR. McCOY: No, your Honor. The Supreme Court never addressed that question.

THE COURT: Right. But basically -- basically, the upshot of your argument, wouldn't it be that the Supreme Court's decision effectively just -- they kind of missed the point?

MR. McCOY: Your Honor, to the extent that that argument was never raised to any court, not the Supreme Court, not, you know, not any court previously, you know, the Supreme Court never ruled on that issue. And if you look at the line of cases, *Webster v. Fall*, that we cite in our briefs, you know, to the extent that the Supreme Court never actually had the question before them, any sort of holding on -- any sort of discussion of the question of authority in their opinion.

THE COURT: What do you have to say -- what do you have to say about the point that's made by the defendants in one of their briefs that, okay, well, if that's right, then the TPS designation was dead to begin with?

MR. McCOY: Your Honor, that's not correct for a few different reasons. First, the agency action that we're challenging here specifically is the termination. This Court has jurisdiction to address that question.

THE COURT: But you're kind of asking me to look at the world in this little tiny set of blinders, right?

MR. McCOY: There are a few other reasons, your Honor.

Second, this case is very much analogous to the *Regents* case that was about the recision of DACA. In the *Regents* case, the Court said you can't just end a program because you think it's unlawful. You have to look at the reliance interest in the case as well.

And here there are regulations that properly were

issued that, you know, are granting benefits to TPS holders. Those individuals have reliance interest even higher than the DACA recipients because that was just a purely discretionary program. There is no statute at play in that case.

But here, if the government decided to take action to end that designation, they would have to consider the reliance interest. And that is seen also in the *A.C.R.* case recently about deferred action for special immigrant juveniles. Different courts have followed that precedent to maintain that proposition.

And, your Honor, to the extent that we can discuss the procedural due process claim as well, the plaintiffs here have due process interests as well that necessitate that those be taken into consideration.

THE COURT: So the due process that you're contending that they're entitled to is the same due process that was previously the subject of the statutory claim, right?

MR. McCOY: That's correct, your Honor. I mean, not exactly the same.

THE COURT: What's different about it?

MR. McCOY: Some of the aspects of the APA claim are not claims that we can bring anymore.

THE COURT: What's the due process you're saying they didn't get that they should have gotten?

MR. McCOY: The due process we're saying they didn't

get --

THE COURT: The consultation with the other agencies and all that?

MR. McCOY: Partially the consultation, partially the consideration of country conditions. And then partially publishing the actual basis of the decision.

THE COURT: That's the same thing.

MR. McCOY: Those three elements are the same. Some of our APA arguments we were not able to bring anymore given the Supreme Court's ruling.

THE COURT: So the whole thing about consultation with the other agencies and whatnot, how do you extract that from due process? I mean, that's not what due process typically requires.

MR. McCOY: Your Honor, we looked to a few different conversations about the due process requirements. Specifically, if you look at the Courts's holding in the *Thuraissigiam* and *Shaughnessy* cases, those were cases where there were non-citizens who were not even yet admitted into the United States. But the Court said that due process, that those individuals were -- had -- the process that they were entitled to was what Congress had said they were entitled to.

And here we have, when there's a termination decision, the process as to TPS holders is to go through those three steps.

THE COURT: Right. I guess the question or the point that the defendants make and I'm trying to get at here is, like, is there some case that says that a statutory process is what the due process clause requires? I mean, there isn't, right? Those are two different things.

MR. McCOY: Your Honor, there is no case that specifically says exactly that. But there are these cases like those two cases I just mentioned as well as the cases in the Seventh Circuit, the *Adame* case, which talks about, you know, the statutory process can be indicative of what is required for considering due process.

THE COURT: You're not arguing, though, that there needs to be some individualized on an immigrant-by-immigrant basis, though.

