SHORT RECORD
NO. 26-8018
FILED 08/17/2026

In the

# UNITED STATES COURT OF APPEALS

for the Seventh Circuit

## No. 26-

MARKWAYNE MULLIN, Secretary of Homeland Security, *et al.*,

Defendants-Petitioners.

v.

AUNG DOE, *et al.*,

Plaintiffs-Respondents,

On Petition for Permission to Appeal from
the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 25 C 15483, Matthew F. Kennelly, *Judge*.

# PETITION FOR PERMISSION TO APPEAL PURSUANT TO 28 U.S.C. § 1292(b) AND FOR A STAY OF DISTRICT COURT PROCEEDINGS PENDING APPEAL

ANDREW S. BOUTROS
United States Attorney
for the Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604

THOMAS P. WALSH
Assistant United States Attorney
Civil Division Chief

JOSHUA S. PRESS
Assistant United States Attorney
(312) 886-7625

## Table of Contents

**Page**

Introduction ........................................ 1

Question Presented ........................................ 3

Statement of the Case ........................................ 3

I. Statutory Background and the Burma TPS Termination ........................................ 3

II. Prior Proceedings and *Mullin v. Doe* ........................................ 4

III. The District Court's Certified Order ........................................ 5

Discussion ........................................ 7

I. The Certified Order Presents a Controlling, Contestable Question of Pure Law That Could End This Litigation ........................................ 7

II. The District Court Incorrectly Answered the Issue Presented. ........................................ 9

III. Immediate Review Will Materially Advance This Litigation and Avoid Discovery That Should Never Occur. ........................................ 14

IV. This Court Should Stay the District Court's Proceedings Pending Disposition of the Instant Appeal ........................................ 15

Conclusion ........................................ 16

Certificate of Compliance

Appendix

Certificate of Service

# Table of Authorities

**Cases** **Page(s)**

*Afr. Cmtys Together v. Mullin*, No. 26-cv-11201,
2026 WL 2364398 (D. Mass. Aug. 14, 2026) .................... 11, 14

*Ahrenholz v. Bd. of Trustees of the Univ. of Ill.*,
219 F.3d 674 (7th Cir. 2000) .................... 7, 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................... 2, 8, 9, 11

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................... 6, 9, 11

*Cheney v. U.S. Dist. Ct.*,
542 U.S. 367 (2004) .................... 11, 14

*City of Chicago v. Shalala*,
189 F.3d 598 (7th Cir. 1999) .................... 13

*Clinton v. Jones*,
520 U.S. 681 (1997) .................... 14

*Demkovich v. St. Andrew the Apostle Par.*,
3 F.4th 968 (7th Cir. 2021) .................... 12

*Doe v. Mullin*, No. 26-1294,
2026 WL 2093686 (7th Cir. July 16, 2026) .................... 1, 5

*Doe v. Noem*,
822 F. Supp. 3d 893 (N.D. Ill. 2026) .................... 5

*Doe v. Village of Arlington Heights*,
782 F.3d 911 (7th Cir. 2015) .................... 11

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) .................... 13

*Fiallo v. Bell*,
430 U.S. 787 (1977) .................... 13

*International Refugee Assistance Project v. Trump*,
961 F.3d 635 (4th Cir. 2020) .................... 3, 10, 13, 15

*Martin v. Goodrich Corp.*,
95 F.4th 475 (7th Cir. 2024) ....................................................................... 7

*Mathews v. Diaz*,
426 U.S. 67 (1976) ....................................................................... 13

*Mohawk Indus., Inc. v. Carpenter*,
558 U.S. 100 (2009) ....................................................................... 7, 14

*Mullin v. Doe*,
146 S. Ct. 2121 (2026) ....................................................................... *passim*

*Narenji v. Civiletti*,
617 F.2d 745 (D.C. Cir. 1979) ....................................................................... 13

*Rajah v. Mukasey*,
544 F.3d 427 (2d Cir. 2008) ....................................................................... 13

*Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ....................................................................... 12

*Rumpke of Ind., Inc. v. Cummins Eng. Co., Inc.*,
107 F.3d 1235 (7th Cir. 1997) ....................................................................... 12

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011) ....................................................................... 12

*Taylor v. JPMorgan Chase Bank, NA*,
958 F.3d 556 (7th Cir. 2020) ....................................................................... 9

*Trump v. Hawaii*,
585 U.S. 667 (2018) ....................................................................... 3, 13

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977) ....................................................................... 6

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
516 U.S. 199 (1996) ....................................................................... 12

**Statutes**

5 U.S.C. § 705 ....................................................................... 5

8 U.S.C. § 1254a ....................................................................... 1

8 U.S.C. § 1254a(b)(1)(C) .................................................................................... 4

8 U.S.C. § 1254a(b)(5)(A) .................................................................................... 13

28 U.S.C. § 1292(b) .................................................................................... 1, 6, 7, 9, 2

**Other Authorities**

Presidential Proclamation 9645 .................................................................................... 10

## Introduction

This petition marks this case's second trip to this court this summer. Plaintiffs challenge the termination of Burma's Temporary Protected Status (TPS) designation. *See* 8 U.S.C. § 1254a. This winter, the district court granted plaintiffs' motion for interim relief from the termination. But after the Supreme Court concluded that other plaintiffs were unlikely to succeed on materially similar challenges to other TPS terminations, this court summarily reversed that grant of interim relief. *Mullin v. Doe*, 146 S. Ct. 2121 (2026); *Doe v. Mullin*, No. 26-1294, 2026 WL 2093686, at *1 (7th Cir. July 16, 2026).

After the Supreme Court's decision, plaintiffs pleaded new claims and sought a new grant of interim relief on their new claims. The district court denied their motion for interim relief and granted defendants' motion to dismiss all but one of the claims in light of the Supreme Court's recent decision.

Plaintiffs' sole remaining challenge is their claim that the TPS termination discriminated based on race, in violation of the equal protection component of the Fifth Amendment. In the district court's view, the Supreme Court's holding that a materially similar equal protection claim was unlikely to succeed prevented a grant of interim relief for plaintiffs, but did not mean that plaintiffs failed to plausibly allege race discrimination.

The district court certified that conclusion for interlocutory appeal under 28 U.S.C. § 1292(b). Accordingly, defendants now petition this court pursuant to 28 U.S.C. §§ 1292(b) and 1651, as well as Federal Rules of Appellate Procedure 5 and

27, for permission to appeal the order, and for a stay of district court proceedings pending appeal.

Interlocutory appeal is warranted. The Supreme Court concluded that a similar race-discrimination claim was unlikely to succeed because none of the statements relied upon by the Haitian TPS plaintiffs was "overtly racial," but instead they "in substance[,] all expressed policy views that could rest on race-neutral justifications," and the administration's termination of each TPS designation it had considered supplied "a strong, race-neutral explanation" for the decisions and statements alike. *Mullin v. Doe*, 146 S. Ct. at 2138–39. The district court concluded that plaintiffs' race-discrimination claim was not *likely to succeed* but could still be *plausibly pleaded*, so plaintiffs should be able to engage in discovery that might "uncover evidence" of the sort "that might have changed the outcome in *Mullin*." R. 115 ("Op.") at 24–25.[1]

That conclusion was wrong. The same strong, race-neutral explanation relied upon by the Supreme Court defeats plausibility under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). At minimum, and sufficient for § 1292(b) certification, there is at least substantial ground for disagreeing with the district court's conclusion on this issue, and resolving the issue would materially advance the ultimate termination of the litigation by clarifying whether defendants are entitled to judgment in their favor now—resolving the final claim in the case—or whether defendants must endure discovery as the district court contemplates.

---

[1] "R. __" refers to numbered items on the district court's docket.

## Question Presented

The question presented for authorization for an interlocutory appeal is whether plaintiffs' claim that the termination of Burma's TPS designation violates constitutional equal-protection principles should have been dismissed. The court should permit such an appeal here to review the denial of defendants' motion to dismiss that claim because it is a pure question of law that controls the only issue remaining in this case. The district court itself recognized that its evaluation of the effect of the Supreme Court's decision was contestable. Immediate review will either end this litigation outright or define its shape before the parties and the courts bear the burdens of discovery into privileged Executive Branch deliberations regarding TPS.

This is familiar terrain. For example, when a district court made precisely the same distinction after the Supreme Court's decision in *Trump v. Hawaii*, 585 U.S. 667 (2018)—denying a Rule 12(b)(6) motion to dismiss on the theory that the Supreme Court had resolved only the issue of whether there was a likelihood of success—the Fourth Circuit granted the government's § 1292(b) petition, stayed district court proceedings, and ultimately reversed the district court with instructions to dismiss with prejudice. *International Refugee Assistance Project v. Trump*, 961 F.3d 635, 646–47, 654 (4th Cir. 2020) (*IRAP*). The same course is warranted here.

## Statement of the Case

### I. Statutory Background and the Burma TPS Termination

The TPS statute authorizes the Secretary of Homeland Security to designate a foreign state for TPS upon finding, as relevant here, that "extraordinary and

temporary conditions" prevent that state's nationals from returning in safety, unless the Secretary finds that permitting them to remain temporarily is contrary to the national interest. 8 U.S.C. § 1254a(b)(1)(C). The Secretary must periodically review each designation in consultation with appropriate agencies and, if the conditions for designation are no longer met, must terminate it by publishing notice in the *Federal Register*. *Id.* § 1254a(b)(3). Congress further provided that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* at § 1254a(b)(5)(A).

Burma was designated for TPS about five years ago in May 2021, following a military coup, 86 Fed. Reg. 28,132 (May 25, 2021), and the designation was extended and newly designated in 2022 and 2024. On November 25, 2025, following review and consultation, the Secretary terminated the designation effective January 26, 2026, citing improvements in Burma's governance and stability and determining that, whatever extraordinary and temporary conditions might remain, permitting Burmese nationals to remain temporarily in the United States was contrary to the national interest for reasons of national security, public safety, foreign policy, and immigration integrity. 90 Fed. Reg. 53,378, 53,379–82 (Nov. 25, 2025).

## II. Prior Proceedings and *Mullin v. Doe*

In December 2025, six Burmese TPS holders filed this case as a putative class action, asserting two claims under the APA and one race-discrimination equal protection claim. The defendants are the Secretary of Homeland Security, the United

States Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services, and the United States, collectively referred to herein as the Department of Homeland Security or DHS. On January 23, 2026, the district court postponed Burma's TPS termination's effective date under 5 U.S.C. § 705 for all Burmese TPS holders, resting exclusively on the APA claims. *Doe v. Noem*, 822 F. Supp. 3d 893 (N.D. Ill. 2026). DHS appealed. While that appeal was pending, the Supreme Court decided *Mullin v. Doe*, reversing postponement orders premised on materially identical APA and equal protection challenges to the terminations of Haiti's and Syria's designations. *See* 146 S. Ct. at 2127–28. Weeks later, this court summarily reversed the district court's postponement order in this case. 2026 WL 2093686, at *1. Plaintiffs responded with an amended complaint re-asserting their original claims, while also adding ultra vires, procedural due process, and "bare animus" equal protection claims. R. 90 ("Am. Compl."). Shortly thereafter, the plaintiffs filed a renewed § 705 motion resting solely on their new claims. R. 98, 99. In response, DHS (1) opposed plaintiffs' renewed § 705 motion, R. 106; (2) moved to dismiss all five counts in the amended complaint, R. 109, 110; and (3) moved to stay discovery, R. 108.

**III. The District Court's Certified Order**

On August 7, 2026, the district court denied plaintiffs' renewed postponement motion and dismissed every claim but one. R. 115. More specifically, the district court dismissed the plaintiffs' ultra vires claim on the merits, holding that the Homeland Security Act transferred TPS authority to the Secretary; held that

§ 1254a(b)(5)(A), as construed in *Mullin v. Doe*, accordingly bars plaintiffs' APA claims; and dismissed both plaintiffs' procedural due process and bare-animus equal protection claims on the merits. Op. 12–25.

As to the plaintiffs' race-discrimination equal protection claim, however, the court denied dismissal. It reasoned that *Mullin v. Doe* "was decided under a likelihood of success standard based on only public statements"; that the Supreme Court "did not decide that the plaintiffs had failed to state a plausible claim for relief"; that *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), calls for a "sensitive inquiry" into circumstantial and direct evidence of intent; and that "it seems plausible that the plaintiffs could uncover evidence that might have changed the outcome in *Mullin*." *Id.* at 23–24.

At the same time, the district court acknowledged that the "strong, race-neutral explanation" the Supreme Court recognized for the terminations and statements applies equally to "the allegations here," which, under *Iqbal* and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), would stop the amended complaint "short of the line between possibility and plausibility." *Id.* at 24. Consequently, because "there is substantial ground for difference of opinion on the scope of *Mullin*," and because resolution of this "controlling question of law may materially advance the ultimate termination of this litigation," the district court *sua sponte* certified its decision for interlocutory appeal under 28 U.S.C. § 1292(b). *Id.* at 25. The district court also denied as moot defendants' motion to stay discovery pending resolution of the motions. *Id.* at 26.

This petition is timely because it is filed within ten days of the entry of the certified order. 28 U.S.C. § 1292(b); Fed. R. App. P. 5(a)(2).

**Discussion**

Permission to appeal under § 1292(b) by its terms is warranted where, as here, a certified order involves a controlling question of law as to which there is substantial ground for difference of opinion, and where an immediate appeal may materially advance the ultimate termination of the litigation. *See, e.g.*, *Martin v. Goodrich Corp.*, 95 F.4th 475, 478 (7th Cir. 2024). This court looks for "a question of law" in the sense of an "abstract legal issue" that the court of appeals can "decide quickly and cleanly without having to study the record," along with controlling effect, genuine contestability, and the promise of speeding up the litigation. *Ahrenholz v. Bd. of Trustees of the Univ. of Ill.*, 219 F.3d 674, 675–77 (7th Cir. 2000). The Supreme Court has likewise instructed that lower courts "should not hesitate" to certify interlocutory appeals presenting questions of special consequence. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110–11 (2009). Each of those criteria is satisfied here, as the district court's own *sua sponte* certification rightly explains. Op. 25.

## I. The Certified Order Presents a Controlling, Contestable Question of Pure Law That Could End This Litigation.

Whether allegations substantially weaker than those the Supreme Court found insufficient in *Mullin v. Doe* state a plausible equal protection claim for the purposes of Rule 12(b)(6) is exactly the kind of abstract legal question that this court contemplated in *Ahrenholz*. It requires no study of a record: the operative complaint's cited statements by the President and the undisputed across-the-board termination

pattern by the Secretary of Homeland Security are before this court on the pleadings, and the Supreme Court has already reviewed materially the same evidentiary universe.

Regardless of whether a holding that a claim is not likely to succeed on the merits (that is, fails to meet the requirements for interim relief) *necessarily* means that the claim is not plausible (or should be dismissed under Rule 12(b)(6)), it is certainly contestable whether the Supreme Court's reasoning in *Mullin v. Doe* leaves the door ajar for plaintiffs' race-discrimination claim. That is because the Supreme Court's reasoning was that a litany of statements regarding Haiti were not overtly racial, and the Secretary's challenged termination was readily explainable in race-neutral terms as part of an effort to end TPS as implemented by previous administrations, given that the Secretary had terminated every TPS designation that came up for review.[2] Put another way, the Supreme Court concluded that even if the statements were consistent with race discrimination, the Haiti plaintiffs had failed to cite any statements that could exclude the possibility of a race-neutral explanation.

The upshot of the Supreme Court's analysis is that plaintiffs' similar—indeed, weaker—allegations cannot survive a motion to dismiss: Even if they could be viewed as "consistent with" race discrimination, plaintiffs' allegations are "not only compatible with, but indeed . . . more likely explained by" the same strong, race-neutral explanation the Supreme Court credited earlier this summer. *Iqbal*, 556 U.S.

[2] Indeed, the Supreme Court still arrived at this conclusion despite other discovery and extra-record materials that the Haiti plaintiffs provided to the Court. *See Mullin v. Doe*, 146 S. Ct. at 2140 n.7.

at 680; s*ee also Taylor v. JPMorgan Chase Bank, NA*, 958 F.3d 556, 562 (7th Cir. 2020) ("Facts that are merely consistent with liability are insufficient." (quotations omitted)). The Supreme Court's reasoning thus makes the district court's conclusion highly contestable, even if some decisions applying a "likelihood of success" standard would not directly control a subsequent motion to dismiss.

The question is also controlling in the strictest sense: the race-discrimination claim is the only claim remaining in the case, so its resolution in defendants' favor would end this litigation. And contestability is established by the certification itself, as the district court set out both readings of *Mullin v. Doe* and expressly acknowledged "substantial ground for difference of opinion" on that opinion's scope. Op. 25.

**II. The District Court Incorrectly Answered the Issue Presented.**

Although the strength of the certified order's reasoning is not itself a § 1292(b) criterion, the clarity of the district court's error here underscores why appellate review should occur now rather than after burdensome, contentious discovery and final judgment.

First, the Supreme Court's reasoning in *Mullin v. Doe* forecloses the plaintiffs' race-discrimination equal protection claim at the pleading stage. As just explained, under *Iqbal*, factual allegations that are "merely consistent with" liability, and as to which an "obvious alternative explanation" exists, do not cross "the line between possibility and plausibility." 556 U.S. at 678, 682 (quoting *Twombly*, 550 U.S. at 557, 567). That hurdle has not been met here because *Mullin v. Doe* recognizes the obvious alternative explanation squarely applicable to plaintiffs' race-discrimination claim.

Examining materially the same statements and the same pattern that plaintiffs' amended complaint alleges, the Supreme Court concluded that none of the statements was "overtly racial," that all "expressed policy views that could rest on race-neutral justifications," and that the terminations reflected "the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies"—"a strong, race-neutral explanation." 146 S. Ct. at 2138–39.

Moreover, other courts of appeals have rejected precisely the same turn the district court took here. *See Trump v. Arab Am. Civil Rights League*, No. 19-114, Dkt. 18 (6th Cir. Nov. 8, 2019) (granting § 1292(b) petition after district court denied a motion to dismiss after the Supreme Court's decision in *Hawaii* regarding the so-called travel ban). In *IRAP*, for example, the district court denied a Rule 12(b)(6) motion directed at constitutional challenges to Presidential Proclamation 9645, reasoning that *Hawaii* had resolved only a preliminary injunction on a limited record, and thus did not answer whether the plaintiffs in that case had stated a plausible claim. 961 F.3d at 639, 645–46. On interlocutory appeal, however, the Fourth Circuit reversed with instructions to dismiss with prejudice. Even though *Hawaii*'s holding was phrased in likelihood-of-success terms, "the reason for that holding was the Court's predicate unconditional conclusion" about the challenged Executive Branch action, which was a conclusion "not stated on a 'likelihood' basis." *Id.* at 653.

So too here. And the district court's remaining rationale (that is, that discovery *might* turn up what the public record has not, *see* Op. 24) inverts the pleading

standard that both *Iqbal* and *Twombly* foreclose: using the discovery process to search for support for a claim that has not been plausibly pleaded. 550 U.S. at 559; *see also Doe v. Village of Arlington Heights*, 782 F.3d 911, 918–19 (7th Cir. 2015). Such an approach is especially impermissible when it comes to a challenge to an Executive Branch action, given the presumption of regularity and the separation-of-powers-based limitations on discovery into Executive Branch decision-making. *See, e.g.*, *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380–82 (2004). Even without those background concerns, the Supreme Court has made it plain that "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

A decision from another district court issued last Friday underscores the same point. *See Afr. Cmtys Together v. Mullin*, No. 26-cv-11201, 2026 WL 2364398 (D. Mass. Aug. 14, 2026). The plaintiffs in that case pointed to many of the same statements included by the plaintiffs here, but with additional statements that were country-specific to Somalia (which the relevant TPS termination there concerned). The district court in that case nonetheless concluded that, after *Mullin v. Doe*, even circumstantial evidence showing (in the district court's view) that a country and its people "are being targeted" cannot sustain a race-based equal protection claim in the immigration context. *Afr. Cmtys.*, 2026 WL 2364398, at *10. If that country-specific showing regarding Somalia cannot escape *Mullin v. Doe*, the amended complaint in this case—whose cited statements principally concern *other* countries, and not Burma—certainly cannot.

Second, even setting aside whether *Mullin v. Doe* directly controls, the allegations in this case are substantially weaker than the showing vis-à-vis Haiti that the Supreme Court addressed in *Mullin v. Doe*. The amended complaint's only Burma-specific allegation is that the President, seven years ago, did not know where Burma was. Am. Compl. at ¶ 132. That allegation hardly makes an inference of racial prejudice against people from Burma plausible under *Twombly* and *Iqbal*.

Further, plaintiffs' own pleading concedes non-racial exceptions to the alleged pattern, such as how South Sudan's and Lebanon's TPS designations were previously extended. *Id.* at ¶ 5 & n.1. And presidential statements cannot, without more, establish animus by the Secretary of Homeland Security, who is the actual decisionmaker, *see Staub v. Proctor Hosp.*, 562 U.S. 411, 418–19 (2011), particularly as they are statements "remote in time and made in unrelated contexts," *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 35 (2020).

Third, review of the district court's certified order would also encompass two threshold legal routes to dismiss the claim, because appellate jurisdiction under § 1292(b) attaches to the order, not merely the certified question. *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996); *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 974 (7th Cir. 2021); *Rumpke of Ind., Inc. v. Cummins Eng. Co., Inc.*, 107 F.3d 1235, 1239 (7th Cir. 1997) ("We may . . . address any issue fairly included within the certified order . . . because it is the order that is before us on appeal, rather than the questions themselves."). Two such grounds are preserved and purely legal.

The first ground is the TPS statute's unqualified command that "[t]here is no judicial review of any determination" respecting TPS designations. 8 U.S.C. § 1254a(b)(5)(A). The Supreme Court reserved decision on whether that review bar extends to constitutional claims, given that case's likelihood-of-success posture. *See* 146 S. Ct. at 2137; *see also id.* at 2140 (Thomas, J., concurring) ("The Court does not decide whether the [Haitian] respondents' equal protection claim is barred as well."). The judicial-review bar presents a threshold ground for dismissing the race-discrimination claim.

The second ground is application of rational-basis review (and not the *Arlington Heights* standard) as the governing framework for constitutional challenges to Executive Branch immigration policymaking. *See Hawaii*, 585 U.S. at 704–05; *Fiallo v. Bell*, 430 U.S. 787, 794–95 (1977); *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976); *City of Chicago v. Shalala*, 189 F.3d 598, 609 (7th Cir. 1999); *see also IRAP*, 961 F.3d at 648–51; *Rajah. v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) ("Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive and must be upheld so long as they are not wholly irrational." (quoting *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) (alterations omitted)). Under the rational-basis standard of review, the decisionmaker's actual motivation is "entirely irrelevant," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993), and the termination of a temporary humanitarian designation pursuant to the statute's review criteria easily survives. Defendants continue to maintain that rational-basis

review applies to this termination, and plaintiffs' claims plainly would not survive a motion to dismiss under that standard.

### III. Immediate Review Will Materially Advance This Litigation and Avoid Discovery That Should Never Occur.

Reversal on any of the grounds discussed above would end this case. Each is independently sufficient to require dismissal, so DHS need prevail on only one to bring the litigation to a close. Alternatively, even an affirmance would define the permissible scope of any proceedings or discovery that might follow. Either way, the appeal will "*speed up* the litigation," *Ahrenholz*, 219 F.3d at 675 (emphasis in original), in the most direct sense.