MR. McCOY: That's correct, your Honor. And I would also just point to the *Mansor* case, which is the Western District of Washington. That was a case about TPS applicants. And, basically, what was happening there is the government was not giving them the work authorization that they were entitled to. The Court there found that because they are entitled to work authorization on a mandatory basis, those folks have a protected interest. And what they are entitled to is what the statute requires for giving them that work authorization, the process that the statute requires. And that was a final decision on summary judgment. And so there are contexts that

go beyond sort of the individual hearing and just notice components. There are cases that look to the statutory requirements as the constitutional floor for what is required.

THE COURT: So, basically, the argument is that the TPS beneficiaries as a group are entitled to have whoever the right official is consult with the other relevant officials, consider the country conditions, and give an explanation for why they're terminating the TPS status, if that's what they're doing.

MR. McCOY: That's correct, your Honor.

THE COURT: Okay.

MR. McCOY: Yes. And just to finish out on a few different due process considerations, I think the government points to a few different cases where they say that really what we're doing is just basing the liberty interest in the statutory process itself.

But that's not the case, your Honor. The TPS holders under this scheme actually have liberty and property interests in the right to work, the right to not be detained, and the right to not be removed from the United States. We're not just basing it on the statutory process of some sort of discretionary grant or not, which is what some of those other cases were about. They actually have protected interests. And the *Ramos* case, the *Mansor* case have said that those TPS holders have those protected interests.

And I just -- I'll go back, your Honor, to the first claim on the secretary's lack of authority, talk through that a bit more.

The government has the burden of establishing the basis of the authority that they're acting under. And they can't point to any provision here that actually indicates a transfer of authority from the Attorney General to the secretary of DHS. They point to 110- -- 8 U.S.C. 1103(a)(1) as some indication for that transfer, but that provision has a very broad exception clause.

THE COURT: Okay. Does that provision transfer anything?

MR. McCOY: That provision does transfer things. It does transfer many authorities within that chapter of the INA to the Homeland Security secretary, but it specifically carves out -- it says: "Except insofar as this chapter or such laws relate to powers, functions, and duties conferred upon the Attorney General."

And, you know, there are duties described that the Attorney General retains within that same section and in other sections of the Immigration and Nationality Act statute. And so the government points to 1103(g), and they want this Court to say that 1103(g), which relates to the Executive Office of Immigration Review authorities is the entire scope of the powers retained by the Attorney General.

But that simply cannot be the case. There's other provisions within that same section beyond 1103(g) that describe other authorities of the Attorney General and the authorities outside of that section that the Attorney General, even as recently as this month, has taken, such as designating individuals as alien terrorists and putting them into removal proceedings. That falls entirely outside the scope of the EOIR powers. And so the government's reading is that, you know, this Court should read that very narrowly, but there's no basis for that reading.

What we're saying is that that first provision does transfer authorities to the Secretary of Homeland Security, but there are many authorities of the Attorney General that have remained in place, including the TPS designation.

THE COURT: Okay. So you certainly agree that 1103 reflects that some functions got transferred, right?

MR. McCOY: Yes, that's correct.

THE COURT: Which ones? Is it just the ones that are specifically mentioned or what? What exactly?

MR. McCOY: Your Honor, there are a number of authorities that are specifically mentioned.

THE COURT: Is there anything -- is there anything outside of 1103 that transfers functions to the Illinois security?

MR. McCOY: Yes, your Honor. If you look at -- the

President was required to submit a reorganization plan to Congress.

THE COURT: Okay.

MR. McCOY: There are specific pieces of that where they say the National Domestic Preparedness Office is going to be transferred to DHS.

THE COURT: On this question, though, if you're right now that the Secretary of Homeland Security can't undo it, then what does that say about the original designation? Is there any case that upholds an invalid agency action, or is it just based exclusively on the fact that somebody relied on it?

MR. McCOY: Your Honor, I think in part that is the basis of the *Regents* decision, the DACA decision, in part that's also the basis of the *A.C.R.* decision, which we cite, which is about deferred action for special immigrant juveniles. And so those are two cases, your Honor, that are about those reliance interests.

THE COURT: Okay.