Without appellate guidance, though, this case would continue straight to the discovery the certified order contemplates: an examination of the motivations of the President and the Secretary of Homeland Security in service of a claim the Supreme Court has already found wanting on materially the same record. Separation-of-powers principles require that the "high respect" owed to the Presidency "inform the conduct of the entire proceeding," including "the timing and scope of discovery." *Cheney*, 542 U.S. at 385 (quoting *Clinton v. Jones*, 520 U.S. 681, 707 (1997)). Those discovery-oriented burdens (such as litigation over privileges and presidential communications) cannot be undone by an appeal from final judgment. That is what makes this the paradigmatic case for § 1292(b) review under *Mohawk*, 558 U.S. at 110–11. The certified question will also recur, as materially similar challenges to other TPS terminations are being litigated across the country. *See, e.g.*, *Afr. Cmtys.*,

2026 WL 2364398, at *9–11. This court's answer will thus supply needed guidance well beyond this case.

## IV. This Court Should Stay the District Court's Proceedings Pending Disposition of the Instant Appeal.

Section 1292(b) provides that an application for appeal shall not stay district court proceedings unless "the district judge or the Court of Appeals or a judge thereof" so orders. The district court denied defendants' motion to stay discovery as moot, Op. 26, and discovery on the sole surviving claim will otherwise commence. A stay from this court would preserve the court's ability to decide the certified question before the very burdens this appeal is designed to avoid are incurred. Absent such a stay, defendants would be forced to litigate privilege disputes over core Executive Branch deliberations while this court considers whether the claim should proceed at all. The Fourth Circuit stayed all district court proceedings when it granted permission to appeal in *IRAP*, 961 F.3d at 646–47, and the same course is warranted here.

## Conclusion

Based on the foregoing, the petition for permission to appeal should be granted, and district court proceedings should be stayed pending this court's disposition of the appeal.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

THOMAS P. WALSH
Assistant United States Attorney
Civil Division Chief

s/ Joshua S. Press
JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7625
joshua.press@usdoj.gov

## Certificate of Compliance

I hereby certify that this petition and motion complies with the type-volume and length limits of Federal Rules of Appellate Procedure 5(c)(1) and 27(d)(2)(A) because it contains 3,851 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

s/ Joshua S. Press

JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7625
joshua.press@usdoj.gov

# Appendix

**Index for Appendix**

Order of the District Court Judge Partially Granting Defendants' Motion to Dismiss dated August 7, 2026, Dkt. 115 ..................................................... 1- 26

Plaintiffs' Amended Complaint, Dkt. 90 ................................................ 27-108

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **AUNG DOE, et al., on their own behalf and on behalf of others similarly situated,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **Case No. 25 C 15483** |
| **MARKWAYNE MULLIN, SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Throughout 2025, then-Secretary of the United States Department of Homeland Security (DHS) Kristi Noem decided to terminate multiple countries' designation for Temporary Protected Status (TPS). This case concerns the decision to terminate Burma's designation. For the second time, the plaintiffs have moved to postpone the termination under section 705 of the Administrative Procedure Act (APA). 5 U.S.C. § 705. The government has moved to dismiss the plaintiffs' amended complaint. The Court assumes familiarity with the case and therefore provides only a sketch of the facts and procedural history relevant to the present motions.

The plaintiffs, six Burmese nationals, initially raised APA and Fifth Amendment equal protection challenges to the termination. The Court granted the plaintiffs' motion

to postpone the effective date of the termination, finding that it had jurisdiction over the claims and that the plaintiffs had demonstrated a likelihood of success on their APA challenges. *Doe v. Noem*, 822 F. Supp. 3d 893, 901 (N.D. Ill. 2026). On June 25, 2026, while this Court's postponement order was on appeal, the Supreme Court reversed postponement orders based on similar APA and equal protection challenges to the Secretary's decision to terminate Haiti and Syria's TPS designations. *Mullin v. Doe*, 146 S. Ct. 2121, 2127–28 (2026). The Court held that a jurisdiction-stripping provision in the TPS statute, 8 U.S.C. § 1254a(b)(5)(A), bars judicial review of nonconstitutional challenges to TPS termination decisions and that the Haiti plaintiffs had not shown a likelihood of success on their race-discrimination equal protection claim, which was the only constitutional claim before the Supreme Court. *Mullin v. Doe*, 146 S. Ct. at 2127–28. The Seventh Circuit then reversed the postponement order in this case and remanded the case to this Court for further proceedings in light of and consistent with the Supreme Court's decision. *Doe v. Mullin*, No. 26-1294, 2026 WL 2093686, at *1 (7th Cir. July 16, 2026).

The plaintiffs have filed an amended complaint adding three new claims to their previous APA and equal protection challenges. First, they assert that the Secretary's termination decision was *ultra vires* on the theory that the Attorney General, not the Secretary, has the authority to terminate TPS designations. Second, they contend that the termination decision violated their procedural due process rights by not adhering to certain processes in the TPS statute. Third, they advance a new equal protection theory in addition to their race-discrimination theory: that the TPS termination reflects a "bare animus" against TPS holders. The plaintiffs have also filed a second motion to

postpone the effective date of the termination based solely on the new *ultra vires* and due process claims. The government has responded with a motion to dismiss the plaintiffs' amended complaint.

For the reasons below, the Court denies the plaintiffs' motion for postponement and grants the government's motion to dismiss the APA, *ultra vires*, due process, and bare-animus equal protection claims. The Court denies the government's motion to dismiss the race-discrimination equal protection claim and certifies this issue for interlocutory appeal under 28 U.S.C. § 1292(b).

**Discussion**

As a threshold matter, the government has renewed its argument that 8 U.S.C. § 1252(f)(1), a different jurisdictional bar from the one addressed by the Supreme Court in *Mullin*, strips this Court of authority to grant the plaintiffs' requested relief. The Court starts with that argument. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998). *But see Biden v. Texas*, 597 U.S. 785, 798 (2022) (holding that section 1252(f)(1) is a limitation on remedial powers, not subject-matter jurisdiction); *Mullin v. Doe*, 146 S. Ct. at 2137 (stating in a portion of the opinion that did not command a majority of the Court that *Steel Co.* does not prevent a court from denying a motion for preliminary relief based on the merits without first assessing jurisdiction).

**A. Section 1252(f)(1)**

8 U.S.C. § 1252(f)(1) was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and provides, in full:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by [IIRIRA], other than

> with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). In the U.S. Code, section 1252 is in subchapter II. Part IV of subchapter II is titled "Inspection, Apprehension, Examination, Exclusion, and Removal" and covers 8 U.S.C. §§ 1221–1232. The TPS statute, 8 U.S.C. § 1254a, is in part V, not part IV. So, based on the U.S. Code, 8 U.S.C. § 1252(f)(1) does not apply to the TPS statute.

The government's counterargument is that the U.S. Code deviates from the statutes at large, and in the event of a conflict between the two, the statutes at large control. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993); 1 U.S.C. § 112; *id.* § 204. There are two relevant differences. First, section 242(f)(1) of the Immigration and Nationality Act (INA)—the statutes at large analog to 8 U.S.C. § 1252(f)(1)—cross-references "chapter 4 of title II," the organization within the statutes at large. IIRIRA, Pub. L. No. 104-208, div. C, sec. 306(a)(2), 110 Stat. 3009-546, 3009-614. Second, the public law for IIRIRA contains an amendment titled "Conforming Amendment to Table of Contents; Overview of Reorganized Chapters," which lists the TPS statute under chapter 4 instead of chapter 5, where it was previously. *Id.* sec. 308(a)(2). So, in the statutes at large, subsection (f)(1) appears to apply to the TPS statute.

A few issues inject some uncertainty into the government's reading. For one, as the Court previously noted, the Supreme Court has repeatedly read subsection (f)(1) as applying to 8 U.S.C. §§ 1221–1232, the provisions in part IV of subchapter II of the U.S. Code. *See, e.g.*, *Biden*, 597 U.S. at 797; *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022); *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (Alito, J., joined by Roberts,

C.J., and Kavanaugh, J.); *id.* at 424 (Thomas, J., concurring); *Jennings v. Rodriguez*, 583 U.S. 281, 312 (2018); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). *But see Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022).

The apparent move of the TPS statute to chapter IV is also somewhat unusual. Before IIRIRA, chapter 4 dealt with "Entry and Exclusion," and chapter 5 addressed "Deportation" and "Adjustment of Status." *See* INA, Pub. L. No. 82-414, ch. 477, 66 Stat. 163, 163 (1952). IIRIRA revised the INA to combine "deportation" and "exclusion" proceedings into one "removal" procedure. *See Cirrus Rojas v. Olson*, No. 25-3127, 2026 WL 2198315, at *13 (7th Cir. July 30, 2026). As part of that restructuring, chapter 4 was renamed "Inspection, Apprehension, Examination, Exclusion, and Removal," and chapter 5 was renamed "Adjustment and Change of Status." *See* IIRIRA sec. 308(a)(2). The TPS statute seems to fit most naturally in the latter. *See Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 825 (N.D. Cal. 2025).

Additionally, subsection (f)(1) seems to be a poor fit for the TPS statute. For whatever provisions subsection (f)(1) applies to, it says that courts may "enjoin or restrain the operation of" those provisions only "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). As applied to 8 U.S.C. §§ 1221–1232, provisions that deal with issues like admissibility, detention, and removal, that makes sense: it precludes class-wide injunctive relief but permits courts to enjoin admissibility, detention, and removal proceedings against individual noncitizens. *See Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 481–82. In contrast, subsection (f)(1)'s language is an uncomfortable fit for the TPS statute. This case illustrates the point. The plaintiffs

claim that the Secretary failed to comply with 8 U.S.C. § 1254a(b)(3)(A), which requires the Secretary to consult with appropriate agencies and review conditions in the foreign state. That provision governs the Secretary's decision regarding an entire country's TPS designation. It is never applied to an individual noncitizen, and individual proceedings against that noncitizen would be an inapt forum to raise a challenge to the Secretary's broader TPS decision.

In any event, the Court need not decide whether 8 U.S.C. § 1252(f)(1) applies to the TPS statute. Even assuming that it applies, the Court concludes that it does not limit declaratory relief. Several courts of appeals have reached the same conclusion. *See, e.g.*, *Onosamba-Ohindo v. Ball*, No. 23-6804, 2026 WL 2176738, at *5–6 (2d Cir. July 29, 2026) (citing decisions from the First, Third, Ninth, and D.C. Circuits). *But see Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018). And although the Supreme Court has not squarely decided the issue, several Justices have suggested that section 1252(f)(1) does not apply to declaratory relief. *See Preap*, 586 U.S. at 402–03 (Alito, J., joined by Roberts, C.J., and Kavanaugh, J.); *Aleman Gonzalez*, 596 U.S. at 571–72, 572 n.9 (Sotomayor, J., concurring).

The Court also concludes—in accordance with the other lower courts to decide the issue, including the Fifth, Ninth, and D.C. Circuits—that section 1252(f)(1) does not preclude vacatur or postponement under the APA. *See, e.g.*, *Texas v. United States*, 126 F.4th 392, 419 (5th Cir. 2025); *Nat'l TPS All. v. Noem*, 166 F.4th 739, 758–61 (9th Cir. 2026); *Make the Road N.Y. v. Noem* (*Make the Road III*), No. 25-5320, 2025 WL 3563313, at *15–18 (D.C. Cir. Nov. 22, 2025); *Make the Road N.Y. v. Mullin* (*Make the Road IV*), 179 F.4th 16, 30–33 (D.C. Cir. 2026). For both issues, the cited decisions

provide thorough analyses of both sides of the argument. Rather than exhaustively retread the same ground, this Court will simply underscore the main points underlying its decision.

By its terms, section 1252(f)(1) only limits courts' authority to "enjoin or restrain" the government's implementation of the immigration laws. The Supreme Court has interpreted "enjoin" to refer to an "'injunction,' which is a judicial order that 'tells someone what to do or not to do.'" *Aleman Gonzalez*, 596 U.S. at 548–59 (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)). A declaratory judgment is not an injunction. *Brito v. Garland*, 22 F.4th 240, 251 (1st Cir. 2021). Neither are vacatur and its temporary form—postponement. *Nat'l TPS All.*, 166 F.4th at 759–61; *Make the Road IV*, 179 F.4th at 32.

The difference is not just in the label. "'[T]he extraordinary remedy of injunction,' . . . directs the conduct of a party, and does so with the backing of its full coercive powers." *Nken*, 556 U.S. at 428. In contrast, a declaratory judgment is a "much milder form of relief than an injunction" that may be persuasive but is "not ultimately coercive" and does not carry the threat of contempt for noncompliance. *Steffel v. Thompson*, 415 U.S. 452, 471 (1974); *see Brito*, 22 F.4th at 251. Likewise, vacatur and postponement operate directly on the agency action at issue rather than "direct[ing] individuals to act or not to act." *Make the Road III*, 2025 WL 3563313, at *16. And importantly, apart from invalidating the agency action, they "neither compel[] nor restrain[] further agency decision-making." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022).

That leaves the question of whether Congress intended to limit declaratory relief or vacatur / postponement through the word "restrain." In interpreting section

1252(f)(1), the Supreme Court has said that "to restrain" means "to 'check, hold back, or prevent (a person or thing) from some course of action.'" *Aleman Gonzalez*, 596 U.S. at 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989)). But the Court also noted that the scope of "restrain" might depend on context: it "sometimes has a 'broad meaning' that refers to judicial orders that 'inhibit' particular actions, and at other times it has a 'narrower meaning' that includes 'orders that stop (or perhaps compel)' such acts." *Id.*

In section 1252(f)(1), there are good reasons to think that "restrain" does not refer to declaratory judgments, vacatur, or postponement. As an initial matter, it is not clear that "restrain" must be interpreted to have independent meaning from "enjoin," as the government urges. As the D.C. Circuit has noted, "the phrase 'enjoin or restrain' is a familiar legal doublet" that can easily be read as "a conventional pairing of terms for emphasis and breadth, not an invitation to parse each word for independent meaning." *Make the Road IV*, 179 F.4th at 32 n.15. And one obvious reason to include the word "restrain" would be to encompass temporary restraining orders. *Id.* The Federal Rules of Civil Procedure use the phrase "enjoined or restrained" for this very reason. Fed. R. Civ. P. 65(c). The heading of section 1252(f)(1), "Limit on injunctive relief," further supports reading "enjoin and restrain" this way.

The government counters that "restrain" must have independent meaning because Congress omitted the word in subsection (f)(2). That subsection, titled "Particular cases," says, "Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order

is prohibited as a matter of law." 8 U.S.C. § 1252(f)(2). The government's argument raises the question of why Congress would establish a "clear and convincing evidence" standard for injunctive relief but not for a declaratory judgment, vacatur, postponement, or whatever other relief is captured by "restrain." That reading seems more unusual than accepting that "enjoin or restrain" is a legal doublet rather than two words with independent meanings. Additionally, the D.C. Circuit has offered one explanation for the difference in language, though not one that helps the government: perhaps "restrain" captures forms of coercive relief (not declaratory judgments, vacatur, or postponement) that "enjoin" might not—such as mandamus, which compels official action and thereby places restraints on the operation of the immigration laws. *Make the Road IV*, 179 F.4th at 32 n.15.

Moreover, comparing subsection (f)(1) to other statutory language cuts more decisively against the government. 8 U.S.C. § 1252(e)(1)—a neighboring provision to subsection (f)(1), in the same section, added at the same time in IIRIRA—says:

> Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may . . . enter *declaratory*, injunctive, or *other equitable relief* in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection.

8 U.S.C. § 1252(e)(1)(A) (emphasis added). The fact that Congress expressly precluded declaratory relief and included a catchall for other equitable relief in subsection (e)(1) but omitted similar language in subsection (f)(1) bolsters the reading that subsection (f)(1) is confined to injunctive relief. *See Brito*, 22 F.4th at 251.

Similarly, the Hobbs Administrative Orders Review Act, which generally governs judicial review of final orders of removal, states that courts of appeal have exclusive

jurisdiction to "make and enter . . . a judgment determining the validity of, and enjoining, setting aside, or suspending" an agency order. 28 U.S.C. § 2349(a). Again, the fact that Congress uses language specific to declaratory judgments, vacatur, and postponement / stays here but not in section 1252(f)(1) supports the reading that the latter does not extend to those forms of relief. The Hobbs Act also uses the word "restrain" as distinct from "suspending" or "setting aside." *Id.* § 2349(b); *cf. Make the Road III*, 2025 WL 3563313, at *18 (pointing out that equating "restrain," "suspend," and "stay" in the Hobbs Act creates a surplusage problem). That further cautions against equating "restrain" in section 1252(f)(1) with postponement or vacatur. And looking to statutes outside of the immigration context adds additional confirmation that Congress knows how to clearly preclude APA remedies but did not do so in section 1252(f)(1). *See Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 990 (9th Cir. 2025) (citing 16 U.S.C. § 1855(f)(1)(A); 42 U.S.C. § 7607(d)(1)).

Reading subsection (f)(1) to limit declaratory relief, postponement, and vacatur also creates conflict with subsection (e)(3) of the same section. Subsection (e)(3) is titled "Challenges on validity of the system" and expressly authorizes judicial review of challenges to 8 U.S.C. § 1225(b) "and its implementation" for "whether such section, or any regulation issued to implement such section, is constitutional," as well as "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued . . . to implement such section, is . . . in violation of law." 8 U.S.C. § 1252(e)(3)(A). Importantly, such challenges "must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." *Id.* § 1252(e)(3)(B). That is in tension with subsection (f)(1)'s channeling

regime. It makes little sense to authorize broad challenges to the validity of a statute, regulations, and policies but then channel them and limit the scope of relief to individual proceedings. *See Make the Road III*, 2025 WL 3563313, at *17. Indeed, subsection (f)(1)'s channeling, in conjunction with subsection (e)(3)(B)'s 60-day deadline, presents the risk of nullifying the review provided by subsection (e)(3) if, for example, an agency implements a policy but waits sixty days before applying it to any individual noncitizen.

Perhaps "first implemented" in subsection (e)(3) can be interpreted to mean when the challenged policy is first applied to an individual noncitizen. *See id.* at *39 (Rao, J., dissenting). That would avoid completely nullifying review under subsection (e)(3), but even then subsection (f)(1) would let the government pin the legality of its policy to a single case involving a plaintiff of the government's choosing. Reading subsection (f)(1) as limited to injunctive relief resolves this tension and harmonizes the provisions. It would permit review under subsection (e)(3) outside of individual proceedings for purposes of awarding a declaratory judgment, postponement, or vacatur—natural remedies for the kind of systemic challenges that subsection (e)(3) authorizes.

Finally, reading subsection (f)(1) as limited to injunctive relief makes sense of the parenthetical exempting the Supreme Court. That parenthetical is apparently a unique one, and the Supreme Court has not said how it would work in practice. *See Biden*, 597 U.S. at 838–39 (Barrett. J., dissenting). But one possibility is this: a lower court could grant vacatur, postponement, or class-wide declaratory relief; the issue would go up on appeal; and if, for example, the Supreme Court held that the lower court correctly decided that the agency action was unlawful, it could issue appropriate injunctive relief.

*See Aleman Gonzalez*, 596 U.S. at 572 n.9 (Sotomayor, J., concurring). If, on the other hand, subsection (f)(1) withdraws all of those remedies from the lower courts, then it is much less clear how the Supreme Court would have the opportunity to exercise the power reserved to it. *Id.*

In sum, the Court concludes that 8 U.S.C. § 1252(f)(1) does not bar the plaintiffs' claims.

**B. Merits**

Section 705 of the APA authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending . . . review." 5 U.S.C. § 705. The standard for a postponement order under section 705 is the same as that for a preliminary injunction. *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020). That standard requires the plaintiffs to show: (1) a likelihood of success on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that preliminary relief is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In a case against the government, like this one, the third and fourth factors merge. *Nken*, 556 U.S. at 435.

The plaintiffs' motion to postpone is based solely on their *ultra vires* and due process challenges. The Court addresses each in turn.

**1. Ultra vires**

The plaintiffs assert that the Secretary's decision was *ultra vires* because the Attorney General, not the DHS Secretary, has the authority to terminate a TPS designation. That theory is rooted in the fact that the provision concerning TPS



AUNGDOE000012

terminations, 8 U.S.C. § 1254a(b)(3)(B), refers to the Attorney General rather than the Secretary. The government responds that this is a nonconstitutional claim that is unreviewable under the TPS statute's jurisdictional bar, 8 U.S.C. § 1254a(b)(5)(A), as interpreted by the Supreme Court's decision in *Mullin*. On the merits, the government contends that the Homeland Security Act of 2002 (HSA), specifically its amendments to 8 U.S.C. § 1103(a), transferred TPS authority from the Attorney General to the DHS Secretary. The government further points out that courts and the executive branch have consistently adhered to that view for over two decades, without any intervention by Congress.

Starting with jurisdiction, the Court does not agree that the plaintiffs' *ultra vires* claim is unreviewable. The TPS jurisdictional bar states that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A). The government seizes on the fact that an *ultra vires* claim is nonconstitutional, and the Supreme Court in *Mullin* expressly held that "the TPS statute's judicial-review bar applies to all non-constitutional claims." *Mullin v. Doe*, 146 S. Ct. at 2137.

The government overreads that statement. No party in *Mullin* raised the issue of who has TPS authority in the first place under the statute. In stating that the jurisdictional bar applied to all nonconstitutional claims, the Supreme Court assumed the undisputed premise that the jurisdictional bar, whatever its scope, applied to the Secretary's determinations. If the plaintiffs' reading is correct, then the jurisdictional bar applies only to "determination[s] of the Attorney General," not to determinations by the

Secretary, and does not preclude their claims in this case. Of course, if the plaintiffs' reading is wrong, then the jurisdictional bar does apply. The jurisdictional issue is intertwined with the merits of the statutory interpretation issue, and the default rule in situations of intertwinement is to proceed to the merits. *See Bell v. Hood*, 327 U.S. 678, 682 (1946); *Land v. Dollar*, 330 U.S. 731, 739 (1947); *Perttu v. Richards*, 605 U.S. 460, 472–74 (2025); *cf. Brownback v. King*, 592 U.S. 209, 217–19 (2021) (stating that because "a federal court always has jurisdiction to determine its own jurisdiction," in cases of intertwinement, a court may issue a decision that is simultaneously a ruling that it lacks jurisdiction and a judgment on the merits).

On the merits, the Court agrees with the government that the HSA, and subsequent amendments in 2003, transferred TPS authority to the Secretary. Congress enacted 8 U.S.C. § 1103 in the original INA under the title "Powers and Duties of the Attorney General and the Commissioner." INA § 103. It stated, in relevant part, that:

> The Attorney General shall be charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens, except insofar as [the INA] or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers . . . .

*Id.* Congress enacted the TPS statute in 1990 amendments to the INA. In accordance with the INA's designation of the Attorney General as the primary administrator of the immigration laws, the TPS statute's provisions referred to the Attorney General. *See* Immigration Act of 1990, Pub. L. No. 101-649, sec. 302, 104 Stat. 4978, 5030–36.

The HSA and follow-up amendments in 2003 made several relevant changes to 8 U.S.C. § 1103. First, they changed the title of 8 U.S.C. § 1103 to "Powers and Duties of the Secretary, the Under Secretary, and the Attorney General." HSA, Pub. L. No. 107-

296, sec. 1102(1), 116 Stat. 2135, 2273. Second, they substituted "Secretary of Homeland Security" for "Attorney General" in both the title and text of (a)(1). Homeland Security Act Amendments of 2003, Pub. L. No. 108-7, div. L, sec. 105, 117 Stat. 526, 531. Third, the HSA added "Attorney General" to the "except" clause. HSA sec. 1102(2). Because of these changes, 8 U.S.C. § 1103(a)(1) now reads: "The *Secretary of Homeland Security* shall be charged with the administration and enforcement of . . . laws relating to the immigration and naturalization of aliens, except insofar as . . . such laws relate to the powers, functions, and duties conferred upon the President, *Attorney General*, [etc.]" 8 U.S.C. § 1103(a)(1) (emphasis added). Fourth, the HSA codified the existence of the Executive Office for Immigration Review (EOIR) as an agency under the Attorney General and added subsection (g) to section 1103. HSA sec. 1102(2). That subsection is titled "Attorney General" and states that "[t]he Attorney General shall have such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by the [EOIR] . . . ." *Id.*; 8 U.S.C. § 1103(g)(1).