MR. McCOY: And this case, I would say, is very similar to *Regents*, your Honor. The Supreme Court even said -- talked about in the *Mullin* opinion that before TPS existed, Congress -- the executive branch actually gave TPS-like protections without statutory authorization for individuals.

And in the *Regents* case, you know, that was a deferred action program. There was no statutory authority to do that.

There was just the discretionary grant by the executive branch of deferred action. And so here, even outside of the sort of statutory scheme, even if the designation is invalid, they still -- the executive branch could still consider the alternatives on the table in the reliance interest, including, you know, whether to grant individuals some discretionary authorization.

THE COURT: Okay. I want to ask you -- I want to give you a chance to talk about your other stuff. I want to ask you a question about the equal protection claim at some point in time; although I know that's only relevant to the motion to dismiss, not the other thing. But you tell me when is a good time to do that.

MR. McCOY: Now is a good time, your Honor.

THE COURT: So how does your equal protection claim differ from the one that the Supreme Court said was insufficient?

MR. McCOY: Your Honor, there are a few different reasons. One is that our claim is based in part on the application of the travel ban and the sort of reliance on the travel ban as one of the central reasons for the equal protection claim -- or for the termination.

THE COURT: When you say the reliance on the travel ban, what do you mean?

MR. McCOY: The government in its termination decision

talks specifically about the application of the travel ban being one of the primary drivers of their decision, and we are talking about that as a basis of national origin discrimination.

THE COURT: How is that different from the things that the Supreme Court said in the *Mullin* case weren't overtly -- quote/unquote, overtly racial, or whatever the lingo was that they used?

MR. McCOY: Your Honor, I think there's a different sort of category -- I mean, there's -- certainly, we would still put forward statements as giving context to those acts, but --

THE COURT: Right. But those statements were all before the Supreme Court in that case, too, right?

MR. McCOY: Yes, your Honor. Yes. I concede that some of the statements are very similar. And so to the extent that we're continuing to pursue this claim, we think that there may be evidence in discovery that generates sort of a better understanding of the policy as it pertains to Burma as well as the broad policy as it pertains to racial discrimination and national origin discrimination.

THE COURT: That would be the only thing is, like, the possibility that you might turn over some rock in discovery that gets you something that you don't already see. Because the whole thrust of the claim as it was laid out in the pages

and, you know, the previous motion and the stuff that's before me now, the complaint, whatever, is all of these comments by, you know, Defense Secretary Noem, the President, and other people that were alleged to be reflective of national origin discrimination, which those are the exact same comments that the Supreme Court said don't add up to that, right?

MR. McCOY: Some of the comments are the same comments, your Honor. And then, you know --

THE COURT: There's a footnote at the end of the Supreme Court opinion that basically says, oh, by the way, after -- you know, after the original briefing, there were additional comments that were referenced. And those really are of the same vein and doesn't really change anything. I mean, it seems to be pretty all encompassing to me.

MR. McCOY: Your Honor, I agree that the decision is broad --

THE COURT: I get that the question of whether something states a claim under 12(b)(6) is maybe different from the sufficiency of it, but I just -- I'm having a hard time seeing daylight between your claim here and the one that got rejected in that case.

MR. McCOY: Your Honor, we understand that that decision kind of does change the context --

THE COURT: Presumably why you're not relying on that for the current --

MR. McCOY: You know, we are pursuing that in discovery, but we're not basing our preliminary motion on --

THE COURT: Why don't you have a seat. I'll give you a chance to talk some more after Mr. Press.

MR. McCOY: Thank you.

THE COURT: Mr. Press, you're up.

MR. PRESS: Good morning, your Honor. AUSA Joshua Press on behalf of the defendants.

We think this is actually a much simpler case now with the benefit of the Supreme Court's opinion from June. To be blunt and short, the *ultra vires* argument is very simple. Effectively, what they're saying is, the words are "our Attorney General," and this is not the Attorney General, which we concede. That's a lot shorter shift to the Homeland Security Act of 2002 than any court since 2003 has ever interpreted that statute. Every action about TPS for every country since the Homeland Security Act of 2002 has been by the Secretary of Homeland Security.