These changes established the Secretary of Homeland Security as the primary administrator of the immigration laws, which include the TPS statute. The plaintiffs challenge this interpretation by pointing out that section 1103(a)'s "except" clause carves out from the Secretary's authority the "powers, functions, and duties conferred upon . . . the Attorney General." They assert that some of those reserved powers are in the rest of section 1103, which enumerates some powers that the text assigns to the Attorney General. *See, e.g.*, 8 U.S.C. § 1103(a)(8). Likewise, because the TPS statute continues to refer to the Attorney General, the plaintiffs contend that TPS decisions

belong to the Attorney General rather than the Secretary.

One problem with this reading is that it draws implausible lines between the powers of the Attorney General and those of the Secretary. The plaintiffs' reliance on section 1103's enumerated powers illustrates the point. Paragraph (a)(2) says, "He shall have control, direction, and supervision of all employees and of all the files and records of the Service." *Id.* § 1103(a)(2). On the plaintiffs' reading, "he" refers to the Secretary. Paragraphs three through seven likewise would refer to the Secretary. Paragraphs eight, ten, and eleven, on the other hand, expressly refer to the Attorney General. The plaintiffs read this difference in language as a deliberate allocation of authority between the Secretary and the Attorney General, but it was already in the original INA, when both "he" and "Attorney General" referred to the same person. *Compare id.* § 1103, *with* INA, § 103(a). It is therefore unlikely that the express references to the Attorney General reflect a congressional intent to carve out that power from the Secretary's overarching authority over the immigration laws.

That conclusion is reinforced by a broader picture of the HSA. Congress did not go through the INA and change specific references to the Attorney General to instead refer to the Secretary. Instead, it broadly reassigned functions and added a provision that "deem[s]" references to other officers to refer to the Secretary. 6 U.S.C. § 557. As a result, the INA is replete with references to the Attorney General that, under the plaintiffs' reading, were never transferred to the Secretary. The TPS statute is one example. Given the statutory history, the Court declines to read those residual references to the Attorney General to significantly undermine the Secretary's role as primary administrator of the immigration laws under section 1103(a)(1).



AUNGDOE000016

Another problem with the plaintiffs' reading is that it renders section 1103(g) superfluous. They seem to suggest that section 1103(a)(1) merely preserves the Attorney General's preexisting authority unless there is a separate express transfer of power. That reading finds some support in other parts of the HSA that expressly transfer certain immigration functions to DHS officials. *See, e.g.*, HSA secs. 441, 451(b). But under that interpretation, section 1103(a)(1) would already preserve the Attorney General's preexisting authority over EOIR, and there would be little reason for Congress to enact 1103(g). The better reading is that section 1103(a) effected a general transfer of immigration authority to the Secretary; section 1103(g), enacted at the same time, clarified that the Attorney General would reserve authority previously exercised by EOIR; and the carve out in section 1103(a)(1) of the "powers, functions, and duties conferred upon . . . the Attorney General" refers primarily to that reservation.

Longstanding practice confirms that TPS authority lies with the Secretary. The government asserts that since Congress enacted the HSA, every court has interpreted the statute as transferring authority to the Secretary. That includes the Supreme Court. *See, e.g.*, *Mullin v. Doe*, 146 S. Ct. at 2129; *Preap*, 586 U.S. at 397 & n.2. Likewise, the government points out that the DHS Secretary has exercised TPS authority since Congress enacted the HSA. The plaintiffs do not dispute this practice, but they say that no decision has squarely addressed their argument and that courts are not bound by executive interpretations of statutes. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). Even so, it is unlikely that everybody has misinterpreted the allocation of immigration authority in the HSA for the past two decades and that Congress has simply let it slide.

Finally, even if the plaintiffs' reading of the statute were correct, it would defeat their own claim to relief. The portion of the TPS statute authorizing designations, like the portion addressing termination, refers to the Attorney General. The plaintiffs' reading would therefore mean that the Secretary lacked authority to designate Burma for TPS in the first place. The plaintiffs offer a few arguments for why their contention is not self-defeating, but none work.

First, they assert that the statute only authorizes TPS termination based on country assessment. But there is a distinction between terminating TPS and there never being a valid TPS designation in the first place. Second, they contend that they only challenge the TPS termination decision, and they say that a challenge to the initial designation would have to be raised in a separate lawsuit. Putting aside the fact that this argument does not get the plaintiffs far as a practical matter, the Court does not see a reason why a challenge to the initial designation would have to be raised separately. The plaintiffs do not provide any authority for that rigid view, nor is the Court aware of any.

Third, the plaintiffs argue that reliance interests require the government to consider alternatives to terminating Burma's TPS designation. They rely on the Supreme Court's decision in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), but that case addressed a different question. The Court in *Regents* held that the Secretary's decision to rescind the Deferred Action for Childhood Arrivals program on the basis that it was unlawful was arbitrary and capricious in part because he had failed to consider whether there were legitimate reliance interests. *Id.* at 30–33. The need to consider reliance interests is a constraint

on agency decisionmaking imposed by the APA. It does not follow from that principle that a court may uphold *ultra vires* agency action solely because of reliance interests.

The Court therefore dismisses the plaintiffs' *ultra vires* claim. And because the Court has concluded that the TPS statute and its jurisdictional bar apply to the Secretary's decision, *Mullin v. Doe* controls and requires dismissal of the plaintiffs' other nonconstitutional (*i.e.*, APA) claims.

**2. Due process**

The plaintiffs' other basis for preliminary relief is their procedural due process claim. That claim "consists of two elements: (i) deprivation by [government] action of a protected interest in life, liberty, or property, and (ii) inadequate . . . process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). To establish the first element, the plaintiffs argue that the TPS statute provides them with a "legitimate claim of entitlement" to TPS status and the benefits that come with it. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). On the second element, the plaintiffs contend that the Secretary's alleged failure to consult appropriate agencies, review country conditions, and publish the "actual 'basis for the determination'"—as required by the statute—meant that the Secretary's process was inadequate. *See* Pls'. Renewed Mem. in Supp. of Mot. to Postpone at 20.

The government responds that the plaintiffs' claim is a relabeled statutory argument that is precluded by the TPS statute's jurisdictional bar. On the merits, the government argues that: the plaintiffs lack a legitimate claim of entitlement because the statute does not impose substantive constraints on the Secretary's determination on whether country conditions continue to be met; the decision to terminate TPS is a

legislative decision that satisfied due process; and the plaintiffs received all the process that they were due because the Secretary was not required by the Constitution to follow the statutory process and that in any event she did so.

The Court again disagrees with the government on the jurisdictional issue but agrees that the due process claim falls short on the merits. Starting with jurisdiction, the Supreme Court in *Mullin* assumed—based on the government's concession—that constitutional claims would still be reviewable under the TPS statute's jurisdictional bar, and this Court sees no reason to depart from that assumption. *See Mullin v. Doe*, 146 S. Ct. at 2137. It is true that the plaintiffs' due process claim relies exclusively on statutory violations. But if the plaintiffs are right that the statutory procedures are required by due process—a floor set by federal constitutional law—the claims are distinct. *See Czerkies v. U.S. Dep't of Labor*, 73 F.3d 1435, 1442 (7th Cir. 1996) (en banc). *Compare id.* at 1448 (Easterbrook, J., concurring) (emphasizing the need to distinguish "systematic and personal challenges" to avoid "dress[ing] ordinary legal arguments in constitutional garb"), *with* Am. Compl. ¶¶ 89–122 (alleging pattern of similar TPS terminations).

Turning to the merits, the Court need not resolve the parties' disputes over whether the plaintiffs have a protected interest or whether TPS terminations are legislative or adjudicative. Even assuming that the plaintiffs prevail on those points, their alleged procedural defects do not state a due process violation. The core of due process is notice and an opportunity to be heard. *See, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). The plaintiffs do not claim that they were entitled to hearings before the Secretary's decision to terminate TPS. And the decision was

published in the federal register, providing notice. The plaintiffs argue that the rationale in the federal register was not the *actual* basis for the decision, but that amounts to a challenge to the merits of the decision or APA review—both barred after *Mullin*—not a due process claim. So too with the alleged failure to (adequately) assess country conditions.

The remaining procedural defect, the failure to consult with appropriate agencies, is a statutory requirement, not one imposed by the Constitution. The plaintiffs have not pointed to any case imposing a similar requirement under the name of due process, nor can the Court find any. And if appropriate consultation is a due process requirement, then it presumably would apply to all sorts of government decisionmaking. The Court sees no basis for imposing that kind of internal government consultation.

The plaintiffs argue that due process in the immigration context is equivalent to statutory process, citing two Supreme Court decisions, *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), and *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950). Both cases, however, establish that whatever processes Congress provides for the lawful admission of noncitizens into the United States automatically satisfy due process. It does not follow that a failure to follow statutorily prescribed procedures also always *violates* due process. In other words, compliance with statutory procedures in this context is sufficient but not always necessary for due process.

The Court therefore dismisses the plaintiffs' due process claim and denies their motion to postpone.

### 3. Equal protection

The final claim remaining is the plaintiffs' equal protection claim, which the government has moved to dismiss. On a motion to dismiss, the question is whether the plaintiffs' complaint alleges sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiffs present two theories for their equal protection claim: (1) the TPS determination was racially discriminatory, and (2) the TPS termination reflects a "bare animus" against TPS holders as a politically unpopular group.

The first theory is substantially similar to the claim the Supreme Court held was unlikely to succeed in *Mullin v. Doe*, 146 S. Ct. at 2138–40. There, the plaintiffs relied on a pattern of allegedly preordained TPS terminations in combination with statements by the President and the Secretary that, in their view, reflected racial discrimination against non-white people. *Id.* Those statements included some from the President that "express strong objections to [recent] immigration," express "great displeasure with TPS," "broadly denigrate the countries for which TPS designations have been granted," and "malign Haitians who have come to the United States"—as well as statements by former Secretary Noem that "express[] antipathy toward travelers from countries covered by a renewed travel ban," made "derogatory comments about immigration and its effects," and "promised changes and criticized past implementation of TPS." *Id.*; *see id.* at 2149–50 (Kagan, J., dissenting) (quoting statements).

The majority concluded that this evidence was not enough. In its view, "[n]one of the cited statements [were] overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications." *Mullin v. Doe*, 146 S. Ct. at 2138.

"[W]hatever one may think of the cited statements," the Court said, "they are insufficient to show that the termination of Haiti's TPS designation was based on the race of the Haitian people." *Id.* at 2139. Additionally, the Court continued, there was a "strong, race-neutral explanation of these officials' statements: the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Id.* In a footnote, the Court acknowledged that the plaintiffs had presented additional, newly discovered evidence, but it dismissed that evidence as cumulative. *Id.* at 2140 n.7. The Court therefore concluded that the Haiti plaintiffs were "not entitled to interim relief on their equal protection claim." *Id.* at 2140.

The plaintiffs here rely upon much of the same evidence for their race-discrimination claim. Some of the Haiti-specific statements in *Mullin* do not apply equally to Burma, but the plaintiffs' theory is less about discrimination against Burma in particular, and more about racial discrimination as between white and non-white people. Several of the statements that could be read as country-specific nonetheless fit the plaintiffs' broader theory of race discrimination against non-white people. *See, e.g.*, *id.* at 2149 (Kagan, J., dissenting) (quoting the President's statement that Haitians and other immigrants are "poisoning the blood" of our country).

This Court has previously concluded, as the Supreme Court assumed in *Mullin*, that *Arlington Heights* supplies the relevant framework. *See Doe v. Mullin*, No. 25 C 15483, 2026 WL 1983721, at *6 (N.D. Ill. July 9, 2026) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). And as the Court previously noted, the Supreme Court's decision in *Mullin* was decided under a likelihood of success standard based on only public statements. *Id.* The Supreme Court did not

decide that the plaintiffs had failed to state a plausible claim for relief. It is hard to say that the statements here are not enough to get past the motion to dismiss stage and provide the plaintiffs with at least an opportunity to prove their case through discovery. *Arlington Heights* calls for a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. And based on the public statements here, it seems plausible that the plaintiffs could uncover evidence that might have changed the outcome in *Mullin*. *Cf. Cook County v. Wolf*, 461 F. Supp. 3d 779, 794 (N.D. Ill. 2020) ("Most people know by now that the quiet part should not be said out loud."); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) ("[O]fficials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority.").

On the other hand, the Supreme Court's reasoning in *Mullin* suggests that it might not be so limited by its procedural posture. In determining that the plaintiffs were unlikely to succeed at showing that discriminatory purpose was a motivating factor in the Secretary's decision, *Mullin* emphasized that the evidence provided a "strong, race-neutral explanation" for the TPS terminations and public statements: "the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Mullin v. Doe*, 146 S. Ct. at 2138–39. Following the reasoning in *Mullin*, the same could be said of the allegations here. *Cf. Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotations omitted)). If that is enough to defeat the race-discrimination

claim, then it is hard to see what evidence, short of an outright admission that racial animus motivated the decision to terminate TPS, would help the plaintiffs.

The Court does not view *Mullin*, decided under a different standard, as controlling the motion to dismiss at issue here. The Court therefore denies the government's motion to dismiss the race-discrimination claim. But because there is substantial ground for difference of opinion on the scope of *Mullin*, and because resolution of this controlling question of law may materially advance the ultimate termination of this litigation, the Court certifies this ruling for interlocutory appeal under 28 U.S.C. § 1292(b).

Finally, the Court addresses the plaintiffs' alternative theory that the TPS termination violates equal protection because it is based on a bare animus against TPS holders. This theory is based on the principle that "a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Romer v. Evans*, 517 U.S. 620, 635 (1996). But there is a distinction between bare desire to harm TPS holders and animus against TPS policy (and immigration as a whole). The Supreme Court's reasoning in *Mullin* points to the latter, not the former.

The Court therefore grants the government's motion to dismiss the plaintiffs' bare animus equal protection claim.

**Conclusion**

In conclusion, the Court denies the plaintiffs' motion to postpone [dkt. 98]; grants the government's motion to dismiss [dkt. 109] as to the plaintiffs' APA, *ultra vires*, due process, and bare animus equal protection claims; denies the motion to dismiss as to the plaintiffs' race-discrimination equal protection claim; and certifies that denial for

interlocutory appeal under 28 U.S.C. § 1292(b). The Court also denies as moot the government's motion to stay discovery pending resolution of these motions [dkt. 108].

Date: August 7, 2026

MATTHEW F. KENNELLY
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Aung DOE; Nina DOE; Thura DOE, Khin Thet DOE; Chu Let DOE; and Maung DOE, on their own behalf and on behalf of others similarly situated,

*Plaintiffs*,

– *versus* –

Markwayne MULLIN, Secretary, United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,

*Defendants*.

**Case No. 1:25-cv-15483**

**FIRST AMENDED COMPLAINT**

**CLASS ACTION**

## INTRODUCTION

1. Burma (also known as Myanmar) remains under siege by its military regime following a coup in 2021. For nearly 4,000 Burmese nationals currently relying on Temporary Protected Status ("TPS") to live and work in the United States, TPS provides some stability and protection from removal to a country overtaken by a campaign of intimidation and violence. TPS is a federal program, authorized by Congress, that offers individuals protection from removal to countries designated unsafe on account of dire country conditions like armed conflict, natural disaster, or other extraordinary circumstances, as well as work authorization and other related benefits.

2. On November 25, 2025, the Department of Homeland Security ("DHS") published a Federal Register Notice announcing that TPS for Burma would end on January 26, 2026. The government's termination decision reverses the United States' prior policy of extending humanitarian support to Burmese nationals in the wake of the coup. In March 2021, the United States government for the first time granted Burmese nationals TPS, and subsequently re-designated TPS twice given continued threats to Burmese civilians' life and liberty at the hands of the authoritarian regime.

3. In a dramatic shift, Defendants' November 2025 termination decision argues that TPS holders can safely return to Burma. Defendants make this claim despite their own sources highlighting deteriorating conditions including anti-democratic crackdowns on dissent, targeted ethnic violence, and military strikes on civilian targets.

4. Defendants' decision was ultra vires and made in violation of the Administrative Procedure Act ("APA") and the Fifth Amendment of the United States Constitution: the Secretary lacked statutory authority to terminate TPS and predetermined her decision based on animus against Burmese TPS holders due to their race, ethnicity, and national origin, as well as

the government's bare desire to harm TPS holders as a group, rather than on the statutorily required objective country conditions review and proper consultation with executive agencies. The termination notice blatantly ignored Burma's incontrovertible ongoing humanitarian catastrophe and relied on impermissible factors in justifying the termination. Because of the Secretary's failure to follow the statutorily required procedures, Burmese TPS holders and applicants now face summary loss of work authorization and protections from detention and removal without due process. They now face a reality that threatens to separate mixed-status families, disconnect them from their home communities, and cut off access to employment altogether.

5. TPS holders from Burma now join those of communities from the twelve other non-white, non-European countries[1] whose protections have been terminated by the Trump Administration—nearly every single TPS country that has come up for review. Secretary Noem, President Trump, and other members of the Trump Administration have repeatedly used racially charged and demeaning rhetoric to justify targeting TPS protections for immigrants from non-white, non-European countries, including Burma, based on their race, ethnicity, national origin, and status as TPS beneficiaries. These statements demonstrate a discriminatory and calculated effort to harm TPS holders.

6. Plaintiffs are six Burmese nationals with TPS, who have lived in the United States for years and have deep ties to this country and their communities. They bring this class action to challenge Defendants' unconsidered and unlawful decision to terminate Burma's TPS

[1] To date, the current Trump Administration has terminated TPS for thirteen countries whose designations have been up for review. The countries subject to termination are: Burma, Syria, Nicaragua, Honduras, Nepal, Cameroon, Afghanistan, Haiti, Venezuela, Ethiopia, Somalia, and Yemen. South Sudan's TPS designation was extended in May 2025, but the government terminated it after six months the second time it came up for potential redesignation. Lebanon's TPS designation was automatically extended without any affirmative decision because the Secretary did not make a decision by the statutory deadline.

designation, effective January 26, 2026. Should TPS for Burma be terminated, all Plaintiffs will face impossible choices: to uproot their lives yet again in search of a pathway to safety in a third country; to remain in the United States without lawful immigration status, at risk of imminent immigration detention and removal; or to relocate to Burma, a country under the rule of the military junta and to which all Plaintiffs fear returning.

7. Defendants' violations of law have already caused cascading consequences for the Plaintiffs and thousands of other TPS holders. The mental distress to Plaintiffs and others—now navigating harrowing decisions about their own safety and the safety of their families—are the consequence of premeditated actions by Defendants, divorced from the required legal process and without regard for the lives the termination decision throws into the balance.

8. Given these impending harms to the Plaintiffs and the class, this Court should set aside Defendants' unlawful decision terminating TPS for Burmese nationals.

## THE PARTIES

**Plaintiffs**

9. **Plaintiff Aung Doe** is a Burmese national and TPS holder who has lived in the United States since 2007 and currently resides in Chicago, Illinois. Aung moved to the United States to teach religious courses. He currently works as a religious leader, teaching and leading religious ceremonies. Aung currently has a pending application with U.S. Citizenship and Immigration Services ("USCIS") and will lose eligibility for the benefits if his TPS ends. He is fearful about being forced to return to Burma because he has publicly spoken out about the Burmese military junta's violent actions to suppress peaceful protesters. He fears that the military will likely arrest him upon his arrival in Burma. Losing TPS will put Aung at immediate risk of detention and being placed into removal proceedings.

10. **Plaintiff Nina Doe** is a Burmese national and TPS holder who has lived in the United States since 2021. Nina resides in Kansas with her husband and baby daughter, both of whom are U.S. citizens. She came to the United States on a Fulbright scholarship to study social work. Nina earned a master's degree in May 2023 and now works as a long-term caseworker for refugees in Kansas City. She serves communities that have fled war, persecution, and sexual violence, and is deeply committed to humanitarian work. Before coming to the United States, Nina worked as a physician and worked with Doctors Without Borders and the United Nations in conflict-affected regions, including Northern Rakhine and Kachin State in Burma, where she served Rohingya communities subjected to genocide by the Burmese military. This work, and her participation in peaceful protests in 2021 place her at risk for arrest by the military regime if forced to return to Burma. Losing TPS will also forcibly separate her from her U.S. citizen husband and daughter and end her ability to financially support their family.

11. **Plaintiff Khin Thet Doe** is a Burmese national who has lived in the United States since 2021. She is in her early 30s and moved to the United States because of a USAID scholarship to study in Illinois. Shortly prior to moving, Khin Thet participated in pro-democracy protests after the coup in Burma. She is concerned that if she is forced to go back to Burma, she will face retaliation due to her involvement in protests and her association with other people who the military has already targeted. She is now married in the U.S., and the termination of TPS puts her at risk of being separated from her U.S.-citizen husband. Khin Thet financially supports her parents, sending them money every month. She fears that if she loses her ability to work under TPS, her parents would be unable to meet their basic needs.

12. **Plaintiff Thura Doe** is a Burmese national and TPS holder who has lived in the United States since 2017. Thura originally came to the United States on an F-1 Visa to pursue his

undergraduate degree in Oklahoma. He graduated with a Bachelor of Science degree in education and worked as a pre-K and kindergarten teacher at Title I schools in Texas before pursuing a master's degree in education in 2024. While Thura was an undergraduate student, he became very involved in advocacy work to support human rights, religious tolerance, and democracy in Burma following the coup. The termination of TPS would subject Thura to potential arrest and detention by ICE and initiation of removal proceedings because he has no other form of immigration status in the United States. Thura's family has ties to members of the former National League for Democracy ("NLD") Party that stewarded the democratic transition in Burma and was forcibly dissolved after the military coup. Thura fears being detained for both his own activism and his family's history of political advocacy. He is also openly bisexual, and he fears being targeted for detention and harm by the military junta as a result of his sexuality, which is a crime in Burma punishable by imprisonment.

13. **Plaintiff Chu Let Doe** is a Burmese national and TPS holder who has lived in the United States since 2021. Chu Let is in her early 40s and moved to the United States on humanitarian parole after fleeing Burma during the coup. Chu Let, a sushi chef in North Carolina, lives with her two children and supports them as the family's sole breadwinner. Chu Let fled Burma after the coup in March 2021 because her activism and her family's activism on behalf of religious minorities and youth in Burma put her at risk of imminent arrest. After the coup, dozens of police officers came looking for Chu Let and her family at her home, and the U.S. Embassy helped her secure a safe house and eventually flee the country. Chu Let fears being forced to return to Burma because the junta may arrest her and imprison her for her past activism. She also is at risk of detention and deportation in the United States once her TPS status ends, leaving her children without their mother.

14. **Plaintiff Maung Doe** is a Burmese national and TPS holder who has lived in the United States since 2016 and currently resides in Iowa. Maung is in his late 20s, and he moved to the United States to go to college in Kentucky. Maung is ethnically Nepali, and his family experienced routine discrimination in Burma because of their darker skin tone and the assumption that they are part of the Muslim Rohingya minority. Maung currently works in IT support in Iowa for a university. He practices Buddhism and Transcendental Meditation and is an active member of the meditation community in Iowa City. Because the coup happened when Maung was still in college, he became involved in student organizing and advocacy for democracy, freedom, and human rights in Burma. He remained involved in this advocacy throughout his graduate studies and still contributes to organizing efforts as a researcher. Losing TPS will put Maung at risk of losing his career, and he will no longer be protected from ICE arrest or removal. He will be separated from his home community in Iowa City, and it is unsafe for him to return to Burma given both his human-rights advocacy and the country's unstable conditions.