THE COURT: Right.

MR. PRESS: It's never come up in any case. Opposing counsel is correct that it wasn't litigated. The reason it wasn't litigated is because the statutory record on this issue and the case law on this issue is crystal clear that the transfer was affected by that act.

THE COURT: Basically, you're saying it wasn't missed

because this was just a -- this brilliant issue that nobody came up with was missed because it's not really an issue.

MR. PRESS: It wasn't a direct issue. That's true. It was considered because this same type of issue, including in other cases involving TPS, which I think we cite to in our brief, *Nielsen v. Preap*, for example, has been considered by the Supreme Court already. This is a statutory change that Congress did not affect because when they passed the Homeland Security Act, they were doing lot of other things. So they were not going back into the direct text to the authorizing parts of the INA of 1952 to change the text directly where it was not needed.

And our point on that is that this ground has been well trodden, and the Supreme Court did not get it wrong in June when they kept inserting the words "secretary" over what is in the INA Attorney General on this direct issue, this exact same issue of the exact same statute.

THE COURT: Kind of what you're saying is that the Supreme Court, more or less, without coming right out and saying, decided this point when they were putting the brackets in there and saying "secretary" every time it said "attorney general."

MR. PRESS: Yeah, they decided this issue -- because they had already decided it before. And it's true this was not directly litigated. We're willing to concede that. But we

don't think that the courts -- district courts, Court of Appeals, and the Supreme Court multiple times have missed out on this, that there is a rock that they forgot to uncover on this issue. We really do think that the courts have been pretty clear about this.

And at best we have Congressional -- at worst we have Congressional acquiescence on this point because there have been numerous proposed amendments to the INA over the last 24 years, and this has never been an issue that has come up at all, to my knowledge.

Turning to due process, I think opposing counsel's argument on this was actually pretty candid that they have essentially constitutionalized what they were arguing before with respect to the lack of consultation or improper considerations going into the decision-making determination before, which was a statutory argument that they were making.

The reason why we believe that matters is because the Supreme Court in *Mullin v. Doe* was crystal clear that non-statutory claims cannot proceed. So we don't think that that is somehow undone once you can affix constitutional labels to the exact same argument, identical deficiencies, and say, oh, well, that gets around *Mullin v. Doe* because we've said "due process." We've incanted the words "due process," so now we can step out of that jurisdiction stripping device.

THE COURT: Maybe the better way of packaging that

would be to say that the due process doesn't require what the statute says is required for statutory purposes.

MR. PRESS: Well, right.

THE COURT: You say tomato; I say tomahto, I suppose.

MR. PRESS: I think the Seventh Circuit has gotten to this point of you can't just say a violation of statute is a violation of due process. Now, they are correct in the context of admission decisions by the executive branch. I think he cited to *Shaughnessy v. U.S. ex rel. Mezei* from the 1950s and *DHS v. Thuraissigiam* from 2020.

It is true that in the admissibility context, due process is whatever Congress says it is, and the Supreme Court has been crystal clear about that for over a century. We are not in the admissibility context. We are in the context --

THE COURT: That's kind of a unique area is what you're saying.

MR. PRESS: Yes. Because that's about controlling sovereign borders. And so obviously (incomprehensible) branches are sort of at their zenith when it comes to their powers there. We're talking about interior enforcement or interior decision-making about immigration and naturalization by the Secretary of Homeland Security.

In this context, Congress has legislated. They've also built in jurisdiction-stripping provisions. And I think the answer that I provided to your Honor seven, eight months

ago on this is they will get -- that the foreign nationals who remain without status will get due process through individualized either applications to the U.S. citizenship and immigration services, or before an immigration judge --

THE COURT: Since you brought that up, I want to ask you about something on page 22 of your -- I guess it's the reply. Let me just see that the right brief -- it's docket number 106.

MR. PRESS: Okay.