**Defendants**

15. **Defendant Markwayne Mullin** is the Secretary of the Department of Homeland Security. As the highest-ranking officer for DHS, Defendant Mullin has asserted ultimate authority over all TPS extension, termination, and designation decisions. He is sued in his official capacity. (Defendant Mullin was preceded in office by Secretary Kristi Noem, who left the position on March 24, 2026, and was an original official-capacity defendant in this action.)

16. **Defendant Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include USCIS, ICE, and U.S. Customs and Border Protection ("CBP"). DHS,

together with its component agencies, is responsible for administering and enforcing the TPS program.

17. **Defendant U.S. Citizenship and Immigration Services** is the component agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

18. **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

## JURISDICTION AND VENUE

19. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution. The Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the APA, 5 U.S.C. §§ 701-706.

20. The federal government has waived sovereign immunity and permitted judicial review of agency action under 5 U.S.C. § 702. *See Blagojevich v. Gates*, 519 F.3d 370, 371-72 (7th Cir. 2008) (noting that § 702 "waived sovereign immunity for most forms of prospective relief"). In addition, sovereign immunity does not bar claims against federal officials seeking to prevent violations of federal law, rather than monetary relief. *See, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697-99 nn.18-19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183-84 (1938).



AUNGDOE000034

21. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, and because at least one named Plaintiff resides in this District.

**THE STATUTORY SCHEME FOR TPS**

22. Congress created TPS in response to unconstrained executive discretion in humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief.[2] Between 1960 and 1989, the Attorney General granted extended voluntary departure to approximately sixteen countries, with periods of protection ranging from eight months to 15 years.[3] This practice lacked "any specific criteria."[4] The arbitrary, overtly political decisions surrounding extended voluntary departure resulted in congressional pressure to reform the system, particularly in the wake of the Attorney General's refusal to grant extended voluntary departure for Salvadoran refugees at the time.[5]

23. Congress designed TPS to ensure that future nationality-based protections would be based on "objective factors" and "identifiable conditions" rather than "the vagaries of our domestic politics."[6] Congress also sought to replace the "ad hoc, haphazard procedures" that existed before, and provide beneficiaries with certainty about "what [their] rights are, how the Justice Department determines what countries merit [protected] status," and "how long they will

---

[2] *See* Lynda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157-60 (1986).
[3] *See* Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status*, 8 J. of Refugee Stud. 339, 362-63 (1995).
[4] *Id.* at 178 n.153 (quoting Letter from William F. Smith, Att'y Gen., to Lawrence J. Smith, Rep. (July 19, 1983)).
[5] *See Hotel & Rest. Emps. Union v. Smith*, 846 F.2d 1499, 1510-11 (D.C. Cir. 1988) (discussing termination of extended voluntary departure for El Salvador) (separate opinion of Mikva, J.).
[6] 135 Cong. Rec. H7477 (Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute).



AUNGDOE000035

be able to stay."[7] While establishing criteria to govern blanket humanitarian protection, Congress also overrode the executive branch and statutorily designated El Salvador for TPS.[8]

24. Since 1990, the TPS statute has given the executive branch authority to provide nationality-based humanitarian relief to certain citizens of countries stricken by war, natural disaster or other catastrophe, who are already present in the United States. *See* 8 U.S.C. § 1254a. The statute provides that the Attorney General may designate a country for TPS where (1) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (2) "there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state" and it is "unable, temporarily, to handle adequately the return" of nationals; or (3) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)-(C).

25. Under the statute, the "national interest" provision limits designation only under subsection (C)'s "extraordinary and temporary conditions" ground; it does not apply to designations under subsections (A) (armed conflict) or (B) (natural disasters).

26. In keeping with its intent to free the process of designating countries for humanitarian protection from domestic politics, Congress established a statutory framework that governs the designations of countries for TPS. The statute first requires the Attorney General to consult with "appropriate agencies." 8 U.S.C. § 1254a(b)(1). After that, the Attorney General "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective

[7] *Id.* at 25837 (statement of Rep. Bill Richardson).
[8] *See* Immigr. Act of 1990, Pub. L. 101-649, Title III, §§ 302-303.

either upon notice in the Federal Register or "such later date as the Attorney General may specify." *Id.* § 1254a(b)(2).

27. The Attorney General thus has substantial discretion over initial TPS designations. So long as she determines certain country conditions exist, she may choose whether and when to designate a country for TPS.

28. By contrast, Congress limited, in important ways, the Attorney General's discretion to review TPS designations after the initial designation is made.[9] The statutory requirements are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

29. The review process typically begins months before the 60-day deadline.[10] As part of the process, both USCIS and the State Department generally prepare country-conditions memoranda and recommendations.[11] Generally, USCIS manages and coordinates the TPS review process for the Attorney General, soliciting a country conditions report from the Refugee, Asylum, and International Operations ("RAIO") unit within USCIS and soliciting a country

[9] *See* U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (2020) ("GAO Report") at 15-18, 27 (differentiating between the discretion afforded before and after an initial designation).
[10] *See* GAO Report at 20-21.
[11] *See id.* 15-16; *see also Ramos v. Nielsen*, 336 F.Supp.3d 1075, 1082 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process). The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case in banc so the panel decision was vacated. *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 11010 (9th Cir. 2023).

conditions report and recommendation from the State Department.[12] After considering the materials provided, USCIS prepares a detailed recommendation, based on country conditions. *Id.* USCIS's recommendation is called a "Director Memo." *Saget*, 375 F.Supp.3d at 299-300.

30. Once the decision has been made, the statute requires that the Attorney General "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

31. Unless the Attorney General timely determines and publishes notice of her decision that the country "no longer to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion . . . a period of 12 or 18 months." 8 U.S.C. § 1254a(b)(3)(C). The statute thus "essentially provides extension as a default[.]" *Nat'l TPS All. v. Noem*, 773 F.Supp.3d 807, 851 (N.D. Cal. 2025), aff'd, 150 F.4th 1000 (9th Cir. 2025) ("NTPSA I PI Decision").

32. In contrast, if the Attorney General timely "determine[s]" that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal register." 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* The statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation.

---

[12] *See* GAO Report at 15-21; *see also Saget v. Trump*, 375 F.Supp.3d 280, 299-300 (E.D.N.Y. 2019).

33. The Attorney General has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office, the agency provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period. Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago.

34. Once the Attorney General has designated a particular country for TPS, individuals from that country (and persons without nationality who last habitually resided in that country) may apply for immigration status under the program. To be eligible for TPS, individuals from a designated country must meet stringent requirements. These requirements include, among other things, (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date designated by the Secretary; (3) satisfaction of the criteria for admissibility as an immigrant or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history such as convictions for a single felony or multiple misdemeanors; and (5) the submission of an application, extensive documentation, and fees. *See* 8 U.S.C. § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9. Further, an individual is not eligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

35. Congress ensured that people who are ultimately granted TPS would enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the United States; "shall not be detained" by the Secretary of Homeland Security based on

immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. § 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. *See id*. § 1254a(b)(1).

36. Individuals who apply for TPS and who are *prima facie* eligible for TPS are entitled to receive work authorization and protection from deportation while the application is pending. *See* 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10(a), (e).

**BURMA'S PRIOR TPS DESIGNATIONS AND CURRENT COUNTRY CONDITIONS**

37. Burma (also known as Myanmar) is a multi-ethnic Southeast Asian nation of 57.5 million people, currently under an authoritarian military junta since a February 2021 coup.

38. Burma gained independence from the United Kingdom in 1948. In its early years, the country entered a period of federalism and efforts among ethnic minorities to assert greater autonomy. A 1962 coup installed a military junta that rejected autonomy for ethnic minority areas, initiating a decades-long period of military rule and ethnic conflict. After a period of one-party rule, in 1990 the military initiated a coup and promised "free and fair" elections. However, after the results of the elections showed a resounding victory by Nobel Laureate Aung San Suu Kyi's NLD, the junta refused to recognize the election results and placed Suu Kyi under house arrest.

39. Nearly two decades later, the country undertook some political and economic reforms and released thousands of political prisoners, under the terms of the new 2008 Constitution. The military retained control of the country's security ministries, key economic assets, and a 25% (unelected) share of the seats in parliament. These reforms also led to a new round of elections in 2010 and 2015. During this period, the military continued to commit grievous human rights abuses, particularly against the Rohingya ethnic minority.

40. The NLD won an overwhelming majority of parliamentary seats in both the 2015 and November 2020 elections. Claiming the results were fraudulent, on February 1, 2021, the military junta launched a coup the day before new members of the NLD-led civilian government and parliamentarians were set to be sworn in and installed a junta, known as the State Administrative Council ("SAC"), led by military commander Min Aung Hlaing.

41. In July 2025, the SAC transitioned power to the State Security and Peace Commission ("SSPC"), also under Min Aung Hlaing's leadership. Authority remains firmly with the military.

**Initial TPS Designation of Burma**

42. Burma was initially designated for TPS on March 11, 2021, after the February 1, 2021, coup overthrowing the democratically elected civilian government. Under the control of the military junta, the SAC declared a state of emergency, dissolved all national legislatures and assumed all executive, legislative, and judicial power.[13]

43. After the coup, nationwide protests quickly emerged, disrupting the junta's attempts to consolidate administrative control. In response, the junta launched a sweeping and violent crackdown to extinguish public opposition. Under the direction of Min Aung Hlaing, security forces committed mass killings, torture, sexual violence, arbitrary arrests, and other abuses that constitute crimes against humanity. From February to November 2021, "the police and military killed at least 1,200 civilians, including approximately 75 children, and . . . detained over 8,700 government officials, activists, journalists, and civil servants."[14] These atrocities are

[13] *See* Designation of Burma (Myanmar) for Temporary Protected Status, 86 Fed. Reg. 28,132, 28,133 (May 25, 2021).
[14] *See* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Custom Report Excerpts*, https://2021-2025.state.gov/report/custom/7273252319-3/ (last visited Dec. 17, 2025).

well-documented, including by prominent international human rights organizations[15] and the U.S. Department of State.[16] The United Nations Office for the Coordination of Humanitarian Affairs reports that as of May 2025, 19.9 million people—over a third of the country's population—are in humanitarian need.

44. On March 25, 2021, then-Secretary of Homeland Security Alejandro Mayorkas designated Burma for TPS on the basis of extraordinary and temporary conditions that made it unsafe for its nationals to return.[17] DHS cited a rapidly worsening humanitarian crisis driven by the Burmese military's escalating repression and violence against civilians, widespread human rights abuses, mass displacement, and major disruptions to essential services like medical care and humanitarian aid.[18]

**Extension and Redesignation of TPS for Burma in 2022**

45. Following the initial 2021 designation, Secretary Mayorkas issued two extensions of Burma's TPS designation, each supported by contemporaneous review of country-conditions analyses prepared by the Department of State and other U.S. government agencies.

46. On September 27, 2022, Secretary Mayorkas extended Burma's TPS designation until May 25, 2024, due to continued "extraordinary and temporary conditions in Burma that prevent Burmese nationals . . . from returning to Burma in safety."[19]

47. The notice also redesignated Burma for TPS through May 25, 2024, extending eligibility to Burmese nationals who had continuously resided in the U.S. since September 25,

[15] *See Myanmar 2024*, Amnesty Int'l, https://www.amnesty.org/en/location/asia-and-the-pacific/south-east-asia-and-the-pacific/myanmar/report-myanmar/ (last visited Dec. 17, 2025).
[16] *See* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Burma 2024 Human Rights Report* (2024), https://www.state.gov/reports/2024-country-reports-on-human-rights-practices/burma.
[17] Designation of Burma (Myanmar) for Temporary Protected Status, 86 Fed. Reg. at 28,135.
[18] *Id.* at 28,133-35.
[19] Designation of Burma (Myanmar) for Temporary Protected Status, 86 Fed. Reg. at 28,135.

2022, were continuously physically present since November 26, 2022, and met all other criteria.[20] DHS estimated about 2,290 additional individuals became eligible under the redesignation of Burma, including Burmese nationals in the United States for tourism, study, temporary work, or without immigration status.[21]

48. Secretary Mayorkas's decision to both extend the 2021 Designation and authorize the 2022 Designation relied on input from the Department of State, other U.S. Government agencies, and a DHS review of country conditions in Burma. The 2022 notice referenced the 2021 Department of State Country Report on Human Rights Practices for Burma, noting widespread abuses by the military junta.

**Extension and Redesignation in 2024 Based on Unimproved Country Conditions**

49. On March 25, 2024, Secretary Mayorkas extended and redesignated Burma for TPS for an additional 18-month period, from May 26, 2024, through November 25, 2025, based on the continued presence of extraordinary and temporary conditions preventing Burmese nationals from safely returning.[22]

50. The notice also redesignated Burma for TPS through November 25, 2025, expanding eligibility to Burmese nationals who had continuously resided in the U.S. since March 21, 2024, were continuously physically present since May 26, 2024, and met all other criteria.[23] DHS estimated about 7,300 additional individuals would become eligible under the redesignation of Burma, including Burmese nationals in the United States in nonimmigrant status or without immigration status.[24]

---

[20] *See id.* at 58,516.
[21] *See id.* at 58,518.
[22] *See* Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status, 89 Fed. Reg. 20,682, 20,686 (Mar. 25, 2024).
[23] *See id.*
[24] *See id.*



AUNGDOE000043

51. Secretary Mayorkas's decisions to extend the 2022 TPS designation and to issue the 2024 redesignation were based on DHS's review of country conditions, informed by assessments from federal agencies, including the Department of State.[25] According to the notice, the Burmese military continued to perpetrate widespread and systematic violence against civilians, including targeted attacks on ethnic minorities; airstrikes, shelling, and village destruction; and torture, beheadings, and mutilation used as "psychological warfare."[26] It also reported that nearly two million people were internally displaced, facing severe food shortages, malnutrition, blocked humanitarian aid, limited health care, and deteriorating economic conditions.[27]

**Conditions in Burma**

52. Reports from Burma in 2025 highlight grave and continued threats to the lives of civilians, ethnic minorities, and individuals and communities seen as opposing the military junta.

53. The U.S. Special Rapporteur on the situation of human rights in Myanmar characterized Burma as a country in "crisis" and "at a critical juncture."[28] The report, released just over a month before DHS's termination decision, describes the conditions as "continu[ing] to worsen" and says "schools, clinics, monasteries, churches, mosques and the shelters of those displaced by violence have been systematically attacked by military aircraft, artillery and well-armed troops."[29] Despite announcing a "humanitarian ceasefire" in the wake of the devastating earthquake on March 28, 2025, the junta proceeded to escalate its attacks on civilians, launching more airstrikes on civilian targets in the second quarter of 2025 than any previous quarter since

[25] *See id* at 20,684.
[26] *See id* at 20,685.
[27] *See id* at 20,686.
[28] Thomas H. Andrews, *Report of the Special Rapporteur on the Situation of Human Rights in Myanmar*, ¶¶ 1, 16, U.N. Doc. A/80/490 (Oct. 20, 2025).
[29] *Id.* at ¶¶ 1-2.

the coup.[30] As recently as December 8, 2025, at least 18 civilians were reportedly killed and 20 wounded at a coffee shop in the Sagaing region, an area known as a stronghold against military rule.[31] On December 11, 2025, a military air-strike reportedly killed over 30 civilians at a hospital in Rakhine state, where the medical infrastructure has already been severely impacted.[32]

54. While the military junta announced elections beginning in late December 2025, human rights experts have emphasized that the elections will not be "free, fair, or inclusive" in part because the junta has imprisoned approximately 30,000 political prisoners since the 2021.[33] The junta criminalized "criticism of the election by banning all speech, organizing, or protest that disrupts any part of the electoral process."[34] Violators can face up to 20 years in prison and the death penalty, and the military has arrested at least 94 people so far under the law.[35]

**DEFENDANTS' UNLAWFUL TERMINATION OF BURMA'S TPS DESIGNATION**

55. On November 25, 2025, DHS published a notice in the Federal Register purporting to terminate Burma's TPS designation, effective January 26, 2026.[36] Secretary Noem

---

[30] *Id.* at ¶ 3.
[31] *See* Grant Peck, *Myanmar Military Air Strike on a Tea Shop Kills 18 Watching a Football Match on TV*, ABC News (Dec. 8, 2025), https://abcnews.go.com/International/wireStory/myanmar-military-air-strike-tea-shop-kills-18-128206092.
[32] *See Dozens Killed in Hospital Strike in Myanmar's Western Rakhine State*, The Guardian (Dec. 11, 2025), https://www.theguardian.com/world/2025/dec/12/dozens-killed-in-hospital-strike-in-myanmars-western-rakhine-state.
[33] News Release, Hum. Rts. Watch, Myanmar: Elections a Fraudulent Claim for Credibility (Nov. 16, 2025), https://www.hrw.org/news/2025/11/16/myanmar-elections-a-fraudulent-claim-for-credibility.
[34] *Id.*
[35] *Id.*; *see also* Thomas H. Andrews, *Report of the Special Rapporteur on the Situation of Human Rights in Myanmar*, U.N. Doc. A/80/490 (Oct. 20, 2025).
[36] *See* Termination of the Designation of Burma (Myanmar) for Temporary Protected Status, 90 Fed. Reg. 53,378 (Nov. 25, 2025).

described the termination decision as another success in the administration's ongoing efforts to "restor[e] TPS to its original status as temporary."[37]

56. In DHS's notice of termination, the Secretary acknowledged the persistence of "certain extraordinary and temporary conditions" and humanitarian challenges in Burma, including ongoing military operation and the need for humanitarian assistance.[38] Nonetheless, she concluded that such conditions no longer hinder the safe return of Burmese nationals to the country, citing the official end of Burma's state of emergency in July 2025. This conclusion directly contradicts the President's February 4, 2025, renewal of Burma's "national emergency" under the International Emergency Economic Powers Act, which found that the emergency created by the 2021 coup—during which the military arbitrarily arrested civilians and government leaders and undermined democracy and the rule of law—continued.[39]

57. Secretary Noem's assessment also fails to mention or consider other U.S. government agencies' concerning assessments of human rights abuses and humanitarian crisis in Burma.

58. Secretary Noem failed to consult with other appropriate federal agencies regarding the country conditions in Burma before making her decision to terminate TPS for Burmese nationals. On information and belief, Secretary Noem's decision also was not based on an objective review of Burma's country conditions. Rather, the decision to terminate TPS for Burma was made as part of a preordained plan to eliminate existing TPS designations based on

[37] News Release, U.S. Citizenship & Immigr. Servs., DHS Terminating Temporary Protected Status for Burma (Nov. 24, 2025), https://www.uscis.gov/newsroom/news-releases/dhs-terminating-temporary-protected-status-for-burma
[38] Termination of the Designation of Burma (Myanmar) for Temporary Protected Status, 90 Fed. Reg. at 53,380.
[39] *See* Continuation of the National Emergency with Respect to the Situation in and in Relation to Burma, 90 Fed. Reg. 9,111 (Feb. 4, 2025).

animus against TPS holders and to reduce the number of immigrants in the United States from non-white, non-European countries.

59. The termination notice wholly ignored key factors considered in the most recent extension and redesignation of Burma's TPS, including pervasive human trafficking, targeted violence towards certain ethnic minorities, widespread food insecurity, and an eviscerated economy.[40] References to input or reports from the Department of State or other federal agencies—aside from boilerplate language that the Secretary "consult[ed] with appropriate U.S. Government agencies"—were also conspicuously missing.[41]

60. Many other federal agency reports, statements, and recommendations on TPS factors made throughout 2025 directly contradict the Secretary's findings about improved conditions in Burma. For example:

- On January 31, 2025, the Department of State asserted that as of 2025, humanitarian needs in Burma had increased twenty-fold since the coup; over one-third of the population—19.9 million people—required humanitarian assistance; 15.2 million needed food aid; and 3.4 million people were internally displaced, nearly one million more than the previous year.[42]

[40] *Compare* 90 Fed. Reg. 53378 *with* 89 Fed. Reg. 20684.
[41] *Compare* 90 Fed. Reg. 53378 *with* 89 Fed. Reg. 20682 (asserting input received from the Department of State on country conditions and citing to Department of State sources on Burma) *and* 87 Fed. Reg. 58515 (same).
[42] *See* Press Release, U.S. Mission Geneva, Four Years from the Military Coup in Myanmar: Joint Statement by Australia, Canada, the European Union, the Republic of Korea, New Zealand, Norway, Switzerland, the United Kingdom and the United States (Jan. 31, 2025), https://geneva.usmission.gov/2025/01/31/joint-statement-on-myanmar/.

- After a 7.7 magnitude earthquake struck Burma on March 28, 2025—killing nearly 4,000 people and injuring over 5,000—the Department of State stated that the devastation "worsen[s] an already-dire humanitarian situation in Myanmar."[43]
- In March of 2025, the United States Commission on International Religious Freedom published its 2025 Annual Report, which recommended Burma be redesignated as a "country of particular concern" "for engaging in systematic, ongoing, and *egregious* violations of religious freedom, as defined by the International Religious Freedom Act," and describing how "religious freedom conditions in Burma continued to worsen" throughout the prior year.[44]
- In May of 2025, the Department of State issue a Level 4 "Do Not Travel" to Burma advisory, warning travelers about "armed conflict, the potential for civil unrest, arbitrary enforcement of local laws, poor health infrastructure, land mines and unexploded ordnance, crime, and wrongful detentions."[45] The travel advisory remains in place as of December 17, 2025.
- On July 1, 2025, the Secretary of State, in a joint statement with representatives of Australia, India, and Japan, affirmed that they remained "deeply concerned by the worsening crisis in Myanmar," while calling for the safe delivery of humanitarian

---

[43] *See* Vibhu Mishra, *'Still reeling': Myanmar Quakes Worsen Humanitarian Crisis in Fractured Country*, U.N. News (June 24, 2025), https://news.un.org/en/story/2025/06/1164881; Media Note, U.S. Dep't of State, Joint Statement by the Quad Partners on Myanmar Earthquake Response (Apr.3, 2025), https://www.state.gov/joint-statement-by-the-quad-partners-on-myanmar-earthquake-response

[44] *Annual Report*, U.S. Comm'n on Int'l Religious Freedom, 14 (Mar. 2025) (emphasis added), https://www.uscirf.gov/sites/default/files/2025-03/2025%20USCIRF%20Annual%20Report.pdf.