THE COURT: Which is the response in opposition to the motion to postpone.

Okay. So let me get back to page 22.

MR. PRESS: Okay.

THE COURT: It's not -- the case is not a humorous case, but I have to say I got a little bit of a chuckle out of this sentence. It says: "Similarly, if plaintiffs are detained, which is a permissible component of the removal process, they may seek review of their detention through habeas."

MR. PRESS: Yes.

THE COURT: I got a little bit of a chuckle out of that given --

MR. PRESS: You and I have seen a lot of these cases.

THE COURT: We've seen a lot of these cases. And the government's position consistently has been, no, they don't.

MR. PRESS: Well, they can petition for habeas. I don't doubt that.

THE COURT: Okay. Let me refine what I said: The government's position on that has been that habeas is effectively a nonexistent remedy because the government has -- the government's position on the 1225 versus 1226 issue has basically been you can do whatever you want.

MR. PRESS: Sorry.

THE COURT: I'm reducing it to its simplest terms.

MR. PRESS: Thank you. So I understand that. Thank you for that clarification.

What we're saying is the detention is lawful, which is the classic response in return to the habeas petition itself. We're not saying what we would typically say -- or our main line argument in this case is that there's no jurisdiction.

THE COURT: Okay.

MR. PRESS: Do you see the distinction?

THE COURT: Yeah.

MR. PRESS: If there's no jurisdiction, that's a jurisdictional defense. Versus if the detention itself is lawful, it's a substantive response.

THE COURT: Four angels dance on the head of a pin as opposed to three. Okay. I get it. I don't want to dwell on that.

Let me ask you a question about -- let me ask you a

question about the due process issue.

MR. PRESS: Sure.

THE COURT: So I get your argument that this is -- in the category of legislative versus adjudicative, this is a legislative decision. Where does the line get drawn between those two things? Because this isn't like -- the decision to revoke or terminate or whatever the term is the TPS status, it's not -- yeah, it covers a lot of people, but it's a very specific decision about applying particular criteria or something like that.

So why does that get categorized as legislative as opposed to adjudicative?

MR. PRESS: Well, I think it's the breath, the scope or breath.

THE COURT: It's a question of how you draw that line is my question.

MR. PRESS: I think it's a scope for breadth issue. And I think we're living with this --

THE COURT: It applies to a lot of people; therefore, it's legislative?

MR. PRESS: More or less, yes. The reason why I'm saying that, and I know that that's reductive, but -- is Justice Holmes's opinion from *Bi-Metallic*.

THE COURT: From *Bi-Metallic*.

MR. PRESS: From a long, long time ago. This is

legislative rulemaking. There's no doubt. That's never been a question here. And the reason why it's legislative rulemaking is because it's affecting substantive conditions. So they are challenging the termination decision in the Federal Register. That is -- so, typically, what goes in the Federal Register would be rulemaking of some kind.

THE COURT: Yeah, but you're not going to argue that because we put it in the Federal Register it's legislative --

MR. PRESS: No. I'm saying the scope here and the nature of this determination -- just the nature of the determination to provide TPS to begin with is a legislative rulemaking maneuver by the executive branch.

They do get individualized hearings or applications. Opposing counsel was alluding to a decision from Washington that was about a challenge to a denial of an application for temporary and protected status. Individuals will apply for TPS with USCIS. They will have an application package. USCIS makes a determination on that application and issues a decision on that application. If they are not happy with that determination --

THE COURT: Hang on. Say that again. I thought I just heard you say -- and that's why I was looking over at the rough transcript -- that individuals will make an individual TPS application.

You don't actually mean that, right? TPS status is

gone.

MR. PRESS: No, no. I do mean that. So once TPS is designated for a country --

THE COURT: No, I'm talking about now. Okay. I thought this part of the discussion had to do with -- you're saying they're going to get due process because even if TPS status is done, each person is going to have to be individually determined whether they get to stay in the country or not stay in the country. I thought that's where you were going with this.