[45] *Burma (Myanmar) Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/burma-travel-advisory.html (last visited Dec. 17, 2025).

assistance; highlighting concerns about the prevalence of transnational crime; and committing to fight cybercrime and online scam operations.[46]

- On August 24, 2025, Principal Deputy Spokesperson for the Department of State, Thomas Pigott, stated that the United States "expresses its support for the people of Burma, including Rohingya and other ethnic groups who have been subjected to violence and displacement."[47] He further commended other countries in the region for hosting Burmese refugees.[48]
- On September 29, 2025, the Department of State released its 2025 *Trafficking in Persons Report: Burma*, describing the military's continued pattern of forcibly recruiting children and adults for forced labor to support military operations, including the use of child soldiers.[49] The report also documented ongoing sex and labor trafficking risks, particularly for populations experiencing displacement and financial hardship in the wake of the 2021 military coup.[50]
- On November 19, 2025, just six days before the Secretary's termination of TPS for Burma, State Department official Michael Heath expressed support for a United Nations General Assembly resolution addressing the military regime's pattern of "appalling human rights violations and abuses," including arbitrary detention, the killing of unarmed

---

[46] Media Note, U.S. Dep't of State, Joint Statement from the Quad Foreign Ministers' Meeting in Washington (July 1, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/07/joint-statement-from-the-quad-foreign-ministers-meeting-in-washington.
[47] Press Release, Thomas Pigott, Principal Deputy Spokesperson, U.S. Dep't of State, Violence in Burma (Aug. 24, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/08/violence-in-burma.
[48] *See id.*
[49] *See* U.S. Dep't of State, *2025 Trafficking in Persons Report: Burma*, https://www.state.gov/reports/2025-trafficking-in-persons-report/burma/#:~:text=In%20March%202025%2C%20the%20media,including%20victims%20of%20forced%20criminality (last visited Dec. 18, 2025).
[50] *See id.*

civilians, and sexual violence, and called for *further* measures banning the sale of weapons "that could be used to attack civilians" to Burma.[51]

61. The Secretary's conclusion that Burmese nationals can safely return to Burma is inconsistent with documented evidence, including from the federal government, demonstrating that deportees face ongoing persecution, arrest, and torture, making return life-threatening.

62. Between April and May 2025, at least 65% of Burmese nationals deported from the United States were immediately arrested upon arrival and detained at the notorious Aung Tha Pyay interrogation center.[52] Aung Tha Pyay is widely known for its brutal treatment of detainees and as the site where numerous protesters were tortured and killed following the February 2021 coup.[53]

63. Many of these deportees, particularly individuals from minority ethnic groups such as the Karen and the Chin, arrived without identification documents, leaving them extremely vulnerable. Their lack of documentation makes survival in Burma uncertain and makes leaving effectively impossible.[54]

64. The Secretary's assessment overlooks the Department of State's firsthand knowledge that these risks extend beyond Burmese nationals to U.S. citizens of Burmese descent. For example, in November 2025, after months of negotiating with the military junta, Department of State officials secured the release of the Venerable U Pyinya Zawta, a senior monk and U.S.

---

[51] Statement by Michael Heath, U.S. Mission to the U.N., Explanation of Position for UNGA 80 Third Committee Resolution: Situation of human rights of Rohingya Muslims and other minorities in Myanmar (Nov. 19, 2025), https://usun.usmission.gov/explanation-of-position-for-unga-80-third-committee-resolution-situation-of-human-rights-of-rohingya-muslims-and-other-minorities-in-myanmar/.
[52] *See* Sa Tun Aung, *Myanmar nationals deported by US being held in notorious junta detention centre*, Myanmar NOW (May. 23, 2025), https://myanmar-now.org/en/news/myanmar-nationals-deported-by-us-being-held-in-notorious-junta-detention-centre/
[53] *Id.*
[54] *Id.*

citizen who had been detained in Burma for a year.[55] During his detention, he endured interrogation, physical assault, and sleep deprivation. Although Department of State officials met with him monthly, his release required an entire year of sustained diplomatic effort.[56]

65. This example reflects the broader reality faced by Burmese nationals in the United States, who consistently face credible, documented threats of persecution if forced to return and recount firsthand experiences of family members being arrested, beaten, or tortured.[57]

66. Instead of addressing these ongoing risks, Secretary Noem relied on speculative improvements in governance and stability, including a projected election timeline and "the promising possibility" that emerging local and ethnic administrations could eventually address gaps in education, health care, the judicial system, and law enforcement. *Id.* at 53380. The Secretary also relied heavily on assumptions that Burmese nationals can safely return to the country based on two tangential facts—namely, the percentage of advance parole document requests for travel to Burma among Burmese nationals between 2021 and 2025 and an unspecified number of U.S. Immigration and Customs Enforcement ("ICE")'s removals to Burma in Fiscal Year 2025. *Id.* at 55380.

67. Remarkably, some of the Secretary's examples of purported improvements were cherrypicked from a 2025 UNHCR report, which asserts that a "human rights crisis characterized by violence and atrocities has affected every single aspect of life" in Burma since the military coup; details the "dire human rights situation" plaguing the country; and urges members of the

[55] *See* Mark Sommer, *'Never Forgot Me': How a Monk's Supporters Helped Him Survive Prison,* N.Y. Times (Nov. 15, 2025) https://www.nytimes.com/2025/11/15/nyregion/monk-myanmar-pyinya-zawta-buffalo.html
[56] *Id.*
[57] *See* Lorcan Lovett, *'A constant fear': Myanmar nationals face imprisonment back home as US ends protected status*, The Guardian (Nov. 27, 2025), https://www.theguardian.com/world/2025/nov/28/usa-terminating-myanmar-protected-status-deportation-fears

United Nations ("UN") to grant international protections to civilians fleeing violence in Burma and seeking safety abroad.[58] In a similar vein, the termination notice focuses on the military regime's promise of free and fair elections without any apparent consideration of widespread and credible concerns that such elections are a sham exercise that will entrench the regime's power and deepen oppression and instability.[59] Inexplicably, the very sources cited by the Secretary in the termination notice report on the broad skepticism about the legitimacy of the elections, yet there is no indication the Secretary considered these concerns.[60] Even more striking, the Secretary disregarded the State Department's unambiguous condemnation of the elections mere months before the termination decision.[61]

68. The Secretary further attempted to justify her purported termination decision by declaring that continuing TPS for Burma was contrary to the "national interest." *Id.* To support this finding, the Secretary pointed to Burma's higher than average rate of visa overstays, as well as a recent Presidential Proclamation (the "Travel Ban") banning entry of Burmese nationals and nationals from 11 other countries into the United States and placing a partial entry ban on 8 other countries.[62] On December 17, 2025, the President expanded the Travel Ban to 39 total countries and kept Burma on the list of countries whose nationals are fully restricted from entry.[63] The

---

[58] Thomas H. Andrews, *Report of the Special Rapporteur on the Situation of Human Rights in Myanmar*, U.N. Doc. A/80/490, 2-3, 15 (Oct. 20, 2025).
[59] RFA Burmese, *Myanmar Junta Announces Schedule for December, January Election*, RFA (Mar. 26, 2025), https://www.rfa.org/english/myanmar/2025/03/26/myanmar-junta-election-schedule/; Tom Bennett, *Myanmar's Milutary Government Says It Will Hold Elections in Next* Year, BBC News (Mar. 8, 2025), https://www.bbc.com/news/articles/c757qk1lnq4o.
[60] RFA Burmese, *supra* note 62; Bennett, *supra* note 62.
[61] Statement by Charles Harder, U.S. Mission to the U.N., Remarks at A High-Level Conference on The Situation of Rohingya Muslims and Other Minorities in Myanmar (Sep. 30, 2025), https://usun.usmission.gov/remarks-at-a-high-level-conference-on-the-situation-of-rohingya-muslims-and-other-minorities-in-myanmar/.
[62] Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 Fed. Reg. 24,497 (Jun. 10, 2025).
[63] Proclamation No. 10998, 90 Fed. Reg. 59,717 (Dec. 16, 2025).



AUNGDOE000052

termination notice for Burma is the first time the government has used a travel ban to justify a termination in the over 35 years since the TPS program was enacted.

69. The Secretary's reliance on the Travel Ban and visa overstay rates to justify termination overlooks critical context. When individuals who entered the country on visas obtain another form of lawful status like TPS or have work permits through their pending asylum applications, overstay reports often lag behind these changes, making the overstay numbers an unreliable measurement for evaluation.[64] This omission is especially significant following Burma's February 2021 military coup, which likely prompted an increase in Burmese nationals seeking TPS and other humanitarian protections in the United States.[65] By failing to account for this, DHS treats overstays as an independent compliance problem without recognizing that TPS itself and asylum filings likely explain much of the reported increase.

**Departure from Reasoned Analysis Evident in Prior Decisions**

70. The chart below demonstrates that, at every relevant review period from the initial designation on May 25, 2021, through the last re-designation and extension on March 25, 2024, conditions in Burma continued to meet the statutory criteria for TPS. The record shows pervasive political repression and widespread human rights abuses, chronic deprivation of basic services, severe economic deterioration, escalating mass internal and external displacement, ongoing threats to vulnerable minority groups, and human trafficking, all documented by numerous intergovernmental and human rights organizations. These ongoing crises reflect the very

---

[64] National Foundation for American Policy, "An Analysis of the DHS Overstay Reports," June 2025, at 1, https://nfap.com/wp-content/uploads/2025/06/Analysis-of-DHS-Overstay-Report.NFAP-Policy-Brief.2025.pdf ("Problems with DHS systems correctly identifying individuals who changed status inside the U.S. or left the country render the reports inappropriate for policy purposes.").

[65] *Id.* at 2 (stating that "DHS systems may record and treat [] as overstays" people who are "from countries experiencing violence [who] may not have overstayed their visas but applied for asylum, received Temporary Protected Status, or remained in the country via other lawful means, such as marriage.").

conditions that supported both the initial designation and subsequent extensions and that Congress intended to be evaluated under § 1254a(b)(3)(A).

71. Rather than adhere to the statutory thresholds and procedural safeguards governing TPS review, the termination notice summarily ignored the factors evaluated in the initial designation, re-designations, and extensions. The termination notice purports to conclude that conditions have improved but does so with vague, unexplained assertions that fail to identify the facts or sources reviewed or to provide a reasoned analysis. And examination of the sources cited in the termination notice reveals that the notice selectively cites cherry-picked facts from sources that do not support the Secretary's conclusions but rather depict an unsafe country that continues in crisis. Unlike prior notices regarding TPS for Burma, the termination notice does not meaningfully grapple with the record evidence or explain why enduring conditions that previously justified TPS no longer do so.

| Issue | Initial Designation (05/25/21) | Re-designation & Extension (09/27/22) | Re-designation & Extension (03/24/24) | Termination Announced (11/25/25) |
|---|---|---|---|---|
| **Political Repression & Human Rights Abuses** | • Internet restrictions, arbitrary arrests, curfews in 36 towns<br>• Over 650 killed & 3,200 + detained<br>• Elected leaders detained/charged | • 10,870 detained + 13,926 arrested<br>• 1,833 killed<br>• Widespread sexual violence, disappearances, excessive force<br>• Civil war conditions; heavy weapons & air assaults to destroy villages | • 4,000+ killed<br>• Violence in 315/330 townships<br>• Airstrikes, shelling, village destruction, blocked aid<br>•Disappearances torture, gender-based violence reported | • Notes Burma ended state of emergency on 07/31/25. Omits President's renewed "national emergency" for 1 year on 02/04/25, citing ongoing crisis.[66]<br>• Cites military promise of "free and fair elections" while |

[66] Continuation of the National Emergency With Respect to the Situation in and in Relation to Burma, 90 Fed. Reg. 9,111 (Feb. 4, 2025).

| Issue | Initial Designation (05/25/21) | Re-designation & Extension (09/27/22) | Re-designation & Extension (03/24/24) | Termination Announced (11/25/25) |
|---|---|---|---|---|
| | | | | ignoring House Foreign Affairs Committee (11/19/25) & bipartisan lawmaker statement (11/20/25) calling them a sham.[67] • Describes China-brokered ceasefire with NDAA as successful despite violations.[68] |
| **Access to Basic Services - Shelter, Food Security, Water, Hygiene, Health, and Education)** | • Bank closures & payment interruptions • Price increases (food, fuel, materials) • Limited medical care | • 4.1M food insecure • Severe acute malnutrition • 2% of eligible children treated • 50% of targeted relief unmet • Major issue re access to basic services • 26,000 | • 12.9M food insecure • Only 17% of children received malnutrition aid in 2023 • Health infrastructure collapsed; hospitals damaged | • Speculates that ethnic administrations offer "promising possibilities" to fill gaps (education, health, justice). |

[67] *No Exit Strategy: Burma's Endless Crisis and America's Limited Options: Hearing Before the E. Asia & Pac. Subcomm. and S. & Cent. Asia Subcomm.*, 119th Cong. (Nov. 19, 2025),https://foreignaffairs.house.gov/committee-activity/hearings/no-exit-strategy-burma-s-endless-crisis-and-america-s-limited-options; Press Release, Ami Bera, Representative, House of Representatives, Reps. Bera, Kim, Kamlager-Dove, & Huizenga Joint Statement on Crisis in Burma (Nov. 20, 2025), https://bera.house.gov/news/press-releases/reps-bera-kim-kamlager-dove-and-huizenga-issue-joint-statement-on-crisis-in-burma?fbclid=IwY2xjawOMsD1leHRuA2FlbQIxMQBzcnRjBmFwcF9pZBAyMjIwMzkxNzg4MjAwODkyAAEeQziy1xXSYf_BepN2qJONWlroQOCAeCgwUhs7u2D-dYyTChdVNy0ztOtseLI_aem_bTNqXo1G9A8SGIPsoFrfTQ.

[68] *TNLA Defies Myanmar Junta Push to Cede Shan Towns in China Talks*, The Irrawaddy (July 7, 2025), https://www.irrawaddy.com/news/burma/tnla-defies-myanmar-junta-push-to-cede-shan-towns-in-china-talks.html.

| Issue | Initial Designation (05/25/21) | Re-designation & Extension (09/27/22) | Re-designation & Extension (03/24/24) | Termination Announced (11/25/25) |
|---|---|---|---|---|
| | | properties destroyed | | |
| **Danger to Vulnerable Minority Groups** | • Increased danger for Rohingya, Karen (200,000 displaced), and Kachin | • US genocide determination re Rohingya<br>• Rohingya movement restricted; increased arrests | • Karen & Karenni targeted<br>• 50,000 Chin fled & 48,000 displaced<br>• Rohingya abuse/genocide | • Not addressed |
| **Economic Conditions** | • Not addressed | • Kyat depreciation, high inflation, 18% GDP contraction<br>•Household income loss >50% | • Partial recovery but still at pre-pandemic levels<br>• 2023 inflation >14% | • Not addressed |
| **Displacement (Internal & External)** | • 330,000 internally displaced | • Internal: 974,000 displaced since coup<br>• Total Internal Displaced: 1.3M<br>• External: 45,500 refugees | • Internal: 694,300 → 1.7M (+146%)<br>• External: 40,200 → 54,900 (+37%)<br>**Total Displacement: 2.6M** | • Displacement not addressed;<br>• Safety determination based on 26% who applied for advance parole to visit Burma.<br>• No data on approval, travel, safety, or 74% who did not apply. |
| **Trafficking** | • Not addressed | • Not addressed | • 120,000 trafficked<br>• Trafficking linked to online scams | • Not addressed |
| **U.S Government References / Int'l Orgs / Human Rights Groups** | • UNHCR<br>• DOS<br>• UN OCHA<br>• UN Special Envoy for Burma<br>• OHCHR<br>• Human Rights Watch | • 2021 DOS Country Report<br>• DOS Genocide Report<br>• OHCHR & UNHCR<br>• UN OCHA | • 2022 DOS Country Report<br>• 2023 DOS Trafficking Report:<br>• DOS Genocide Report | • DHS Entry/Exit Overstay Report (2023-24)<br>• Presidential Proclamation on Entry Restrictions<br>• OHCHR Report |

| Issue | Initial Designation (05/25/21) | Re-designation & Extension (09/27/22) | Re-designation & Extension (03/24/24) | Termination Announced (11/25/25) |
|---|---|---|---|---|
| | | • Int'l Crisis Group & USIP | • OHCHR Report | |

## THE FIRST TRUMP ADMINISTRATION'S EFFORTS TO ELIMINATE TPS PROTECTIONS

72. The first Trump Administration attempted to end TPS designations for six non-white, non-European countries. Between 2017 and 2018, DHS announced terminations of TPS designations for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *See Ramos v. Nielsen*, 709 F.Supp.3d 871, 877-78 (N.D. Cal. 2023). If the terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, comprising approximately 98 percent of all TPS holders at the time.[69] In each case, the Secretary announced either a 12- or 18-month orderly transition period, which would have delayed the effective date of termination.

73. Litigation and congressional investigations subsequently revealed that the termination decisions were not based on an objective review of country conditions as required by statute—and as had been the past practice over multiple administrations, both Democratic and Republican—but rather were part of a "predetermined presidential agenda to end TPS." *Ramos v. Nielsen*, 336 F.Supp.3d 1075, 1094-99 (N.D. Cal. 2018) (vacated and remanded on different grounds; quoting then-DHS Secretary Duke's assurance to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close").[70]

[69] Marcela Valdes, *Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call*, N.Y. Times (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.
[70] *See also* MINORITY STAFF OF S. COMM. ON FOREIGN RELS., 116th Cong., PLAYING POLITICS WITH HUMANITARIAN PROTECTIONS: HOW POLITICAL AIMS TRUMPED U.S. NATIONAL SECURITY AND THE SAFETY OF TPS RECIPIENTS 41 (U.S. Gov't Publ'g Off. Wash. 2019) (finding that termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).

74. Moreover, every district court to consider the question of whether animus was a motivating factor for the agency action found that the terminations were part of a policy "to decrease the presence of non-white immigrants in the United States." *Saget*, 375 F.Supp.3d at 368-372 (also finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti); *see also Ramos*, 336 F.Supp.3d at 1100 (noting "evidence that President Trump harbors an animus against non-white, non-European [noncitizens] which influenced his (and thereby the Secretary's) decision to end . . . TPS designation[s]"); *Centro Presente v. DHS*, 332 F.Supp.3d 393, 415 (D. Mass. 2018) ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador, and Honduras).

75. DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual terminations of TPS designations for nearly everyone who held the status. *Ramos*, 336 F.Supp.3d at 1101. For example, in terminating TPS for Nepal, career officials were instructed not to devote research to crises not directly related to the earthquake, and when drafts did not adequately support the proposal to terminate, career officials omitted or deemphasized ongoing problems in Nepal.

76. The courts considering challenges to these decisions consistently found that DHS had radically changed the way it approached TPS decisions, justifying the terminations by considering a much narrower range of country conditions than had been considered in the past. *See Saget v. Trump*, 375 F.Supp.3d 280, 346 (E.D.N.Y. 2019); *Ramos*, 336 F.Supp.3d at 1097-

98; *Centro Presente v. DHS*, 332 F.Supp.3d 393, 412-14 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F.Supp.3d 307, 321 (D. Md. 2018).

77. To justify the termination of designations, and undermine the TPS program, political appointees during the first Trump Administration sought to paint TPS holders as criminals and manufactured evidence to support this implausible claim. A court in the Eastern District of New York found that Acting Secretary Duke decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute. *Saget*, 375 F.Supp.3d at 343, 347-48, 359-62. Acting Secretary Duke specifically sought out a rationale to "[s]eparate out Haiti." *Id.* at 348. Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance, despite that virtually any criminal record is disqualifying for TPS. *Id.* at 307-09. Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest." *See id.* at 352; *cf.* 8 U.S.C. § 1254a (b)(1)(C), (c)(2)(B). Another federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – *i.e.*, that non-whites commit crimes and are on the public dole." *Ramos*, 336 F.Supp.3d at 1105.

78. After analyzing "a wealth of record evidence" regarding the terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, a federal district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad . . . The evidence . . . suggests this change may have been made in order to implement and justify a pre-ordained result." *Id.* at 1092, 1097-98; *see also Centro Presente v. DHS*, 332

F.Supp.3d at 416 (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees"). A court in the Eastern District of New York came to the same conclusion after a four-day bench trial regarding Haiti's TPS termination, finding that the termination "was preordained and pretextual" and "was made in part due to political influence," violating the TPS statute's requirement that decisions be based on country conditions. *Saget*, 375 F.Supp.3d at 346.

79. Indeed, then-Acting Secretary Duke's writings revealed that "she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS." *Ramos*, 336 F.Supp.3d at 1099. Specifically, she expressed that her TPS decision-making was based on "an America first view," a term that invoked President Trump's preference for immigration from majority-white European countries. *Id.* at 1099-1100, 1104. Notably, Secretary Noem expressly included the same "America First" objectives in the published Federal Register Notice terminating TPS for Burma and other countries in 2025.

80. As a result of injunctions issued in these cases and subsequent stipulated orders, the terminations sought by the first Trump Administration did not go into effect. *See, e.g.*, *Ramos*, 709 F.Supp.3d at 878-79. And in 2023, DHS rescinded the TPS terminations for Honduras, Nicaragua, Nepal, and El Salvador and extended TPS designations for those countries instead. *See id.* DHS issued new extensions for Haiti and Sudan on May 21, 2021, and April 19, 2022, respectively, effectively overturning their TPS terminations.[71] *See id.* In doing so, DHS

[71] *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863 (Aug. 3, 2021); Designation of Sudan for Temporary Protected Status, 87 Fed. Reg. 23,202 (Apr. 19, 2022).

extensively criticized the flawed country-conditions analyses in the termination decisions issued under the first Trump Administration.[72]

## THE SECOND TRUMP ADMINISTRATION'S PROMISE TO END TPS

### Secretary Noem, President Trump, and Vice President Vance Publicly Commit to Terminating TPS

81. Secretary Noem, President Trump, and Vice President Vance have repeatedly characterized TPS itself as illegal and committed to ending protections for TPS holders well before the Secretary conducted any statutorily required review. Secretary Noem's TPS termination decisions treated both the program and its beneficiaries as illegal from the outset. The Administration's approach reduced the statutory periodic review process to a foregone conclusion in which termination and harm to TPS holders was predetermined and every review served only to rationalize that outcome.

82. Even before she became Secretary of DHS, Secretary Noem publicly committed to ending TPS protections in statements reflecting her antipathy toward TPS holders.

83. Secretary Noem repeatedly insinuated that TPS was an illegal program and denigrated its beneficiaries. In announcing her decision to end TPS for Venezuela, for instance, she said she would not allow Venezuelan TPS holders to "stay here and violate our laws."[73] In her press statement announcing the partial vacatur of TPS for Haiti, Secretary Noem emphasized

---

[72] *See* Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day."); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40,294, 40,297 (June 21, 2013) (same for Nicaragua); Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023) (same for Nepal).

[73] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad686037 (at approximately 1:00).



AUNGDOE000061

that "TPS is a type of immigration status available to nationals of certain designated countries that allows aliens, *even if they entered the country illegally*, the ability to reside *temporarily* in the U.S."[74] Secretary Noem further cited Haiti as an "example" of the "exploit[ation]" of the system because "Haiti has been designated for TPS since 2010"; and because "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."[75]

84. President Trump, Vice President Vance, and Trump surrogates have likewise expressed their disagreement with TPS, characterizing designations as illegal, or, in Vice President Vance's words, "a magic amnesty wand."[76]

85. Both the President and the Vice-President made clear their intent to target TPS holders before taking office.[77] President Trump, while campaigning, said that he would "[a]bsolutely . . . revoke" TPS from Haitians, saying, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal."[78] He decried TPS as a "little trick,"

[74] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphasis in original).
[75] *Id.* (Here, Defendant Noem presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit from TPS).
[76] Gabe Whisnant, *JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims*, Newsweek (Sep. 16, 2024), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036.
[77] *See* Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. Times (Oct. 22, 2024), *https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html*; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. Times (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.
[78] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,* NewsNation (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:00); *see also* Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. Times (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.