MR. PRESS: That is. They wouldn't be able to apply for TPS anymore with USCIS.

THE COURT: So how is this going to work? Here's my question: How is this going to work? You're already a little bit further down the road on Haiti and Somalia maybe?

MR. PRESS: I think Syria.

THE COURT: Haiti and Syria.

So how does it work? The TPS status is "done" done, concluded by the Supreme Court decision. There's no further litigation about it because the Supreme Court decided on it. So what's happening? Do people get put into removal proceedings? They just get scooped off the street? How does it work?

MR. PRESS: Well, actually, the TPS -- or former TPS recipients would immediately revert back to whatever status

they had prior to getting TPS.

THE COURT: Got it.

MR. PRESS: And so that's an individualized assessment in the context --

THE COURT: It depends on the person. Okay. I get it.

MR. PRESS: And if they didn't have status, then they would revert back to not having status. That does not mean --

THE COURT: What happens to a person that doesn't have status? They basically get something that says time to leave, or if not leave, you're subject to being arrested and deported basically or --

MR. PRESS: You're subject to being arrested; placed into removal proceedings; and then, depending on the outcome of those proceedings, deported. That's how the process works for literally millions of people without status in the United States.

THE COURT: I'm just curious -- it's a little bit different situation. It's not somebody who just got here all of a sudden without status. It's somebody who was here, maybe had status, maybe didn't have status. Let's talk about the ones who didn't. Then they got this TPS, quote/unquote, status, and now it's going away.

So basically you're saying that they revert to whatever they were, whatever their status was or lack of status

was before the TPS designation.

MR. PRESS: That's correct. That's the immediate impact. That's correct.

THE COURT: Do people -- I suppose I could ask plaintiffs' counsel this. So do people come here -- this is going to sound like a dumb question. Okay?

MR. PRESS: Don't worry.

THE COURT: I want to understand how it works. So the TPS status applied, I assume, both to people who were already here from the country and didn't have other status and also people who came here after that? Like in the intervening period after the -- in other words, TPS status gets declared on January the 1st of 2008 or whatever it is. If somebody comes here on January the 1st of 2009 from that country, they have that kind of status.

MR. PRESS: So my understanding is that TPS was designed to be preservation. It was designed to go into effect for people who were here already.

THE COURT: Who were already here.

MR. PRESS: Who were here already.

THE COURT: Not people who come after that.

MR. PRESS: Right. The reason for that is TPS is supposed to be mercy, and it's supposed to be dispensation of mercy.

THE COURT: It's basically we're not going to kick you

out because we have this status.

MR. PRESS: If you go back to a hell hole, that would be a bad thing. That was the premise of the EBD program opposing counsel was alluding to before, prior to TPS's convocation.

THE COURT: Here's where I was going with this. Is there any category of people who would have come here thinking that by coming here, they'll get the already existent TPS status and, therefore, kind of relied on that?

MR. PRESS: I'm sure there are such people, but they should not be thinking that.

THE COURT: Why not?

MR. PRESS: Because of the preservation --

THE COURT: Because it's temporary.

MR. PRESS: -- and, of course, the temporary nature of the program.

THE COURT: I've gotten way off track here. Go back to whatever track --

MR. PRESS: No, no. That's a very fair point, though, because it gets to -- the assessments will be done on an individual level by USCIS or by an immigration judge both --

THE COURT: So that's what you're saying is the individualized determination, and that's more adjudicative.

MR. PRESS: Exactly.

THE COURT: And what we're talking about now is

legislative, applies to a whole category.

MR. PRESS: Right. And so Congress has legislated more due process, the due process that probably is required, literal process that is required, for this type of circumstance where if someone loses their TPS but they remain here, they have other avenues that they can pursue through other procedures that they can pursue to stay here and vindicate those interests that they want to litigate about, including constitutional issues, by the way.

That's why we continue to make the notation that constitutional claims are supposed to be channelled. But we're not really directly dealing with more constitutional claims other than the garb, constitutional garbing that they're doing with their statutory arguments that were rejected in *Mullin v. Doe* six weeks ago.