AUNGDOE000062

asserting that Haitian migrants "are illegal immigrants" who were "destroying the town"[79] and that he would "do large deportations" of Haitian TPS holders.[80]

86. Vice-President Vance repeatedly stated during the campaign that he intended to eliminate TPS and remove protections for TPS holders, declaring, "We're going to stop doing mass grants of Temporary Protected Status."[81] In a September 2024 CNN interview, he rejected the legal status of TPS holders, characterizing TPS designations as "magic amnesty" and asserting that granting TPS "does not mean they are here legally."[82]

87. According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of status from TPS holders as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[83]

88. Project 2025, "the 2025 Presidential Transition Project," a product of current and former Trump political appointees, also called for the "[r]epeal [of] TPS designations" without

---

[79] Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far as I'm Concernced'*, Rolling Stone (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621/.
[80] Soo Rin Kim et al., *Trump calls US 'garbage can for the world' in latest anti-immigrant rhetoric*, ABC News (Oct. 24, 2024), https://abcnews.go.com/Politics/trump-calls-us-garbage-world-latest-anti-immigrant/story?id=115149893; Alexandra Ulmer et al., *Trump Pledges to Deport Haitians in Ohio City if Elected*, Reuters, (Sep. 14, 2024), https://www.reuters.com/world/us/biden-says-attacks-haitian-immigrants-have-stop-2024-09-13/.
[81] Chris Cameron, *Vance Vows an End to Programs for Legal Migrants*, N.Y. Times (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html.
[82] Interview of Senator J.D. Vance, CNN (Sep. 16, 2024) at approx. 5:00, http://youtube.com/watch?v=djpTr5r0zMQ.
[83] *See* Charlie Savage et al., *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. Times (Nov. 11, 2023), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

elaboration as to any consideration of individual country conditions or any other statutory requirements.[84]

**DEFENDANTS' RENEWED EFFORTS TO END TPS**

89. Neither the adverse decisions of federal courts nor DHS's 2023 analysis have deterred the second Trump Administration from pursuing the termination of TPS protections for beneficiaries and enacting harm on TPS holders consistent with campaign promises. To date, the Administration has attempted to terminate all but one TPS designation that has come up for review. The purported termination decisions—including the termination of TPS for Burma—reflect preordained outcomes driven by animus against TPS holders and nonwhite immigrants, and the very sort of domestic politics the statute is intended to forestall.

90. On his first day in office, President Trump issued an executive order titled "Protecting the American People Against Invasion."[85] The supposed "invasion" at issue involved purportedly "unprecedented" levels of irregular entry into the United States.[86] The executive order describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans."[87] "Invasion" is a "code word" often used to "express[] that Racial/Ethnic Minorities spread something harmful within communities, institutions, or other societal domains."[88]

91. The Executive Order directs the DHS Secretary to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led

---

[84] *Mandate for Leadership: The Conservative Promise* 150 (Paul Dans & Steven Groves eds., 2025) (chapter written by Ken Cuccinelli). https://static.project2025.org/2025_MandateForLeadership_FULL.pdf.
[85] Exec. Order No. 14159 § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025) ("Invasion EO").
[86] *Id.* § 1
[87] *Id.*
[88] Deirdre Pfeiffer & Xiaoqian Hu, *Deconstructing Racial Code Words*, 58 L. & Soc'y Rev. 294, 310 (2024).



AUNGDOE000064

to the increased or continued presence of illegal aliens[89] in the United States," including by reviewing "designations of Temporary Protected Status."[90] Although TPS holders are, by definition, lawfully present in the United States, the Executive Order demanded that TPS designations be "appropriately limited in scope" to restrict the "continued presence of illegal aliens in the United States."[91]

92. Immediately after Secretary Noem was confirmed as Secretary of DHS, Defendants began to implement the Executive Order's mandate and several of Secretary Noem's termination orders rely explicitly on this order. In fact, when publicizing the Venezuela TPS vacatur described below, Secretary Noem explained that the vacatur reflected President Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives a directive, the Department of Homeland Security will follow it."[92]

**Venezuela**

93. Within days of taking office, Secretary Noem made the unprecedented decision to reverse and vacate the prior Administration's extension of Venezuela's 2023 TPS designation. *See NTPSA I* PI Decision at 819-20. The termination of Venezuelan TPS followed soon after. A federal court later found that Secretary Noem's official justification for her unprecedented

[89] "Illegal alien" is widely recognized as a derogatory term used to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such). *See, e.g.,* Kai Wei et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) Soc. Scis. J. 1, 10-11 (2019), https://www.mdpi.com/2076-0760/8/3/93#B63-socsci-08-00093. The administration's use of this term "conveys a message of rejection and exclusion" and further evinces its animus against non-white immigrants. *See also infra* ¶¶ 91-113.
[90] Invasion EO § 16(b).
[91] Invasion EO § 16(b).
[92] Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 18:57 ET), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (statement appears in posted video clip from CNN interview).

vacatur was a pretext to cover "the desire to totally undo" the redesignation signed by then-Secretary Alejandro Mayorkas. *Id.* at 855.[93]

94. Secretary Noem's decisions were not based on the statutorily required country conditions review. Rather, the limited review the agency conducted was designed to find support for a termination decision that had already been made. Information produced as part of litigation challenging these decisions revealed that DHS had begun drafting the vacatur decision even before Secretary Noem had been confirmed as Secretary. The hasty process Defendants' undertook for Venezuela illustrates the decision's pretextual nature; "just two days after a draft of the vacatur decision was prepared and/or circulated . . . a draft of the termination decision was prepared and/or circulated," indeed the termination notice was prepared "even before the vacatur decision was finalized," and "DHS staff was asked to 'focus on any improvements in Venezuela,' implicitly to advance and support termination of Venezuela's TPS." *Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 2578045 at *29 (N.D. Cal. Sep. 5, 2025) ("NTPSA I SJ Decision").

95. A comparison of Venezuela's two competing decision memos—dated only three weeks apart—is illustrative. USCIS's earlier decision memo, dated January 9, 2025, recommended extension, describing Venezuela's country conditions as a "complex, serious and multidimensional humanitarian crisis." In sharp contrast, USCIS's January 31, 2025, memo

[93] This decision issuing preliminary relief was stayed by the Supreme Court in a non-precedential decision with no analysis. *See Noem v. Nat'l TPS All.*, 145 S.Ct. 2728 (2025). The Ninth Circuit later upheld the district court's preliminary relief decision in a detailed opinion, *Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025), terminating the Supreme Court's stay, 145 S.Ct. at 2729. Meanwhile, the district court issued a decision on summary judgment in the same case, holding that plaintiffs had established that the agency's vacatur and termination decisions were unlawful and/or arbitrary and capricious. *Nat'l TPS All. v. Noem,* No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025) ("*NTPSA I* SJ Decision"). That merits decision was then stayed as to the vacatur by the Supreme Court in another non-precedential decision with no analysis. *Noem v. Nat'l TPS All.,* No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025).



AUNGDOE000066

recommended termination and was terse. In justifying its recommendation, it focused on insignificant positive changes, including a "permit for [a U.S. corporation] to operate in Venezuela," while ignoring relevant country conditions the January 9th memo assessed, including food insecurity, political repression and human rights abuses, and restricted access to certain basic services.

96. Defendants could not even agree on a justification for terminating Venezuelan TPS. USCIS suggested—despite the absence of supporting evidence—that conditions in Venezuela had improved. Secretary Noem, however, based her decision primarily on national interest grounds, asserting that because Venezuela was designated for TPS on the grounds of extraordinary and temporary conditions (rather than natural disaster or war), she did not need to find improved conditions in order to terminate its TPS.[94] The Venezuela termination was the first termination in the history of the TPS program based on national-interest grounds.

**Haiti**

97. Defendants targeted Haiti next. DHS partially vacated an existing TPS extension for Haiti and purported to retroactively shorten the expiration dates of all documents issued under the prior Secretary's extension by six months. Defendants' hasty and limited review process for Haiti mirrored that of Venezuela and, as a district court has found, similarly reflects Defendants' preordained plan to terminate TPS designations and remove protections from TPS holders. *NTPSA I* SJ Decision at *34.

98. Secretary Noem's press statement on Haiti's partial vacatur also underscores the pretextual nature of her decision. The release announced that Secretary Noem "vacated a

[94] Termination of the October 3, 2023, Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 ("[E]ven assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States.").

decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."[95] The press statement also referenced the recission of Venezuela's TPS extension, explicitly linking the two vacaturs as part of the same project to change "the TPS system."[96]

99. The justifications provided by Secretary Noem in the Federal Register for the partial vacatur of TPS for Haiti had no basis in the TPS statute and were inconsistent with the history of TPS decision-making. For example, Secretary Noem substantially based the vacatur decision on a critique of former DHS Secretary Mayorkas for purportedly failing to explain why he chose an 18-month extension period or why extension and redesignation for Haiti's TPS were not contrary to the national interest.[97] But as a federal district court found, "the absence of a specific justification for the length of a [TPS] extension," once that decision has been made, is neither "unusual [n]or impermissible." *NTPSA I* SJ Decision at *33. Similarly, "DHS Secretaries typically have not given explanations as to why allowing TPS holders to remain in the United States is not contrary to the national interest." *Id.* at *34. The court held that Defendants' decision "was preordained" and made without "any meaning[ful] analysis and review [of country conditions]." *Id.*

[95] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status [hereinafter "Haiti Termination Press Release"].
[96] *Id.*
[97] Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511, 10,513-14 (Feb. 24, 2025).



AUNGDOE000068

100. On June 27, 2025, Defendants terminated Haiti's TPS designation.[98] Because Haiti, like Venezuela, was designated for TPS on the grounds of extraordinary and temporary conditions, the Secretary believed she could justify termination based solely on a finding that extension is not in the national interest. And that is what she did—claiming that crisis-level conditions actually *required* termination because continuing TPS for a country facing total societal collapse is contrary to the U.S. national interest.[99] Secretary Noem also identified the actions of one individual convicted of numerous violent crimes as "underscor[ing] the broader risk posed by rising Haitian migration." DHS' press release, however, proclaimed that "country conditions have improved to the point where Haitians can return home in safety."[100]

101. On July 1, 2025, the Eastern District of New York held that the partial vacatur exceeded the Secretary's authority and set it aside, with the effect that no termination could take place before February 3, 2026, the expiration of the most recent extension. *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp 3d 255, 267, 272-73 (E.D.N.Y. 2025). In view of that ruling, the Secretary made "a new, superseding determination," announced November 28, 2025, resting on an assertion that no extraordinary and temporary conditions prevent safe return and on the same national-interest ground. 90 Fed. Reg. 54,733, 54,734-35.

**Afghanistan**

102. On May 12, 2025, DHS announced the termination of TPS for Afghanistan. Despite an ongoing State Department warning against any travel to the country "due to civil

[98] Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760 (July 1, 2025).
[99] *Id.* at 28,763 (terminating Haitian TPS despite acknowledging "[w]idespread gang violence . . . sustained by the country's lack of functional governmental authority" has "destabilized Haiti," and that "'Haiti is in the grip of severe humanitarian and human rights crisis'").
[100] *See DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status*, U.S. Citizenship & Immigr. Serv., https://www.uscis.gov/newsroom/news-releases/dhs-terminates-haiti-tps-encourages-haitians-to-obtain-lawful-status.

unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"[101] Secretary Noem claimed that conditions had "notabl[y] improve[d]." She cited the fact that only 23.7 million (rather than 29 million) Afghan nationals relied on humanitarian assistance to support the conclusion that "the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety."[102] She also failed to address entire categories of conditions previously identified as bases for Afghanistan's TPS designation and prior extensions, including human rights abuses and the welfare of women and girls.[103]

103. Secretary Noem also asserted that extending TPS would be contrary to the national interest. Her sole explanation for this conclusion was that "DHS records indicate that there are Afghan nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security."[104]

**Cameroon**

104. Defendants terminated TPS for Cameroon on June 4, 2025.[105] Cameroon had been designated for TPS because of the existence of armed conflict and extraordinary and temporary conditions. Secretary Noem issued the termination despite acknowledging that "Cameroon is experiencing two major conflicts" that "remain active."[106] Secretary Noem again failed to address conditions previously cited as a basis for TPS, including human rights abuses,

[101] *Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Afghanistan.html (last visited Dec. 19, 2025).
[102] Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. 20,309, 20,310 (May 13, 2025).
[103] *Compare* Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,730-33 (Sept 25, 2023), *with* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,310.
[104] Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,311
[105] Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697 (June 4, 2025).
[106] *Id*. at 23,698.

food insecurity, a cholera epidemic, and ongoing mass displacement.[107] Documents produced as part of litigation demonstrated that Secretary Noem's decision to terminate TPS for Cameroon was made without any recommendation or input from the Department of State. *See CASA, Inc. v. Noem,* 792 F.Supp.3d 576 (D. Md. 2025).

105. As with the other terminations, she insisted that continuing TPS would be "contrary to the national interest."[108] In this instance, Secretary Noem reached her conclusion based solely on the executive order directing her to limit TPS and President's Trump's broader "policy imperatives" related to immigration.[109]

**Nepal**

106. On June 6, 2025, Defendants terminated TPS for Nepal.[110] Repeating the pattern developed in the prior terminations, Secretary Noem claimed that "notable improvements" justified ending Nepal's designation while ignoring entire categories of conditions—such as widespread food insecurity and lack of access to sanitation—that DHS had previously considered.[111]

---

[107] *Compare* Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023), *with* Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,697.
[108] Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,698.
[109] *Id.*
[110] Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025).
[111] *Compare Id.*at 24,151 *with* Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023).

**Honduras and Nicaragua**

107. On July 8, 2025, Defendants announced the termination of TPS for Honduras and Nicaragua.[112] These notices came two days after the expiration of the most recent previous extension for each country and were thus untimely.[113] .

108. The Honduras termination notice cites to the Invasion E.O., noting that "the Secretary should . . . ensur[e] that designations of Temporary Protected Status . . . are appropriately limited in scope and made for only so long as may be necessarily to fulfill the textual requirements of that statute."[114]

109. Repeating the pattern developed in the prior terminations, Secretary Noem identified certain positive indicators—such as increasing tourism and real estate investment—while ignoring major categories of conditions that had previously been considered, including "political violence" and "staggering levels of crime" with "[g]angs that originated in the United States . . . la[ying] siege to communities and . . . plung[ing] the country into a state of crisis."[115] The Nicaragua termination notice similarly relies on the Invasion E.O.[116] It recognizes that "certain conditions for the TPS designation of Nicaragua may continue," but nonetheless terminates Nicaragua's designation on the ground that "notable improvements . . . allow Nicaragua to adequately handle the return of its nationals."[117] The termination notice fails to acknowledge or consider numerous categories of conditions that formed the basis of prior

---

[112] Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,089 (July 8, 2025) ("Honduras Termination Notice"); Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30,087 (July 8, 2025) ("Nicaragua Termination Notice").
[113] *See* 8 U.S.C. § 1254a(b)(3)(B)
[114] Honduras Termination Notice, at 30091 n.10.
[115] Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,310 (June 21, 2023) (internal quotation marks and citations omitted); *see* Honduras Termination Notice (not addressing political violence or crime).
[116] Nicaragua Termination Notice, at 30088 n.4.
[117] Nicaragua Termination Notice, at 30,088.



AUNGDOE000072

extensions, including "political instability," a "deteriorat[ing]" "human rights situation," and a related "humanitarian crisis."[118]

110. In finding that Honduras and Nicaragua can "handle adequately the return" of their nationals, *see* 8 U.S.C. § 1254a(b)(1)(B), Secretary Noem adopted a new definition of "adequate," defining the term to mean "[s]atisfactory, but worthy of no stronger praise or recommendation; barely reaching an acceptable standard; just good enough."[119]

111. Discovery produced in litigation challenging Defendants' termination of TPS for Nepal, Honduras and Nicaragua[120] confirms that USCIS drafted decision memoranda recommending termination for Honduras and Nicaragua *before* drafters had reviewed USCIS country conditions reports—and for Nepal and Nicaragua, without ever receiving any recommendation or contemporaneous conditions report from the State Department. This process violated the statutory directives to engage in interagency consultation and further evidences Defendants' ends-oriented approach.

**Syria**

112. On September 19, 2025, Defendants announced the termination of Syria's TPS designation. The termination was published in the Federal Register on September 22, 2025, with a termination date of November 21, 2025—a mere 60 days later and the minimum required by statute.[121]

113. Secretary Noem acknowledged that "the civil war in Syria displaced over half of the country's population, resulted in the deaths of more than 500,000 people, destroyed critical

---

[118] Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40,294, 40,300. *See* Nicaragua Termination Notice (failing to address the political or humanitarian situation).
[119] *See* Honduras Termination Notice, at 3,009 n.23; Nicaraguan Termination Notice, at 30,088 n.14.
[120] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*").
[121] *See* Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. 45,398 (Sep. 22, 2025).



AUNGDOE000073

infrastructure, and significantly weakened the Syrian economy."[122] However, she stated that, in large part due to the fall of the Assad regime in December 2024, "the situation [in Syria] no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals."[123]

114. With respect to Syria's designation due to "extraordinary and temporary conditions," Secretary Noem dismissed the dire security and humanitarian situation, acknowledging that "most Syrians require some form of humanitarian assistance" but nonetheless concluding that "this does not prevent nationals from returning in safety."[124]

115. Remarkably, the Trump Administration took a contradictory position regarding Syria's country conditions on September 30, 2025, just days *after* DHS announced the termination of TPS for Syria. On that date, President Trump renewed Syria's "national emergency" designation pursuant to the International Emergency Economic Powers Act, finding that the "situation in and in relation to Syria undermines the campaign to defeat . . . ISIS, endangers civilians, and further threatens to undermine the peace, security, and stability in the region."[125]

**South Sudan**

116. On November 5, 2025, Defendants published a Federal Register notice terminating TPS for South Sudan.[126] Defendants attempt to justify the termination based on an end to the civil war, "diplomatic developments between the U.S. Department of State and South

---

[122] Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. at 45,400.
[123] *Id.*
[124] *Id.*
[125] Continuation of the National Emergency With Respect to the Situation in and in Relation to Syria, 90 Fed. Reg. 47,967 (Oct. 2, 2025).
[126] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484 (Nov. 6, 2025)

Sudan's transitional government," and "improvements in displacement trends, infrastructure, and governance."[127] While the termination notice says there is ongoing "inter/intra-communal violence linked to border disputes, cross-border violence, cyclical and retaliatory attacks, and ethnic polarization," it does not cite any sources regarding those threats nor does it address the potential impact on TPS holders.[128] Instead, it focuses more on the U.S. government's national interest in ensuring South Sudan accepts people who are deported from the U.S. and the termination notes the government of South Sudan's willingness to facilitate deportations, including deportations of people from third-countries.[129] While pointing generally to webpages for the UN Mission to South Sudan, the termination notice ignores findings of "escalating conflict" in South Sudan, and also reports of continued widespread conflict and forced displacement, impacting at least 300,000 people in 2025 alone.[130]

**Ethiopia**

117. On December 15, 2025, Defendants announced the termination of TPS for Ethiopia. Similarly to the South Sudan termination, the termination focuses on some improvements in armed conflict between government forces and other militia groups, while simultaneously noting reports show attacks on civilians in some regions have increased.[131] The termination also points to changes in conditions regarding healthcare and displacement.[132] It

---

[127] *Id.* at 50,485.
[128] *Id.* at 50,485.
[129] *Id.* at 50,485-86.
[130] Press Release, Comm'n on Hum. Rts. in S. Sudan, Hum. Rts. Council, South Sudan: UN Commission urges AU and UN Security Council to act decisively as crisis deepens, demanding urgent action and renewed commitment to peace, accountability and a credible transition, U.N. Press Release (Oct. 13, 2025), https://www.ohchr.org/en/press-releases/2025/10/south-sudan-un-commission-urges-au-and-un-security-council-act-decisively.
[131] Termination of the Designation of Ethiopia for Temporary Protected Status, 90 Fed. Reg. 58,028 (Dec. 15, 2025).
[132] *Id.* at 58,031.

cites the Invasion EO as well to justify national interest in ending TPS, and points to vague national security, public safety, and fraud-focused administrative investigations of some Ethiopian TPS holders, including a footnote that leads to no citation or additional information.

**Somalia**

118. On January 14, 2026, Defendants issued a notice in the Federal Register, terminating Somalia's TPS designation, effective 11:59 p.m. on March 17, 2026. 91 Fed. Reg. 1,547. Despite the fact that Congress tasked the Attorney General with reviewing TPS designations, President Trump posted on social media that he was terminating TPS for Somalis "effective immediately."[133] The termination announcement declines to provide country conditions, does not specify by name any other agency consulted during the process, and does not mention that on April 8, 2025, President Trump himself renewed recognition of Somalia's "national emergency" status under the International Emergency Economic Powers Act, citing to the deterioration of the security situation and the "persistence of violence" that is "committed against civilians" and attributable to al-Shabaab. Nor does the notice mention the Level 4 State Department travel advisory for Somalia or explain why such conditions are consistent with safe return for Somali nationals.

**Yemen**

119. On February 13, 2026, Secretary Noem announced her intent to terminate Yemen's TPS designation.[134] In her press announcement, she stated: "Allowing TPS Yemen beneficiaries to remain temporarily in the United States is contrary to our national interest. TPS was designed to be temporary, and this administration is returning TPS to its original temporary

---

[133] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 21, 2025, at 8:37 PM), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464

[134] *See* USCIS, DHS Terminates Temporary Protected Status for Yemen (Feb. 13, 2026), available at https://www.uscis.gov/newsroom/news-releases/dhs-terminates-temporary-protected-status-for-yemen.

intent. We are prioritizing our national security interests and putting America first." The press announcement offered a "complimentary plane ticket" and "$2,600 exit bonus" payment for any Yemeni TPS beneficiaries willing to voluntarily self-deport.

120. DHS formally announced the termination of Yemen's Temporary Protected Status, effective May 4, 2026, via a notice published under Secretary Noem's name in the Federal Register on March 3, 2026. 91 Fed. Reg. 10402 (Mar. 3, 2026). In the notice, Secretary Noem conceded that "Yemen still experiences extraordinary and temporary conditions" "that prevent Yemeni nationals from returning in safety, *id.* at 10,404-10,405, but determined that "it is contrary to the national interest" to allow Yemini TPS holders to remain in the U.S. *Id.* at 10404.

**Defendants' Departure from Past Practice Regarding Timing and Transition**

121. In another break with past practice, Secretary Noem provided that, for every country whose TPS designation was terminated (Venezuela, Haiti, Cameroon, Afghanistan, Nepal, Nicaragua, Honduras, Syria, Burma, South Sudan, Ethiopia, Somalia, and Yemen), the TPS termination would take effect in 60 days—the minimum period permitted under the TPS statute. *See* 8 U.S.C. § 1254a(b)(3)(B)

122. Prior to this administration, DHS maintained a clear practice over the past twenty years of providing at least a six-month orderly transition period for any TPS termination. But in each termination notice this year— including for Burma— the Secretary provided only a sixty-day wind-down period and failed to acknowledge DHS's twenty-year practice of providing at least a six-month orderly transition period when ending a TPS designation.

## SECRETARY NOEM AND PRESIDENT TRUMP EXPRESSED DISCRIMINATORY ANIMUS BASED ON RACE, ETHNICITY, NATIONAL ORIGIN, AND MEMBERSHIP IN A POLITCALLY UNPOPULAR GROUP

123. Secretary Noem's TPS termination decision was driven in substantial part by animus against Burmese TPS holders based on their race, ethnicity, national origin, and membership in a politically unpopular group: TPS holders. Public statements by Secretary Noem, President Trump, and other Administration officials—some of which are described herein—make clear that the decisions to terminate TPS for Burma and 12 other countries were motivated by discriminatory animus.

### Secretary Noem's Statements Against Non-White, Non-European Immigrants and TPS Holders

124. Secretary Noem has repeatedly disparaged non-white, non-European immigrants, calling them "dirt bags"[135] and labeling them as "criminals." In many comments between February 2024 through the present, Secretary Noem has "equated . . . TPS holders with gang members, criminals, mentally unstable persons, and the like." *NTPSA I* PI Decision at *39-45 (finding Plaintiffs likely to succeed on their claim that the Secretary's decision to vacate and terminate Venezuela's TPS designation was motivated by animus in violation of the Constitution).