That's all I have with respect to likelihood of success on the merits for the postponement order. I'm not sure if your Honor would like --

THE COURT: That's the only thing I want to hear about.

MR. PRESS: Okay.

THE COURT: Yeah. The other stuff I think is sufficiently covered in the briefs.

MR. PRESS: Okay. Thank you.

THE COURT: Okay. Your rebuttal.

MR. McCOY: Just a few quick points, your Honor. First, on the equal protection claim, we did also amend our complaint to add a claim based on bare animus against a politically unpopular group, TPS holders. And we think that the statements in that context actually reflect a stronger position that the history on TPS and how this administration has talked about TPS indicates a bare animus against this unpopular group.

THE COURT: Okay. And therefore what? Let's say the government has animus against a politically unpopular group. Therefore what? What does that mean? Is there a law that says that that gives rise to an equal protection claim because you're politically unpopular?

MR. McCOY: Well, to the extent that they are acting without a rational basis for their decision-making and retaliating against that group.

THE COURT: So how does this differ -- I'm just going to pull up the -- it'll just take me a second to get to the right part of it.

How does that differ from what the Supreme Court said -- was talking about in the *Mullin* case. When you look at the U.S. reports, it covers a lot of pages. It takes a while to get to the end.

MR. McCOY: Your Honor, if I may, I think I have some sense, but -- the Supreme Court looked at those statements and

said, you know, this is not -- these statements can't be making out a racial animus claim. There's rational -- there's race-neutral elements to the statements. And so we are bringing forward a different kind of claim based on the bare animus. And I don't mean to belabor that, but I can talk about --

THE COURT: Tell me what you mean by "bare animus" then, because I'm not sure I'm getting it.

MR. McCOY: Similar to the *Romer* case, your Honor, to the extent that it's targeting a group because of their political unpopularity.

I just want to speak to a few other things. The government talked about -- opposing counsel talked about constitutionalizing our claims. But statutory claims and constitutional claims can overlap. There's no question about that. We brought the statutory claim first because we thought that was the strongest basis for a decision, but that doesn't mean that our constitutional claim is invalid in some way. What we have at stake here is protected liberty and property interest. And because of those interests, the plaintiffs are entitled to due process.

THE COURT: Yeah, I get that. And we can argue about whether there's a protected property interest or deliberate interest or whatever. But, I mean, in the final analysis, I think it boils down to what's the due process that's required?

And, I mean, basically, when you get to that, you then do kind of revert back to the statute, which would be kind of an unusual way of interpreting due process.

MR. McCOY: Your Honor, we believe that's consistent with the case law. Even the *Adame* case in the Seventh Circuit talks about, quote, statutorily required procedures assure compliance with constitutional due process requirements. A petitioner may have a legal claim when she can show statutory procedural shortfalls.

And we think that here where there are protected liberty interests at stake, those procedural shortfalls matter and rise to the type of process that's required for a termination.

I'll just also speak to the adjudicative versus legislative balance. Even the Supreme Court has recognized that that's not a black-and-white distinction. That is a balancing test. And in this case, what we have is, you know, disputed facts over whether the grounds for termination exist.

THE COURT: You could say that about any legislative decision, couldn't you?

MR. McCOY: In some sense, I guess, your Honor, to the extent that there is --

THE COURT: Why did Congress choose to pass this law and not that law? Or why did they pass it or not pass it? One group says it's because of this. One group says it's because

of that. There's always disputed facts.

MR. McCOY: But, your Honor, what makes this different is they assigned that process responsibility to a specific person. It's not just, you know, Congress legislating, you know, on a blank slate that they want to issue a new policy. It's, you know -- there's a specific authority, the Attorney General, who needs to go through this process. And that's what Congress has required.