125. She has described migration as "an invasion happening on purpose…to remake the foundation of this country," reflecting the so-called "replacement theory." That theory posits that non-white immigrants will "replace" the white population and undermine the country's perceived white foundation, history, and culture.[136]

---

[135] Secretary Kristi Noem (@Sec_Noem, X. (Jan. 28, 2025, 10:35 ET), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off these streets.").
[136] *See The 'Great Replacement' Theory, Explained*, National Immigration Forum, 1-2 (Dec. 1, 2021), https://forumtogether.org/wp-content/uploads/2021/12/Replacement-Theory-Explainer-1122.pdf.

126. DHS recently amplified this message with a one-word social media post: "Remigrate."[137] This term is widely understood as a call for the mass expulsion of non-white immigrants and is closely associated with white nationalist ideology, where it functions as a euphemism for ethnic cleansing.[138]

127. Under Secretary Noem's leadership, DHS claimed that TPS allowed "half a million poorly vetted migrants into this country—from MS-13 gang members to known terrorists and murderers," despite the program being limited to individuals already in the U.S. and excluding those with more than a single misdemeanor.[139] These types of baseless stereotypes and statements about TPS holders demonstrate bare animus toward them simply because of their status as TPS holders.

128. Secretary Noem's termination order for Burma explicitly relies on President Trump's Travel Ban which imposes full or partial entry restrictions on nationals of nineteen countries—all non-white countries—including Burma.

129. On December 1, 2025, mere days after publishing her termination notice for Burma, Secretary Noem posted on social media that she had met with the President and was recommending "a full travel ban on every damn country that's been flooding our nation," describing immigrants as "killers," "leeches," and "foreign invaders," and stating, "WE DON'T WANT THEM. NOT ONE."[140] Since Burma is one of the countries on the Travel Ban, Secretary Noem's disparaging remarks evince animus towards Burmese nationals specifically.

---

[137] Homeland Security (@DHSgov), X (Oct. 14, 2025, 15:06 ET), https://x.com/DHSgov/status/1978175527329358094.
[138] *See* Connor Greene, *Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism*, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate-homeland-security/.
[139] Homeland Security (@DHSgov), X (May 19, 2025, 17:18 ET), https://x.com/DHSgov/status/1924575437344186612.
[140] Secretary Kristi Noem (@Sec_Noem), X (Dec. 1, 2025, 18:25 ET), https://x.com/Sec_Noem/status/1995642101779124476?s=20.

**President Trump's Racist Statements Against Non-White, Non-European Immigrants**

130. From his candidacy through his presidency, President Trump has repeatedly disparaged immigrants perceived to be non-white and non-European, and has specifically targeted groups based on their national origin and status as TPS holders.

131. On December 9, 2025, at a rally in Pennsylvania, President Trump praised his administration's decision to bar nationals of nineteen countries—all non-white and non-European—from entering the United States, stating: "I've also announced a permanent pause on Third World migration, including from hellholes like Afghanistan, Haiti, Somalia and many other countries."[141]

132. Although the President did not specifically mention Burma in his December 9, 2025, remarks, Burma is among the countries affected by the restrictions he described—a country whose location he admitted in July 2019 that he did not know.[142]

133. In addition to exhibiting limited familiarity with the region, the President has resorted to crude and derogatory stereotypes to denigrate certain South Asian countries and their peoples. For example, during his first term, while studying a map in preparation for a meeting with the Prime Minister of India, the President deliberately mispronounced "Nepal" as "nipple"

[141] Alexandra Marquez, *Trump Revives Slur while Discussing Immigrants from Somalia and Other 'Disgusting' Nations*, NBC News (Dec. 10, 2025), https://www.nbcnews.com/politics/donald-trump/trump-immigrants-somalia-slur-rcna248395

[142] Susie Heller, *Trump Asked 'Where Is That?' When a Rohingya Refugee Asked Him if He was Doing Anything to Stop the Genocide in Myanmar*, Bus. Insider (July 18, 2019), https://www.businessinsider.com/trump-asked-rohingya-refugee-where-myanmar-is-2019-7



AUNGDOE000080

and mockingly referred to Bhutan as "button."[143] He also faked an Indian accent to imitate Prime Minister Narendra Modi during Oval Office meetings.[144]

134. At the recent December 9, 2025, rally, the President recounted telling Democratic Senators that the United States "was going to hell" and asked, "Why is it we only take people from shithole countries? Why can't we have some people from Norway, Sweden, just a few? Let us have a few from Denmark. Do you mind sending us a few people?" He added, "[w]e always take people from Somalia, places that are a disaster, right? Filthy, dirty, disgusting, ridden with crime."[145]

135. These recent statements reflect a continuation of the President's longstanding racist and discriminatory rhetoric—expressed during his current term, his first administration, and his campaigns—directed against immigrants from non-white, non-European countries.

136. During his first term, President Trump repeatedly denigrated immigrants from TPS-designated countries. Most notoriously, he referred to TPS-designated countries as "shithole" countries in a conversation with legislators about TPS, saying, "[w]hy do we need more Haitians?" He asked officials to "[t]ake them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway."[146]

---

[143] Daniel Lippman, *Trump's Diplomatic Learning Curve: Time Zones, 'Nambia' and 'Nipple'*, POLITICO, (Aug. 13, 2018) (https://www.politico.com/story/2018/08/13/trump-world-knowledge-diplomatic-774801.

[144] Cristina Maza, *Trump Fakes Indian Accent When Speaking About Indian Prime Minister Modi, Report Claims,* Newsweek (Jan. 22, 2018), https://www.newsweek.com/trump-racist-president-imitates-modis-indian-accent-meetings-787071.

[145] Heller, *supra* note 96.

[146] Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

137. On his recent campaign trail, he repeatedly contrasted "nice countries, like Denmark, Switzerland, Norway" with "unbelievable places…countries that are a disaster," signaling a preference for white immigrants while disparaging Black and non-white nations as inherently undesirable, criminal, and filthy.[147]

138. These longstanding racist views persist in the President's current term. On December 2, 2025, the President declared at a cabinet meeting, "We're going to go the wrong way if we keep taking in garbage into our country," specifically referring to individuals from Somalia, a TPS-designated country.[148] He continued, "I don't want them in our country. I'll be honest with you. Somebody will say, 'Oh, that's not politically correct.' I don't care. I don't want them in our country. Their country is no good for a reason. Their country stinks. And we don't want them in our country. I could say that about other countries too . . . We don't want them."[149] He disparaged Somalia further, claiming, "With Somalia, which is barely a country…they have no anything. They just run around killing each other. There's no structure."[150] This language demonstrates not only racism but also animus toward TPS holders on account of their nationality and as members of a politically unpopular group.

139. Yet, despite denigrating TPS-designated countries for their lack of infrastructure and stability, the President has simultaneously condemned efforts to address the resulting humanitarian crises. At the United Nations General Assembly, he denounced international

---

[147] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").
[148] Max Matza & James FitzGerald, *Trump says he does not want Somalis in US as ICE plans Minnesota operation,* BBC News (Dec. 3, 2025), https://www.bbc.com/news/articles/c208x9v68w3o
[149] Associated Press, *WATCH: Trump Says He Doesn't Want Somali Migrants in the U.S., Calls People 'Garbage'*, PBS News (Dec. 2, 2025), https://www.pbs.org/newshour/politics/watch-trump-says-he-doesnt-want-somali-migrants-in-the-u-s-calls-people-garbage.
[150] Matza & FitzGerald, *supra* note 148.



AUNGDOE000082

humanitarian aid for migrants as "funding an assault on Western countries and their borders," warning that "immigration and their suicidal energy ideas will be the death of Western Europe."[151]

140. Just days before his attack on Somali immigrants, and in the wake of the November 26, 2025 shooting of two National Guard members in Washington, D.C., in which the suspect is an Afghan national who had been granted asylum by the Trump Administration, President Trump posted on social media that he would "permanently pause migration from all Third World Countries," remove noncitizens deemed not to be a "net asset" to the United States, terminate federal benefits for noncitizens, "denaturalize migrants who undermine domestic tranquility," and deport noncitizen he described as incompatible with "Western Civilization,"[152] concluding that "[o]nly REVERSE MIGRATION can fully cure this situation."[153]

141. The President has consistently portrayed non-white, non-European immigrants as incompatible with Western civilization, a view he has expressed throughout his campaigns and first term. While campaigning in 2023, he repeatedly asserted that non-white, non-European, and non-Christian immigrants were "poisoning the blood of our country."[154]

142. At the Republican Convention speech in July 2024, President Trump escalated his rhetoric, declaring: "The greatest invasion in history is taking place right here in our country.

---

[151] *Trump Speaks at U.N.*, rev, https://www.rev.com/transcripts/trump-speaks-at-un (last visited Dec. 18, 2025).

[152] Robert Tait, *Trump Vows to Slam America's Doors Shut as He Heaps Scorn on Immigrants*, The Guardian (Dec. 7, 2025), https://www.theguardian.com/us-news/2025/dec/07/trump-immigration-ice.

[153] Josh Boak, *Trump Says He Wants to 'Permanently Pause' Migration to the U.S. from Poorer Countries*, PBS (Nov. 28, 2025), https://www.pbs.org/newshour/politics/trump-says-he-wants-to-permanently-pause-migration-to-the-u-s-from-poorer-countries.

[154] *Donald Trump on Illegal Immigrants 'Poisoning the Blood of Our Country"*, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15); Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, YouTube (Sep. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45).

They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East. . . . They're coming at levels that we've never seen before. . . . and [the Biden] administration does absolutely nothing to stop them."[155]

143. At a rally in Arizona in August of 2024, President Trump described immigrants as "mak[ing] our criminals look like the nicest people on earth. That's how tough they are. They come from the Middle East. They come from areas that we're fighting. They come from enemy terrain."[156]

144. A few months later, at a campaign event in October 2024, President Trump stated: "They're coming from the Congo, . . . from Asia, from the Middle East, they're coming out of Yemen . . . A lot of people coming out of Yemen. And they're known terrorists . . . and they are released into our country."[157]

145. Also in October 2024, during an interview with conservative radio host Hugh Hewitt, the President claimed that non-white, non-European immigrants were genetically inferior, asserting that many had "murdered far more than one person" and that "it's in their genes."[158]

---

[155] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. Times (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.

[156] *Speech: Donald Trump Holds a Political Rally in Glendale, Arizona - August 23, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-glendale-arizona-august-23-2024/#90.

[157] *Trump directs serious accusations against Yemeni immigrants in America*, Yemen Press Agency (Oct. 6, 2024) https://en.ypagency.net/337276

[158] Jake Traylor & Alana Satlin, *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC News (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.

146. By contrast, when addressing a predominantly white audience at a Minnesota campaign rally, he described them as having "good genes," highlighting a stark racial distinction.[159]

147. President Trump has used overtly dehumanizing rhetoric to describe non-white, non-European immigrants as "animals,"[160] and compared them to snakes that will bite and kill anyone foolish enough to shelter them.[161] At a March 2024 rally, he questioned whether undocumented immigrants could be considered human, stating, "I don't know if you call them people. . . . In some cases they're not people, in my opinion, but I'm not allowed to say that."[162]

148. He has specifically targeted non-white TPS holders, repeatedly spreading false claims that Haitian TPS recipients in Springfield, Ohio, were "eating the dogs," "eating the cats," and "eating the pets of the people that live there."[163] He further labeled Haitian TPS holders as "illegal migrant[s]" who "descended upon a town of 58,000 people, destroying their way of

[159] *Id.*

[160] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* Politifact (May 17, 2018), https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[161] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John T. Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, Roll Call (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. . . .And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.]").

[162] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, Missouri Independent (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/.

[163] *See, e.g.*, *Simulcast - ABC News Presidential Debate*, C-SPAN (Sep. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 (at approximately 29:26).

life."[164] Following these statements, Springfield experienced multiple bomb threats against hospitals, government buildings, and schools.[165]

149. In stark contrast, President Trump has consistently favored immigrant populations perceived as white. He has repeatedly retweeted white nationalists, such as @WhiteGenocideTM, and dined publicly with self-declared white supremacists, amplifying their racist views.[166]

150. On February 7, 2025, President Trump signed Executive Order No. 14204, directing Secretary Noem and others to prioritize humanitarian relief, including admission and resettlement through the U.S. Refugee Admissions Program, for Afrikaners in South Africa—remarkably, on the grounds that they are "victims of unjust racial discrimination."[167] The presidential determination for refugee admissions in 2025 explicitly provides only 7500 refugee slots for white Afrikaners (down from 125k slots for refugees from across the world the prior year).[168]

---

[164] Sam Levine, *'They've Destroyed the Place': Trump Repeats Racist, Anti-immigrant Lies*, The Guardian (Sep. 13, 2024https://www.theguardian.com/us-news/2024/sep/13/trump-repeats-lies-haitian-immigrants; *see also* Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed'*, NewsNation (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (at approximately 12:45, "Springfield is such a beautiful place. Have you seen what's happened to it? It's been overrun. You can't do that to people. . . . I'd revoke [TPS], and I'd bring [the migrants] back to their country.").

[165] Edward Helmore, *More Bomb Threats Hit Springfield, Ohio, After Trump Elevates False Claims About Haitians*, The Guardian (Sep. 14, 2024), https://www.theguardian.com/us-news/2024/sep/14/more-bomb-threats-hit-springfield-ohio-after-trump-elevates-false-claims-about-haitians.

[166] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC News (Jan. 22, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *OPINION: Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?*, USA Today (Sep. 23, 2024), https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

[167] Exec. Order No. 14204, 90 Fed. Reg. 9,497, 9,497 (Feb. 12, 2025).

[168] Presidential Determination on Refugee Admissions for Fiscal Year 2026, 90 Fed. Reg. 49,005 (Oct. 31, 2025).

**Statements of Trump Surrogates Against Non-White, Non-European Immigrants and TPS Holders**

151. Like President Trump, senior officials who influence DHS's TPS decision-making have acted out of blatant animus. Racial hostility, as well as discriminatory animus against Burmese nationals, nationals from other countries, and TPS holders as a group, drove them to interfere in and manipulate the TPS process, deliberately pushing for termination and stripping protections from vulnerable immigrant populations.

152. For example, Vice President Vance has repeatedly amplified baseless rumors that Haitian immigrants were eating pets. With full knowledge of the lack of any evidence, he openly admitted that he was willing to manufacture a story about Haitian migrants to manipulate the media and public perception, declaring that if "I have to create stories" about Haitian migrants "so that the American media actually pays attention to the suffering of the American people, then that's what I'm going to do."[169]

153. Additionally, Vice President Vance attacked TPS holders by invoking longstanding stereotypes of immigrants as disease carriers, claiming they were driving "a massive rise in communicable diseases, rent prices, car insurance rates, and crime." [170] He falsely asserted that Haitian TPS holders were responsible for increases in TB and HIV.[171]

154. Stephen Miller, Deputy Chief of Staff and principal architect of the Administration's immigration agenda, has made the restriction of immigration—particularly

---

[169] Kit Maher & Chris Boyette, *JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets*, CNN (Sep. 15, 2024), https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv.
[170] J.D. Vance. (@JDVance), X (Sep. 13, 2024, at 9:25 ET), https://x.com/JDVance/status/1834584115825226087?s=20*; see also* Video posted by WCNC (@WCNC), YouTube, *JD Vance Has Heated Exchange Over Claims Migrants Are Eating Pets in Ohio,* (Sep. 11, 2024), https://www.youtube.com/watch?v=LqjLoSNkyDs.
[171] JD Vance (@JDVance), X (Sep. 10, 2024, at 9:58 ET), https://x.com/jdvance/status/1833505359513661762?s=46.

from non-white countries—his defining priority.[172] As the President's senior advisor during his first term, Miller repeatedly pressured DHS officials to terminate TPS. He has openly embraced white nationalist ideology, including promoting white nationalist literature, pushing racist immigration narratives to the media, and praising historical immigration laws that imposed racially discriminatory quotas under the guise of defending "Western civilization."[173]

155. For years, Miller has advanced the racist premise that non-white immigrants are inherently violent and uniquely dangerous to Americans.[174] In November 2025, following the shooting of two National Guard members in Washington, D.C. by an Afghan asylum seeker—whose status had been granted by the Trump Administration itself—Miller exploited the tragedy to promote collective racial blame. Rejecting calls to protect Afghans who assisted the United States, he asserted that "[a]t scale, migrants and their descendants recreate the conditions, and terrors, of their broken homelands,"[175] endorsing a core white nationalist belief that non-white populations are permanently violent and incompatible with American society.

---

[172] Lauren Villagran, *Who Is Stephen Miller, Architect of Donald Trump's Mass Deportation Plans?*, USA Today (Nov. 25, 2024), https://www.usatoday.com/story/news/politics/elections/2024/11/21/stephen-miller-trumps-mass-deportation-architect/76260908007/; Elliot Spagat, *Trump Picks a Pair of Experienced Advisers Motivated to Carry Out His Immigration Crackdown*, Associated Press (Nov. 12, 2024), https://www.usatoday.com/story/news/politics/elections/2024/11/21/stephen-miller-trumps-mass-deportation-architect/76260908007/; Elliott Spagat, *Trump Picks a pair of Experienced Advisers Motivated to Carry Out His Immigration Crackdown*, Associated Press (Nov. 12, 2024), https://apnews.com/article/immigration-deportation-homan-miller-trump-border-abb1a75497d11c978c369cb20016eecb.

[173] Adam Serwer, *Trump's White-Nationalist Vanguard*, The Atlantic (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . show Miller praising racist immigration restrictions from a century ago, while bitterly lamenting the law that repealed them.").

[174] Nicole Narea, *Stephen Miller Sought to Link Immigrants to Crime and Terrorism in Private Emails to Breitbart*, VOX (Nov. 25, 2019), https://www.vox.com/policy-and-politics/2019/11/12/20961458/stephen-miller-white-supremacist-anti-immigrant-emails-breitbart-southern-poverty-law-center.

[175] Tait, *supra* note 152.

**Other Evidence of Bare Animus Towards TPS Holders**

156. The multiple disparaging statements that Trump Administration officials have made about TPS holders show that their efforts to end TPS protections go beyond program hostility. Instead, the Administration has displayed bare animus towards TPS holders themselves.

157. The Trump Administration's animus towards TPS holders has expressed not just in word but also in deed. For example, the President's June 4, 2025, Travel Ban suspended entry of nationals of twelve countries, six of which are TPS countries, including Burma, Afghanistan, Haiti, Somalia, Sudan, and Yemen.[176]

158. On December 2, 2025, USCIS issued a memorandum directing officers to freeze pending benefit requests from nationals of the Travel Ban countries and to re-review already-approved benefits, thus preventing TPS holders with pending immigration applications from obtaining permanent or otherwise stable status.[177]

159. On December 16, 2025, President Trump issued Proclamation 10988, re-asserting the prior Travel Ban and expanding the number of countries subjected to full or partial entry restrictions, effective January 1, 2026. Eight of the thirteen countries whose TPS designation this Administration has stripped are covered by the extended Travel Ban.

160. On January 1, 2026, USCIS issued a new memorandum expanding the freeze on pending benefits requests to nationals of Travel Ban countries, including Burma and several other countries whose nationals in the United States have been beneficiaries of TPS, including Afghanistan, Haiti, Somalia, South Sudan, Sudan, Syria, Venezuela, and Yemen. Again, TPS

[176] Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 Fed. Reg. 24,497 (Jun. 10, 2025).
[177] USCIS Memorandum, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High Risk Countries, PM 602-0192 (Dec. 2, 2025).



AUNGDOE000089

holders already in the United States with pending immigration applications would be unable to change or adjust status.[178]

161. On January 21, 2026, the Department of State paused the issuance of all immigrant visas to applicants who are nationals of certain countries.[179] Thirteen out of seventeen countries with TPS designations in effect on January 20, 2025, are subject to the pause.

162. Having terminated TPS for Venezuela, Haiti, Afghanistan, Cameroon, Nepal, Honduras, Nicaragua, Syria, South Sudan, and Burma, in the ensuing months, Secretary Noem continued the campaign to terminate TPS for countries experiencing devastating crises: Ethiopia, Somalia, and Yemen.

163. In the wake of the Supreme Court's June 25, 2026, decision overturning postponement orders in *Doe v. Mullin*, challenging the termination of TPS for Syrians, and *Miot v. Trump*, challenging the termination of TPS for Haitians, the Administration has continued its attacks on TPS holders. Although in both cases a mandate is expected to issue on July 27, 2026, the Department of Justice took the time to ask the appellate courts to issue immediate stays in advance of the mandate issuing so as to deprive these TPS holders of a mere two to three weeks of work authorization, income, and protection from detention and deportation. *See* Appellants' Renewed Stay Motion, *Miot v. Trump*, No. 26-5050, (D.C. Cir. July 1, 2026) ECF No. 2181436; Defendant-Appellants' Renewed Motion for a Stay, *Doe v. Mullin*, No. 25-2995, (2d Cir. July 1, 2026) ECF No. 57.

[178] USCIS Memorandum, Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries, PM-602-0194 (Jan. 1, 2026).
[179] Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance, Dept. of State (Feb. 2, 2026), https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-processing-updates-for-nationalities-at-high-risk-of-public-benefits-usage.html.

164. Taken together with a series of denigrating and inflammatory statements against TPS holders, these actions—terminating more than a dozen countries whose countries of origin remain in dire crisis; providing just 60 days' notice of termination for people who have lived in lawfully in the United States for years; freezing the adjudication of many TPS holders' applications for other immigration statuses; and expending extensive resources to cut protective status short by a matter of days—evince a desire to harm a politically unpopular group and cannot be explained by policy preferences or disagreement with the TPS program or its implementation.

## HARMS CAUSED BY DEFENDANTS' TERMINATION OF TPS FOR BURMA

### Harms to TPS Holders and Their Families

165. Defendants' decision to terminate TPS for Burma would strip nearly 4,000 Burmese nationals of lawful status overnight and prevent over 236 Burmese nationals with pending applications from securing further protection. Many have lived in the United States for years, raising and caring for family members who are U.S. citizens or permanent residents, and are deeply embedded in their communities. Should Defendants' biased and unlawful termination stand, the resulting harm will be immediate, profound, and far-reaching.

166. The loss of TPS exposes Burmese TPS holders to the constant and imminent threat of detention and deportation. They are forced into an impossible choice: return to a country in dire humanitarian crisis under the rule of a violent military junta, remain in the United States without lawful immigration status and live in perpetual fear of detention and deportation, or uproot themselves once again to find refuge in a third country, if they have the means to do so. None of these options offer safety, dignity, or stability.

167. Some TPS holders may currently be seeking other legal avenues to remain in this country (such as asylum, adjustment of status, or employment-based nonimmigrant status). However, due to the years-long asylum backlog, affirmative asylum applications remain long pending and do not guarantee protection from either detention or deportation in the interim.