Just lastly, your Honor, on the individualized removal proceedings point and the relevance to due process, you know, ICE is already calling TPS holders in for check-ins from Haiti and Syria. People have been issued with notices to appear and are at risk of being detained. And they can't actually bring some of these claims in immigration court at all. Due process claims are not viable in immigration court. It would be -- it would have to take getting that claim up to a higher court to evaluate that piece.

And the government is actively foreclosing other avenues for relief. They --

THE COURT: Like such as?

MR. McCOY: What's that?

THE COURT: Such as?

MR. McCOY: You know, it's only because of a current court order that USCIS is even processing asylum applications for individuals from Burma.

THE COURT: You referred to this in one of your briefs, that there was some sort of a blanket decision to stop. Remind me what it is --

MR. McCOY: Yeah. It's the adjudication pause policy, basically saying that all the countries on the travel ban, if you're on the travel ban, you won't get adjudicated for a final decision on your asylum.

THE COURT: Ever or just for now?

MR. McCOY: For however long the government wants that policy to be in place.

THE COURT: Okay. And when you say countries on the travel ban, that includes Burma.

MR. McCOY: That's correct, your Honor. And it's only because of a court order that that's now happening.

THE COURT: What's the court case?

MR. McCOY: That's the *Dorcas International* --

THE COURT: In D.C. somewhere?

MR. PRESS: Rhode Island.

MR. McCOY: Rhode Island.

THE COURT: Rhode Island. Okay.

MR. PRESS: And so, really, those avenues are not providing the type of process required to protect TPS holders' interests. And Congress mandated a specific process that does protect TPS holders, and we're asking your Honor to set aside the policy given those constitutional violations.

Thank you, your Honor.

THE COURT: I found the thing I was looking for.

MR. McCOY: Okay.

THE COURT: It's a sentence that says -- it's in section (3)(b) of the Supreme Court opinion in the *Mullin* case. The topic sentence of the paragraph says: "None of the cited statements by either the President or the Secretary was overtly racial," blah, blah, blah.

Then it says: "For example, one may oppose TPS in favor of tighter restrictions on immigration for economic or other reasons that have nothing to do with race."

So, in other words, there's a specific reference about anti-TPS sentiment. Like, why doesn't that dispose of the sort of modified equal protection claim that you referenced?

MR. McCOY: Your Honor, I think that question, again, was never before the Supreme Court. They never evaluated a claim based on an animus to the extent that, you know, they were thinking about the equal protection claim for Haiti in regard to racial animus. And I think that's -- we've seen in a number of regards the Supreme Court evaluating racial animus and saying that, you know, some statements don't raise to that level. The *Trump v. Hawaii* case. You know, this is a different kind of claim.

THE COURT: How many people are there who are from Burma and have TPS status right now?

MR. McCOY: I believe slightly -- around 4,000 people, your Honor.

THE COURT: All right. I hope somebody is talking to them about what their options are if everything goes negatively for them. That's all I'm going to say.

MR. McCOY: Thank you, your Honor.

THE COURT: All right. The matter is taken under advisement. I think I had -- the stay only goes through this Friday, so you're going to get a decision before that.

MR. PRESS: Your Honor, this is the last thing.

THE COURT: Yes, sure.

MR. PRESS: I'm advised to ask, if you were to rule against the government on this and grant the postponement, we would ask for you to stay that order for 14 days so that we can appeal to the Seventh Circuit.

THE COURT: So this is one of these little -- so you've asked me to stay a postponement. So what does that -- what does --

MR. PRESS: I think it would go into effect during that period of time.

THE COURT: That's what you're asking me. Okay. I understand what you're asking me. Thanks.

The matter is taken under advisement. Take care.

MR. PRESS: Thank you.

UNIDENTIFIED SPEAKER: Your Honor, did you want to

talk about any discovery today?

THE COURT: No, I don't. Sorry. I want to just focus on this. I apologize for leading you to believe that.

(Proceedings concluded at 11:15 a.m.)

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

*/s/ Carolyn R. Cox* August 12, 2026
Carolyn R. Cox, RPR, F/CRR
Official Court Reporter