168. In addition, as of December 2, 2025, the U.S. Citizenship and Immigration Services announced a pause on adjudication of all pending affirmative asylum applications for nationals of any country, as well as a pause on adjudication of all USCIS immigration benefit applications filed by individuals from Burma and 18 other countries,[180] throwing into question when and how TPS holders from Burma who otherwise qualify for asylum will be able to obtain asylum, and when Burmese TPS holders who have applied for other benefits will have those applications adjudicated. USCIS expressly identifies nationality in a country subject to the administration's re-entry ban—here, Burma—as a "significant negative factor" when adjudicating discretionary benefits applications.[181] Accordingly, Burmese TPS holders with pending discretionary applications, including applications for adjustment of status, face a substantially heightened risk that USCIS will deny those applications.[182]

169. Defendants' actions also eliminate viable pathways to lawful status for many TPS holders. Although some are pursuing asylum or other forms of relief, those processes often take

---

[180] Policy Memorandum from U.S. Citizenship and Immigration Services, Hold and Review of all *Pending Asylum Applications and all USCIS Benefit Applications Fild by Aliens from High-Risk Countries* (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf; note that just days later, the Trump administration added 20 additional countries to the Travel Ban, *see supra* ¶¶ 68, 159.
[181] Policy Alert, U.S. Citizenship & Immigr. Servs., Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits, PA-2025-06 (Nov. 7, 2025), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20251127-Discretion.pdf
[182] A recent decision in a separate lawsuit has set aside the USCIS adjudication pause policy. *Dorcas Int'l Inst. of Rhode Island v. U.S. Citizenship & Immigr. Servs.*, No. 26-CV-132-JJM-PAS, 2026 WL 1622708, at *57 (D.R.I. June 5, 2026), judgment entered, No. 26-CV-132-JJM-PAS, 2026 WL 1695954 (D.R.I. June 11, 2026).

years and often provide no protection from detention or removal while applications remain pending. That uncertainty has been compounded by USCIS's December 2, 2025, announcement pausing adjudication of affirmative benefit applications filed by Burmese nationals, effectively freezing access to lawful status for many who qualify.[183] The government has withdrawn protection from individuals who have complied with every requirement asked of them.

170. TPS exists precisely to protect this population—individuals who cannot safely return home but may not fit the narrow technical requirements of asylum. The loss of TPS exposes them to detention and deportation and, in many cases, permanently forecloses immigration options that require lawful status as a prerequisite.[184] Compounding this harm, a recent Presidential Proclamation categorically banning Burmese nationals from reentering the United States means that most TPS holders now face the prospect of permanent exile if deported.[185]

171. Even TPS holders who may be entitled to a fear-based form of immigration relief—such as withholding of removal or protection pursuant to the Convention Against Torture—are not safe and face the prospect of deportation to unsafe third countries. At the same time the government stripped Burmese TPS holders of any affirmative path to asylum by freezing all asylum adjudications for Burmese nationals—including long-pending applications—it has also pursued removals to third countries without meaningful notice or a genuine

[183] Individuals can still obtain some forms of immigration relief from immigration judges in defensive removal proceedings, but they face detention and possible deportation to third countries while their claims are evaluated.

[184] *See Temporary Protected Status: An Overview*, American Immigration Council (Sep. 2025), https://www.americanimmigrationcouncil.org/wp-content/uploads/2017/08/Temporary-Protected-Status-An-Overview-0925.pdf (noting some TPS recipients may be eligible to adjust status).

[185] 8 U.S.C. §§ 1182(a)(9)(A)(ii), (B)(i)(II).



AUNGDOE000093

opportunity to present protection claims—a practice the Supreme Court has allowed to proceed while litigation continues.[186]

172. Terminating TPS will also strip TPS holders of their ability to work legally. Many will lose their jobs immediately, plunging families into financial crisis. Without stable employment, they face eviction, loss of housing, and the collapse of years of hard-earned stability. Many TPS holders also face the imminent loss of their driver's licenses and or state-identification in many states, cutting off mobility, freedom of movement, and basic participation in daily life.[187] TPS holders and their families also risk losing health insurance, access to medical care, and Social Security benefits they have earned through years of work. Because the Secretary's termination goes into effect so quickly, TPS holders have been afforded almost no time to pursue alternative relief. The human cost extends far beyond economic harm. Termination of TPS places families on the brink of separation. Many Burmese TPS holders live in mixed-status families with U.S. citizen children, spouses, and elderly parents. They now face an agonizing choice: leave their children behind in the United States or uproot them to a country devastated by violence, repression, and humanitarian collapse—a place many of those children have never lived or even visited.

173. Returning to Burma is not merely unsafe—it is life-threatening. The military junta has revoked and cancelled passports of its citizens abroad, denied citizenship to ethnic and religious minorities, and targeted perceived opponents for arrest, torture, and disappearance.[188]

---

[186] *Dep't of Homeland Sec. v. D.V.D.*, 145 S.Ct. 2153, 2155 (2025) (Sotomayor, J. dissenting). TPS holders now face the terrifying possibility of being sent to countries where they have no ties and no protection—or returned directly to danger.
[187] *See Driver's Licenses*, Nat'l Immig. L. Ctr. (Mar. 2023), https://www.nilc.org/work/drivers-licenses/.
[188] *See* Will Jackson, *Myanmar Junta Revoking Citizenship of Actors, Singers and Other Celebrities*, ABC (Sep. 22, 2025), https://www.abc.net.au/news/2025-09-23/myanmar-celebrities-left-stateless-after-criticising-junta/105787574.



AUNGDOE000094

TPS holders who have been involved in political activism, or who belong to minority ethnic and religious communities, face a real and imminent risk of detention, torture, and death if they are forced to return.[189] Some have already experienced the current regime detaining and torturing their family members or friends because of their political advocacy.[190]

174. Finally, the ever-present threat of deportation inflicts severe emotional and psychological harm on TPS holders and their loved ones. Since the termination was announced, TPS holders from Burma have reported heightened anxiety, trauma, insomnia, and depression—harms that will only intensify as the effective date approaches.

175. These devastating injuries are compounded by a fundamental constitutional violation. TPS holders have been subjected to an agency action motivated by racial, ethnic, or national-origin discrimination. The law does not permit the government to dismantle lives, tear apart families, and expose people to grave danger based on who they are or where they are from.

**Harms to the Named Plaintiffs**

176. Aung Doe is 51 and a Burmese TPS holder living in Chicago, Illinois. He serves as a religious leader in his community, teaching courses, leading ceremonies, and providing spiritual guidance. TPS provides his only protection from deportation and his sole means to maintain lawful status while his pending religious worker visa application is adjudicated.

177. If the TPS termination goes into effect, Aung will lose his work authorization and the ability to maintain lawful status, putting his pending visa at risk and exposing him to possible immigration detention and deportation. He cannot return to Burma because he publicly criticized the military regime and led fundraising efforts for disaster relief—activities the military views as

---

[189] Lorcan Lovett, *'A Constant Fear': Myanmar Nationals Face Imprisonment Back Home as US Ends Protected Status*, The Guardian (Nov. 27, 2025), https://www.theguardian.com/world/2025/nov/28/usa-terminating-myanmar-protected-status-deportation-fears.
[190] *Id.*

oppositional. Burmese authorities have already detained returning religious leaders, and Aung would face immediate detention, persecution, torture, and death.

178. TPS termination would also devastate Aung's community in Chicago, depriving them of spiritual guidance, teachings, and leadership for critical life events such as weddings, births, and funerals. Losing their religious leader would destabilize the community and strip members of the guidance they rely on for both daily life and major life events. Defendants' two-month notice forces Aung to live in constant fear for his future and the safety of his community while leaving him no time to prepare or seek alternatives.

179. Nina Doe is 33 and a Burmese TPS holder living in Kansas with her U.S.-citizen husband and 13-month-old daughter. She came to the United States on a Fulbright scholarship and earned a Master's degree in Social Work in 2023. A trained doctor, she spent years serving conflict-affected populations in Burma, including Rohingya communities, providing medical care, psychological support, and training local staff in regions devastated by violence and persecution.

180. TPS allows Nina to work full-time as a caseworker for refugees at Catholic Charities in Kansas City, supporting survivors of war, sexual violence, and persecution. Losing TPS would strip her of work authorization, destroying her family's financial and emotional stability and abruptly ending her ability to serve both the refugees she works with professionally and the vulnerable populations she supports through volunteer efforts. These communities would lose a trusted caregiver and advocate.

181. Without TPS, Nina would face forced separation from her husband and infant daughter—or be compelled to take her child to Burma, a country where she risks detention, torture, sexual violence, or death. The Burmese military has already surveilled and threatened her

family and frozen her bank account, signaling that she is known and targeted. She cannot safely bring her daughter, and leaving her behind would be equally devastating, forcing her to choose between remaining unlawfully to stay with her child without the ability to support her or leaving her daughter behind to grow up without her mother.

182. Khin Thet Doe is 32 and a Burmese TPS holder living in Southern Illinois with her husband. She is ethnically Karen and Chin—minority groups persecuted in Burma—and is a practicing Christian. She holds a master's degree in economics and works for a nonprofit coordinating international development and healthcare programs, including work related to Burma. TPS is her only protection from deportation and her sole authorization to work. She also financially supports her elderly parents, who rely entirely on her income for basic survival.

183. If TPS ends, Khin Thet will immediately lose her ability to work, cutting off the only means of supporting herself and her parents. She will face forced separation from her spouse, with whom she has built a life in Illinois, and will lose any realistic opportunity to pursue lawful status from within the United States.

184. Defendants' termination of TPS would expose Khin Thet to grave danger. She participated in pro-democracy protests after the 2021 coup, maintains close associations with activists detained by the military, and bears a visible tattoo symbolizing resistance to the regime—markings the Burmese authorities use to identify, detain, and torture dissidents. She knows of individuals arrested upon return to Burma based on political activity conducted abroad. If forced to return, she faces a serious risk of detention, torture, or death.

185. Defendants' two-month notice has caused her to endure severe fear and emotional distress, leaving her without time to prepare or seek alternatives, and leaves her in constant fear for her future and her family's survival.

186. Thura Doe is 28 and a Burmese TPS holder living in Boston, Massachusetts. He is an early childhood learning specialist at Boston Public Schools, where he supports pre-K and kindergarten students, including multilingual learners and students with learning disabilities. He has worked in early childhood education since 2021 and has devoted years of training and experience to reach his current role. He has also volunteered extensively in his community, earning recognition for his service.

187. TPS is the only lawful status he holds, keeping him safe from immigration detention and the threat of deportation. If Defendants end TPS, he will be at risk of ICE detention given his lack of status.

188. He cannot safely return to Burma. He fears immediate detention, indefinite imprisonment, or extortion by the military for information about her family or political associates. His family's ties to the NLD political party put them at risk of arrest and retaliation. Thura has spoken out in support of democracy and against the military junta, and he is openly bisexual, exposing him to further danger under Burma's criminalization of homosexuality. His friends who have returned to Burma have been detained, restricted, or remain in detention.

189. The threat of losing TPS has already taken a severe toll on Thura's mental and physical health. He struggles to eat or sleep, has lost weight, and cannot fully focus or engage at work or in his personal life because of constant anxiety and fear. If Thura loses his TPS and is detained, this would also devastate the students and educators he serves, depriving classrooms of essential support for vulnerable students, and disrupting education for children who rely on his guidance and assistance. Defendants' two-month notice forces Thura to live in constant fear for his safety, his students, and his family, leaving him no time to prepare or seek alternatives.

190. Maung Doe is 28 and a Burmese TPS holder living in Iowa City, Iowa. He works in IT support at a university and is active in the local meditation and Buddhist community. He first came to the United States in 2016 on an F-1 student visa, earning his bachelor's degree in Kentucky and a master's degree in Iowa. He became involved in Burmese student organizing and human rights advocacy after the 2021 military coup and continues to contribute to these efforts as a researcher.

191. TPS is Maung's only lawful immigration status and only protection from being placed in detention and deportation proceedings. If he loses TPS and is detained, he would likely lose his job, ending his career prospects after 8 years of higher education and professional investment in the United States.

192. Maung cannot safely return to Burma. His family, ethnically Nepali, faces routine discrimination under the military regime, and because of their darker skin, the military assumes they are Rohingya, putting them at risk of persecution. His parents periodically flee to Thailand for safety. Maung personally faces retaliation due to his political activism and prior public association with advocacy groups. The Burmese military surveils and targets those connected to political organizing, putting Maung at risk of detention, torture, or worse if he returns.

193. Defendants' two-month notice has already caused Maung severe fear and emotional distress. He lives in constant anxiety about his future, his ability to support himself, and the safety of his family. He has no time to prepare or seek alternatives.

194. Chu Let Doe is a Burmese TPS holder living in Durham, North Carolina with her two children. She works as a chef and is the sole provider for her children, as well as for her parents in Burma. She has a long history of political advocacy for religious minorities and youth in Burma. When the military coup occurred in 2021, soldiers immediately targeted her and her

family. Dozens of police came to her home searching for them, and the U.S. Embassy had to help her secure a safe house to hide from the military junta. Recognizing the ongoing danger, she fled Burma in March 2021 and came to the United States through humanitarian parole.

195. TPS is Chu's only lawful immigration status, shielding her from deportation and authorizing her to work. Losing TPS could strip Chu Let of her livelihood if she is detained, preventing her from supporting her children and family abroad, and exposing her to detention. She cannot safely return to Burma, where the military continues to target activists like her, and her family there has been forced to hide and sell their businesses.

196. Chu Let faces an impossible choice: take her children to a country where their lives would be in danger or leave them in the United States without her care and guidance, in turn putting their safety, well-being, and education at serious risk. TPS termination would shatter her family's stability and deprive her children of their primary caregiver. It could also strip her of the means to support relatives in Burma who rely on her financially.

197. Defendants' two-month notice forces Chu Let to live in constant fear for her life and her children's well-being while leaving her no time to prepare or seek alternatives.

198. All Plaintiffs are potentially targets for immigration detention here in the United States prior to future removal.

199. All Plaintiffs have expressed deep fear and anxiety over forcibly returning to Burma given the continuing violence after the coup there, as well as given the potential for being arrested and imprisoned by the military based on their actual or perceived political involvement.

200. TPS for Burmese nationals serves the purpose intended by Congress—providing nationality-based humanitarian relief regardless of whether individuals meet the more stringent eligibility requirements for other forms of humanitarian protection, such as asylum. Immigrants,

including TPS holders, are integral to the social and economic fabric of the United States and, as the named Plaintiffs exemplify, contribute to their communities and this country in countless ways. The length of time TPS holders have lived in the United States and the deep ties they have built with families and communities make the loss of legal status especially devastating and, equally important, highlight the real human cost of Defendants' unlawful actions.

## CLASS ACTION ALLEGATIONS

201. This case is brought as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of Burmese nationals (or individuals having no nationality who last habitually resided in Burma) who had TPS status or a pending application for TPS status on November 25, 2025.

202. The proposed class is sufficiently numerous so as to make joinder impracticable. Based on Defendants' own accounting in the Federal Register notice, the class consists of 3,969 TPS holders from Burma, and 236 pending applicants.

203. There are common questions of law and fact affecting the members of the class, including (a) whether Defendants' decision to terminate TPS for Burmese nationals was preordained, without regard to country conditions and prior to consulting with other appropriate agencies in violation of the TPS statute; (b) whether the TPS statute authorizes the Secretary to consider national interest as a sole justification to terminate TPS; (c) whether Defendants' decision to terminate TPS was impermissibly motivated by animus based on race, ethnicity, national origin, or membership in a politically unpopular group; (d) whether the termination caused a deprivation of a liberty and/or property interest without due process of law; and (e) whether the purported termination is *ultra vires* because the power over termination decisions continues to reside with the Attorney General rather than the DHS Secretary.

204. The claims of Aung, Nina, Khin Thet, Thura, Chu Let, and Maung Doe are typical of those of the class with respect to the legality of Defendants' actions. Plaintiffs will fairly and adequately protect the interests of the class. None of the named Plaintiffs are aware of any conflicts that would preclude fair and adequate representation.

205. Proposed class counsel has substantial experience litigating both cases involving challenges to federal immigration policies and class actions.

206. Defendants' illegal termination of TPS for Burma applies to the entire class, making class-wide relief appropriate.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### (Administrative Procedure Act)

207. The foregoing allegations are repeated and incorporated as though fully set forth herein.

208. The Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, ensures that executive agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

209. The APA provides that a Court "shall—hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). The right of review under the APA includes a right to judicial review of actions that "fail[] to meet statutory, procedural, or constitutional requirements." *See Widakuswara v. Lake*, 773 F.Supp.3d 46, 56

(S.D.N.Y. 2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971); *accord FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009)

210. Defendants' termination of the TPS designation for Burma is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

211. Defendants' termination of the TPS designation for Burma violates the APA because, among other things:

a. Defendants' decision to terminate TPS for Burma occurred prior to the requisite consultation with other appropriate agencies as required by 8 U.S.C. § 1245a(b)(3);

b. Defendants' decision to terminate was not based on an objective review of country conditions, as required by 8 U.S.C. § 1254a(b)(3). Rather, it was based on a discriminatory effort to harm TPS holders based on their race, ethnicity, national origin, and status as TPS beneficiaries; a consideration of extra-statutory factors; and a selective review of country conditions designed to identify only improvements and ignore entire categories of conditions that did not support Defendant's preordained end goal to terminate TPS;

c. The research, consultation, and review process leading up to the termination of Burma's TPS designation deviated dramatically from past practice without explanation;

d. To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute;

e. Defendants relied on statutorily impermissible factors to justify their decision to terminate;

f. Defendants' decision to terminate occurred under circumstances and a timeline that reflect that they were pretextual and motivated by animus against Burmese TPS holders based on their perceived race, national origin, ethnicity, and status as TPS holders;

212. Plaintiffs will suffer irreparable injury from the unlawful termination.

213. Defendants' decision to terminate Burma's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

**SECOND CLAIM**
**(Administrative Procedure Act)**

214. All the foregoing allegations are repeated and realleged as though fully set forth herein.

215. To engage in appropriate decision-making, an agency must ordinarily "display awareness that it *is* changing position." *Fox Television Stations, Inc.*, 556 U.S. at 515 (emphasis in original). Agencies "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id*. And the APA requires a "reasoned explanation. . . for disregarding facts and circumstances that underlay . . . the prior policy." *Id*. at 515-16.

216. Defendants' termination of the TPS designation for Burma with only 60-days' notice was arbitrary, capricious, and contrary to law in violation of the APA because it represented an unacknowledged and unexplained departure from decades of decision-making practices and ordinary procedures.

217. Plaintiffs will suffer irreparable injury from the unlawful terminations.

**THIRD CLAIM**
**(Fifth Amendment of the U.S. Constitution—Equal Protection)**

218. All the foregoing allegations are repeated and incorporated as though fully set forth herein.

219. The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that is motivated in part by a discriminatory intent or purpose based on race, national origin, or ethnicity. Classifications based these characteristics receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than the protected characteristics. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

220. Defendants' decision to terminate Burma's TPS designation impermissibly and intentionally discriminates against Plaintiffs because of their race, ethnicity, or national origin.

221. Defendants' decision to terminate Burma's TPS designation, like its decision to terminate TPS for country after country still experiencing devastating humanitarian conditions, impermissibly and intentionally discriminates against Plaintiffs because of explicit animosity and desire to harm holders of TPS as a group. *See Romer v. Evans*, 517 U.S. 620, 634 ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.") (emphasis in original).

222. Plaintiffs will suffer irreparable injury resulting from the unlawful termination.

223. Defendants' termination of Burma's TPS designation must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment's guarantee of equal protection.

**FOURTH CLAIM**
**(Fifth Amendment of the U.S. Constitution—Due Process)**

224. All the foregoing allegations are repeated and incorporated as though fully set forth herein.

225. The Due Process Clause of the Fifth Amendment applies "to all 'persons' within the United States, including aliens,"[191] and "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests."[192]

226. Plaintiffs have liberty and property interests in their TPS status and related benefits, including employment authorization and removal protection. Defendants' purported termination of TPS for Burma without following the statutorily mandated requirements for termination deprives Plaintiffs of their liberty and property interests without due process of law.

227. Plaintiffs will suffer irreparable injury resulting from the unlawful termination.

228. Defendants' purported termination of Burma's TPS designation must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment's guarantee of due process.

**FIFTH CLAIM**
**(Ultra Vires / Administrative Procedure Act)**

229. All the foregoing allegations are repeated and incorporated as though fully set forth herein.

230. The power to terminate TPS designations is assigned by statute to the Attorney General of the United States, *see* 8 U.S.C. § 1254a(b)(3)(B), who has not exercised it to terminate the designation of Burma.

---

[191] *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).
[192] *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

231. That power was never properly transferred to the Secretary of Homeland Security, and therefore former Secretary Noem's purported March 3, 2026, termination of Burma's TPS designation is void as statutorily *ultra vires* and is contrary to law and in excess of statutory jurisdiction, authority, or limitations in violation of the Administrative Procedure Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

232. Declare that Defendants' termination of TPS for Burma was *ultra vires,* unlawful under the APA, and unconstitutional under the Due Process Clause of the Fifth Amendment;

233. Set aside or otherwise vacate the termination of TPS for Burma as beyond Defendants' authority and/or unlawful under the APA;

234. Postpone or stay the termination of TPS for Burma from taking effect or being put into effect;

235. Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of TPS for Burma;

236. Order Defendants to take all steps necessary to ensure that the TPS designation for Burma remains in full force and effect;

237. Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

238. Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: July 14, 2026

Respectfully submitted,

ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
*/s/ Phi Nguyen*
Phi Nguyen
Dinesh McCoy
Razeen Zaman
Helen Anne Schutz Lo
Niji Jain
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 922-5932
dmccoy@aaldef.org
pnguyen@aaldef.org
rzaman@aaldef.org
alo@aaldef.org
njain@aaldef.org

THE LAW OFFICES OF JUNE J. HTUN
/s/ *June Htun*
June Htun
3643 West Belmont Avenue
Chicago, Illinois 60618
(773) 362-5000
june@htunlaw.com

INTERNATIONAL REFUGEE ASSISTANCE PROJECT
/s/ *Guadalupe Aguirre*
Guadalupe Aguirre
Pedro Sepulveda
One Battery Park Plaza, Fl 33
New York, NY 10004
(929) 246-0154
laguirre@refugeerights.org
psepulveda@refugeerights.org

Megan Hauptman
650 Massachusetts Ave NW
Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org

*Counsel for Plaintiffs*

**Certificate of Service**

I hereby certify that on August 17, 2026, I filed the foregoing Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b) and Motion for a Stay of District Court Proceedings with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by e-mailing the Petition and Motion to USCA_Clerk@ca7.uscourts.gov. I hereby certify that I served the same by e-mailing the Petition and Motion to respondents' counsel listed below

s/ Joshua S. Press
JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7625
joshua.press@usdoj.gov

June J. Htun
Law Offices of June J. Htun
3643 West Belmont Avenue
Chicago, IL 60618
773-362-5000
Fax: 773-362-5005
june@htunlaw.com

Dinesh Keith McCoy
Asian American Legal Defense and Education Fund
99 Hudson St
12th Floor
New York, NY 10013
646-459-4109
dmccoy@aaldef.org

Guadalupe Victoria Aguirre
International Refugee Assistance Project
One Battery Park Plaza
Fl 33
New York, NY 10004
(929) 246-0154
LAguirre@refugeerights.org

Helen Anne Schutz Lo
Asian American Legal Defense and Education Fund
99 Hudson Street
12th Floor
New York, NY 10013
(212) 966-5932
alo@aaldef.org

Megan McLaughlin Hauptman
International Refugee Assistance Project
650 Massachusetts Ave
Ste 600
Washington, DC 20001
(646) 939-7329
mhauptman@refugeerights.org

Niji Jain
Asian American Legal Defense and Education Fund
99 Hudson St
12th Floor
New York, NY 10013
678-571-8616
njain@aaldef.org

Pedro Sepulveda, Jr.
International Refugee Assistance Project
One Battery Park Plaza
33rd Fl
New York, NY 10004
(646) 819-3805
psepulveda@refugeerights.org

Phi Uyen Nguyen
Asian American Legal Defense and Education Fund
99 Hudson Street
12th Floor
New York, NY 10013
(646) 459-4107
pnguyen@aaldef.org

Razeen Zaman
Asian American Legal Defense and Education Fund
99 Hudson Street
12th Floor
New York, NY 10013
212-966-3392
rzaman@aaldef.org